1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JAMES DAVID MAJORS,                     No.  2:99-cv-00493 MCE KJN

12             Petitioner,                    DEATH PENALTY CASE

13        v.

14   WARDEN, San Quentin State Prison,        FINDINGS & RECOMMENDATIONS

15             Respondent.

16

17        Petitioner is a state prisoner under sentence of death.  He seeks relief pursuant to

18   28 U.S.C. § 2254. The parties briefed the application of 28 U.S.C. § 2254(d) to each claim in the

19   amended petition.  After careful consideration of the parties' briefs and of the state court record,

20   this court concludes that petitioner has satisfied the requirements of section 2254(d) for aspects of

21   claims 1, 2, 10, 21, and 23; has shown that consideration of claim 17 should be deferred; and has

22   failed to satisfy the requirements of section 2254(d) for the remaining claims in the amended

23   petition.  Accordingly, this court recommends that these federal proceedings continue on the

24   following claims in the amended petition:  (1) the prosecutor potentially failed to reveal

25   prosecution witness Bonnie Hogue's memory problems (claim 23); (2) petitioner's trial counsel

26   failed to investigate and present evidence of Ms. Hogue's relationship with co-perpetrator Robert

27   Reese (claim 2); (3) counsel failed to question prosecution witness Kellie Harley regarding

28   Robert Reese's unpredictable and violent nature (claim 2); (4) counsel failed to correctly advise

                                        1

1  petitioner about potential sentences causing petitioner to forego a lesser-included-offense

2  instruction (claim 2); (5) Juror Mohr was biased (claim 1); (6) counsel failed to investigate and

3  present mitigating evidence (claim 10); and (7) petitioner suffered prejudice from the cumulative

4  effect of these errors (claim 21).  In addition, this court recommends that consideration of claim

5  17 be deferred until the court addresses any procedural default issues.  Finally, this court

6  recommends that the remaining claims in the amended petition be denied.

7  BACKGROUND FACTS[1]

8  I. <u>Guilt Phase Evidence</u>

9  A. <u>Prosecution Evidence</u>

10  Donald Hobbs, who was 10 years old at the time of trial, lived in a house on Kaula Drive

11  in the Sacramento suburb of Fair Oaks with his mother, Jeanine Copeland (Copeland), and

12  Thomas Probst (Probst), her live-in companion.  On the morning of January 26, 1989, after

13  finishing his breakfast, Hobbs found Copeland lying on the floor and noticed blood next to her

14  head.  When Hobbs was unable to awaken her, he called "911."[2]  Sheriff's deputies responding to

15  the scene discovered the bodies of Copeland, Probst, and Patrick Mungavin (Mungavin).

16  Copeland was lying face down on the living room carpet.  She had been struck by a

17  gunshot, fired at close range, that entered at her right temple and exited on the left side of her

18  neck.  A forensic pathologist testified that such a wound would have caused an immediate loss of

19  consciousness and that death would have ensued within a matter of minutes.  In his opinion,

20  Copeland had been killed between midnight and 6:00 a.m. on January 26.  Tests of Copeland's

21  blood showed evidence of methamphetamine use.

22  ////

23

24  [1] This overview of the facts is derived from the California Supreme Court's recitation of the
    evidence presented at trial and from the court's independent review of the state court record.  <u>See</u>
25  <u>People v. Majors</u>, 18 Cal. 4th 385, 394-402 (1998).

26  [2] The parties stipulated that in an earlier statement, Hobbs told detectives he had previously
27  gotten up at approximately 4 to 5 a.m. to get a drink of water and go to the bathroom.  He found
    the front door wide open and noticed that Probst's TransAm was not there.  When authorities
28  responded to Hobbs's call, the TransAm was parked outside the residence.

Mungavin was seated on the living room couch with his hands folded in his lap, his head over to one side, and blood coming from his right nostril. He had a loaded .22–caliber handgun under his left armpit, but there was no evidence that the handgun had been fired. Mungavin had suffered multiple gunshot wounds, including a fatal wound to the back of his head. The forensic pathologist estimated the time of Mungavin's death to be between midnight and 6:00 a.m. on January 26; he could not determine to a medical certainty that Mungavin had been shot at the location where his body was found. Although Mungavin had methamphetamine on his person, there was no evidence of either drugs or alcohol in his system. A criminalist testified that .38–caliber bullets removed from Mungavin's body had most likely been fired from either a ".38 special" or a .357 magnum. A hollow-point slug found underneath Mungavin's right leg, between his leg and the couch, appeared to have been fired from the same weapon.

Probst was lying on the floor of a bedroom that had been turned into an office. Probst had sustained a fatal wound to his left cheek by a gunshot fired at close range. He also suffered an abrasion to the right side of his face consistent with falling as a result of the gunshot wound. The forensic pathologist estimated the time of Probst's death to be between midnight and 5:00 a.m. on January 26; he could not be certain that Probst had been shot at the location where his body was found. Probst's blood tested positive for Valium and methamphetamine. A criminalist testified that an expended .32–caliber bullet removed from the right side of Probst's neck had been fired from either a .32–caliber semiautomatic pistol or a .32–caliber revolver. The contents of a wallet were strewn about the office, and Probst's pants' pockets were pulled out.

In the office where Probst's body was found, deputies found evidence of drug sales, including a scale, packaging material, a cutting agent, a pay-owe sheet, and powder residue on the surface of a mirror. Deputies also found a loaded, sawed-off .12–gauge shotgun leaning up against the wall in the corner of the room. A number of witnesses confirmed that Probst was a methamphetamine and marijuana dealer.

In the hallway of the residence, deputies found a screwdriver, a hammer, and a strongbox or safe that appeared to have been pried open. They also noted a depression in the carpet of the office closet floor that was approximately the same size as the strongbox or safe. Probst was

3

1    known to keep a safe in this location, where he stored jewelry, drugs, and proceeds from drug

2    sales. Although both Probst and Copeland were known to wear jewelry, there was no jewelry on

3    their bodies except for an anklet around Copeland's ankle. Jewelry boxes in the residence were

4    empty, and there was evidence of ransacking. There was no sign of forced entry into the

5    residence itself and no evidence of a struggle.

6        During the course of their investigation, deputies alerted Probst's parents to the possibility

7    of an Arizona connection to the homicides. Subsequently, while going through Probst's

8    belongings, his mother found a note with the name "Robert Reese" and the address 14031 North

9    72nd Lane in Peoria, Arizona. According to Probst's mother, the note was not in his handwriting.

10        At trial, the prosecution theorized that the three victims had been killed by petitioner and

11    Robert Reese (Reese) during the course of a drug-related robbery. The prosecution offered

12    extensive circumstantial evidence in support of this theory.

13        In December 1988, Reese lived in a house on 72nd Lane in Peoria, Arizona. Petitioner

14    also had a room at the house, although it was not his primary residence. Both petitioner and

15    Reese moved out shortly after Christmas of 1988.

16        According to a neighbor of Reese's aunt, petitioner and Reese visited the aunt at her

17    apartment in Rancho Cordova, near Sacramento, sometime between December 27 and December

18    29, 1988, at approximately 10:30 to 11:00 p.m. Reese acted in a hyperactive fashion and

19    appeared to be under the influence of drugs. Other witnesses confirmed that Reese sold and used

20    methamphetamine. Reese was also known to carry firearms.

21        Several witnesses testified that Probst was planning to conduct a drug transaction with

22    someone from out of state the night he was killed. Probst's brother, Wayne Probst, who was at

23    Probst's house until about 9:20 or 9:30 p.m. on January 25, 1989, testified that Probst told him he

24    had arranged a deal to sell a pound of methamphetamine later that evening. According to Wayne

25    Probst, his brother had an established clientele and dealt only with customers he knew.

26        James Pluskett, who talked to Probst on the telephone between 8:00 and 10:00 p.m. on

27    January 25, offered similar testimony regarding Probst's plans to sell $10,000 worth of

28    methamphetamine to someone who was flying in from Las Vegas. Pluskett understood this to be

4

about a pound of methamphetamine.  He thought two people were involved in the purchase, the person actually making the purchase and the person providing the money.  Pluskett assumed these were the same regular customers from Arizona who purchased a half-pound of methamphetamine from Probst every couple of weeks.

Freddie Gregg, who was at Probst's house until about 11:00 or 11:30 p.m. on January 25, testified that Probst told him he was expecting a visit from someone from Arizona who would be bringing drug paraphernalia.  During Gregg's visit, Probst took him into the kitchen and showed him a plastic freezer bag filled with methamphetamine.  The bag was approximately the size of a tissue box.

Sandra Morgera, who was at Probst's house until about 11:15 or 11:30 p.m. on January 25, testified that Probst told her he had another two deals scheduled that night, one of which was a deal with Gregg, which occurred before she left.  The second deal was a $10,000 deal with people from Arizona for a pound or a pound and a half of drugs.  On cross-examination, Morgera admitted she might have gotten the $10,000 figure from newspaper articles about the case, admitted Probst had told her about both a drug purchase and a drug sale scheduled for that evening, and admitted it was not until trial that she stated that one of the two deals was the deal with Gregg.

Catherine Bailey, who spent the day at Probst's house on January 25, testified that Probst told her he had just bought a pound of methamphetamine and was planning to conduct a drug transaction with someone from Arizona.  According to Bailey, Probst told her he had completed another transaction with the same person about a month earlier and the person felt he had been "burned."  Although she was unclear as to how she acquired the information, Bailey identified the person as Robert Reese of Peoria, Arizona.[3]  Before Bailey left, Probst had her sample the methamphetamine to make sure it was okay.  While Bailey was in Probst's office, she saw a large amount of cash.  Probst told her it was about $2,000.

---

[3] Sally Rojic confirmed that Reese had previously purchased methamphetamine from Probst at the Kaula Drive residence.

Several witnesses from Arizona offered details regarding a trip petitioner and Reese had taken to California. Michelle Blouir, Reese's former girlfriend, testified that petitioner and Reese had taken an evening trip to California sometime in January. Shortly before they left, Blouir saw petitioner with two brand new pairs of dark cotton garden-type gloves still in their original packaging. She watched petitioner hand one of the pairs to Reese.[4] Later, on Valentine's Day, while Blouir was talking on the telephone to a detective from Sacramento, Reese asked whom she was talking to. When she told him, he appeared frightened, bolted out of the apartment, and drove away. To the best of her recollection, petitioner's and Reese's trip to California had been about two weeks earlier. Blouir also talked to petitioner about a week after he came back from the trip. He told her he had gone to California to get drugs and that Reese had left him in a motel room for six hours and had never come back, so petitioner flew back home.

Kristi Crancer, a friend of Blouir's, verified the timing of the trip, testifying that it had occurred about a week after her January 19, 1989 graduation. When Reese returned from the trip, he showed Crancer jewelry, a plastic bag of drugs, and two handfuls of money. Crancer also confirmed that Reese had left abruptly when he found out that Blouir was talking to a detective from Sacramento.

The parties stipulated that if Karen Brott were called as a witness she would have testified that Reese showed her a plastic bag of drugs, a large amount of cash, and two items of jewelry after he returned from Sacramento. Reese told her the bag contained a quarter- or half-pound of methamphetamine and that he had approximately $12,000 in cash. Reese later called Brott on February 14, 1989, and asked her if anyone was looking for him.

Richard Hartley, a housemate of petitioner's at the residence on 72d Lane, testified that petitioner was involved in both the methamphetamine and gun trades.[5] When petitioner used methamphetamine, he ingested the drug by sprinkling it on tissue paper, which he then wadded up

---

[4] None of the fingerprints found at the crime scene matched those of defendant or Reese.

[5] Sean McMillan, another housemate of defendant's, offered similar testimony, although it was McMillan's understanding that defendant was a moneyman who did not actually participate in drug deals himself.

1  and ate.  Hartley acknowledged he had previously told investigators only about "suspicions"

2  petitioner used methamphetamine and had not told them about being involved in several drug

3  transactions with petitioner.  On February 14, 1989, detectives from Sacramento came looking for

4  Reese as a suspect in a triple homicide.  After meeting with the detectives, Hartley met with

5  petitioner, who told him about a trip he and Reese had taken to Sacramento.  According to

6  petitioner, he had sold a pound of marijuana there.  Petitioner told Hartley he had stayed in a

7  motel room with a prostitute and that Reese was gone overnight with their rental car.  When

8  Reese returned the next day, he was acting in a paranoid fashion and said he wanted to go home.

9  Petitioner and Reese ended up taking separate flights home.

10       Petitioner offered his own account to Robert Bell, a homicide investigator for the

11  Sacramento County Sheriff's Department, during a February 17, 1989 telephone conversation.  A

12  tape recording of this conversation was played to the jury.[6]  During the conversation, petitioner

13  told Bell he had gone to Sacramento with Reese about a month earlier, selling a pound of

14  marijuana for $1,400, $300 of which he gave to Reese.[7]  Once they arrived in Sacramento,

15  petitioner rented a car and they drove to a Denny's restaurant.[8]  At the restaurant, petitioner gave

16  Reese the marijuana, and Reese left, returning 20 to 40 minutes later.  When Reese returned, they

17  went to a motel and spent the night in a room with a prostitute named Bonnie.  After dropping

18  Reese off at the airport the next morning, petitioner spent the day with Bonnie, taking her

19

20  [6] The transcript of that conversation was Exhibit 107A at trial.  It is included in the Augmented
21  Clerk's Transcript ("ACT") at 418-46.

22  [7] At trial, the prosecution offered testimony that marijuana sold for between $500 and $700 per
   pound in the Sacramento area in January 1989.  Records seized during a search of defendant's
23  residence reflected expenses for the trip well in excess of $1,400.

24  [8] Airline records introduced at trial stated that on January 25, 1989, a "Robert Reese" and a
   "James Majors" had taken a flight from Phoenix to Las Vegas, where they transferred to another
25  flight to Sacramento.  The second flight arrived in Sacramento at approximately 11:55 p.m.
   Rental car records introduced at trial stated that a "James David Majors" from Phoenix had rented
26  a car at Sacramento Metropolitan Airport on January 26, 1989, at 12:03 a.m.  The car was
   returned the same day at 5:42 p.m.  Parking lot records introduced at trial stated that defendant's
27  pickup truck was parked at the Phoenix airport from 8:51 p.m. on January 25, 1989, until 9:42
   p.m. the next day.
28

1   shopping.  Petitioner flew home that night.  Petitioner admitted he had taken a "380" gun with

2   him on the trip.[9]  Petitioner told Bell he had taken another trip to Sacramento about three months

3   earlier, buying a quarter pound of methamphetamine during that trip.[10]

4          Bonnie Hogue, a Sacramento prostitute, placed petitioner and Reese in the Sacramento

5   area at the time of the homicides.  On the evening of January 25, 1989, Hogue was soliciting

6   clients at a local truck stop.  On January 26, between 2:00 and 3:00 a.m., Hogue finished her

7   evening's work and returned to her motel room across the street.  As she headed towards her

8   room, Hogue was approached by Reese, who introduced himself as "Albert" and asked if he and

9   petitioner could stay in her room.  Reese later admitted that his real name was Robert.  Reese

10  explained that he did not want to use his identification to rent a room, and the motel would not

11  rent him one without it.  After Reese paid Hogue $500, she agreed.  Petitioner and Reese brought

12  three bags of luggage into the motel room.

13         Once in the room, petitioner pulled a plastic bag of methamphetamine out of the piece of

14  luggage he had carried in and passed the bag to Reese.  Reese snorted some of the drug, and

15  petitioner ingested some by sprinkling it in his coffee and by rolling it up in a piece of toilet paper

16  and eating the paper.  During the course of conversation, the men told Hogue they had come in

17  from Arizona around midnight, although Reese was originally from Rancho Cordova.  Petitioner

18  told Hogue they had just completed a $10,000 or $15,000 drug deal, had bought some guns, and

19  had sold a Harley–Davidson motorcycle.

20         Hogue became frightened when she noticed the butt of a gun sticking out of the bag

21  petitioner had carried in.  When Hogue asked that the gun be removed from the motel room, the

22  two men took the bag out to the car, removed the gun, and brought the bag back in.  Hogue

23  searched the bag to make sure the gun had been removed, observing methamphetamine, money,

24  _____

25  [9] Following the interview, petitioner's wife provided Bell with the .38–caliber weapon defendant
    claimed to have taken to Sacramento.  Two more .38–caliber weapons were seized during a
26  search of petitioner's residence.  None of these weapons were involved in the homicides.

27  [10] Telephone records introduced at trial showed a collect telephone call from a pay telephone in
    Sacramento to petitioner's residence in Phoenix on January 3, 1989.  They also showed a
28  telephone call from petitioner's cellular telephone to Probst's residence on November 22, 1988.

1   and jewelry in the process.  Reese appeared very nervous, was sweating a lot, and kept peering
2   out the window.

3       Eventually, Reese paid Hogue $200 to engage in sexual activity with petitioner in the
4   shower.  As she left the bathroom, Hogue found Reese sitting on the floor of the motel room
5   dividing methamphetamine, money, and jewelry into two piles.  Reese handed some of each to
6   petitioner, telling petitioner the money was what he owed him.

7       Petitioner and Reese discussed whether to drive or fly back to Arizona, eventually
8   deciding to fly back separately.  Petitioner and Hogue dropped Reese off at the airport about 5:00
9   a.m. that morning.  Before he left, Reese gave Hogue another $200 to keep his "partner"
10  company.  Petitioner and Hogue returned to the motel room, and petitioner paid for Hogue to rent
11  the room for another day.

12      Petitioner told Hogue he needed to send some things back to Arizona he could not take on
13  the airplane and asked her for the location of a Greyhound bus depot.  Petitioner paid her $250 to
14  help him ship the items, which included a gun petitioner said he had purchased during the trip.
15  After getting a box at a Chinese restaurant, petitioner packed up his things and they proceeded to
16  the Greyhound station.  Hogue used her birth certificate, which was issued in her maiden name
17  Bonnie Starr, as identification to mail the package.  As instructed by petitioner, Hogue identified
18  the contents of the package as "books" and addressed it to a "Stanley Johnson" in Phoenix.[11]
19  After Hogue sent the package, petitioner took her clothes shopping; although Hogue claims he
20  spent $300 to $400 on her, store receipts showed total sales of only $225.05 for that day, the
21  largest single sale of which was $63.

22      Later that day, petitioner had Hogue call and book him a return flight to Phoenix under the
23  name "Stanley Johnson."[12]  They left for the airport about 5:00 p.m.  After petitioner returned his

24  _____

25  [11] Greyhound records introduced at trial confirmed that on January 26, 1989, a package had been
    sent from a "Bonnie Starr" of West Sacramento to a "Stan Johnson" of Phoenix.  The contents of
26  the package were listed as "book."

27  [12] Airline records introduced at trial stated that on January 26, 1989, a "Stanley Johnson" had
    taken a 6:35 p.m. flight from Sacramento to Phoenix.  The flight reservation was made over the
28  telephone by a person identifying herself as "Bonnie Hogue."

rental car, he caught his flight home.  Before he left, petitioner wrote his cellular telephone and pager numbers down in Hogue's telephone book and made arrangements to call her in a few days. After petitioner left, Hogue returned to the motel room, where she found a pair of soft brown gardening gloves.  Although Hogue retrieved the gloves and took them home, she could not recall what she had done with them.

When petitioner called Hogue a few days later, he told her he had received the package she had sent and asked her to come to Arizona to perform prostitution services for him.  Hogue eventually agreed to make the trip and did so on February 4 or 5.  A few weeks after returning from Arizona, Hogue read a newspaper article about a triple murder in Fair Oaks.  The article contained a picture of Reese.  After reading the article, Hogue was scared, picked up the telephone, and called the authorities.  When she first contacted them, Hogue was unaware that a reward had been offered in the case, although she later accepted a $2,500 reward after detectives suggested she apply for it.  The same day she read the newspaper article, Hogue received three or four telephone messages from petitioner, who was persistent about needing to talk to her.  Prior to testifying at petitioner's preliminary hearing, Hogue was granted immunity in exchange for her testimony.

On cross-examination, Hogue was challenged on a number of collateral matters, including statements she had previously given to the authorities about being a truck driver and about her husband being a highway patrolman.  She was also questioned about the fact that some of the information she provided the authorities was contained in the newspaper article she had read about the case.  In addition, Hogue was impeached with certain inconsistencies between her trial testimony and statements she had previously given, such as the timing of when she saw the gun in the motel room, whether both petitioner and Reese left to take the gun out to the car, where she and petitioner got the box for the package they sent to Phoenix, and details about her trip to Arizona.  Hogue attributed several inconsistencies to the fact she was very upset the night she first talked to the authorities.

////

////

B. Defense Evidence

Denise Madsen testified that on January 25, 1989, she was working the night shift at a Denny's restaurant.  During the late night hours of January 25 or the early morning hours of January 26, petitioner and another individual came to the restaurant.  The second individual left for about 45 minutes to an hour and returned in a "shook up, kind of spaced out" state wearing different clothes.  Madsen testified, "It had to be before midnight."  On cross-examination, Madsen admitted she had no independent recollection of the exact date she had seen petitioner and that the only reason she remembered the date of January 25 or 26 was that "everybody keeps asking me the same dates and they've been consistent."  She also admitted she had not previously told the district attorney's investigator the second man had left the restaurant and come back in different clothes, explaining she had been tired at the time of the interview.

II. Penalty Phase Evidence

The prosecution called two witnesses who testified to the facts underlying petitioner's 1972 conviction for first degree burglary and his 1977 convictions for robbery and kidnapping. Nancy Jo Fleig testified that in 1971, when she was 19 years old, she returned home to find petitioner, his face covered with pantyhose, in her home.  Petitioner had a gun and told Ms. Fleig to give him any valuables.  Ms. Fleig could tell petitioner had taken a bath at her house and was wearing her husband's clothes.  After petitioner mentioned he was hungry, Ms. Fleig offered to make him a hamburger and did so.  Petitioner removed the pantyhose; he ate the burger, and the two talked for a couple hours.  During cross-examination, Fleig agreed that she had told police after the incident that she and petitioner had discussed her life and marital problems and had kissed.  Twice, Fleig drove petitioner places and had an opportunity to leave in her car, but did not do so.  A jury convicted petitioner of first degree burglary.

Ronald Hayes testified that as he was exiting his car in a parking lot, two men came up with a gun and told him to drive.  Mr. Hayes identified one of the men as petitioner.  They robbed him and eventually put Mr. Hayes in the trunk of the car, parked the car, and left him there. Several hours later, police released him from the trunk.  Three weeks after this incident, Mr. Hayes answered the door to his apartment and petitioner and another man were standing outside.

11

1    Petitioner had a gun and ordered Mr. Hayes to lie on the floor.  When Mr. Hayes refused, the two

2    struggled and petitioner shot Mr. Hayes through his shoulder.  Petitioner plead guilty to the

3    robbery and kidnapping.

4        The defense called petitioner's biological parents, who briefly described his upbringing by

5    his maternal grandmother and asked the jury to spare their son's life.  They also described

6    incidents in which petitioner had hurt his back in an automobile accident, had his work tools

7    stolen, and had lost a finger as a result of a rattlesnake bite.   Defense counsel argued that these

8    setbacks caused petitioner to turn back to dealing drugs and focused much of the argument on

9    lingering doubt about petitioner's guilt.

10                                                    PROCEDURAL HISTORY

11       An amended complaint was filed in March 1989 charging petitioner with the three

12   murders, enhancements for personal use of a firearm, and two special circumstances:  murder

13   during the course of a robbery and multiple murders.  (CT 424-27.[13])  At the preliminary hearing

14   in September 1989, petitioner was represented by appointed counsel William Owen.  (CT 3.)

15   Later that month, an information was filed adding charges of robbery.  (CT 419-23.)  Mr. Owen

16   and attorney Michael Brady were appointed to represent petitioner in superior court.  (CT 433,

17   444.)

18       In May 1990, petitioner filed a motion to relieve attorney Owen.  (CT 466-68.)  The court

19   granted the motion and attorney Brady moved into the position of lead counsel.  (CT 469.)  A

20   week later, the court appointed Richard Hamlin, an attorney in Brady's law firm, as second

21   counsel.  (CT 470.)

22       Jury selection began on September 18, 1990.  (RT 1008.)  The prosecution began

23   presenting its case on October 22.  (RT 1892.)  On November 6, the defense put on its only

24   witness.  (RT 3374.)  Her testimony is reflected in about 25 pages of the transcript.  (RT 3374-

25   ////

26   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [13] The record of transcript from trial ("RT"), the clerk's transcript ("CT"), the briefs and decision
27   on appeal, and the pleadings and appendices from the 1997, 2001, and 2003 state habeas
     proceedings have been lodged herein.  (See ECF No. 175.)  Each volume lodged is identified with
28   a lodged document ("LD") number.

1    3401.)  The prosecution's witnesses' testimony comprises well over 1000 pages.  (RT 1892-

2    3418.)

3         On November 20, 1990, the jury returned its verdicts finding petitioner guilty on three

4    counts of first degree murder and one count of first degree robbery.  It also found true both

5    special circumstances and the firearms enhancements.  (RT 3816-828.)

6         On December 10, 1990, the penalty phase began.  (RT 3913.)  Petitioner waived his

7    presence at the penalty phase and, after some discussion, the judge allowed him to be absent.  (RT

8    3889-907.)  Both sides presented their evidence in just one day.  (CT 749.)  The two defense

9    witnesses' testimony amounts to just fourteen transcript pages.  (RT 3978-991.)

10        On December 12, 1990, the jury returned a death verdict.  In 1992, almost sixteen months

11   after the judgment, petitioner filed a federal habeas corpus petition based on the state court's

12   failure to provide him with counsel.  On December 30, 1993, the California Supreme Court

13   appointed Richard Power to serve as counsel for the direct appeal and Elizabeth Barranco to serve

14   as counsel for the purpose of filing a state habeas corpus petition.  In 1994, the federal proceeding

15   was dismissed without prejudice.

16        On June 22, 1998, the California Supreme Court affirmed the conviction and sentence on

17   appeal.  People v. Majors, 18 Cal. 4th 385 (1998).  The United States Supreme Court denied

18   certiorari review in 1999.  Majors v. California, 526 U.S. 1007 (1999).

19        On June 30, 1997, petitioner filed his first state habeas petition ("1997 State Pet.").  After

20   the state filed a response in 1998, Ms. Barranco was granted five extensions of time to file a reply

21   brief, but never did so.  In February 2001, the California Supreme Court notified petitioner that

22   any reply brief must be filed by March 26, 2001.  Thereafter, Ms. Barranco and Mr. Power filed a

23   number of documents in the habeas proceeding accusing each other of misconduct.  (See ECF No.

24   140 at 6-7.)  Ultimately, on March 23, Mr. Power filed the habeas reply brief.  On March 28, Ms.

25   Barranco was relieved as petitioner's counsel.  On September 19, 2001, the California Supreme

26   Court summarily denied the petition on the merits without issuing an order to show cause.  In re

27   Majors, No. S062533.

28   ////

1    On October 12, 2001, Mr. Power filed on petitioner's behalf a second state petition ("2001

2    State Pet.") alleging the single claim that Ms. Barranco had attempted unsuccessfully to amend

3    into the first state petition. In re Majors, No. 2101360. On October 31, the California Supreme

4    Court summarily denied the petition on the merits.

5    Petitioner initiated this federal habeas action by filing a motion for appointment of counsel

6    on March 12, 1999. He filed a first federal petition on June 27, 2003 (ECF No. 21), and an

7    identical state petition, his third, the same day, In re Majors, No. S117112. The federal

8    proceedings were stayed until the resolution of the state proceedings. (ECF No. 49.) The stay

9    was lifted temporarily in 2005 by the magistrate judge then assigned to this case to permit limited

10   discovery. (ECF Nos. 73, 81, 83.) After a hearing at which he was told about a statement by

11   Bonnie Hogue's sister that Hogue admitted committing perjury, the magistrate judge, among

12   other things, ordered sua sponte that Bonnie Hogue and her sister, Susan Riley, be deposed.

13   (ECF No. 83.) The depositions were conducted in court over several days in December 2005 and

14   January 2006. (ECF Nos. 99-107.) Shortly afterwards, the magistrate judge denied all then

15   outstanding discovery requests and stated "[c]omity counsels this court involve itself no further in

16   developing the factual record at this point." (ECF No. 120.) The magistrate judge concluded that

17   he felt the discovery produced in federal court was sufficient to "bolster a request [that] the state

18   court permit further inquiry." (Id. at 6.) However, he also stated that should the California

19   Supreme Court deny specific discovery without a convincing reason for doing so, the magistrate

20   judge would permit the discovery of Hogue's mental health records and law enforcement records

21   implicating Hogue and Reese. (Id.)

22   On July 7, 2006, petitioner filed an amended federal petition. (ECF No. 140.[14])

23   On April 28, 2010, the California Supreme Court summarily denied the exhaustion

24   petition on the merits and denied many claims on procedural grounds as well. (LD 57.) The

25   federal stay was lifted in May 2010. Since then, petitioner filed a renewed motion for discovery

26   that was granted in part. (ECF No. 183.) In January 2011, respondent filed an answer and a

27

28   [14] ECF No. 140 appears immediately after ECF No. 129 on this court's electronic docket.

1   motion to dismiss claims as procedurally defaulted.  (ECF Nos. 195, 196.)  Petitioner's motion to

2   strike the answer was denied.  (ECF No. 225.)  Based on the United States Supreme Court

3   decisions in Pinholster and Richter, this court determined that it would resolve the satisfaction of

4   28 U.S.C. § 2254(d) before considering the procedural default issues.  (ECF Nos. 225-27.)  The

5   motion to dismiss remains pending.  The parties have briefed the application of section 2254(d) to

6   all claims in the petition.  (ECF Nos. 235, 237, 243.)

7        For the reasons set forth below, this court finds that petitioner has satisfied 28 U.S.C.

8   §2254(d) for aspects of claims 1, 2, 10, 21, and 23; has shown that consideration of claim 17

9   should be deferred; and has failed to satisfy section 2254(d) for the remaining claims and

10   subclaims.  This court therefore recommends that the district court deny all claims and subclaims

11   for which petitioner has failed to meet the standards of section 2254(d).  After the district court

12   makes its determination on these findings and recommendations, this court will proceed to

13   consider respondent's pending motion to dismiss and any motion for an evidentiary hearing with

14   respect to the remaining claims.

15                    APPLICATION OF 28 U.S.C. § 2254(d)

16   I.  Legal Standards

17        Title 28 U.S.C. § 2254 confers upon a federal district court the jurisdiction to consider a

18   petition for writ of habeas corpus challenging a state court conviction.  A writ of habeas corpus is

19   available under section 2254 only on the basis of some transgression of federal law binding on the

20   state courts.  See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v. Cupp, 768

21   F.2d 1083, 1085 (9th Cir. 1985).  A federal writ is not available for alleged error in the

22   interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

23   Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.

24        Where a state court resolves a federal constitutional claim on the merits, the petitioner in

25   federal court may not succeed on that claim absent a showing that the state court resolution of the

26   claim was contrary to law or unreasonable.  28 U.S.C. § 2254(d).  Congress adopted this standard

27   when it revised the habeas statutes in 1996 as part of the Anti-terrorism and Effective Death

28   Penalty Act (the "AEDPA").  To meet the standards, a petitioner must establish that the state

1  court's adjudication of the claim

2      (1) resulted in a decision that was contrary to, or involved an
3  unreasonable application of, clearly established Federal law, as
    determined by the Supreme Court of the United States; or

4      (2) resulted in a decision that was based on an unreasonable
5  determination of the facts in light of the evidence presented in the
    State court proceeding.

6  28 U.S.C. § 2254(d).  Section 2254(d) is a gateway.  If a petitioner satisfies either subsection (1)

7  or (2) for a claim, then the federal court considers that claim de novo.  See Panetti v. Quarterman,

8  551 U.S. 930, 953 (2007) (When section 2254(d) is satisfied, "[a] federal court must then resolve

9  the claim without the deference AEDPA otherwise requires.");  Frantz v. Hazey, 533 F.3d 724,

10  737 (9th Cir. 2008).

11      In 2011, the Supreme Court elucidated the section 2254(d) standards.  First, the Court

12  made clear that, when making the determination that a state court decision was contrary to law or

13  unreasonable, a federal court may not consider evidence which was not before the state court.

14  Cullen v. Pinholster, 563 U.S. 170, 180-82 (2011).  Second, the Court "tightened" section

15  2254(d)'s rule of deference:

16      As a condition for obtaining habeas corpus from a federal court, a
    state prisoner must show that the state court's ruling on the claim
17      being presented in federal court was so lacking in justification that
    there was an error well understood and comprehended in existing
18      law beyond any possibility for fairminded disagreement.

19  Harrington v. Richter, 562 U.S. 86, 103 (2011); see also Amado v. Gonzalez, 758 F.3d 1119,

20  1131-32 (9th Cir. 2014).  Thus, federal habeas relief is precluded if "'fairminded jurists could

21  disagree' on the correctness of the state court's decision."  Richter, 562 U.S. at 101 (quoting

22  Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  This objective standard of reasonableness

23  applies to review under both subsections of 28 U.S.C. § 2254(d).  See Hibbler v. Benedetti, 693

24  F.3d 1140, 1146-47 (9th Cir. 2012).  The federal court must engage in the deferential review even

25  where the state court has not provided a reasoned decision.  Richter, 562 U.S. at 99-100.

26      In the present case, some of petitioner's claims were raised, and summarily rejected, in the

27  habeas corpus proceedings before the California Supreme Court.  A summary denial is presumed

28  to be a denial on the merits of the petitioner's claims.  Stancle v. Clay, 692 F.3d 948, 957 & n.3

1   (9th Cir. 2012) (The presumption that the denial is based on the merits, rather than on procedural

2   grounds, may be overcome if it is not "plausible.").  While the federal court cannot analyze just

3   what the state court did when it issued a summary denial, the federal court must review the state

4   court record to determine whether there was any "reasonable basis for the state court to deny

5   relief."  Richter, 562 U.S. at 98.  The federal court "must determine what arguments or theories ...

6   could have supported, the state court's decision; and then it must ask whether it is possible

7   fairminded jurists could disagree that those arguments or theories are inconsistent with the

8   holding in a prior decision of [the Supreme] Court."  Id. at 102.  The petitioner bears "the burden

9   to demonstrate that 'there was no reasonable basis for the state court to deny relief.'"  Walker v.

10  Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

11          When reviewing the California Supreme Court's summary denial of a petition, this court

12  must consider that

13              the California Supreme Court's summary denial of a habeas petition
                on the merits reflects that court's determination that 'the claims
14              made in th[e] petition do not state a prima facie case entitling the
                petitioner to relief.' It appears that the court generally assumes the
15              allegations in the petition to be true, but does not accept wholly
                conclusory allegations, and will also "review the record of the trial
16              ... to assess the merits of the petitioner's claims."

17  Pinholster, 563 U.S. at 188 n.12 (quoting In re Clark, 5 Cal. 4th 750, 770 (1993) and citing

18  People v. Duvall, 9 Cal. 4th 464, 474 (1995)).[15]  Accordingly, the absence of a prima facie case is

19  _____

20  [15]  Respondent argues that the California Supreme Court accepts as true only petitioner's
    statements that are backed by a proffer of "admissible evidence."  (ECF No. 237 at 7.)
21  Respondent cites only two cases from California Courts of Appeal and one California Supreme
    Court case from the 19th Century in support of this argument.  The California Supreme Court's
22  20th and 21st Century descriptions of the support required for allegations in a habeas petition do
    not mention a requirement of "admissible" evidence.  See In re Martinez, 46 Cal. 4th 945, 955-56
23  (2009) (at pleading stage, petitioner should state facts "fully and with particularity" and include
    "copies of reasonably available documentary evidence"); In re Hawthorne, 35 Cal. 4th 40, 48
24  (2005) (same); In re Sassounian, 9 Cal. 4th 535, 547, 549-51 & nn.12-15 (1995) (to carry his
    "burden of allegation" petitioner must state "specific facts which, if established, entitle him to . . .
25  relief").  Requiring a well-plead petition supported only by reasonably available evidence makes
    sense under the California scheme for considering habeas petitions.  In California, a petitioner
26  first carries a pleading burden.  If the state court determines the petitioner has established a prima
    facie case for relief, the court will issue an order to show cause.  Only then must petitioner prove
27  the factual allegations made in the petition.  See Sassounian, 9 Cal. 4th at 546; Duvall, 9 Cal. 4th
    at 475.
28

1   the determination that this court must review under section 2254(d).  See Nunes v. Mueller, 350

2   F.3d 1045, 1054-55 (9th Cir. 2003).  Respondent argues that this conclusion is incorrect.

3   According to respondent, the "only relevant question before a federal court is whether 'there is no

4   reasonable basis for the state court to deny relief.'"  (ECF No. 237 at 11 (quoting Richter, 562

5   U.S. at 98)).  Respondent's argument ignores the fact that the Supreme Court described review

6   under section 2254(d)(1) as "focus[ing] on what a state court knew and did."  Pinholster, 563 U.S.

7   at 182.  The Court then considered the reasonableness of the California Supreme Court's

8   summary denial of an ineffective assistance of counsel claim in terms of the petitioner's failure to

9   make a prima facie showing of ineffective assistance of counsel.  The Court held that petitioner

10  Pinholster "has not shown that the California Supreme Court's decision that he could not

11  demonstrate deficient performance by his trial counsel necessarily involved an unreasonable

12  application of federal law."  Id. at 1400-01.[16]  It is quite clear that the Court is considering what

13  the state court in fact decided – that petitioner had failed to establish that "he could" prove his

14  claim, in other words, that petitioner had failed to make a prima facie showing that he was

15  entitled to relief.

16       A petitioner establishes a prima facie case of a constitutional violation if his assertions are

17  sufficient to support the claim.  Nunes, 350 F.3d at 1054-55.  The question is whether the

18  petitioner has demonstrated that "he ha[s] sufficient evidence for a reasonable fact finder to

19  conclude" that he has proved his claim.  Id.  In other words, a holding that petitioner has not made

20  out a prima facie case amounts to a holding that no reasonable factfinder could find in petitioner's

21  favor.  Id. at 1055.  If this court finds petitioner has unarguably presented a prima facie case for

22  relief on a claim, the state court's summary rejection of that claim would be unreasonable.  Id.[17]

23  _____

24  [16] Respondent argues that the Pinholster dissent, but not the majority, framed the issue as review
    of the California Supreme Court's finding that petitioner had not established a prima facie case.

25  Respondent ignores the portion of the majority's opinion quoted here in the text that shows the
    majority framed the issue in terms of the California Supreme Court's denial of a prima facie case.

26  Respondent further ignores the fact that the majority did not reject the dissent's explicit statement
    that the question to be considered was the reasonableness of the state court's determination that

27  petitioner had not stated a claim.

28  [17] Petitioner notes that the California procedures allow an opportunity for discovery and an

1        Under subsection (d)(1), a state court decision is "contrary to . . . clearly established

2 Federal law" if it applies a rule contradicting a holding of the Supreme Court or reaches a result

3 different from Supreme Court precedent on "materially indistinguishable" facts.  Price v. Vincent,

4 538 U.S. 634, 640 (2003).  A state court decision is an "unreasonable application" of clearly

5 established federal law if "the state court correctly identifies the governing legal principle ... but

6 unreasonably applies it to the facts of the particular case."  Bell v. Cone, 535 U.S. 685, 694

7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 407-08 (2000)).  "Clearly established Federal

8 law" is found in the United States Supreme Court's "applicable holdings."  Carey v. Musladin,

9 549 U.S. 70, 74 (2006).  It refers to "'holdings, as opposed to the dicta, of [the Supreme Court's]

10 decisions' at the time the state court decides the matter."  Cannedy v. Adams, 706 F.3d 1148,

11 1157 (9th Cir. 2013) (quoting Stanley v. Schriro, 598 F.3d 612, 617 (9th Cir. 2010)), amended on

12 other grounds, 733 F.3d 794 (9th Cir. 2013).  "'[C]ircuit court precedent may be persuasive in

13 determining what law is clearly established and whether a state court applied that law

14 unreasonably.'"  Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (quoting Maxwell v. Roe,

15 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or

16 sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e]

17 [Supreme] Court has not announced."  Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013) (citing

18 Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per curiam)).  Nor may it be used to

19 "determine whether a particular rule of law is so widely accepted among the Federal Circuits that

20 it would, if presented to th[e] [Supreme] Court, be accepted as correct."  Id.  Further, where

21 courts of appeals have diverged in their treatment of an issue, it cannot be said that there is

22 "clearly established Federal law" governing that issue.  Carey, 549 U.S. at 77.

23        There are two ways a petitioner may satisfy subsection (d)(2).  Hibbler, 693 F.3d at 1146.

24 He may show the state court's findings of fact "were not supported by substantial evidence in the

---

25 evidentiary hearing if a prima facie case is established.  (ECF No. 235 at 66-67.)  According to

26 petitioner, this "statutory obligation to initiate formal, plenary review" of the claim creates a
liberty interest enforceable under the Due Process Clause.  However, "an expectation of receiving

27 process is not, without more, a liberty interest protected by the Due Process Clause."  Olim v.
Wakinekona, 461 U.S. 238, 250-51 & n.12 (1983); Elliott v. Martinez, 675 F.3d 1241, 1245-46

28 (10th Cir. 2012).

1   state court record" or he may "challenge the fact-finding process itself on the ground it was

2   deficient in some material way."  Id. (citing Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir.

3   2004)); see also Hurles v. Ryan, 752 F.3d 768, 790-91 (9th Cir.) (If a state court makes factual

4   findings without an opportunity for the petitioner to present evidence, the fact-finding process is

5   deficient and the state court opinion is not entitled to deference.), cert. denied, 135 S. Ct. 710

6   (2014).  The standard for determining whether the state court's factfinding process is insufficient

7   requires the federal court to "be satisfied that any appellate court to whom the defect [in the state

8   court's fact-finding process] is pointed out would be unreasonable in holding that the state court's

9   fact-finding process was adequate."  Hibbler, 693 F.3d at 1146-47 (quoting Lambert v. Blodgett,

10  393 F.3d 943, 972 (9th Cir. 2004)).  The state court's failure to hold an evidentiary hearing does

11  not automatically render its fact finding process unreasonable.  Id. at 1147.  Further, a state court

12  may make factual findings without an evidentiary hearing if "the record conclusively establishes a

13  fact or where petitioner's factual allegations are entirely without credibility."  Perez v. Rosario,

14  459 F.3d 943, 951 (9th Cir. 2006) (citing Nunes, 350 F.3d at 1055).

15        The Ninth Circuit explained in Hibbler that federal standards for determining when an

16  evidentiary hearing is mandatory are a useful guide to determining the reasonableness of the state

17  court's refusal to hold a hearing:

18          A state court's decision not to hold an evidentiary hearing
19      does not render its fact-finding process unreasonable so long as the
        state court could have reasonably concluded that the evidence
        already adduced was sufficient to resolve the factual question.  See
20      Earp, 431 F.3d at 1170 (noting that a state court is not required to
        hold an evidentiary hearing when it is possible to resolve the factual
21      question "based on 'documentary testimony and evidence in the
        record'" (citation omitted)); Perez v. Rosario, 459 F.3d 943, 950
22      (9th Cir. 2006) (holding that it is reasonable for a state court to
        resolve a disputed factual question without an evidentiary hearing
23      when the petitioner's allegations are "incredible in light of the
        record, or . . . when the record already before the court is said to
24      establish a fact conclusively").  The ultimate issue is whether the
        state's factfinding procedures were reasonable; this is a fact-bound
25      and case-specific inquiry.

26          Because AEDPA does not provide any specific guidance on
        what sort of procedural deficiencies will render a state court's fact-
27      finding unreasonable, we have sometimes turned for guidance to
        cases considering a similar issue in a different context: when a
28      federal district court considering a habeas petition must or should

20

conduct an evidentiary hearing.  See Earp, 431 F.3d at 1166-67, 1169-70 (looking to Townsend v. Sain, 372 U.S. 293, 313 (1963), which governs when a federal district court reviewing a habeas petition de novo must grant an evidentiary hearing, in determining whether the state court decision was based on an unreasonable determination of the facts).  In this context, the Supreme Court has recently clarified that, "[i]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Landrigan, 550 U.S. at 474.  More specifically, "[i]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id. " '[A]n evidentiary hearing is not required on issues that can be resolved by reference to the state court record.' " Id. (quoting Totten v. Merkle, 137 F.3d 1172, 1176 (9th Cir. 1998)).

While this framework for determining when a district court errs in failing to conduct an evidentiary hearing provides useful guidance, it is useful only by analogy and does not answer conclusively whether the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). . . .  Unlike our review of a district court's determination that an evidentiary hearing is unnecessary, which is for abuse of discretion, see Landrigan, 550 U.S. at 474-75, we may not "second-guess a state court's fact-finding process" unless we determine "that the state court was not merely wrong, but actually unreasonable." Taylor, 366 F.3d at 999. Nevertheless, the rules governing when a district court must grant an evidentiary hearing are informative: if a district court would be within its discretion in denying an evidentiary hearing, a state court's similar decision is probably not objectively unreasonable.

Accordingly, in considering a petitioner's argument that the state court's failure to hold an evidentiary hearing rendered its factual findings unreasonable, we may first consider whether a similarly situated district court would have been required to hold an evidentiary hearing. See Earp, 431 F.3d at 1167. We begin with the rule that no such hearing is required "[i]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief." Landrigan, 550 U.S. at 474; see also Perez, 459 F.3d at 950; see also Lambert, 393 F.3d at 965-66 (holding that an evidentiary hearing is not a prerequisite to an adjudication on the merits triggering AEDPA deference). The ultimate question, however, is whether an appellate court would be unreasonable in holding that an evidentiary hearing was not necessary in light of the state court record. Taylor, 366 F.3d at 1000.

693 F.3d at 1147-48.

If a petitioner overcomes one of the hurdles posed by section 2254(d), this court may review the merits of the claim de novo.  See Frantz, 533 F.3d at 737.  For the claims upon which

1    petitioner seeks to present evidence, petitioner must meet the standards of 28 U.S.C. § 2254(e)(2)

2    by showing that he has not "failed to develop the factual basis of [the] claim in State court

3    proceedings" and by meeting the federal case law standards for the presentation of evidence in a

4    federal habeas proceeding.  See Pinholster, 563 U.S. at 185-86.

5           For the reasons set forth below, this court finds that seven claims or subclaims survive

6    section 2254(d) review.

7    II.  Application of 28 U.S.C. § 2254(d) to Petitioner's Claims

8           The court discusses petitioner's claims in the order in which they have been briefed by the

9    parties.

10          A.  Claims Involving the Veracity of Bonnie Hogue's Testimony

11          Petitioner first argues several claims with the same underlying allegation – that the

12   testimony of prosecution witness Bonnie Hogue was false.  In claim 23, petitioner argues

13   prosecutorial misconduct for the failure to provide the defense with information that could have

14   impeached Hogue and for the presentation of false testimony.  In claim 2, petitioner argues

15   ineffective assistance of counsel at the guilt phase for the failure to discover and present evidence

16   to impeach Hogue.  For the reasons set out below, this court finds petitioner has satisfied the

17   requirements of 28 U.S.C. § 2254(d) for his arguments that the prosecutor failed to reveal witness

18   Bonnie Hogue's memory problems (claim 23) and that counsel failed to investigate and present

19   evidence of Ms. Hogue's relationship with Robert Reese (claim 2).

20                1.  Legal Standards

21                      a.  Prosecutorial Misconduct for Withholding Impeachment Evidence

22          The Court of Appeals for the Ninth Circuit recently re-stated the clearly established

23   federal law under the "landmark case of Brady v. Maryland, 373 U.S. 83, 87 (1963)":

24                prosecutors are constitutionally obligated to disclose "evidence
                  favorable to an accused ... [that] is material either to guilt or to
25                punishment." This prosecutorial duty is grounded in the Fourteenth
                  Amendment, which instructs that states shall not "deprive any
26                person of life, liberty, or property, without due process of law."
                  U.S. Const. amend. XIV, § 1.  The purpose of Brady is to ensure
27                that "criminal trials are fair," Brady, 373 U.S. at 87, and "that a
                  miscarriage of justice does not occur," United States v. Bagley, 473
28                U.S. 667, 675 (1985).  Placing the burden on prosecutors to

                                                      22

> disclose information "illustrate[s] the special role played by the American prosecutor in the search for truth in criminal trials." <u>Strickler v. Greene</u>, 527 U.S. 263, 281 (1999).  The prosecution is trusted to turn over evidence to the defense because its interest "is not that it shall win a case, but that justice shall be done." <u>Id.</u>

<u>Amado v. Gonzalez</u>, 758 F.3d 1119, 1133-34 (9th Cir. 2014) (some citations omitted).   Evidence "favorable to an accused" is not limited to exculpatory evidence.  It includes "all material impeachment evidence."  <u>Id.</u> at 1134 (citing <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972), and <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985)).

The standard for materiality under <u>Brady</u> is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  <u>Bagley</u>, 473 U.S. at 682, <u>quoted in</u> <u>Kyles v. Whitley</u>, 514 U.S. 419, 433-34 (1995).  Essentially, this is a prejudice analysis.  <u>See</u> <u>United States v. Price</u>, 566 F.3d 900, 911 n.12 (9th Cir. 2009) (the "terms 'material' and 'prejudicial' are used interchangeably in <u>Brady</u> cases").  The Court in <u>Kyles</u> further explained the materiality standard by focusing on four aspects of it.  First, the Court looked to the term "reasonable probability":

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

514 U.S. at 434 (quoting <u>Bagley</u>, 473 U.S. at 678).  Second, the Court stressed that the materiality test is "not one of sufficiency of the evidence."  <u>Id.</u> at 435.  Rather, the test is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  <u>Id.</u>  Third, the materiality inquiry subsumes any harmless error analysis:  if error is found, "it cannot subsequently be found harmless under <u>Brecht</u>."  <u>Id.</u>  Finally, the Court stressed that materiality requires considering the cumulative effect of all suppressed evidence.  <u>Id.</u> at 436-37.  The Court explained that to do so, a court must first "evaluate the tendency and force of the undisclosed evidence item by item" because "there is no other way."  <u>Id.</u> at 436 n.10.  A court may then evaluate the cumulative effect of all undisclosed evidence on the verdict.  <u>Id.</u>

1    The duty to disclose favorable, material evidence "extends to information that is not in the

2    possession of the individual prosecutor trying the case" but is known by "others acting on the

3    government's behalf." Amado, 758 F.3d at 1134 (citing Kyles , 514 U.S. at 441–42). The Court

4    in Kyles held that a prosecutor had "had a duty to learn of any favorable evidence known to the

5    others acting on the government's behalf, including the police." 514 U.S. at 437.

6        b.   Prosecutorial Misconduct for Presentation of False Evidence

7    A conviction obtained through the use of false evidence violates a defendant's due process

8    rights. Napue v. Illinois, 360 U.S. 264, 269 (1959). This is true whether the prosecutor knew the

9    evidence was false or should have known it was false. United States v. Agurs, 427 U.S. 97, 103

10    (1976). The false evidence must have been material. Evidence is not material if "the false

11    testimony could not in any reasonable likelihood have affected the judgment of the jury." Napue,

12    360 U.S. at 271; Giglio, 405 U.S. at 154.

13        c.   Ineffective Assistance of Counsel

14    "The Sixth Amendment right to counsel in a criminal trial includes 'the right to the

15    effective assistance of counsel.'" Summerlin v. Schriro, 427 F.3d 623, 629 (9th Cir. 2005)

16    (quoting McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)). "This right extends to 'all

17    critical stages of the criminal process,' including capital sentencing." Id. (citations omitted). The

18    Sixth Amendment standard for analyzing an ineffective assistance of counsel claim is well

19    established. To prevail on a claim of ineffective assistance of counsel, a petitioner must show

20    that his trial counsel's performance "fell below an objective standard of reasonableness" and that

21    "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

22    proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687-88, 694

23    (1984).

24        i.   Deficient Performance

25    Under the first prong of the Strickland test, a petitioner must show that counsel's conduct

26    failed to meet an objective standard of reasonableness. Strickland, 466 U.S. at 687. There is "a

27    'strong presumption' that counsel's representation was within the 'wide range' of reasonable

28    professional assistance." Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, 466

1  U.S. at 689.)  Petitioner must rebut this presumption by demonstrating that his counsel's

2  performance was unreasonable under prevailing professional norms and was not the product of

3  "sound trial strategy."  Strickland, 466 U.S. at 688-89.  Judicial scrutiny of counsel's performance

4  is "highly deferential," and thus the court must evaluate counsel's conduct from her perspective at

5  the time it occurred, without the benefit of hindsight.  Id. at 689.

6          When determining whether counsel's conduct was a reasonable strategy, courts may not

7  "indulge in 'post hoc rationalization' for counsel's decisionmaking that contradicts the available

8  evidence of counsel's actions."  Richter, 562 U.S. at 109.  Courts may, however, consider

9  objectively reasonable bases for counsel's actions.  Id.  The limitation on that inquiry is whether

10  those bases "contradict" the record of counsel's actions.  Id.  "Strickland . . . calls for an inquiry

11  into the objective reasonableness of counsel's performance, not counsel's subjective state of

12  mind."  Id. at 109-110 (citing Strickland, 466 U.S. at 688).  The federal court is not required to

13  divine counsel's thinking to determine whether counsel's conduct was reasonable.

14          The Supreme Court has "declined to articulate specific guidelines for appropriate attorney

15  conduct and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains

16  simply reasonableness under prevailing professional norms.'"  Wiggins v. Smith, 539 U.S. 510,

17  521 (2003) (quoting Strickland, 466 U.S. at 688).  However, "general principles have emerged

18  regarding the duties of criminal defense attorneys that inform [a court's] view as to the 'objective

19  standard of reasonableness' by which [a court must] assess attorney performance, particularly

20  with respect to the duty to investigate."  Summerlin, 427 F.3d at 629.  "[S]trategic choices made

21  after thorough investigation of law and facts relevant to plausible options are virtually

22  unchallengeable."  Strickland, 466 U.S. at 690.  However,

23          strategic choices made after less than complete investigation are
         reasonable precisely to the extent that reasonable professional
24          judgments support the limitations on investigation.  In other words,
         counsel has a duty to make reasonable investigations or to make a
25          reasonable decision that makes particular investigations
         unnecessary.  In any ineffectiveness case, a particular decision not
26          to investigate must be directly assessed for reasonableness in all the
         circumstances, applying a heavy measure of deference to counsel's
27          judgment.

28  Wiggins, 539 U.S. at 521 (quoting Strickland, 466 U.S. at 690-91); see also Thomas v. Chappell,

25

1    678 F.3d 1086, 1104 (9th Cir. 2012) (counsel's decision not to call a witness can only be

2    considered tactical if he had "sufficient information with which to make an informed decision");

3    Reynoso v. Giurbino, 462 F.3d 1099, 1112-115 (9th Cir. 2006) (counsel's failure to cross-

4    examine witnesses about their knowledge of reward money cannot be considered strategic where

5    counsel did not investigate this avenue of impeachment); Jennings v. Woodford, 290 F.3d 1006,

6    1016 (9th Cir. 2002) (counsel's choice of alibi defense and rejection of mental health defense not

7    reasonable strategy where counsel failed to investigate possible mental defenses).

8        When determining whether the state court's application of the Strickland standard was

9    reasonable, the federal court must be "doubly" deferential.  Richter, 562 U.S. at 105.  The

10   "standard for judging counsel's representation is a most deferential one" and the reasonableness

11   standards of section 2254(d) are also "highly deferential."  Id.  Further, because the Strickland

12   rule is a "general" one, courts have "more leeway ... in reaching outcomes in case-by-case

13   determinations" and the "range of reasonable applications is substantial."  Id. at 101, 105; Premo

14   v. Moore, 562 U.S. 115, 122-23 (2011).  As the Court described in Richter, "[w]hen § 2254(d)

15   applies, the question is not whether counsel's actions were reasonable.  The question is whether

16   there is any reasonable argument that counsel satisfied Strickland's deferential standard." 562

17   U.S. at 105.

18                          ii.     Prejudice

19       The second part of the Strickland test requires a petitioner to show that counsel's conduct

20   prejudiced him.  Strickland, 466 U.S. at 691-92.  Prejudice is found where "there is a reasonable

21   probability that, but for counsel's unprofessional errors, the result of the proceeding would have

22   been different."  Id. at 694.  The errors should be considered cumulatively to assess prejudice.  Id.

23   at 695, 696; Silva v. Woodford, 279 F.3d 825, 834 (9th Cir. 2002).  A reasonable probability is

24   one "'sufficient to undermine confidence in the outcome.'"  Summerlin, 427 F.3d at 640 (quoting

25   Strickland, 466 U.S. at 693).  "This does not require a showing that counsel's actions 'more likely

26   than not altered the outcome,' but the difference between Strickland's prejudice standard and a

27   more-probable-than-not standard is slight and matters 'only in the rarest case.'"  Richter, 562 U.S.

28   at 111-12 (quoting Strickland, 466 U.S. at 693).  "The likelihood of a different result must be

26

1   substantial, not just conceivable." Id. at 112.  Prejudice is established if "there is a reasonable

2   probability that at least one juror would have struck a different balance" between life and death.

3   Wiggins, 539 U.S. at 537.

4           2.   Factual Background for Claims based on Bonnie Hogue's Veracity

5           a.  Evidence at Trial

6        Bonnie Hogue[18] was the only witness to petitioner's conduct during the time period

7   immediately after the crimes.  Because no eyewitness or physical evidence directly connected

8   petitioner to the crime scene, Ms. Hogue's testimony was critical to the prosecution's case.  She

9   testified as follows.

10        In January 1989, Hogue was a prostitute working in Sacramento, primarily at truck stops.

11   (RT 2923-924.)   In the early morning hours of January 26, Hogue walked from a truck stop in

12   South Sacramento to her motel room in the Sixpence Inn across the street.  (RT 2931-933.)  As

13   she walked near the motel office, she encountered a man she had never seen before.  (RT 2933-

14   934.)  He asked her if he and his friend could use her room.  (Id.)  She identified the man as

15   Robert Reese from a photo.  (RT 2934.)  After he offered her money, she agreed to let them stay

16   in her room.  (RT 2934.)  Reese gave her $500.  (RT 2935.)  Reese told her he "didn't want to use

17   his identification to get a room and they wouldn't rent one to him."  (RT 2938.)  Hogue identified

18   petitioner as the man accompanying Reese.  (RT 2940.)  The men got three pieces of luggage and

19   entered Hogue's room with her.  (RT 2943.)

20        After they entered her room and sat down, petitioner took out some methamphetamine and

21   passed it to Reese.  (RT 2944.)  Both Reese and petitioner ingested some of the drug.  (RT 2946-

22   949.)  Hogue was smoking marijuana during that time.  (RT 2948.)  Reese and petitioner told

23   Hogue they had come from Arizona that evening.  (RT 2950.)  Petitioner told her they had just

24   done a big drug deal.  (RT 2950.)  They also told Hogue the drug deal was worth ten or fifteen

25   ////

26   

---

[18] Ms. Hogue used this name at the time of trial and she is referred to as "Hogue" in both the state
and federal petitions.  At the time of the depositions ordered by this court, she was using her
maiden name Bonnie Starr.  For the sake of consistency, she is referred to herein as Bonnie
Hogue.

1   thousand dollars and that since they had been in Sacramento they had bought some guns and sold

2   a Harley Davidson motorcycle.  (RT 2950-951.)

3       Hogue saw a gun in the bag on the desk next to where petitioner was sitting.  (RT 2951-

4   952.)  She asked the men to remove it from the room and they took the bag out to the car, opened

5   the trunk, and returned with the bag.  (Id.)  She checked the bag to make sure the gun had been

6   removed.  Inside, she saw a plastic bag with methamphetamine, clothing, some shaving items,

7   money, and some jewelry.  (RT 2953.)  She then told the men to raise their shirts and drop their

8   pants so she could be sure neither had a gun.  (RT 2954.)  She did not see any other guns.

9       Reese was "nervous," "sweating a lot," and "real jumpy."  (RT 2955.)  Reese would pull

10  back the curtains and look outside the window, then "move all around the room," and talk about

11  leaving.  (RT 2955-956.)  He acted "real paranoid."  (RT 2956.)  Petitioner was "[e]xceptionally

12  quiet."  (RT 3059.)

13      Petitioner asked Hogue to have sex with him.  (RT 2959-960.)  Reese gave her $200 to

14  have sex with petitioner in the bathroom.  (RT 2960.)  Afterwards, as she left the bathroom, she

15  bumped into Reese, who was sitting on the floor in the room.  (RT 2962-963.)  She saw a number

16  of things on the floor around Reese – ten to fifteen baggies containing white powder, a small

17  scale, money, and jewelry.  (RT 2963-965.)  She testified that the drugs, money, and jewelry were

18  divided into two piles each.  (RT 3088-091.)  When Reese saw Hogue, he started to pick up the

19  objects around him.  He handed petitioner some jewelry and money and told him, "This is the

20  money I owe you."  (RT 2966.)   Reese gave Hogue a necklace and a ring.  (RT 2969-971.)

21      Reese made two phone calls from the room.  (RT 2972.)  Hogue testified that the calls had

22  to do with making travel arrangements for Reese and petitioner to leave.  (RT 2973.)  The men

23  decided Reese would leave by himself on an early flight and petitioner would stay with Hogue

24  and go back on his own.  (Id.)  Reese gave Hogue $200 to keep petitioner with her for another

25  day.  (RT 2976-977.)  Shortly before 5:00 a.m. that morning, the three drove in the men's car to

26  the airport.  (RT 2973-974.)  Petitioner drove and dropped Reese off there.  Reese did not take

27  any luggage with him.  (RT 2975.)

28  ////

1    Hogue testified that Reese told her he and Majors were "[c]lose enough to be father and

2    son." (RT 2977.)  Later, Reese told her that the familial characterization was not really true.

3    Rather, she agreed that Reese told her that petitioner took "care of Robert [Reese] financially and

4    that Robert takes care of him in other ways." (RT 3094.)  She stated that Reese thought of

5    petitioner as a "sugar daddy." (RT 3094.)  Petitioner told her the two were "partners." (RT

6    2978.)  During discovery, Hogue stated that "'[Petitioner] just said that Robert handled his drug

7    deals and does all his buying and selling of [petitioner's] drugs." (RT 3093-094.)

8    Hogue and petitioner then got breakfast and returned to the motel.  Petitioner told Hogue

9    he wanted to stay there an additional day so he gave her money and she paid for another day.  (RT

10   2976.)  Petitioner asked Hogue about the location of the Greyhound bus depot.  He told her he

11   wanted to package his things, including the gun that he could not take on the plane, and send

12   them back to Arizona by bus.  (RT 2979.)  Petitioner gave Hogue $250 to help him package and

13   ship his things.  (RT 2980.)  The two then shopped for toiletries and Hogue found a box for

14   petitioner.  (RT 2982.)  Next, they went by Hogue's house in West Sacramento to pick up laundry

15   and her house keys.  (Id.)  While she was inside, petitioner opened the trunk of the car and began

16   packing the box with things from his luggage.  (RT 2984.)  After getting some tape, they went to

17   the downtown Sacramento Greyhound station.  (RT 2985.)  Hogue took care of shipping the

18   package and, at petitioner's direction, listed herself as the sender and "Stanley Johnson" as the

19   recipient at an address petitioner provided.  (RT 2987-988.)  Petitioner told her to identify the

20   contents of the package as "books," which she did.  (Id.)

21   Afterwards, the two drove to a clothing store Hogue liked.  Petitioner told her he would

22   buy her whatever she wanted.  (RT 2992.)  He paid about $300-$400 for the clothes.  (RT 2995.)

23   When they returned to the motel, Hogue made phone calls to make airplane reservations

24   for petitioner.  (RT 2997.)  She made two reservations for him.  (RT 2997.)  That evening, she

25   drove him to the airport.  (RT 2998.)  Before he left the motel, petitioner took some more

26   methamphetamine.  (Id.)  He left some in the motel room and told Hogue it "was profitable." (RT

27   2999-3000.)  She attempted to sell it through a friend, but it was stolen from her.  (RT 3001-002.)

28   After petitioner left, Hogue found a pair of brown, soft gardening gloves and a bandana in the

1    motel room.  (RT 3037.)  She took both with her but does not recall what happened to them.  (RT

2    3038-039.)

3         The two then drove to the airport, returned the rental car, and purchased petitioner's plane

4    ticket.  (RT 3003-007.)  Hogue called friends to pick her up there.  (RT 3005-007.)  Before he

5    left, petitioner told Hogue he would call her in a couple days.  (RT 3007-008.)  They had

6    exchanged phone numbers.  (Id.)

7         Petitioner called her two days later and asked her to come to Arizona.  (RT 3009.)  He told

8    her he would pay her for sex.  (Id.)  Hogue estimated that the total amount of money Reese and

9    petitioner gave her on January 26 was $1150 to $1250.  (RT 3009-010.)  During one of the phone

10   calls they had to plan the trip, petitioner told Hogue that Reese had broken up with his girlfriend

11   and moved.  (RT 3016.)  In addition, petitioner asked Hogue to bring along another prostitute for

12   his friend "Joe."  (RT 3017.)  Petitioner told Hogue there would be two airplane tickets waiting

13   for her at the airport.  (RT 3018.)  Hogue's fellow prostitute was unavailable so she traveled to

14   Arizona alone on February 4 or 5, 1989.  (RT 3019.)  Petitioner and Reese picked Hogue up at the

15   airport.  (RT 3020.)  They drove to a restaurant to eat and Reese made a phone call and then left.

16   (RT 3022.)  She did not see Reese again.  (Id.)  She and petitioner then went to a bar and met up

17   with his friend Joe.  (RT 3023.)  Next, the two took a cab to a motel where petitioner had a room.

18   (RT 3024-025.)  She was paid $400 to have sex with petitioner that night.  (RT 3025.)  Petitioner

19   left her at the motel around 4:00 or 5:00 a.m. the next morning.  (RT 3025-026.)  Hogue stayed in

20   the room sleeping until early evening, took a cab to the airport, and flew back to Sacramento.

21   (RT 3026.)  Petitioner called Hogue later, on Valentine's Day.  (Id.)

22        On February 18, Hogue's roommates informed her that petitioner had called several times

23   in one day, "real persistent to talk to [her]" and she saw an article about Reese and triple murders

24   in Fair Oaks in the newspaper.  (RT 3027-028, 3047.)  After seeing the article, she called the

25   police.  (RT 3030.)  Detective Kay Maulsby called her back and she and Detective Bob Bell

26   picked Hogue up at the motel where she was staying and drove her to the sheriff's office.  (RT

27   3031.)  Hogue testified that she had not heard about the triple murders before reading the article

28   that night.  (RT 3031-032.)  She said that she read the paper "on a regular basis.  If I'm in town I

30

1   read it." (RT 3031.)  She said she had been out of town for the few days prior to seeing the

2   article.  (RT 3029; 3032; 3044-045.)  On cross-examination she testified that even though she was

3   mostly in Sacramento in the few days after the crimes, she did not read the paper because she

4   "was very busy."  (RT 3045.)

5          Hogue spoke to the detectives that night and again the next morning.  (RT 3032.)  Hogue

6   testified that when she first spoke to the detectives, she was not aware a reward had been offered

7   for information regarding the murders.  (RT 3034-035.)  Detective Bell told her about the reward

8   later, around the end of March, and gave her a phone number to call to collect it.  (RT 3035.)  She

9   received $2500 through a secret witness program for providing the information.  (RT 3035-036.)

10          On cross-examination, Hogue confirmed that she had been granted immunity from

11   prosecution for any crimes she committed "during the course of the days that [she] was with Mr.

12   Majors."  (RT 3041–042.)  Attorney Brady then questioned Hogue about many discrepancies in

13   her statements to police and her testimony.  Hogue confirmed that she told police officers she had

14   at one point been employed by Lowery Trucking and driven eighteen-wheel trucks on long hauls.

15   (RT 3042-043.)  When told that Lowery Trucking had no record of her working for them, she

16   testified that "they're wrong."  (RT 3043.)  She later testified that she "shared driving with"

17   someone who paid her for it.  (RT 3044.)  Brady pointed out that she had told an Arizona

18   detective that her husband was a Highway Patrol Officer when she knew he was not.  (RT 3045-

19   046.)  Hogue told police she could not recall the name of the truck driver she had sex with before

20   meeting Reese and petitioner because she had only "dated" him that one time.  However, at trial,

21   Hogue testified the truck driver had paid her for sex five or six times previously and she identified

22   him by a nickname.  (RT 3051-052.)  Hogue told police she first saw that Reese and petitioner

23   had a gun when she was leaving the bathroom and saw it on the floor.  (RT 3057.)  At trial, she

24   testified she saw the gun before she entered the bathroom with petitioner.  Hogue told police she

25   sold the drugs petitioner left for her, but testified that they had been stolen from her.  (RT 3071-

26   072.)  She also told police that petitioner left the drugs for her in a Ziploc baggie, but testified that

27   he left it in two piles on a table.  (RT 3070-071, 3101-102.)  She told police she picked up a box

28   to ship petitioner's things from her apartment, but testified that she and petitioner picked one up

31

1   from a restaurant.  (RT 3075-076.)  Brady also cast doubt on Hogue's testimony about the amount

2   of money petitioner spent on her for clothes and details about her trip to Arizona after the

3   murders.  (RT 3074-75, 3101-02, 3077-81.)  Finally, Brady questioned Hogue about the fact a

4   number of things she told police were the same as information from newspaper articles published

5   the day she said she had read the paper.  (RT 3047-049.)  Hogue testified that some of the

6   discrepancies were the result of the fact that she was "[v]ery shaken" and "[v]ery scared" the first

7   night she spoke to police.  (RT 3057-058, 3077.)

8            At the conclusion of the attorney's examination of Hogue, jurors were permitted to ask

9   questions of Hogue.  The questions were written down and read by the prosecutor.  (RT 3136-

10  139.)  Jurors asked about the type of gun Hogue saw in the motel room, about whether Reese told

11  her he had killed someone, about when she was granted immunity, and about whether she had

12  used marijuana around the time of her testimony.

13                      b.   Evidence Presented to the California Supreme Court

14           Petitioner describes the following evidence presented to the California Supreme Court to

15  demonstrate Bonnie Hogue's unreliability:  (1) Hogue received benefits for her cooperation that

16  were not disclosed; (2) Hogue had a pre-existing relationship with Robert Reese, contrary to her

17  trial testimony; (3) prior to trial, Hogue told police she was present at the crime scene; (4) Hogue

18  was suffering from an untreated psychotic disorder both at the time of the crimes and at trial; (5)

19  Hogue had a history of false statements to police and in legal proceedings; and (6) in 2003,

20  Hogue admitted to her sister that she committed perjury at petitioner's trial.

21                          i.      Undisclosed Benefits Received by Hogue

22           At trial, Hogue testified that she received the $2500 reward money for providing

23  information, immunity from prosecution for her acts involving Reese and petitioner, and witness

24  expenses.  Petitioner provided the state court with information that Hogue either received or

25  anticipated receiving other benefits.

26                              (a)   Money

27           Hogue told one friend that she expected to receive $10,000 from the "secret witness

28  program."  Petitioner presented an investigation report provided to his original state attorney,

1    William Owen, regarding an interview with Christopher Lichman.  (LD 44, Ex. 727 (C. Lichman

2    Int.).[19])  Lichman told investigators he was a friend of Hogue's during this time period and lived

3    with her during her initial involvement in the case.  Lichman said he heard the prosecutor indicate

4    to Hogue that some information about benefits she would receive needed to be kept from the

5    defense.  Lichman also stated that Hogue had received monetary rewards for providing

6    information to the police in the past.   Hogue's sister, Susan Riley, similarly stated that Hogue

7    had called a secret witness program in 1984 or 1985 to turn in a friend, for which she received a

8    reward.  (LD 52, Ex. 581 (Dec. 13, 2005 Depo. of Susan Riley) at 951-52.)

9         Hogue told a number of other people that she was receiving money from the prosecution

10   for testifying.  (LD 31, Ex. 110 (June 24, 2003 Decl. of Deborah Farmer), ¶4; LD 31, Ex. 113

11   (June 24, 2003 Decl. of Linda Sicard), ¶4; LD 55, Ex. 735 (Dfs. interview of Shari Lichman) at

12   1633; LD 47, Ex. 149 (Feb. 28, 2006 Decl. of Alvin Starr), ¶5; LD 47, Ex. 144 (Oct. 13, 2005

13   Decl. of Susan Riley), ¶4.)  Shari Lichman reported seeing her with large amounts of cash.  (LD

14   55, Ex. 735 (S. Lichman Int.) at 1633.)   However, two of these people characterized those

15   payments as being living expenses during the time Hogue was involved in petitioner's case.  (LD

16   31, Ex. 110 (Farmer Decl.), ¶4; LD 31, Ex. 113 (Sicard Decl.), ¶4.)

17                         (b)  Legal Favors

18        Hogue also told people she had a "get out of jail free" card after testifying in this case.

19   (LD 52, Ex. 581 (Riley Depo.) at 932-34.)  Susan Riley stated that Hogue had been arrested

20   numerous times since the trial and the charges were always dropped.  (Id. at 932-33.)  At the time

21   of trial, Hogue told Deborah Farmer she could call the D.A.'s office if she got in any trouble, and

22   they would "come and pick her up."  (LD 31, Ex. 110 (Farmer Decl.), ¶4.)  Petitioner provides

23   numerous specific examples of apparent leniency Hogue received.  On November 14, 1989, at the

24   time Hogue was cooperating with prosecutors in this case, Hogue was arrested for prostitution

---

25   [19] Exhibits to the state petition have been lodged herein.  (See ECF No. 175.)  It should be noted
26   that they were not provided to the court in numerical order.  Some were appended to the state
     petition and others to the state reply.  However, the exhibit numbers are intermingled between the
27   two sets of exhibit volumes.  To make this confusing system somewhat easier to reference, the
     undersigned identifies the exhibits by referring to the volume in which they were lodged, their
28   Lodged Document or "LD" number, and their exhibit number.

1   and had three outstanding warrants.  (LD 48, Ex. 339 (West Sac. Police Arrest Rpt.); LD 53, Ex.

2   583 (Court records) at 1228-229; LD 48, Ex. 336 (Yolo Co. Muni. Ct. records for People v.

3   Hogue, No. 1-15552); LD 48, Ex. 337 (Yolo Co. Jail record re Bonnie Hogue's failure to

4   appear).)   In April 1989, Hogue's brother-in-law called police to report that she had stolen his

5   car.  (LD 48, Ex. 338 (Sac. Police Dept. Rpt. dated Apr. 3, 1989).)  Petitioner also cites to a

6   record entitled "Crime Analysis Event Profile" which indicates that in August 1990, Hogue was

7   "walking the stroll."  (LD 48, Ex. 340.)  According to petitioner, none of these incidents resulted

8   in prosecution.[20]  However, according to respondent, petitioner has not shown that those incidents

9   were resolved to Hogue's benefit during the time of trial or shortly thereafter.  Respondent shows

10  that almost two years after petitioner's trial, Hogue's forgery charge remained pending.  (LD 49,

11  Ex. 556.)  He points out that petitioner failed to show any resolution for the prostitution charge.

(c) Gifts

13          Petitioner also presents evidence from the prosecutor's case file of receipts and notes

14  regarding payment of Hogue's motel bills, cash payments, and the provision of transportation.

15  (LD 53, Ex. 583 at 1287-315.)  Ms. Riley testified at her federal deposition that she had heard

16  from her mother that the prosecutor took Hogue clothes shopping.  (LD 52, Ex. 581 at 935-36.)

17  The file also includes documentation of numerous contacts between the prosecutor and Hogue.

18  Some apparently internal notes refer to Hogue as prosecutor O'Mara's "sweetheart" or "sweetie."

19  (Id. at 1293, 1294.)

20  ////

---

[20] It is not surprising that some of these incidents did not result in prosecution.  Hogue's brother-in-law's complaint ended with the statement "I want her arrested."  (LD 48, Ex. 338.)  This appears to have been a family dispute that went no further than that.  With respect to the "walking the stroll" record, there is no indication Hogue was arrested or that there was any sort of further involvement by the police or prosecutors.

Petitioner also alleges the Sacramento County District Attorney's Office "engaged in a pattern and practice of clearing outstanding warrants and dropping charges for government witnesses in exchange for their favorable testimony."  (ECF No. 235 at 40.)  However, the evidence presented in support of this allegation is simply a similar allegation made by a Sacramento County Public Defender and a showing of those sorts of favors provided to just one witness/informant.  (LD 31, Ex. 124; LD 44, Ex. 609.)  The California Supreme Court would have been reasonable in rejecting this "pattern and practice" allegation based on the inadequacy of the evidentiary support provided.

ii.     Hogue's Pre-existing Relationship with Robert Reese

Petitioner presents the declarations of several people who stated that Hogue told them she knew Robert Reese before meeting up with him the evening of the crimes.  (LD 31, Ex. 111 (June 23, 2003 Decl. of Fred Starr ) (he and Hogue knew Reese "since we were young"); LD 31, Ex. 109 (June 24, 2003 Decl. of Christopher Lichman), ¶8.)   In addition, three people had seen Reese in Hogue's apartment in 1984, several years before trial.  (LD 47, Ex. 147 (Mar. 3, 2006 Decl. of Donald Riley), ¶2; LD 47, Ex. 148 (Mar. 9, 2006 Decl. of Donald Strong), ¶3; LD 47, Ex. 149 (A. Starr Decl.), ¶2.)   The defense was aware before trial that Hogue had told her friends Christopher Lichman and Sharon Fischer that she had a pre-existing relationship with Reese.  (LD 44, Ex. 727 (C. Lichman Int.); LD 55, Ex. 734 (Jan. 30, 1989 Dfs. Interview of Sharon Fischer).)

iii.     Hogue's Statement that she was Present at the Crime Scene

Before petitioner's trial, Hogue told numerous people she was present at the murders and the prosecution was aware of some of these statements.  (LD 48, Ex. 333 (Oct. 24, 1989 D.A. Interview of Tim Hogue) at 155; LD 48, Ex. 332 (Aug. 15, 1989 D.A. Interview of Bill Garrison) at 140; LD 48, Ex. 331 (Nov. 15, 1989 D.A. Interview of Sharon Fischer[21]).)   The defense had similar statements from witnesses before trial.  (LD 55, Ex. 733 (Sept. 5, 1989 Dfs. Interview of Sharon Fischer); LD 55, Ex. 734 (Jan. 30, 1989 Dfs. Interview of Sharon Fischer); LD 44, Ex. 727 (C. Lichman Int.); LD 44, Ex. 726 (Mar. 23, 1990 Dfs. Interview of Nancy Starr); LD 44, Ex. 726 (Mar. 23, 1990 Dfs. Interview of Linda Howe); LD 44, Ex. 726 (Mar. 23, 1990 Dfs. Interview of Fred Starr).)   In her 2005 deposition, Hogue's sister Susan Riley stated that Hogue told her she drove Reese, but not petitioner, to the murder scene and back.  (LD 52, Ex. 581 (S. Riley Depo.) at 871-72, 911-12); see also LD 47, Ex. 144 (S. Riley Decl.).)   Hogue testified that her 2005 deposition that she never talked to her family about the crimes.  (LD 53, Ex. 582 at 1064.)

---

[21] The November 1989 interview was not Fischer's first.  Several months earlier, Fischer told police both she and Hogue accompanied petitioner and Reese to the victims' house and that she witnessed petitioner shooting three people at the house.  (LD 48, Ex. 330 (June 21, 1989 D.A. Interview of Sharon Fischer).)  When interviewed again in November 1989, Fischer recanted and told police everything she knew about the crimes she had learned from Hogue.  (LD 48, Ex. 331 (Nov. 15, 1989 D.A. Int. of S. Fischer).)

iv.     Hogue's Mental Disorder

Hogue testified during her federal deposition, which was presented to the state court, that she has suffered since her teen years from a mental disorder characterized by hearing voices, visual hallucinations, memory black-outs, and attempted suicide.  She testified that this disorder was untreated at the time of the crimes and petitioner's trial.  (LD 53, Ex. 583 at 1167, 1170, 1179-80, 1185, 1188; LD 54, Ex. 584 at 1372.)  Hogue testified that as a teen she thought "god was talking to me all the time" and she recalled "seeing things like flying saucers coming down on me, thinking I was somewhere I wasn't."  (LD 54, Ex. 584 at 1372-73.)  She further testified that since her teens, she has "pretty much" "had the voices continuous."  (Id. at 1374, 1375.)

Hogue recalled that sometime in 1979 or during the early 1980s, she was taken into custody in Sacramento County for a mental health "observation."  (LD 53, Ex. 583 at 1169.)  In addition, during the same time period "or when I was a teenager," she was hospitalized at U.C. Davis Medical Center after a suicide attempt.  (Id. at 1170.)  Hogue also testified that both as a juvenile and as an adult, she had contact with mental health services while in custody.  (Id. at 1184-85.)

Hogue's testimony revealed that she was suffering from both visual and aural hallucinations around the time of the crimes and trial and tried to commit suicide then.  (LD 54, Ex. 584 at 1383-85.)  She also reported having memory blackouts during that time period.  (Id. at 1384.)  She did not recall telling prosecutor O'Mara about these problems and felt it was unlikely she would have done so.  (Id. at 1388.)  She was afraid that people who found out about her problems would have her locked up in a hospital or rehab facility.  (Id. at 1388, 1390.)

Hogue recalled that she was not always sure what parts of the story she told O'Mara were true and which were not.  (LD 54, Ex. 584 at 1390.)  She specifically recalled being unsure that she had gone to the Greyhound station to help petitioner send a package.  (Id. at 1391-96.)  When the district attorney's investigator showed her a shipping receipt, she felt that it "validated what I remembered."  (Id. at 1391.)  She testified: "I couldn't remember what was real . . . .  if I said, well, I'm not sure if I remembered that . . .  what would happen was, Mr. Daeker would come and get a little bit of information that would fit the puzzle, and then I knew it was real in my head."

1    (Id. at 1390.)   In addition, she used transcripts and reports of her prior statements to prepare for

2    her trial testimony.  (Id. at 1390-95.)

3                              v.      Hogue's History of False Statements

4                Petitioner sets out several categories of false statements Hogue made before and during

5    petitioner's trial.   Contrary to Hogue's testimony that she had tried methamphetamine only a few

6    times and was afraid of needles, numerous people knew about Hogue's use of meth and had seen

7    her injecting it.  (LD 31, Ex. 111 (F. Starr Decl.), ¶3; LD 31, Ex. 109 (C. Lichman Decl.), ¶4; LD

8    31, Ex. 113 (Sicard Decl.), ¶4; LD 47, Ex. 147 (D. Riley Decl.), ¶4; LD 47, Ex. 151 (Feb. 8, 2006

9    Decl. of Allan Ellsworth), ¶2; LD 47, Ex. 148 (D. Strong Decl.), ¶5; LD 52, Ex. 581 (S. Riley

10   Depo.) at 843-44.)  Christopher Lichman told defense investigators that Hogue told him she had

11   used meth with petitioner and Reese, contrary to Hogue's trial testimony that she did not.  (LD

12   44, Ex. 727 (C. Lichman Int.) at 3.)  During interviews prior to her 2005 deposition, Hogue lied

13   about her criminal record.  (LD 48, Ex. 347 (Nov. 28, 2005 DOJ Interview of Hogue) at 276-77.)

14   Petitioner also provides evidence to support several instances in which Hogue lied to police about

15   her identity.  (See ECF No. 235 at 42.)  Finally, petitioner provides declarations from several

16   people, including Hogue's brother, attesting to Hogue's reputation for dishonesty.  (LD 31, Ex.

17   111 (F. Starr Decl.), ¶2; LD 31, Ex. 113 (Sicard Decl.), ¶2; LD 31, Ex. 110 (Farmer Decl.), ¶3;

18   LD 44, Ex. 727 (C. Lichman Int.) at 1.)  Petitioner also shows that Hogue told numerous lies

19   related to being pregnant, including that she was carrying either petitioner's or Reese's baby

20   before trial.  (See ECF No. 235 at 41.)

21                              vi.     Hogue's Post-trial Admission that she Committed Perjury

22               As described above, in 2005 when petitioner's exhaustion petition was pending before the

23   California Supreme Court, the magistrate judge previously assigned to this case permitted

24   petitioner to move for discovery.  During the hearing on petitioner's motion, the magistrate judge

25   learned that Hogue's sister Susan Riley had reported that Hogue confessed to committing perjury

26   at petitioner's trial.  The magistrate judge then ordered that Hogue and Susan Riley be deposed in

27   court.  (ECF No. 83.)  The depositions were conducted over several days in December 2005 and

28   January 2006.  (ECF Nos. 99-107.)  Petitioner submitted transcripts of those depositions to the

1  California Supreme Court in support of his then-pending habeas petition.  (LD 52, Ex. 581; LD

2  53, Exs. 582, 583; LD 54, Exs. 584-86.)

3        During the depositions, Ms. Riley testified that in July 2003, her brother told her that

4  investigators had come by asking about Hogue and trying to locate her.  (LD 52, Ex. 581 at 856.)

5  The following day, Hogue called Riley.  Hogue asked Riley to search on her computer for any

6  information about petitioner's trial.  She told Riley she needed that information because petitioner

7  had "got his appeal" and the investigators were asking questions.  (Id. at 861.)  Hogue explained

8  that she wanted to make sure she remembered what she had said at the trial.

9        Riley further testified that Hogue told her she lied at petitioner's trial to protect

10  "somebody close to her."  (Id. at 861.)  Hogue told her petitioner did not do it.  (Id. at 862.)   She

11  also told Riley that she had driven Reese to the victims' house that night.  (Id. at 872-73.)

12  Riley's deposition testimony was corroborated by handwritten notes she had made shortly after

13  the conversations with her sister.  (Id. at 863-64.)  Petitioner presented the state court with

14  declarations from Riley's husband and two daughters which describe Susan Riley's discussions

15  with them in 2003 about Hogue's revelations.  (LD 47, Ex. 145 (Mar. 4, 2006 Decl. of Jennifer

16  Riley); LD 47, Ex. 146 (Mar. 3, 2006 Decl. of Christina Carney); LD 47, Ex. 147 (D. Riley

17  Decl.).)  While Hogue testified at her deposition that she never spoke to Susan Riley that summer,

18  Christina Carney and Donald Riley state that they saw Hogue speaking to Susan Riley in the

19  driveway of Riley's home in 2003.  (LD 47, Exs. 146, 147.)  Another sister, Linda Howe, told an

20  interviewer that she had given Hogue a ride to Riley's house and Hogue had asked Riley to print

21  something from her computer about the case.  (LD 44, Ex. 726 (L. Howe Int.) at 376.)

22              3.  Prosecutorial Misconduct re Bonnie Hogue's Veracity – Claim 23

23                  a.  Brady Claim

24        The standards for satisfaction of a claim under Brady v. Maryland, 373 U.S. 83, 87

25  (1963), are set out above.  To summarize:

26        a Brady claim of prosecutorial misconduct requires a petitioner to
        show that the evidence suppressed by the prosecutor satisfies three
27        elements:  "The evidence at issue must be favorable to the accused,
        either because it is exculpatory, or because it is impeaching; that

28

evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."

Amado v. Gonzalez, 758 F.3d 1119, 1134 (9th Cir. 2014) (quoting Banks v. Dretke, 540 U.S. 668, 691 (2004)).  The parties disagree on how far a prosecutor's constructive knowledge of information extends.   For example, petitioner argues the prosecutor should be charged with constructive knowledge of Bonnie Hogue's mental health records and criminal records from other jurisdictions.  Respondent, on the other hand, argues that the prosecutor should not be charged with knowledge of juvenile records or records from jurisdictions that were not involved in the prosecution of petitioner's case.

It is well established that "Brady suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor.'" Youngblood v. West Virginia, 547 U.S. 867, 869-70 (2006) (per curiam) (quoting Kyles v. Whitley, 514 U.S. 419, 437 (1995)); see also Kyles, 514 U.S. at 437-38 ("prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case"); Giglio v. United States, 405 U.S. 150, 154 (1972) ("whether the nondisclosure was the result of negligence or design, it is the responsibility of the prosecutor").  According to respondent, a prosecutor's Brady obligation extends only to law enforcement agencies involved in the investigation into the crimes for which the defendant is on trial.  (ECF No. 237 at 27:21-23.) However, the Ninth Circuit Court of Appeals appears to cast the prosecutor's Brady net further. The Court of Appeals has held that the prosecutor has a duty to disclose a witness's criminal records.  In Carriger v. Stewart, 132 F.3d 463, 480 (9th Cir. 1997), the court held that the prosecutor had a duty to turn over "the criminal record, including prison records" of the prosecution's "star witness" who had been granted immunity to testify.  The court stressed that:

> The need for disclosure is particularly acute where the government presents witnesses who have been granted immunity from prosecution in exchange for their testimony. We have previously recognized that criminals who are rewarded by the government for their testimony are inherently untrustworthy, and their use triggers an obligation to disclose material information to protect the defendant from being the victim of a perfidious bargain between the state and its witness.

1    132 F.3d at 479.  Because the prosecutor in Carriger knew that the witness had a "criminal record

2    going back to adolescence," he was obligated to provide the defense with the witness's criminal

3    record, including prison records.  Id. at 480.  In Amado, the Court held that the prosecutor had

4    access to, and an obligation to turn over, the conviction and probation records of a prosecution

5    witness who was prosecuted by the same office that prosecuted petitioner Amado, the Los

6    Angeles County District Attorney's Office.  Amado, 758 F.3d at 1138.  Conversely, apart from

7    requiring the provision of information that would be available to a prosecutor by running a

8    criminal records check and providing information that is known to the police or the prosecutor's

9    own office, courts seem to be consistent in holding that "prosecutors are not obligated to learn of

10   all information 'possessed by other government agencies that have no involvement in the

11   investigation or prosecution at issue.'"  United States v. Risha, 445 F.3d 298, 304 (3rd Cir. 2006)

12   (quoting United States v. Merlino, 349 F.3d 144, 154 (3rd Cir. 2003)).  Similarly, a prosecutor is

13   not charged with knowledge of charges that have been filed against a witness in another

14   jurisdiction.  United States v. Geames, 427 F.3d 1333, 1337 (10th Cir. 2005).

15         Petitioner also argues the prosecutor had a Brady obligation to investigate Hogue's mental

16   competence.  However, petitioner presents no legal support for that proposition.  The cases he

17   cites involve witnesses with mental health problems known to the prosecutor.  For example, Silva

18   v. Brown, 416 F.3d 980 (9th Cir. 2005), involved a situation very different from the present one.

19   In Silva, the prosecution's "chief witness" entered into a plea agreement that included a promise

20   that he would not undergo a psychiatric evaluation before testifying.  Silva, 416 F.3d at 982.  The

21   witness had been involved in a motorcycle accident several years earlier and had suffered severe

22   brain damage.  Id.  Before the plea deal was arranged, the witness's attorney told the prosecutor

23   that he planned to have his client psychiatrically evaluated because he believed he was either

24   incompetent or insane.  Id. at 984.  The agreement to forego psychiatric testing was never

25   revealed to petitioner Silva's attorney.  In the other cases cited by petitioner, the prosecution had

26   similar actual knowledge of the witnesses' mental health problems.  See Wilson v. Beard, 589

27   F.3d 651, 659-60, 664 (3rd Cir. 2009) (A detective from the prosecutor's office took the witness

28   ////

1    to an emergency health center during the petitioner's trial.  The witness was diagnosed as

2    schizophrenic there.)

3           Petitioner also cites to East v. Scott, 55 F.3d 996 (5th Cir. 1995), and Mr. East's case after

4    remand, East v. Johnson, 123 F.3d 235 (5th Cir. 1997).  Petitioner relies on the first case for his

5    argument that a prosecutor has a duty to investigate a witness's mental health when the record

6    shows facts putting the prosecutor on notice of mental health problems.  (ECF No. 243 at 26-27.)

7    Petitioner describes the second case as a grant of habeas relief "where prosecution failed to

8    disclose mental health history of witness."  (ECF No. 235 at 57:13-14.)  Both of these

9    descriptions are inaccurate.  In East v. Scott, the petitioner argued a Brady violation based on the

10   prosecutor's failure to turn over mental health records of an important witness.  55 F.3d at 1003.

11   The court first described established law that charges a prosecutor with constructive knowledge of

12   a witness's criminal record available through a "routine check of FBI and state crime databases,

13   including witness's state 'rap sheet.'"  Id. at 1003.  The court then specifically held that the

14   prosecution's duty to investigate a witness's criminal history does not extend to the witness's

15   mental health history.  Id. at 1003-04.  The court found the prosecutor may have violated Brady

16   by failing to turn over the witness's criminal record, if that record turned out to be "material."  Id.

17   at 1004.  The case was remanded for that determination.  Id.

18          When the case returned to the Fifth Circuit court as East v. Johnson, one of the primary

19   issues was whether the witness's mental health history would have been revealed had her criminal

20   records been disclosed.  East, 123 F.3d at 236 & n.1.  Nowhere in either decision did the Fifth

21   Circuit opine that a prosecutor had a duty to investigate and disclose a witness's mental health

22   records.

23          A related issue is petitioner's contention that the prosecutor was obligated to reveal

24   Hogue's memory problems.   Hogue testified in her federal deposition that:  "I couldn't remember

25   what was real . . . .  if I said, well, I'm not sure if I remembered that . . .  what would happen was,

26   Mr. Daeker would come and get a little bit of information that would fit the puzzle, and then I

27   knew it was real in my head."  (LD 54, Ex. 584 at 1390.)  Petitioner argues the prosecution should

28   be charged with knowledge of Hogue's memory problems based on this testimony, and based on

41

1   the statement of Hogue's friend Christopher Lichman that prosecutor O'Mara interviewed Hogue

2   and made "at least one tape recording of Ms. Hogue's lack of recall of events." (LD 31, Ex. 109

3   (C. Lichman Decl.), ¶7.) A review of Mr. Lichman's declaration shows that this is not exactly

4   what he said. Rather, Lichman stated that he and Hogue met with O'Mara "several times" "in his

5   office." (Id.) Lichman stated that O'Mara "generally" took notes but that he recalled O'Mara

6   taping one meeting. Lichman described the meetings as

> necessary because Bonnie could never remember how many bags of
> meth she was supposed to have  seen.  Nor could she remember
> what color, how many, and the contents of the duffel bags Jim
> Majors and Robert Reese were supposed to be traveling with.  I got
> the impression that she did not know.  Mr. O'Mara coached Bonnie
> about what she was supposed to say about these things when she
> testified at the preliminary hearing.  Mr. O'Mara was also coaching
> Bonnie on how to avoid answering certain questions that he thought
> the defense lawyer would ask her.  Mr. O'Mara said he did not want
> Bonnie to admit she was receiving any financial help from the DA's
> office for her testimony.  He also did not want Bonnie to say she
> had been coached or that he had told her not to talk with the
> defense.

14  (Id.)

15      Considering these standards, and mindful that the California Supreme Court denied

16  petitioner's claim for failure to state a prima facie case, this court finds the California Supreme

17  Court could reasonably have denied petitioner's Brady claim on all but one ground. First, this

18  court finds the prosecutor cannot be charged with actual or constructive knowledge of Hogue's

19  mental health problems. Petitioner makes many inferential leaps to conclude that local police

20  must have been involved in Hogue's suicide attempts and mental health treatments and, even if

21  they had not, that such information would have been available through a standard criminal

22  records check of Hogue. (See ECF No. 235 at 55 n.51.) Petitioner has also failed to show that

23  Hogue told prosecutor O'Mara she had attempted suicide. In fact, in her testimony Hogue first

24  stated she "may" have told him, and later testified that it was very unlikely she would have

25  because she feared being institutionalized. Because petitioner did not make a prima facie

26  showing that the mental health evidence was available to the prosecutor, the California Supreme

27  Court would not have been unreasonable in finding petitioner failed to make out a Brady claim

28  with respect to that evidence.

1       Hogue's memory problems are a different issue.  Between Hogue's deposition testimony

2   and the declaration of Christopher Lichman, petitioner has made a strong showing that the

3   prosecution knew Hogue could not recall important details.  While a prosecutor is not required to

4   provide the defense with his "strategies, legal theories, or impressions of the evidence," the

5   prosecutor is obligated to provide the defense with that information if it contains "underlying

6   exculpatory facts."  See Morris v. Ylst, 447 F.3d 735, 742 (9th Cir. 2006); United States v.

7   Kohring, 637 F.3d 895, 907 (9th Cir. 2011).  Lichman's declaration states that Hogue's memory

8   problems were a primary subject of meetings that he and Hogue attended with prosecutor

9   O'Mara.  Lichman recalled that O'Mara either took notes or tape-recorded those meetings.  It

10  seems likely O'Mara took notes which described these memory problems.  Hogue was the

11  primary prosecution witness and her credibility was very important to the case against petitioner.

12  The fact that she had so much difficulty recalling details and had to be coached repeatedly would

13  have been important impeachment.  See Kohring, 637 F.3d at 906 (government attorney's hand-

14  written notes stating that important prosecution witness had "bad recall," "vague memory" and

15  that "meds affecting cognitive memory" held exculpatory under Brady).  So, while prosecutor

16  O'Mara was not required to turn over his opinion that Hogue's memory was bad, he was required

17  to turn over any "underlying exculpatory facts" such as her statements that she was unable to

18  recall details or her statements that otherwise contradicted her testimony.  Id. at 907-08.

19      Respondent contends the district attorney provided the defense with "all investigative

20  reports and tape-recorded interviews of witnesses revealing inconsistent statements by Hogue

21  regarding her role in the case."  (ECF No. 237 at 31:709.)   While that may be true, and while

22  petitioner has not shown O'Mara "made at least one tape recording of Ms. Hogue's lack of recall

23  of events," petitioner has made a sufficient showing that O'Mara likely had something besides the

24  "investigate reports and tape-recorded interviews" respondent states were already provided, such

25  as handwritten notes with information regarding Hogue's lack of memory.

26      Petitioner's argument that evidence shows that Hogue received a better deal than what

27  was revealed at petitioner's trial is based on a patchwork of statements made by Hogue's

28  associates that she told them various things at various times that conflicted with her testimony

1   about her agreement with the prosecution.  At trial, she testified she was granted immunity from

2   prosecution for the crimes she may have committed with petitioner and Reese: prostitution;

3   possession of marijuana; and possession and attempting to sell methamphetamine.  (RT 3041-42.)

4   In addition, the defense was aware that before trial Hogue had received $2500 from the

5   Sacramento Bee's Secret Witness Program and was made aware during trial that, based on a

6   reported threat made by petitioner on Hogue's life, the prosecution put Hogue up in a motel and

7   paid her living expenses.  (CT 323, 324.)  With respect to money and gifts Hogue may have

8   received, petitioner has made an insufficient showing of a <u>Brady</u> violation.  A statement by one of

9   Hogue's friends that she told him she would receive $10,000 for testifying is hardly sufficient to

10  establish that, at the time of trial, prosecutors gave Hogue an expectation that she would receive

11  more than the $2500 secret witness money.  Nor does Susan Riley's testimony that she heard

12  prosecutor O'Mara bought Hogue clothes amount to something sufficiently material or

13  impeaching to have stated a <u>Brady</u> claim.  Petitioner's continual reference to two telephone

14  messages to O'Mara that do nothing more than refer to Hogue as his "sweetheart" demonstrate

15  the weakness of this aspect of his <u>Brady</u> claim.

16         Petitioner's detailed accounting of apparent legal benefits Hogue received has somewhat

17  better evidentiary grounding, but it is not clear that it is sufficient to establish a claim under

18  <u>Brady</u>.  As the Ninth Circuit Court of Appeals explained recently, several appellate courts have

19  noted that "<u>Brady</u> is not violated when a government witness merely desires or expects favorable

20  treatment in return for his or her assistance, and no evidence of an agreement between the

21  government and the witness is presented."  <u>Ford v. Gonzalez</u>, 683 F.3d 1230, 1238 n.5 (9th Cir.

22  2012) (citing <u>Shabazz v. Artuz</u>, 336 F.3d 154, 165 (2d Cir. 2003)); <u>Todd v. Schomig</u>, 283 F.3d

23  842, 849 (7th Cir. 2002); <u>Bell v. Bell</u>, 512 F.3d 223, 234 (6th Cir. 2008) (en banc)).  The Ninth

24  Circuit court found it did not need to decide "whether to join our sister circuits."  <u>Id.</u>  Based on

25  the Ninth Circuit's description of the state of the law on this issue, it can hardly be said that the

26  rule petitioner seeks to apply – that a prosecutor has a <u>Brady</u> obligation to reveal information that

27  a witness hoped to received favorable treatment – is "clearly established Federal law as

28  determined by the Supreme Court" and the California Supreme Court's refusal to find petitioner

1  had established a prima facie case of a <u>Brady</u> violation on this basis should not be considered

2  unreasonable under section 2254(d).

3      Petitioner's remaining allegations that Hogue received gifts and money from prosecutors

4  are insufficient to warrant a finding that the prosecutor committed <u>Brady</u> violations.  The defense

5  was aware that Hogue was being supported through a witness protection program.  None of the

6  evidence petitioner presents indicates she received more than support.  Because Hogue was being

7  protected based on an alleged threat on her life made by petitioner, it goes without saying that the

8  evidence would not have been exculpatory under <u>Brady</u>.

9      This court finds petitioner has made out a prima facie claim that the prosecutor violated

10  his <u>Brady</u> obligations by failing to reveal information to the defense that Hogue had memory

11  problems.  Prosecutor O'Mara was aware that Hogue had memory problems.  That evidence

12  would have been favorable to petitioner as additional impeachment of Hogue.  In addition, had

13  the defense known of the memory problems, it is possible that, through investigations or through

14  examining Hogue at trial, the defense may have uncovered some of Hogue's mental health issues.

15      This evidence was material because Hogue's testimony was so important to the

16  prosecution's case.  Some of her testimony was corroborated by other evidence, but much

17  important evidence was not corroborated.  There was no evidence presented directly tying

18  petitioner to the scene of the crimes or the murder weapons, which were never recovered.  Rather,

19  the prosecution relied upon testimony about petitioner's actions both before and after the crimes.

20  Without Hogue's testimony, the prosecution had little more than the facts that petitioner travelled

21  to Sacramento with Reese, whose name was found at the crime scene, and that two guns were

22  used in the killings.

23      Hogue filled in the details.  She was the only person to testify to the events occurring

24  immediately after the crimes.  She testified that petitioner and Reese were together and sharing in

25  the proceeds of the robbery, that she saw gloves in the motel room like those Michelle Blouir saw

26  petitioner hand to Reese before the crimes, that she helped petitioner ship home a package

27  containing, among other things, a gun, and that she purchased an airline ticket for petitioner to

28  return to Arizona under an assumed name.  Greyhound and airline records confirmed the latter

1   two statements. However, the gloves Hogue testified she took from the room were never

2   recovered by police, nor were the drugs, money, or jewelry Hogue testified she saw petitioner and

3   Reese divide up. Had the jury known Hogue was frequently unable to remember events without

4   prompting and that she had memory blackouts and visual and aural hallucinations, they would

5   have reason to wonder whether Hogue really remembered these events or had read or learned

6   about them from another source. Additional impeachment of Bonnie Hogue's testimony, when

7   considered along with the other errors described below, may have resulted in a different guilt

8   phase result for petitioner.[22]

9       Because the California Supreme Court decision is silent, it is not possible to know just

10  why the California Supreme Court denied the Brady claim. However, it is known that the

11  California Supreme Court was required to consider petitioner's allegations as true when

12  determining whether he had made out a prima facie case for relief. See Cullen v. Pinholster, 563

13  U.S. 170, 188 n.12 (quoting In re Clark, 5 Cal. 4th 750, 770 (1993), and citing People v. Duvall, 9

14  Cal. 4th 464, 474 (1995)). As set out above, petitioner made a prima facie showing that the

15  prosecutor violated Brady. To find otherwise, the California Supreme Court would have had to

16  determine Christopher Lichman's declaration and Bonnie Hogue's deposition testimony about her

17  _____

18  [22] Petitioner argues that the California Supreme Court also failed to consider the effect of the misconduct cumulatively. He points to the procedural rulings on claim 23. The California Supreme Court denied all claims as untimely "except . . . [Claim 23] to the extent [it is] supported by the Riley declaration and the transcripts of the December 2005 and January 2006 depositions."

19  The California Supreme Court then made a similar statement regarding the successiveness bar.

20  Petitioner argues this apparent parsing of his Brady/Napue claims for the application of procedural bars indicates the California Supreme Court similarly parsed the claims when it considered the merits in violation of federal law requiring the evaluation of the materiality of

21  undisclosed evidence collectively. See Kyles v. Whitley, 514 U.S. 419, 436 (1995). Petitioner claims this parsing is the California Supreme Court's practice. He relies for that statement on just

22  one comment in just one case that indicated the California Supreme Court had, in that case, divided one of the petitioner's claims into subparts and then applied timeliness standards to each

23  subpart, rather than to the claim as a whole. In re Robbins, 18 Cal. 4th 770, 820-21 (1998)

24  (Kennard, J., dissenting). Petitioner presents nothing to show the California Supreme Court regularly engages in this practice when considering the merits of a habeas petitioner's claims. In

25  fact, the California Supreme Court has cited Kyles appropriately. See In re Miranda, 43 Cal. 4th

26  541, 580 (2008) ("[T]he prosecution's disclosure obligation turns on the collective effect of all suppressed evidence favorable to the defense, not on the effect of such evidence considered item

27  by item.") Petitioner provides insufficient reason to believe the California Supreme Court, in this

28  case, engaged in a practice that was contrary to federal law.

1   memory problems were unbelievable or construed <u>Brady</u> incorrectly.  Neither approach would be

2   reasonable under 28 U.S.C. § 2254(d).  To make out a prima facie case, petitioner need only

3   make a showing that his evidence, if proved, would satisfy <u>Brady</u>.  Petitioner makes that showing

4   with respect to each element of <u>Brady</u>.  If the California Supreme Court chose to disbelieve

5   Lichman and Hogue, it made factual determinations on an important aspect of the <u>Brady</u> claim

6   without holding a hearing, contrary to 28 U.S.C. § 2254(d)(2).  <u>See</u> <u>Hurles v. Ryan</u>, 752 F.3d 768,

7   790-91 (9th Cir.) (If a state court makes factual findings without an opportunity for the petitioner

8   to present evidence, the fact-finding process is deficient and the state court opinion is not entitled

9   to deference.), <u>cert. denied</u>, 135 S. Ct. 710 (2014).  If the California Supreme Court accepted

10  Lichman's declaration and Hogue's testimony, then it could only have rejected petitioner's claim

11  if it applied incorrect law or unreasonably applied <u>Brady</u>, satisfying section 2254(d)(1).  Any

12  other basis for the California Supreme Court's denial would have been unreasonable under

13  section 2254(d)(1).

14              b.   <u>Napue Claim</u>

15          In order to establish a <u>Napue</u> claim, petitioner must show the prosecutor knew or should

16  have known the testimony was false.  <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976).  In

17  addition, the false evidence, considered cumulatively, must have been material.  <u>Giglio v. United</u>

18  <u>States</u>, 405 U.S. 150, 154 (1972).

19          The sticking point in petitioner's argument is his failure to show that the prosecutor knew

20  or should have known Bonnie Hogue's testimony was false.  The prosecutor knew that Hogue

21  told conflicting stories to others and that her memory was bad.  However, neither of these facts

22  establishes that the prosecutor knew or should have known that the story she told police, and the

23  testimony she gave, was false.  Nor would those facts have lead the prosecutor to know that:  (1)

24  Hogue had a pre-existing relationship with Robert Reese, contrary to her testimony that she met

25  him for the first time on the night of the murders; or (2) Hogue was lying about seeing a pair of

26  ////

27  ////

28  ////

47

1    gloves in the motel room.[23]  Petitioner cites no authority that would require a prosecutor to

2    investigate every aspect of Hogue's testimony based on her memory problems and the stories she

3    told others.[24]  Petitioner's statement that it "strains credulity" that prosecutor O'Mara did not

4    know from some police source that Hogue used drugs is similarly based on nothing more than

5    guesswork.

6            4.    Ineffective Assistance of Counsel Claims re Hogue's Veracity – Claim 2

7            As one aspect of claim 2, petitioner argues that attorney Michael Brady, petitioner's lead

8    trial attorney who conducted the guilt phase defense, was constitutionally ineffective because he

9    failed to investigate and present evidence to challenge Bonnie Hogue's veracity.

10                a.    General Challenges to California Supreme Court's Application of
                       Strickland
11

12           In his arguments regarding each of his ineffective assistance of counsel claims, petitioner

13   raises challenges to the California Supreme Court's application of the well-established standards

14   of Strickland v. Washington, 466 U.S. 668 (1984).  Those challenges are addressed, and rejected,

15   herein.

16                    i.    Failure to Consider Cumulative Effect of Errors

17           Petitioner makes a brief argument that the California Supreme Court's parsing of the

18   procedural defaults for his ineffective assistance of counsel claim shows that it inappropriately

19   parsed the prejudice analysis of those claims.  Petitioner's argument is the same as that made

20   _____

21   [23] While petitioner flatly states that Hogue lied about the gloves, petitioner presents no support for
     that statement.  As respondent points out, any conclusion that Hogue lied about that point requires
22   a series of unsupported inferences.  (ECF No. 237 at 38.)

23   [24] The cases petitioner cites for the proposition that O'Mara had a duty to investigate "leads that
     call into doubt a witness" all involved clear evidence of falsity that petitioner has failed to show
24   for the present case.  See Commonwealth of Northern Mariana Islands v. Bowie, 243 F.3d 1109
     (9th Cir. 2001) (prosecutor had "concrete documentary evidence" in the form of a letter showing
25   that eyewitnesses were conspiring to testify falsely); United States v. Bernal-Obeso, 989 F.2d 331
     (9th Cir. 1993) (government provided the defense with incorrect information about the criminal
26   history of informant/witness; case remanded for evidentiary hearing to determine whether
     government knew or should have known of the error); Morris v. Ylst, 447 F.3d 735 (9th Cir.
27   2006) (status report prepared by prosecutor's legal assistant stated that witness perjured herself;
     court assumes prosecutor had a duty to investigate further but finds no prejudice).

28

1   regarding his prosecutorial misconduct claims.  For the same reasons, it is baseless.  See n.22,

2   supra.

3                              ii.        Inappropriate Prejudice Standard

4          Petitioner next argues that the California Supreme Court applied an incorrect test for

5   determining prejudice by using the United States Supreme Court's decision in Lockhart v.

6   Fretwell, 506 U.S. 364 (1993), to modify the Strickland standard.  In Fretwell, the Court was

7   confronted with a unique situation.  There was no question that Mr. Fretwell's trial attorney acted

8   unreasonably in failing to object to an aggravating factor used to determine Fretwell's penalty.

9   506 U.S. at 369 n.1.  The issue was whether that failure prejudiced the petitioner.  At the time of

10   trial, the answer to that question was "yes."  Id. at 367.  The Court of Appeals for the Eighth

11   Circuit had ruled the use of that aggravating factor unconstitutional.  Id.  However, later, after the

12   petitioner sought federal habeas relief, the Court of Appeals overruled its decision and held that

13   the use of that aggravating factor did not violate the federal constitution.  Id.  Therefore, if the

14   prejudice inquiry was considered as of the time the federal courts rendered their habeas decisions,

15   the answer would have been "no," the petitioner was not prejudiced by his attorney's failure to

16   object.  Recognizing that strict application of the Strickland standard would result in "an error in

17   [the petitioner's] favor," the Court looked beyond Strickland's outcome determinative standard

18   and considered whether the failure to object rendered the defendant's trial "unreliable or the

19   proceeding fundamentally unfair."  Fretwell, 506 U.S. at 372.  It held that the result of Fretwell's

20   sentencing proceeding "was neither unfair nor unreliable."  Id. at 371.  Accordingly, the Court

21   found Fretwell suffered no prejudice.

22          In April 2000, the United States Supreme Court held that a state court erred in finding that

23   the Court's decision in Fretwell modified the Strickland standards.  Williams v. Taylor, 529 U.S.

24   362, 391-98 (2000).  The Court recognized there may be limited situations in which "it would be

25   unjust to characterize the likelihood of a different outcome as legitimate 'prejudice.'"  Id. at 391-

26   92.  The Court characterized cases such as Fretwell as involving an unreasonable action of a trial

27   attorney that did "not deprive the defendant of any substantive or procedural right to which the

28   law entitles him."  Id. at 393 n.17.  The Court concluded that the state court holding that Fretwell

                                                   49

1   modified Strickland "was contrary to, or involved an unreasonable application of, clearly

2   established Federal law." Id. at 399.

3       Petitioner argues that the California Supreme Court applied the Fretwell prejudice

4   standard before and after the Supreme Court's decision in Williams.  The California Supreme

5   Court's decision on petitioner's ineffective assistance of counsel claims was rendered in 2010,

6   well after the 2000 decision in Williams.  Petitioner cites to just two post-2000 cases in which the

7   California Supreme Court relied, or appeared to rely, on Fretwell.  (ECF No. 235 at 74-75.)

8   However, both before and after the decision in Williams, the California Supreme Court frequently

9   looked solely to Strickland as the standard for determining prejudice.  The following is only a

10  small sample of the California Supreme Court's cases with appropriate citation to Strickland:

11  People v. Musselwhite, 17 Cal. 4th 1216, 1260 (1998); People v. Ochoa, 19 Cal. 4th 353, 445-46

12  (1998); In re Gay, 19 Cal. 4th 771, 827 (1998); People v. Hart, 20 Cal. 4th 546, 624, 632, 634

13  (1999); People v. Welch, 20 Cal. 4th 701, 743 (1999); People v. Smithey, 20 Cal. 4th 936, 986-

14  87, 1012 (1999);  People v. Hester, 22 Cal. 4th 290, 297 (2000); People v. Riel, 22 Cal. 4th 1153,

15  1175-77 (2000); People v. Friend, 47 Cal. 4th 1, 46-47 (2009); People v. Gamache, 48 Cal. 4th

16  347, 382-83 (2010); People v. Alexander, 49 Cal. 4th 846, 888 (2010).  Included in this list is the

17  California Supreme Court's decision on petitioner's appeal.  In its reasoned decision, the court

18  relied upon the appropriate Strickland prejudice standard.  People v. Majors, 18 Cal. 4th 385, 403

19  (1998).

20      When determining whether a state court's decision was contrary to or an unreasonable

21  application of federal law, this court must "presum[e] that state courts know and follow the law."

22  Woodford v. Visciotti, 537 U.S. 19, 24 (2002).  Of course, petitioner may rebut this presumption,

23  but he has not done so.  Petitioner has shown only that one or two times after the United States

24  Supreme Court issued Williams the California Supreme Court may have used the inappropriate

25  Fretwell prejudice standard.   However, in many more cases decided before and at the time of the

26  California Supreme Court decision in this case, the California Supreme Court cited and/or applied

27  the correct prejudice standard.  The state court decision is entitled to the benefit of any doubt.

28  ////

1   <u>Visciotti</u>, 537 U.S. at 24.  Petitioner's showing is insufficient to convince this court that the

2   California Supreme Court likely applied an incorrect prejudice standard to petitioner's claims.

3                              b.   <u>Merits of Ineffective Assistance Claim re Hogue's Veracity</u>

4            Petitioner alleges that attorney Brady failed to investigate several areas of evidence to

5   impeach Bonnie Hogue.  This court finds petitioner has satisfied the requirements of 28 U.S.C. §

6   2254(d) for one argument here – that counsel acted unreasonably in failing to investigate and

7   present evidence of Hogue's relationship with Robert Reese.

8                                  i.   <u>Deficient Performance</u>

9            Petitioner argues that Brady's inexperience and alcohol abuse should be considered when

10  determining the reasonableness of his conduct.  Courts have considered such personal information

11  when it likely impacted the attorney's work at the time of trial.  <u>See</u> <u>Sanders v. Ratelle</u>, 21 F.3d

12  1446, 1460 (9th Cir. 1994) (court considers counsel's pattern of indifference to other clients'

13  interests, and eventual disbarment on that basis, as refuting argument that counsel's failures in

14  this case were strategic);  <u>Cargle v. Mullin</u>, 317 F.3d 1196, 1209-10 (10th Cir. 2003) (court

15  considers effect of counsel's involvement in bankruptcy and professional grievance proceedings

16  at the time of trial).  However, the standard under <u>Strickland</u> is an objective one.  Where the

17  record provides evidence to support a determination that a reasonable attorney in Brady's position

18  could have taken the actions Brady took or made the decisions he made, then a determination by

19  the California Supreme Court that Brady acted reasonably is supported.  Where the record does

20  not provide evidence about the bases for Brady's actions or inactions, then the court will consider

21  whether Mr. Brady's inexperience and personal problems may be relevant to any presumption

22  that his conduct was based on sound trial strategy.

23           Respondent also makes a general argument that Brady cannot be charged with a failure to

24  investigate because he had little time to prepare based on petitioner's refusal to agree to a

25  continuance of the trial.  The court does not find this argument persuasive.  Whether counsel's

26  failures were based on a lack of time or a misuse of the time he had is a factual issue that this

27  court cannot resolve on the papers.  Further, it is worth noting that counsel had an obligation to

28  seek a continuance even despite petitioner's wishes if they were unable to conduct a reasonable

1    investigation without one.  Case law shows that it is counsel, not solely the client, who has "the

2    power to control judicial proceedings."  <u>Townsend v. Superior Court</u>, 15 Cal. 3d 774, 781 (1975);

3    <u>see also</u> <u>United States v. Wadsworth</u>, 830 F.2d 1500, 1509 (9th Cir. 1987) ("appointed counsel,

4    and not his client, is in charge of the choice of trial tactics and the theory of defense") (citing

5    <u>Henry v. Mississippi</u>, 379 U.S. 443, 451 (1965)).

6                        (a)   <u>Hogue's Relationship with Reese</u>

7         At trial, Hogue testified that she met Robert Reese for the first time the night of the

8    crimes.  (RT 2933-934.)  As described above, petitioner presents several people's statements that

9    Hogue knew Reese before then.  (<u>See</u> LD 31, Ex. 111 (F. Starr Decl.) (he and Hogue knew Reese

10   "since we were young"); LD 31, Ex. 109 (C. Lichman Decl.), ¶8 (Hogue told him she knew

11   Reese when she was younger); LD 47, Ex. 147 (D. Riley Decl.), ¶2 (saw Reese at Hogue's

12   apartment in 1984); LD 47, Ex. 148 (D. Strong Decl.),  ¶3 (same); LD 47, Ex. 149 (A. Starr

13   Decl.), ¶2 (same).)

14        Defense investigators' interviews with Hogue's friends Christopher Lichman and Sharon

15   Fischer before trial showed that Hogue told them she had a pre-existing relationship with Reese.

16   (LD 44, Ex. 727 (C. Lichman Int.); LD 55, Ex. 734 (Jan. 30, 1989 S. Fischer Int.).)  While

17   petitioner argues these interviews put defense counsel on notice of the issue, counsel had reasons

18   to discount Fischer's statements – the defense investigator's report shows that Fischer told

19   contradictory stories and when the investigators confronted her with the contradictions, she "just

20   made up something to cover" them.  However, the report of the interview with Lichman gave no

21   indications that the investigators doubted his credibility.  And, Lichman's statement gives more

22   credence to Fischer's similar statement.

23        Petitioner argues the evidence that Hogue and Reese had a pre-existing relationship was

24   important because it could show "Hogue had cooperated with Reese in setting up Mr. Majors."

25   (ECF No. 235 at 64:8-9.)  This argument is based on statements made by Hogue's sister Susan

26   Riley.  During her deposition in this court, Ms. Riley testified that Hogue told her she lied at

27   petitioner's trial to "frame him" to protect someone close to her.  (LD 52, Ex. 581 (Riley Depo.)

28   ////

                                             52

1   at 867, 873.)   Riley also testified that Hogue told her she had known Reese for a long time and

2   had picked him up "on many occasions to do the same drug deal." (Id. at 872.)

3            The record before the California Supreme Court and this court provides no reason to think

4   the guilt phase investigation included following up on the initial investigative report's revelations

5   that Hogue knew Reese.  Discussions on the record regarding Lichman do not indicate that Brady

6   pursued this line of inquiry with him or otherwise.  During a hearing on petitioner's pro se motion

7   for a new trial, in which petitioner alleged ineffective assistance of counsel, the issue of Brady's

8   failure to call Lichman to the stand was raised.  (RT 4264:9-13.[25])  Petitioner apparently felt

9   Brady should have put on Lichman to testify, along the lines of his statement to investigators, that

10  the prosecutor bribed Hogue and told her how to testify.  (RT 4264.)  Brady explained to the

11  judge that Lichman was in custody in Auburn at the time of trial.   He felt that Lichman's

12  credibility would be suspect because he would be testifying in belly chains.  Brady also

13  apparently felt Lichman's testimony was weak because he had no other information to

14  corroborate these allegations against the prosecutor.  (Id.)  He then stated that he, personally,

15  found Lichman "to be lacking in credibility."  (RT 4265.)  It is not clear from Brady's statements,

16  however, whether he had interviewed Lichman.  The focus of petitioner's post-trial motion and

17  the inquiry was Lichman's possible testimony regarding the prosecution's preparation of Hogue.

18  It does not appear the discussion focused on other information Lichman could have provided,

19  such as evidence that Reese and Hogue had a pre-existing relationship.

20           Respondent hazards a number of guesses why Brady may have decided not to pursue

21  interviewing Lichman.  One reason is that respondent finds the assertion that petitioner was

22  unaware of Reese and Hogue's relationship to be unbelievable.  Its believability, however, is a

23  question of fact and credibility that should not be resolved on the record.  Further, many of

24  respondent's arguments require making a credibility determination regarding Hogue's deposition

25  testimony that she did not have a preexisting relationship with Reese.  Such a determination based

26  ////

27  _____

28  [25] The transcript refers to Lichman as "Chris Leachman."  The context makes clear that this is a
    transcription error and Brady and petitioner were referring to Lichman.

1   solely on the record when deciding only whether petitioner had established a prima facie claim of

2   Brady's unreasonable conduct would amount to an unreasonable construction of the facts.

3                                      (b)  Hogue's Statements that She Witnessed the Murders

4        Petitioner argues that Hogue's claims that she witnessed the murders should have been

5   used to impeach her.  The issue of Brady's use of Hogue's statements that she witnessed the

6   murders was raised in an ineffective assistance of counsel claim in petitioner's pro se motion for a

7   new trial.  (RT 4228, 4246-248.)  Brady told the judge:

8              I simply wasn't going to bring that particular statement up about
             Bonnie Hogue being at the crime scene and seeing my client run
9            through the house and shoot three people.  There were plenty of
             other things to attack her credibility without something as volatile
10           and dangerous to my case as that.

11   (RT 4248:13-18.)  Petitioner argues that this decision was unreasonable because Hogue's

12   statements were obviously lies and would have supported a showing that Hogue was attempting

13   to frame him.  While that may or may not have been a more reasonable use of Hogue's

14   statements, the question at this point is whether the California Supreme Court could have

15   reasonably decided Brady's decision was a strategic one.  Given the multiple layers of deference

16   due counsel's decision, this court finds the state court could have reasonably found Brady acted

17   reasonably regarding Hogue's statements.

18                                      (c)  Hogue's Mental Illness

19       As described above in the prosecutorial misconduct claim, petitioner has failed to show

20   evidence of Hogue's mental illness was available at the time of trial.  Nor has petitioner shown

21   Brady was unreasonable in failing to investigate Hogue's mental health.  Petitioner claims Brady

22   should have recognized that Hogue's extravagant lies were signs of mental illness.  As respondent

23   points out, not all liars are mentally ill.  The California Supreme Court could have reasonably

24   found Brady's conduct reasonable in this regard.

25                                      ii.      Prejudice

26       This court finds the California Supreme Court could not have reasonably found Brady's

27   actions regarding Hogue's pre-existing relationship with Reese were adequate.  The next

28   question, then, is whether the California Supreme Court could have reasonably determined that

1    Brady's failure did not matter.  Because determining prejudice at the guilt phase requires looking

2    at the cumulative effect of all errors, this court also considers the effects of prosecutorial

3    misconduct regarding Hogue's credibility and considers the effects of counsel's errors set out

4    below.  As described in more detail below, this court finds petitioner has adequately made a

5    prima facie showing of prejudice from the combined effect of guilt phase errors.

6         B.    Ineffective Assistance of Counsel at the Guilt Phase – Claim 2

7         In addition to the claims that counsel failed to investigate and present evidence to impeach

8    Bonnie Hogue, petitioner alleges that counsel rendered constitutionally ineffective assistance at

9    the guilt phase in numerous other respects.  For the reasons set out below, this court finds

10   petitioner has satisfied section 2254(d) for his subclaims that counsel was ineffective for failing to

11   question prosecution witness Kellie Harley regarding Robert Reese's unpredictable and violent

12   nature, and for failing to correctly advise petitioner about potential sentences, causing petitioner

13   to forego a lesser-included-offense instruction.

14        1.    Failure to Investigate, Develop, and Present Evidence

15             a.    Cash in Petitioner's Possession

16        At trial, the prosecution presented evidence that petitioner had $2,436 in cash on his

17   person when he was arrested and another $6,800 was found in his home.  (RT 3283, 3284.)

18   Various people testified at trial that either victim Tom Probst or petitioner told them that the drug

19   deal was worth $10,000.  (RT 2563, 2950-51, 3221.)  While the defense argued the money was

20   not necessarily robbery proceeds, Brady presented no contrary evidence.  Petitioner presents new

21   evidence that his mother and her husband loaned him $20,000.  The question is whether a

22   reasonable attorney conducting an investigation would have discovered this evidence.

23        Petitioner states that Brady had only to "read the reports and correspondence provided him

24   by predecessor counsel" to know about the loan and a lawsuit initiated by petitioner's wife to get

25   the seized money returned.  However, petitioner identifies no reports containing this information.

26   Petitioner points only to a September 3, 1989 letter to attorney Owen from petitioner's wife

27   Shirley Majors.  (LD 44, Ex. 701.)  The letter discusses a search warrant served on petitioner's

28   mother, Betty Canary, in Indiana.  The warrant stated that it sought evidence of the "crimes of

1    Murder, Kidnapping and Robbery." Ms. Majors questioned the validity of the warrant, noting

2    that it looked nothing like the one she had received in Phoenix, and stated that Indiana police

3    officers told Ms. Canary that it was invalid. She concluded that Ms. Canary is "getting an

4    attorney, and is going to sue."

5         Petitioner does not explain how information about these search warrants put Brady on

6    notice of Ms. Majors' suit or the loan. Without that connection, or any other indication Brady

7    was told about the loan by petitioner or his wife, it would not have been unreasonable for the

8    California Supreme Court to find Brady was not unreasonable for failing to discover and put on

9    evidence of the loan.

10                        b.   Petitioner's Back Injury

11        Evidence at trial showed that victim Thomas Probst's safe was found open and emptied in

12   the hallway of the house. (RT 1956, 2028.) It appeared that the safe was kept in a closet and had

13   been moved. (RT 2030.) An officer testified that it "would be difficult to say it was dragged or

14   how it got to that location." (RT 2082.) When asked whether anything on the carpet surface

15   indicated the safe had been dragged to the hallway, the officer testified, "I don't recall anything

16   that indicated that." (RT 2082.)

17        Petitioner argues that the safe must have been moved, that it was so heavy it required two

18   men to move it when it was empty, and that petitioner suffered a back injury leaving him unable

19   to lift anything over 25-30 pounds without "incapacitat[ing]" pain. The argument continues that

20   Brady should have been aware of petitioner's back problems and should have argued that he

21   could not have assisted in moving the safe. Petitioner's argument rests on several questionable

22   interpretations of the evidence. First, the fact that an officer did not recall drag marks on the

23   carpet does not necessarily show that the safe was lifted, rather than dragged, from the closet.

24   Second, petitioner cites to nothing in the transcript showing that the safe was so heavy it required

25   "two able-bodied people" to move it. He cites only to an officer's testimony that he and a

26   technician "removed a safe from the residence and brought it to the I.D. bureau." (RT 2380.)

27   Finally, the doctor's report submitted did not show that petitioner would have been

28   "incapacitated" if he had helped lift the safe. The report certainly shows petitioner suffered a

56

1    serious back injury and was limited in his ability to lift.  However, the doctor stated only that it

2    was "most likely" petitioner "will be unable to" lift "25 to 30 pounds."  (LD 32, Ex. 204.)

3        Petitioner has presented insufficient evidence to make a prima facie showing that Brady

4    erred by failing to discover petitioner's back problems and present this evidence.  Petitioner has

5    not shown that the safe was so heavy it required two people to lift it or that petitioner would have

6    been unable to help move it.  The California Supreme Court would not have been unreasonable in

7    rejecting petitioner's construction of the evidence.

8                    c.    Failure to call Kellie Harley

9        In state court, petitioner argued Brady should have put on witness Kellie Harley to testify

10   to Reese's unpredictable behavior around the time of the crimes.  In his brief, petitioner adds an

11   argument that Harley's testimony would have supported a theory that someone besides petitioner

12   accompanied Reese to the Probst house on the night of the crimes.

13       Through discovery, the government provided the defense a Maricopa County Sheriff's

14   Office report which referred to officers' unsuccessful attempts to locate Kellie Harley.  (LD 35,

15   Ex. 317.)  The reason they attempted to contact Ms. Harley was that she "was listed on a Phoenix

16   Police Field Interrogation Card with subject ROBERT REESE in January of 1989."  (Id.)  The

17   discovered document provided no additional detail regarding the field interrogation card.

18   Petitioner argues the temporal proximity of the incident with Harley and Reese should have

19   caused Brady to investigate further.

20       Petitioner provided the state court with the declaration of federal habeas investigator Paul

21   Mann, who interviewed Harley.[26]  (LD 31, Ex. 126.)  Harley told Mann that she was a friend of

22

23   [26] Respondent argues that the California Supreme Court would have chosen to disregard Mr.
     Mann's declaration because it is hearsay.  As discussed above, this court will not assume that the
24   California Supreme Court requires admissible evidence at the pleading stage.  The cases cited as
     support by respondent are not on point.  See People v. McCarthy, 176 Cal. App. 3d 593, 596-97
25   (1986) (petition does not establish a prima facie case for relief when it is signed by attorney on
     information and belief rather than by petitioner); People v. Madaris, 122 Cal. App. 3d 234, 241-
26   42 (1981) (unsworn statements of trial attorney are insufficient to establish factual basis for
     ineffective assistance of counsel claim).  Further, petitioner explains why Ms. Harley did not
27   provide a declaration.  In his declaration, Mr. Mann states that he was unable to locate Ms. Harley
     after their interview so he prepared his own declaration to meet the filing deadline.
28

1   Robert Reese.  She had taken methamphetamine with Reese on numerous occasions and told

2   Mann that "Reese was pretty wild, hyper, and unstable when he was on meth, which was

3   basically all the time." (Id., ¶ 5.)  In January 1989, in Arizona, she saw Reese with a large

4   amount of methamphetamine and "a bunch" of jewelry.  Reese gave her a necklace that she told

5   him she liked.  About a week later, Reese and a friend of his she identified as "Rusty" banged on

6   her door.  Reese was "acting crazy" and demanding she return the necklace.  She could see

7   through the peephole that Reese was carrying a gun, as he often did.  Harley returned the

8   necklace.  A couple days later, Harley was in the parking lot of her apartment complex.  In a car

9   driving by, she saw Reese, hanging out of the passenger window.  He shot at her with a handgun.

10  She believed the car's driver was Reese's friend Rusty because the driver was wearing a hat and

11  Rusty always wore a hat.  Her roommate called the police.  Harley told investigator Mann that the

12  police field interrogation card listing her name and Reese's was likely the result of this incident

13  because she had had no other interactions with Reese and the police around that time.

14          The first question is the reasonableness of counsel's conduct.   The record does not show

15  whether or not attorney Brady attempted to locate Ms. Harley.  Petitioner's claim rests on the fact

16  that Ms. Harley did not appear for the defense.  At this stage, that showing is sufficient to make a

17  prima facie case that Brady acted unreasonably.  This court cannot think of a strategic reason why

18  Brady might have chosen not to pursue the information that Ms. Harley and Reese had been

19  involved with the police right around the time of the crimes.  Given the potential importance of

20  this line of investigation and given the questions of fact surrounding this claim, this court finds

21  that the California Supreme Court could not reasonably have found petitioner failed to make a

22  prima facie showing that Brady acted unreasonably.

23          With respect to the question of prejudice, it must first be noted that in state court, and in

24  fact in the amended petition filed in this court, petitioner does not identify the "Rusty" described

25  by Ms. Harley as Richard "Rusty" Hartley, who testified against petitioner.  Rather, it appears

26  that the first attempt to make the connection between the two men was made in petitioner's brief

27  on the application of 28 U.S.C. § 2254(d).  (ECF No. 235 at 83.)  Petitioner argues there, for the

28  first time, that had Brady investigated the incident with Kellie Harley, he would have discovered

1    Richard Hartley's involvement and could have argued Hartley, not petitioner, accompanied Reese

2    to the Probst's house.  Because petitioner did not raise this argument in state court, this court

3    obviously cannot consider the reasonableness of its rejection.  Even if this court could consider it,

4    it is insufficiently supported.  Petitioner presents nothing besides Hartley's presence at the

5    incidents with Ms. Harley in support of the connection to the crimes.  The fact that Hartley

6    accompanied Reese at that time hardly shows he was a second shooter at the Probst house.

7    Petitioner presents nothing to show Hartley was in the Sacramento area at that time or otherwise

8    involved.

9         The second aspect of petitioner's prejudice argument has better support.  The defense at

10   trial attempted to show Reese's unpredictable and violent nature.  Ms. Harley's testimony would

11   have been relevant to that showing.  While petitioner has made a prima facie showing of

12   unreasonableness, the question of prejudice requires examining the cumulative effect of all guilt

13   phase errors.  As discussed below, this court finds petitioner has adequately shown prejudice at

14   the guilt phase from a combination of constitutional errors.

15               d.    Additional Support for Testimony of Denise Madsen

16        Denise Madsen, the Denny's waitress, was the only defense witness at the guilt phase.

17   She corroborated petitioner's statement to police that Reese left him at Denny's to make a drug

18   transaction.  In addition, she testified that the other man had returned about 45 minutes to an hour

19   later wearing different clothes.  However, on cross-examination she could not confirm that

20   January 25 or 26 was the date she had seen petitioner and another man.  In addition, it was

21   pointed out that she had failed to tell the district attorney's investigator that the other man had left

22   and returned in different clothes.  Petitioner argues that had Brady better prepared Ms. Madsen,

23   her testimony would have been more convincing.

24                    i.    Madsen's Trial Testimony

25        On direct examination, Ms. Madsen testified as follows.  On January 25/26, 1989, she

26   worked at Denny's Restaurant from 10:00 p.m. to 6:00 a.m.  (RT 3374-76.)  She recalled that she

27   served petitioner and another man "on one of the evenings in question."  (RT 3376, 3380.)  She

28   also recalled speaking with three defense investigators, Mr. Deragisch, Mr. Harmon, and a third

1    investigator prior to her testimony.  (RT 3377, 3382.)  Brady showed Ms. Madsen a summary of

2    what she told Harmon.[27]  She recognized it and testified that she had had an opportunity to review

3    it to refresh her recollection.  (RT 3377-78.)  She then testified that after the men started eating,

4    the "other guy" left while petitioner stayed in the restaurant.  (RT 3380-81.)  The "other guy came

5    back later with different clothes on."  He had been gone about 45 minutes to an hour.  When the

6    other guy returned, he "was shook up, kind of spaced out like maybe he drank too much coffee or

7    something."  (RT 3381.)  During cross-examination, she described the other man as "agitated,"

8    "squirming," and "nervous."  (RT 3393.)  He seemed different than before he left the restaurant.

9    (Id.)  Ms. Madsen testified that the men had to have arrived at the restaurant "before midnight."

10   (RT 3382.)

11          The first question on cross-examination asked how Ms. Madsen knew she had seen the

12   men on January 25/26, 1989.  (RT 3383.)  She stated, "[b]ecause ever since then everybody keeps

13   asking me the same dates and they've been consistent."  She continued, "[t]hat's the only way I

14   remember it."  In one question, the prosecutor confirmed that he had seen Ms. Madsen's

15   employment records and knew she had been working that night.  (Id.)  He also confirmed, and

16   Ms. Madsen recalled, that she had spoken with the district attorney's investigator Dacre shortly

17   before trial.  (RT 3388.)  Finally, Ms. Madsen agreed that she had spoken "to Mr. Brady a couple

18   days ago about these events."  During his re-direct examination, Brady attempted to refresh Ms.

19   Madsen's recollection by referring to their meeting on "Sunday."  (RT 3397.)  Madsen testified

20   on a Tuesday.  (See RT 3330.)

21          The prosecutor then asked Madsen about the fact that she told defense investigator

22   Wellman, the first person to interview her, that the men left the restaurant together.  (RT 3389.)

23   She testified that she did not recall telling him that and thought he "may have misunderstood me."

24   She could not recall how much total time the men were in the restaurant.  (RT 3390-91.)

25          While Madsen confirmed her direct testimony that the other guy appeared nervous and

26   jittery when he returned to the restaurant, the prosecutor pointed out that Harmon's report stated

27   _____

28   [27] It does not appear that investigator Harmon's summary is in the record before this court.

1    that she told him the other guy did not seem nervous when he returned.  (RT 3394.)  Again,

2    Madsen stated that the investigator must have misunderstood her.  She also confirmed that she did

3    not tell investigator Dacre about the man leaving the restaurant and returning in different clothes.

4    (RT 3397.)  She testified that she was "half asleep" when she spoke to him.

5                          ii.        Evidence Presented to the California Supreme Court

6            Petitioner presented the state court with two declarations and an investigative report in

7    support of this claim.  Ms. Madsen was first interviewed by the public defender's investigator

8    Glenn Wellman in July 1989.  In his declaration, Mr. Wellman states that he showed Ms. Madsen

9    a photograph of petitioner.  (LD 31, Ex. 23 at 2.)  She told him "[w]ithout hesitation" that she

10   remembered having served petitioner at Denny's, in particular because they had discussed the fact

11   he was from Phoenix and because he had stayed at Denny's for quite a while.  In his declaration,

12   Wellman states that Madsen recalled that petitioner and another man came into the restaurant on

13   the evening of January 25, 1989, and stayed until the early morning hours of January 26.  Mr.

14   Wellman stated that after the public defender's office withdrew from petitioner's case, he was

15   never contacted by anyone from attorney Brady's office.  (Id. at 3.)

16           Mr. Wellman's report to attorney Don Manning regarding this interview was also

17   provided.  (LD 44, Ex. 730.)  Therein, he states that he first asked Ms. Madsen if she recognized a

18   photo of petitioner and whether she could recall seeing him at Denny's on January 25/26, 1989.

19   Madsen told him she had "definitely seen" petitioner before.  Wellman then related her story that

20   petitioner and another man had come into the restaurant and sat down at a specific booth.  She

21   recalled what petitioner was wearing and that both men looked "rather scruffy."  She could not

22   recall much about what the other man was wearing.  She recalled that the men ate something and

23   that they "stayed here together."  When Wellman described a bit about the case and the fact

24   petitioner was from Phoenix, Madsen remembered the discussion she had had with the men about

25   being from Phoenix.

26   ////

27   ////

28   ////

1    In her declaration, Ms. Madsen[28] described meeting with Mr. Wellman in July 1989.  (LD

2    31, Ex. 112.)  She stated that Wellman showed her a picture of petitioner and asked if she had

3    seen him on the night of January 25/26, 1989.  She told Wellman that she "had definitely seen the

4    man before."  She remembered serving him and engaging in conversation with him.  She also

5    stated that according to her time cards, she worked at Denny's that night.  Significantly, Ms.

6    Madsen does not state in her declaration that she recalled seeing petitioner and the other man that

7    specific night.

8    Ms. Madsen also described a later meeting with another investigator.  (Id., ¶2.)  During

9    that interview, she

10   > remembered additional details about that night.  I told the
     > investigator that the dark haired person (not Mr. Majors) had a cup

11   > of coffee and after a few minutes he left.  He was gone for what I
     > estimate to be about 45 minutes to 90 minutes.  When he returned,

12   > he was dressed differently and appeared to be nervous.

13   (Id.)  Ms. Madsen states that her declaration is based on reading the various statements and

14   testimony she gave previously.  However, she did recall that on the day she testified Brady picked

15   her up at the hotel where she worked.  (Id., ¶5.)  Brady "quickly talked to me about my

16   testimony."  Mostly, she stated, he talked about himself and "bragg[ed]" about his car.  Madsen

17   felt nervous and unprepared.  She stated that she "had never been given an opportunity to review

18   the statements I had previously made."  She did not recall meeting with anyone else in the days

19   before her testimony besides the "brief time in the car with Mr. Brady."  (Id.)

20                                   iii.    Discussion

21   Petitioner argues that Brady failed to properly prepare Ms. Madsen or support her

22   testimony because he failed to follow up on investigator Wellman's report, failed to contact

23   Wellman, failed to go over Madsen's testimony with her, failed to give Madsen the reports of her

24   statements to review before testifying, failed to present evidence to corroborate Madsen's work

25   hours, and failed to show that many of her prior statements were consistent.

26   ////

27   _____

28   [28] Ms. Madsen now goes by Denise Renee Deadwiley, which is how she signed her declaration.
     For clarity, the court will use the name she used at trial.

1       Most of petitioner's arguments are simply undercut by either the trial testimony or the

2   evidence petitioner presented to the California Supreme Court.  First, Brady did follow up on

3   Wellman's report.  Defense investigator Harmon also interviewed Madsen.  While investigator

4   Harmon worked for Bill Owen, one of petitioner's original attorneys, Brady obviously had that

5   report because it was presented at trial.  Further, Ms. Madsen was also interviewed by

6   investigator Deragisch, who worked for Brady.  In fact, Mr. Deragisch's invoices submitted to

7   Brady show that he spoke to Madsen on November 2, 1990, shortly before she testified.  (LD 44,

8   Ex. 715.)  They also show that he, not attorney Brady, picked up Madsen at the hotel where she

9   worked and drove her to court for her testimony on November 6, 1990.

10      Second, Ms. Madsen testified that she met with Brady before she testified.  Brady

11  described that meeting as occurring on "Sunday."  While it is not apparent what that meeting

12  entailed, petitioner's statement that Brady completely failed to prepare Madsen is therefore not

13  correct.  Third, contrary to petitioner's assertion and Madsen's recollection at the time of her

14  2003 declaration, Madsen testified at trial that she received a copy of Harmon's report before she

15  testified.  Fourth, corroborating Madsen's work hours would have been unnecessary.  There was

16  no issue at trial that Madsen worked the night shift on January 25/26, 1989.  The prosecutor

17  specifically stated that he had seen Ms. Madsen's employment records and they confirmed that

18  she had worked that night.  Finally, petitioner argues Brady should have shown the consistencies

19  in Madsen's statements but does not show what are those consistencies or why they would have

20  been important.

21      No one appears to dispute that Madsen was nervous when she testified.  A review of the

22  transcript of her testimony shows she was rushed, nervous, and maybe a bit angry.  However,

23  petitioner has presented insufficient evidence that anything Brady could have done would have

24  changed that fact.  Nor has petitioner shown Brady acted unreasonably in any other way with

25  respect to Madsen's testimony.  Accordingly, the California Supreme Court would not have been

26  unreasonable in finding that petitioner failed to make a prima facie showing of ineffective

27  assistance of counsel in this regard.

28  ////

e.   Failure to Impeach Other Witnesses

Petitioner argues attorney Brady failed to follow up on the government's failure to provide the defense with rap sheets for its witnesses, as it had been ordered to do.  Had Brady done so, petitioner claims he would have been able to impeach the following witnesses' testimony.

i.   James Pluskett

At trial, Mr. Pluskett testified that Thomas Probst was a drug dealer, and that Mr. Pluskett "fairly regularly" bought methamphetamine from Mr. Probst, occasionally reselling it. (RT 2554-59.)  Mr. Pluskett testified that on the night Mr. Probst was murdered, Probst told Pluskett that he was planning to sell about $10,000 worth of methamphetamine to some people "flying in from Las Vegas."  (RT 2562-63.)  Pluskett also testified that Probst had a safe on the floor of his closet, in which he kept cash, drugs, and jewelry.  (RT 2566.)  Petitioner alleges that attorney Brady rendered ineffective assistance in failing to cross-examine Mr. Pluskett regarding a criminal charge that was pending against him at the time of trial.  He claims that court records show that Mr. Pluskett was charged with an unspecified offense on August 30, 1990, which was "mysteriously . . . disposed."

Records submitted by petitioner show that Mr. Pluskett was charged with four vehicle code infractions on that date, which were subsequently "disposed."  (See LD 37, Ex. 514.) Because none of these infractions involved a crime of moral turpitude, Mr. Pluskett could not have been impeached with any of them.  See People v. Wheeler, 4 Cal. 4th 284, 296 (1992). Moreover, the records do not show that the case against Mr. Pluskett was dismissed; the case could have been "disposed" because the fines were paid.  Petitioner fails to show that any unreasonable conduct on the part of attorney Brady resulted in any prejudice to him with respect to Mr. Pluskett's rap sheet.

ii.   Roxanne Hughes

Ms. Hughes testified that she was an Arizona resident.  (RT 2669.)  She met Robert Reese several years previously through her boyfriend, Richard Hartley.  (RT 2671.)  Her daughter, Michelle Blouir, was Reese's girlfriend.  (RT 2670, 2674.)  She testified that she saw Reese on

////

64

1   and off in either Rancho Cordova or Phoenix between 1984 and 1989.  Reese was using speed

2   and, at one point, Hughes kicked him out of her house because he became violent.  (RT 2678.)

3       In December 1988, Hughes moved into a house with her daughter, Reese, and Richard

4   Hartley.  Petitioner had a room in the house for about three weeks but, Hughes testified, she never

5   saw him spend the night there.  (RT 2679-81, 2683.)  Petitioner and Hartley both did repair work

6   and sometimes worked together.  (RT 2681.)  Hughes testified that across town petitioner had a

7   "beautiful home where he lived with his wife and his son."  (RT 2683.)

8       On cross-examination, Hughes confirmed that she was then on felony probation for a drug

9   offense.  (RT 2689.)  She also testified that Reese's primary means of support appeared to be

10  drug transactions.  (RT 2690.)

11      Petitioner argues Brady acted unreasonably by failing to question Hughes about the details

12  of her drug conviction, including the fact that she agreed to cooperate with Arizona authorities in

13  exchange for probation.  Petitioner has failed to make a prima facie showing of either

14  unreasonable conduct or prejudice.   Petitioner fails to show how any further questioning would

15  have impeached Hughes' credibility.  Petitioner does not allege that the Arizona agreement

16  involved Hughes' testimony in petitioner's case.  He argues only that the fact Hughes made a deal

17  in Arizona would have shown her "bias toward the prosecution."  (See LD 29, 2003 State Pet. at

18  160 n.82.)  Petitioner does not explain why an unrelated agreement with unrelated Arizona

19  prosecutors would have created a pro-prosecution bias in petitioner's California case.  The

20  California Supreme Court was not unreasonable in finding petitioner failed to make a prima facie

21  showing of ineffective assistance of counsel with respect to Hughes' testimony.

22                          iii.      Kristie Crancer

23      Ms. Crancer was also acquainted with Reese in Arizona.  (RT 2757.)  She saw Reese

24  around the last weekend in January 1989.  (RT 2762.)  He told her he had just been on a trip to

25  "where he used to live."  He showed Crancer and her friend money, drugs, and jewelry.  (RT

26  2763.)  Crancer borrowed $60 from him.  (RT 2765.)  He showed her that he had a lot more than

27  $60.  (RT 2784.)  The drugs were a white powder in a ziplock baggie.  (Id.)  The jewelry

28  consisted of a woman's diamond solitaire ring, a man's wedding band, and a gold chain necklace.

1    (RT 2767.)  When Reese visited Crancer at her house a couple days later, he was driving a

2    limousine that he "was bragging about."  (RT 2770.)  Later, Reese showed her a gun, which he

3    referred to as an "Uzzi"; he told her he had purchased it.  (RT 2772.)

4         The last time Crancer saw Reese, he was in her home when Sacramento detectives called

5    her.  (RT 2771.)  When Reese found out the detectives were in Arizona, "he went outside real

6    quick, pulled Michelle outside real quick and then left."  (Id.)  Crancer testified that she had met

7    petitioner at Richard Hartley's house in January.  (RT 2773.)  However, she testified that she did

8    not "know him."  (RT 2779.)

9         On cross-examination, Crancer testified that she knew she would not be prosecuted for

10   anything she said about her past.  (RT 2775.)  She testified that she had sold and taken drugs in

11   the past.  (Id.)  However, she testified that she had not taken methamphetamine for about a year.

12   Crancer agreed she had called Reese "a schizo" and "a psychopath" in the past.  (RT 2778.)

13        Petitioner argues Brady should have impeached Crancer with her criminal history and

14   drug use.  However, petitioner makes no attempt to explain how Crancer's testimony prejudiced

15   him.  Crancer's testimony supported the defense at trial that Reese, not petitioner, committed the

16   crimes.  The California Supreme Court would not have been unreasonable in rejecting this aspect

17   of petitioner's ineffective assistance of counsel claim based on his failure to show prejudice.

18                          iv.      Linda Hamilton

19        Ms. Hamilton testified that she lived with victim Tom Probst for about eleven months in

20   the house on Kaula Drive where the crimes occurred.  (RT 2530-532.)  Probst supported himself

21   mostly by selling methamphetamine.  (RT 2531.)  Hamilton moved out in September or October

22   1988 to get away from their drinking and drug use.  (RT 2532.)  Probst kept a safe in the closet of

23   his home office.  The safe contained money, jewelry, and meth.  (RT 2532-533.)

24        Hamilton testified that she met Reese during the summer of 1988.  (RT 2539.)  She met

25   him at the Kaula Drive house when he and a mutual friend, who was also a customer of Probst's,

26   came by.  (RT 2538.)  However, Hamilton also testified that she did not see Reese purchase drugs

27   from Probst.  (Id.)

28   ////

                                        66

On cross-examination, Hamilton testified that Probst mostly sold small to medium quantities of meth. (RT 2540.) She qualified that statement by explaining that while she knew Probst was dealing drugs, she was not involved in the details. (RT 2543-544.)

Again, petitioner argues Brady should have impeached Hamilton with evidence of her legal problems and drug use. Petitioner presents evidence that Hamilton may very well have had a number of outstanding traffic warrants dismissed to convince her to cooperate with the prosecution. (LD 29, 2003 State Pet. at 165.) Petitioner argues that Hamilton's testimony that Probst kept jewelry in his safe prejudiced him because it supported other testimony that petitioner had a large quantity of jewelry. However, several people testified that jewelry was stolen from Probst's house and there was no link made between jewelry stolen from Probst and jewelry in petitioner's possession. In fact, Richard Hartley testified, as discussed below, that he saw petitioner with a large quantity of jewelry a month or two before the crimes. The California Supreme Court would not have been unreasonable in finding that petitioner had not shown he was prejudiced by any failure to more thoroughly cross-examine Hamilton.

v.      Richard "Rusty" Hartley

Mr. Hartley, another Arizona witness, gave more substantial testimony than the other witnesses discussed in this section because he had a more significant relationship with petitioner. Hartley testified that he first met Reese in 1984 in the Sacramento area. (RT 2863.) Shortly after meeting Reese, Hartley and Roxanne Hughes moved to Phoenix. In 1986, Reese visited them in Phoenix. He lived with them for several months, but when "the drugs started getting back into the scene," he was asked to leave. (RT 2864.) In the latter part of 1988, Reese returned. Hartley understood that Reese was in trouble for a check-cashing scheme. (RT 2865-866.) Hartley testified that he and Reese were taking meth at that time. At one point, Reese and Hartley moved into an apartment together in the Phoenix area.

Hartley testified that he met petitioner in the summer of 1987. (RT 2868.) He and petitioner were both working as handymen and Hartley felt petitioner was a good friend to him at that time. In late 1988, petitioner started using meth as well. (RT 2870.) While Hartley and Reese snorted the drug, petitioner would eat it by putting it on a tissue and wadding it up into a

1    pill that he swallowed.  (RT 2871.)  Hartley also testified that he saw petitioner "eat" the meth

2    this way only once or twice.

3        In late 1988, Hartley and petitioner moved into a house together on 72nd Lane.  (RT

4    2871.)  Other people joined them there, including Roxanne Hughes and Robert Reese.  (RT

5    2872.)  Hartley testified that petitioner did not live at this house.  (RT 2873.)  Rather, he used his

6    room as "a bachelor's pad and drugs and kinds of things."  Hartley testified that the plan had been

7    to use the room to buy methamphetamine, and cut, mix, and package the drugs.  (RT 2874-875.)

8    Petitioner lived with his wife and son in another house.  After other people started moving in,

9    petitioner moved out of the house.  Hartley testified that he was only there for about a month and

10   during that month petitioner "rarely even came over."  (RT 2874.)

11       During this time, Hartley and petitioner participated in a couple of drug transactions.

12   Hartley testified that he "lined [petitioner] up with the place to buy the drugs" because petitioner

13   did not know anybody and wanted to "make money in the trade."  (RT 2875-876.)  In addition to

14   drugs, petitioner was involved in the "trade of drugs for guns."  (RT 2878-879.)  Hartley saw

15   petitioner in possession of a number of guns.  Hartley purchased handguns from petitioner.  (RT

16   2881-882.)  He saw petitioner in possession of a .32 caliber handgun in November or December

17   1988.  (RT 2883-885.)  He also saw petitioner in possession of a large quantity of jewelry around

18   the same time.  (RT 2885-887.)

19       On February 12, 1989, Hartley saw Reese.  Reese showed him "everything he had that

20   was new," including a gold necklace, new clothes, new boots, new leather jacket, new car, mobile

21   phone, and gun.  (RT 2891-892.)  Hartley did not see Reese again.

22       On February 14, 1989, Sacramento Sheriff's Department detectives spoke to Hartley.  (RT

23   2893-894.)  They were looking for Reese as a suspect in a triple homicide.  After they left,

24   Hartley phoned petitioner.  They arranged to meet.  That night, around 9:00 or 10:00 p.m.,

25   petitioner and Hartley met at a bar and they drove out into the desert in petitioner's truck.  (RT

26   2894-895.)  There, petitioner told Hartley about his trip to Sacramento with Reese:

27           He told me that he sold a pound of pot out in California.  He was in
             a motel room with a whore and Robert had the rental car and didn't
28           come back until the next day and was all paranoid when he came

> back and said he wanted to go home and be with Michelle and
> Robert took off and went to the airport and Jim ended up taking a
> separate flight home.

(RT 2895.)  Petitioner told Hartley he made $700 off the sale of the marijuana.  (RT 2896.)

Hartley further testified that petitioner carried a .380 caliber automatic revolver, usually in the

small of his back.  Hartley finished his direct testimony by stating that Reese smoked Camel

cigarettes, petitioner did not smoke, and Hartley smoked Marlboros.  (RT 2897.)

On cross-examination, Hartley confirmed that petitioner "always" had the .380 revolver

with him.  (RT 2898.)  He also made clear that he saw petitioner's collection of jewelry in

petitioner's room in the 72nd Lane house.  (RT 2899.)  Brady asked Hartley if he had problems

with his temper and had ended up in some fist fights.  Hartley agreed that "[i]t's happened

before."  (RT 2900.)  Brady followed up by asking:  "In fact, you have been previously convicted

of a couple felonies, haven't you?"  Hartley responded, "One felony that I'm aware of that I

thought was going to get reduced to a misdemeanor after I went three years probation.  But I

guess it didn't, no."  (RT 2900:19-21.)

Hartley was aware petitioner "collected" a lot of things, including jewelry and knives.

(RT 2901.)  Hartley also confirmed that petitioner had told him he was allergic to cigarette

smoke.  (RT 2902.)  Hartley then discussed petitioner's gun collection and trading in guns.

On redirect, Hartley testified that he had been convicted of burglary and possession of a

deadly weapon.  (RT 2904.)  Finally, Brady asked Hartley about his statement that he had seen

petitioner take meth by putting it on paper and swallowing it.  Brady pointed out that when

Hartley had spoken to police in March 1989, he told them he had "suspicions" petitioner was

using drugs, but was not sure.  (RT 2906.)  He also did not tell police that he and petitioner had

been involved in several methamphetamine transactions.  (RT 2907.)

Petitioner argues attorney Brady should have impeached Hartley with the full extent of his

criminal history, including convictions in 1982 for burglary and possession of a deadly weapon.[29]

---

[29] In his state petition, petitioner refers to "additional criminal convictions" including a 1989
felony aggravated assault, a 1987 misdemeanor trespassing, and a 1989 "threats."  However, the
footnotes included in the petition indicate that these were charges and petitioner is uncertain of
their resolution.  (LD 29, 2003 State Pet. at 167-68.)

1   Petitioner also contends Brady should have impeached Hartley by showing the animosity he

2   demonstrated towards petitioner in his interviews with police, by showing Hartley's attempts to

3   extract some sort of benefit from talking to both police and a defense investigator, and by

4   showing police coercion of Hartley.  (LD 29, 2003 State Pet. at 168-76.)

5       Respondent argues that Brady had reasons not to impeach Hartley because he provided

6   testimony that was helpful to the defense.  Petitioner does not respond to this argument.

7   Petitioner simply argues that Hartley's testimony was "particularly damning."  (LD 29, 2003

8   State Pet. at 176.)  Hartley's testimony was inculpatory in a number of ways.  First, Hartley's

9   description of the way in which petitioner took methamphetamine corroborated Bonnie Hogue's

10  testimony that she saw petitioner take meth the same way in the motel.  Second, Hartley

11  described petitioner's involvement in selling methamphetamine, including using the room in the

12  72nd Lane house to package it and having Hartley purchase it for him.  Third, Hartley testified

13  that petitioner was in possession of a large quantity of guns, and "ran" guns between Arizona and

14  Indiana.  Fourth, he described petitioner's large stash of jewelry.  Petitioner also argues the

15  testimony implicating Robert Reese was damning to petitioner.[30]

16      Petitioner has failed to make a prima facie showing of either unreasonable conduct or

17  prejudice from Brady's failure to attempt to more thoroughly impeach Hartley.  To start, the

18  prosecutor raised the issue of Hartley's two prior felonies, referring to them specifically as

19  burglary and possession of a deadly weapon.  Petitioner has not shown why Brady should have

20  questioned Hartley in greater detail about those crimes.  Further, petitioner has not shown that

21  impeaching Hartley further would have been beneficial.  As respondent points out, some of

22  Hartley's testimony favored petitioner.  Petitioner's stories to the police and Hartley largely

---

24  [30] Here, and with respect to some other claims, petitioner contends his counsel should have
25  challenged the identification of Reese as a perpetrator of the crimes.  Yet, in other arguments,
    petitioner contends counsel erred in failing to present additional evidence indicating Reese was
26  the perpetrator.  Petitioner's defense was based on this latter argument.  In particular, Denise
    Madsen's testimony, the only testimony presented by the defense at the guilt phase, was certainly
27  presented to implicate Reese, but not petitioner, in the murders.  Petitioner cannot have it both
    ways – counsel's strategy at trial made sense given the evidence.  Defense counsel did not act
28  unreasonably in failing to challenge evidence that tended to identify Reese as a perpetrator.

1    coincided.  And, the implications that Reese committed the crimes was consistent with

2    petitioner's defense showing that Reese left him at Denny's that night, presumably to commit the

3    crimes.  The fact that Hartley's testimony about the way petitioner took meth corroborated

4    Hogue's is a small point.  Petitioner told police he was with Hogue that night.  The fact that he

5    may have ingested meth would not have demonstrated that he was involved in the killings.  While

6    the court understands that Brady should have done everything possible to pick apart Hogue's

7    testimony because it was so important, this is simply not a point that would have made a

8    difference in the determination of petitioner's guilt.

9         The other aspects of Hartley's testimony were similarly of minimal importance to

10   showing guilt or were also reflected in the testimony of others.  With respect to the descriptions

11   of petitioner's other illegal activities, several people testified that petitioner was involved in

12   selling and buying drugs, including methamphetamine.  In fact, the jury heard that petitioner told

13   Detective Bell that he had been in Sacramento about three months earlier to purchase "crank" or

14   meth.  (LD 5, ACT at 441.[31])  With respect to Hartley's testimony that petitioner bought and sold

15   guns, petitioner told police he had taken a gun with him on the trip to Sacramento.  In addition,

16   records seized from petitioner's house showed that the expenses for the Sacramento trip included

17   $1500 for guns.  Finally, several guns were seized from petitioner's home.  There was significant

18   evidence besides Hartley's testimony that petitioner was familiar with and in possession of guns.

19   Hartley's addition of the fact that petitioner may have traded in guns would not have prejudiced

20   him.

21        Finally, to the extent there was any implication that the jewelry Hartley saw came from

22   Probst's house, the prosecutor did not pursue it.  Hartley testified he saw the jewelry when

23   petitioner had a room at the 72nd Lane house, before the crimes.  By all accounts, petitioner had

24   moved out of the house well before the January 25/26, 1989 murders.  The jewelry at issue was

25   found at the home petitioner shared with his wife and son.  And, even that jewelry was referred to

26   as "insignificant" by the prosecutor in his closing argument.  (RT 3740-741.)  In fact, Hartley's

27

28   [31] This is a transcript of a taped telephone conversation Detective Bell had with petitioner prior to
     his arrest.  The tape recording was played for the jury.  (See RT 1801.)

1   testimony helped establish the insignificance of the jewelry because it showed that the seized

2   jewelry could have been the jewelry that was in petitioner's possession before the crimes.

3            2.   Other Allegations of Ineffective Assistance of Counsel at the Guilt Phase

4            Petitioner briefly argues a number of other instances of ineffective assistance of counsel.

5   However, petitioner fails to make any showing that he may have suffered prejudice from any of

6   the alleged unreasonable conduct.  Accordingly, the California Supreme Court would not have

7   been unreasonable in finding that petitioner did not make a prima facie case that Brady's conduct

8   was constitutionally defective.

9                      a.   Defense Binder

10          When attorney Brady's investigator attempted to interview Bonnie Hogue, he left behind a

11  binder containing "confidential defense work-product that included Mr. Brady's own handwritten

12  derogatory comments about Ms. Hogue." (ECF No. 235 at 85.)  Petitioner does not explain what

13  those derogatory comments were or explain what sort of attorney work product was contained

14  therein.  After reading some documents in the binder, Ms. Hogue gave it to the prosecutor, who

15  returned it to Brady.  (RT 3114-115, 3757.)  Petitioner argues that the investigator, Charles

16  Pacheco, was inexperienced and should not have been hired to investigate a multiple-murder,

17  capital case.  (See LD 31, Ex. 133 Decl. of Charles Pacheco.)   Petitioner has failed to show that

18  leaving the binder was the result of inexperience, rather than simply a mistake, and has failed to

19  show how he was prejudiced by Ms. Hogue's and the district attorney's possession of the binder.

20                      b.   Other Potential Suspects

21          Petitioner states that a copy of a motion to seal a search warrant, which was provided to

22  the defense in discovery, referenced a multiple murder investigation in Arizona.  Petitioner argues

23  that Brady should have investigated the warrant to uncover potential other suspects in the

24  Sacramento crimes.  Petitioner makes absolutely no showing of any exculpatory evidence that

25  might have been uncovered had Brady conducted a further investigation of the warrant.  The

26  same is true for petitioner's allegation that Brady unreasonably and belatedly sought to

27  investigate the persons listed in victim Probst's address book.  Petitioner fails to make a prima

28  facie showing of prejudice.

1

### c.   Forensic Experts

2      Petitioner provides nothing more than a list of experts he contends attorney Brady should

3  have consulted, including experts in ballistics, serology, and crime scene reconstruction.

4  However, petitioner makes no showing that the use of any such experts may have made a

5  difference in the verdict.

6

### d.   Failure to Object to Hearsay

7      Petitioner presents a list of ten instances of hearsay testimony to which, he argues, Brady

8  should have objected.  Petitioner made these arguments in both his appeal and his 2003 state

9  habeas petition.  (LD 18, AOB at 139-41; LD 29, 2003 State Pet. at 201-04.)  After setting out the

10  standards for considering a claim of ineffective assistance of counsel, the California Supreme

11  Court rejected the arguments on appeal as follows:

12            Where "there was no sound legal basis for objection,
       counsel's failure to object to the admission of the evidence cannot
13       establish ineffective assistance." (People v. Cudjo (1993) 6 Cal.4th
       585, 616 [25 Cal.Rptr.2d 390, 863 P.2d 635].) And, even when
14       there was a basis for objection, "'[w]hether to object to inadmissible
       evidence is a tactical decision; because trial counsel's tactical
15       decisions are accorded substantial deference [citations], failure to
       object seldom establishes counsel's incompetence.' (People v.
16       Hayes (1990) 52 Cal.3d 577, 621 [276 Cal.Rptr. 874, 802 P.2d
       376].) 'In order to prevail on [an ineffective assistance of counsel]
17       claim on direct appeal, the record must affirmatively disclose the
       lack of a rational tactical purpose for the challenged act or
18       omission.' (People v. Ray (1996) 13 Cal.4th 313, 349 [52
       Cal.Rptr.2d 296, 914 P.2d 846].)" (People v. Williams, supra, 16
19       Cal.4th at p. 215.)

20            The bulk of the evidence that defendant now claims his trial
       counsel should have objected to is evidence of Probst's statements
21       to third parties regarding his intent to conduct a drug deal with
       people from Arizona on the night he was killed. (See, e.g., ante, at
22       pp. 396-397 [testimony of Wayne Probst, James Pluskett, Freddie
       Gregg, Sandra Morgera, and Catherine Bailey].) Since defendant's
23       counsel had posed hearsay objections to the admission of such
       evidence during the preliminary hearing, the prosecution filed an in
24       limine motion arguing that the evidence was admissible. Among
       other things, the prosecution argued that Probst's statements were
25       admissible as statements of intent to do a future act. (See Evid.
       Code, §1250, subd. (a).) FN12 At trial, defendant was represented
26       by new counsel, who declined to oppose admission of the evidence,
       explaining that "from my research it is my opinion that it comes in
27       under the victim's statement of intent to do something in the
       future," and noting that he too might "be calling witnesses who also
28       talk about what Mr. Probst said to them on that particular evening

about this drug deal."

FN12 Evidence Code section 1250, subdivision (a), provides as follows: "Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." Evidence Code section 1252, in turn, precludes the admission of such a statement if it "was made under circumstances such as to indicate its lack of trustworthiness."

Trial counsel reasonably concluded that the evidence in question was admissible. Our decision in People v. Alcalde (1944) 24 Cal.2d 177 [148 P.2d 627] (hereafter Alcalde), a decision the Legislature subsequently codified in Evidence Code section 1250 (see People v. Jones (1996) 13 Cal.4th 535, 548 [54 Cal.Rptr.2d 42, 917 P.2d 1165]), is instructive in this regard. In Alcalde, we considered the admissibility of a decedent's statement that she was planning to go out with a man named Frank, the defendant's nickname, on the night she was killed. (Alcalde, supra, 24 Cal.2d at pp. 187-188.) We held that "[e]lements essential to admissibility are that the declaration must tend to prove the declarant's intention at the time it was made; it must have been made under circumstances which naturally give verity to the utterance; it must be relevant to an issue in the case." (Id. at p. 187.) Applying this test, we concluded that the decedent's statement was admissible because "it was a natural utterance made under circumstances which could create no suspicion of untruth in the statement of her intent.... Unquestionably the deceased's statement of her intent and the logical inference to be drawn therefrom, namely, that she was with the defendant that night, were relevant to the issue of the guilt of the defendant." (Id. at pp. 187-188.)

Throughout his briefing, defendant disparages our decision in Alcalde, pointing to both the dissent in Alcalde itself as well as subsequent criticism of the decision by legal scholars. In his reply brief, defendant urges that Alcalde "is technically wrong" insofar as "it allowed the declarant's statements to be used by the prosecutor to indirectly prove the actions of a person other than the declarant." This argument is misplaced. Alcalde has been codified in Evidence Code section 1250 (see ante, fn. 12), and, hence, we lack the authority to reconsider it. (See People v. Jones, supra, 13 Cal.4th at p. 548.)

Defendant also attempts to distinguish Alcalde on the grounds "Mr. Probst's conduct is not in dispute" because "he didn't go anywhere to meet anyone." That Probst's stated intent was to meet the people from Arizona at his house, rather than somewhere else, does not render his conduct any less in dispute. Probst's

conduct on the night in question, be it his conduct at home or away from home, was one of the central issues in the case. As in <u>Alcalde</u>, Probst's statements of his intent and the logical inference to be drawn therefrom, namely, that he met with people from Arizona to conduct a drug deal on the night he was killed, were relevant to the issue of the guilt of defendant. (<u>Alcalde</u>, <u>supra</u>, 24 Cal.2d at pp. 187-188.) Nor does the fact that Probst's statements did not specifically reference defendant provide a basis for distinguishing <u>Alcalde</u>. As in <u>Alcalde</u>, there are ample "corroborating circumstances" linking defendant to the planned drug deal. (See ibid. [noting other evidence demonstrating that the defendant was the "Frank" referenced in the decedent's statement].)

       In addition, defendant maintains that even if Probst's statements were admissible under Evidence Code section 1250, subdivision (a)(2), as statements of intent to do a future act, admission of the statements would nonetheless violate his constitutional right to confront his accuser under the Sixth and Fourteenth Amendments to the United States Constitution. We disagree. Since Probst's statements were relevant to the issue of defendant's guilt and "were properly admitted under the well recognized state-of-mind exception to the hearsay rule, the federal confrontation clause would likewise permit admission of such evidence. [Citations.]" (<u>People v. Morales</u> (1989) 48 Cal.3d 527, 552 [257 Cal.Rptr. 64, 770 P.2d 244]; <u>see also People v. Cummings</u> (1993) 4 Cal.4th 1233, 1322 [18 Cal.Rptr.2d 796, 850 P.2d 1].)

       Finally, defendant points to a small number of hearsay statements that he claims do not fall within the scope of the state-of-mind exception to the hearsay rule. Some of the evidence, such as Probst's statements identifying the people he was planning to meet as people from Peoria, Arizona, does indeed fall within the scope of the exception. As to the remainder of the evidence, the record fails to establish either prejudice or the lack of a rational tactical purpose for trial counsel's failure to object to the evidence. (<u>People v. Williams</u>, <u>supra</u>, 16 Cal.4th at p. 215.) For example, the evidence elicited from Sean McMillan to the effect that defendant was a moneyman who did not participate in drug deals himself was actually helpful to the defense, which was trying to establish that defendant did not accompany Reese to the Kaula Drive residence.

<u>People v. Majors</u>, 18 Cal. 4th 385, 403-05 (1998).

      The California Supreme Court's holding that the various statements of Mr. Probst were admissible under state law is binding on this court.  See <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").  Therefore, not only was the California Supreme Court's determination that Brady

////

1  acted reasonably a reasonable one, but petitioner suffered no prejudice from the lack of objections

2  to this evidence.

3      The state court found there was no showing that Brady lacked a tactical reason not to

4  object to the other instances of hearsay and no showing that they were prejudicial.  Those

5  instances were Sean McMillan's testimony that Hartley and Reese told him petitioner sold them

6  meth, traded in firearms, and was the money man, and Detective Bell's testimony that Karen

7  Brott told him she received a gold nugget from Robert Reese and later traded it to Reese for a

8  gold rope-type necklace.  (LD 29, 2003 State Pet. at 203.)  McMillan's testimony was nothing

9  new.  Other witnesses testified that petitioner dealt in meth and Richard Hartley also testified that

10  petitioner dealt in guns.  Further, as the California Supreme Court pointed out, the fact that

11  petitioner was the "money man" supported the defense theory that petitioner provided only the

12  money, while Reese went to the Kaula Drive house to conduct the deal.  Detective Bell's

13  statement implicated Reese, not petitioner, and thus it would have been reasonable for the

14  California Supreme Court to determine petitioner did not suffer prejudice from its admission.

15              e.   Failure to Object to Weapons Evidence

16      Two people testified that petitioner traded in guns and/or possessed guns.  (See RT 2878-

17  83 (Richard Hartley), RT 3176-77 (Sean McMillan).)  In addition, evidence was presented that

18  several guns were seized from petitioner's home.  For several reasons, any failure to object to this

19  evidence did not prejudice petitioner.  First, the prosecution stipulated at trial that none of the

20  guns found at petitioner's home were involved in the homicide.  Second, evidence that petitioner

21  often carried a .380 caliber handgun would not have been prejudicial because petitioner told the

22  police he had carried that gun with him to Sacramento.  Furthermore, it was also ruled out as a

23  possible murder weapon.  Finally, respondent argues that because no bullets were recovered from

24  Ms. Copeland's body, evidence about petitioner's possession of weapons would have been

25  admissible under state law, rendering any objection useless.  (See ECF No. 196 at 107.)

26  Petitioner does not respond to that argument.

27  ////

28  ////

1

f.    Failure to Bring Suppression Motion

2          Without citation to authority, petitioner argues the warrant used to search petitioner's

3    home was invalid due to numerous defects in the affidavit and that some items seized exceeded

4    the scope of that warrant.  (ECF No. 235 at 86; LD 29, 2003 State Pet. at 208-10.)  Respondent

5    argues that even had attorney Brady moved to suppress items seized in the search, that motion

6    would have been denied.  (ECF No. 196 at 107-10.)  Again, petitioner makes no attempt to refute

7    the arguments respondent makes.  Without more, petitioner fails to show Brady would have been

8    successful had he made a suppression motion.  Accordingly, petitioner fails to make a prima facie

9    showing that Brady was ineffective.

10

g.    Failure to Impeach Detective Bell

11          Petitioner claims Brady should have impeached Detective Bell with false testimony Bell

12    gave at an Arizona bail hearing held in connection with petitioner's arrest.  At that hearing, Bell

13    testified that petitioner gave Bonnie Hogue jewelry from the Probst residence.  (LD 36, Ex. 509.)

14    At trial, Hogue testified that Reese was the one to give her some jewelry.  (RT 2969-970.)

15    Petitioner does not explain why the fact Bell identified the wrong man as providing Hogue the

16    jewelry would have made a difference when Hogue's story included seeing both men in the motel

17    room with money, jewelry, and drugs.  Nor does petitioner explain what aspects of Bell's

18    testimony were so prejudicial that impeaching him may have made a difference in his guilt phase

19    verdict.  The California Supreme Court was not unreasonable in rejecting this allegation of

20    ineffective assistance of counsel.

21

h.    Failure to Request Lesser Related Offense Instruction

22          Petitioner claims Brady rendered ineffective assistance by failing to request an instruction

23    on the lesser related offense of accessory after the fact.  He raised this claim in his appeal and

24    again in his state habeas petition.  (LD 18, AOB at 175-81; LD 29 at 204-05.)  The California

25    Supreme Court rejected the claim, finding that counsel decided to forgo the instruction based on

26    petitioner's wishes:

27                 trial counsel's decision to forgo the instruction was not a result of
                 oversight but rather deference to defendant's own wishes. During
28                 the discussion of guilt phase jury instructions, the trial court

specifically asked trial counsel to confirm "you were not requesting instruction on P.C. 32 as a lesser-included or reasonably related." Counsel responded, "That's correct. I have discussed it with Mr. Majors. I recommended it to him. His position is he doesn't want it and I'm going to defer to his judgment. I'm not requesting a 32 P.C." Defendant personally acknowledged, "That's absolutely correct. All or nothing." "The invited-error doctrine operates ... to estop a defendant from claiming ineffective assistance of counsel based on counsel's acts or omissions in conformance with the defendant's own requests." FN13 (People v. Lang (1989) 49 Cal.3d 991, 1032 [264 Cal.Rptr. 386, 782 P.2d 627], fn. omitted; see also People v. Frierson (1985) 39 Cal.3d 803, 817 [218 Cal.Rptr. 73, 705 P.2d 396].)

> FN13 Defendant makes much of the fact that later, in connection with the new trial motion, his counsel urged that the evidence adduced at trial showed defendant was, at most, an accessory after the fact. Contrary to defendant's assertion, there is nothing inconsistent between counsel's initial decision to defer to defendant's wishes and counsel's subsequent characterization of the state of the evidence after defendant's chosen strategy had proved unsuccessful.

18 Cal. 4th at 409 & n.13.  On habeas, petitioner added a contention that Brady misinformed him of the consequences of a conviction as an accessory after the fact to murder.  According to petitioner's declaration,

> Prior to the conference between counsel and the trial court concerning instructions to be given the jury at the guilt phase of my trial, my attorney, Michael K. Brady, advised me that if I were convicted as an accessory after the fact to murder, the sentence would be the same as for a murder, that is, that I would end up with a life sentence.  That was why I didn't want accessory after the fact instructions.

> I have recently learned that Mr. Brady's advice was inaccurate and that, in fact, the maximum sentence upon conviction as an accessory after the fact to murder would have been three years imprisonment, a sentence I would have almost served by the time my trial ended.  Had I understood the actual sentence that could be imposed upon an accessory after the fact, I would not have opposed accessory instructions.  I would have requested them.

(LD 31, Ex. 134.)

Petitioner argues Brady acted unreasonably by erroneously advising petitioner of the law, and by deferring to petitioner's wishes.

Under state law, the California Supreme Court's summary denial of this claim means that the court determined that even if petitioner's allegations were true, petitioner did not make a

78

1   prima facie showing of a constitutional violation.   According to petitioner's allegations, the

2   following occurred:  (1) Brady misadvised petitioner of the consequences of an accessory

3   conviction; (2) based on this incorrect assumption of the potential consequences, petitioner chose

4   to forego such an instruction; (3) Brady advised against that decision but, as he informed the

5   court, felt that it was petitioner's decision to make; and (4) no instruction on the lesser related

6   offense was given.  Taken as true, petitioner's allegations show Brady acted unreasonably.

7        Respondent argues the California Supreme Court could have reasonably rejected

8   petitioner's declaration because it is "refuted by the record."  According to respondent, the fact

9   that Brady recommended the instruction shows that he knew it must have some benefit to

10   petitioner.  Petitioner counters by arguing that Brady could have misadvised petitioner of the

11   possible sentence for an accessory conviction while understanding it held some benefits,

12   particularly that an accessory who did not have the intent to commit murder could not have been

13   sentenced to death.  See Enmund v. Florida, 458 U.S. 782, 790-91 (1982).  While petitioner's

14   declaration is somewhat confusing – he states Brady told him the sentences for accessory and

15   murder were both life, this court agrees that petitioner's argument is not necessarily inconsistent.

16   If he believed he could face a life sentence if convicted as an accessory, petitioner may have

17   chosen an "all or nothing" strategy to avoid both a life sentence for an accessory conviction and a

18   death sentence for murder.

19        Respondent next argues that if petitioner actually believed the sentences for accessory and

20   murder were the same, he would not have told the judge he wanted an "all or nothing" defense.

21   Respondent does not explain why this is so.  It is certainly possible to construe petitioner's

22   statement as a wish to be considered innocent of any offense.

23        In determining at this stage whether petitioner has made out a colorable, or prima facie,

24   claim of ineffective assistance of counsel, he has adequately shown unreasonable conduct.

25   Particularly when considered in the context of petitioner's other colorable allegations of guilt

26   phase error, he has also made a prima facie showing of prejudice.  Instructions on lesser-related

27   offenses have particular importance in capital cases.  A trial judge in a capital case is required to

28   give such an instruction sua sponte where the evidence supports a verdict on the lesser offense.

1   In Beck v. Alabama, 447 U.S. 625 (1980), the Court held that a sentence of death may not be

2   constitutionally imposed where "the jury was not permitted to consider a verdict of guilt of a

3   lesser included non-capital offense, and when the evidence would have supported such a verdict."

4   Inclusion of a lesser offense instruction "accord[s] the defendant the full benefit of the

5   reasonable-doubt standard" by affording the jury "a less drastic alternative than the choice

6   between conviction of the offense charged and acquittal."  447 U.S. at 633-34.  A court need not

7   instruct on the lesser-related offense, however, if the defendant knowingly waives his right to the

8   instruction.  See Spaziano v. Florida, 468 U.S. 447, 456-57 (1984).  Courts have accepted a

9   defendant's choice of this "all-or-nothing" strategy.  Id.

10       Petitioner has shown that his waiver was potentially not "knowing" because Brady

11   misinformed him of the possible sentence for an accessory conviction.  This court further finds a

12   reasonable possibility that, had the jury been instructed on the lesser offense and had the defense

13   been stronger, as more thoroughly described below, the jury may have had a reasonable doubt

14   that petitioner intended to kill the victims.  As the Court described in Beck, the jury may have felt

15   that petitioner had some culpability and, particularly due to the severity of the crimes, may have

16   felt that acquitting petitioner would be unjust.  The jury knew petitioner had some involvement in

17   the crimes based on his travel to Sacramento with Robert Reese and based on his association with

18   Reese after the crimes and his conduct after Reese left – shipping home a package and flying

19   home under an assumed name.  Petitioner has made an adequate showing that he was potentially

20   prejudiced under Strickland by Brady's misinformation and, as described below, has shown the

21   California Supreme Court could not reasonably have held otherwise for this claim alone, and for

22   other guilt phase errors considered cumulatively with it.

23           i.    Failure to Request Unanimity Instruction

24       Petitioner next argues Brady acted unreasonably in failing to request an instruction that

25   the jury must be unanimous in determining whether petitioner was guilty under the felony/murder

26   rule or of premeditated first degree murder.   Respondent shows that the United States

27   Constitution does not require unanimity on a theory of guilt for first degree murder.  See Schad v.

28   Arizona, 501 U.S. 624, 630-45 (1991).   He alleges the same is true under California law.

1   Petitioner has not shown California law required such a unanimity instruction.  Accordingly the

2   state court was not unreasonable in rejecting this aspect of claim 2.

3                              j.   Misleading Closing Argument

4           Petitioner argues that Brady was "unprepared to argue the guilt phase case to the jury and

5   had to 'wing it,' making unsupported contentions, misunderstanding the law, failing to confront

6   the prosecution evidence, misunderstanding other evidence, etc." (LD 29, 2003 State Pet. at 212.)

7   Despite this broad assertion of errors, petitioner identifies only two problems with Brady's

8   argument.  First, he points to Brady's statement that, "I can't remember the facts of this case."

9   (RT 3616.)  Second, he notes that Brady misstated the law regarding use of a firearm.  (Compare

10  RT 4201 with RT 4295.)

11          These supposed errors hardly amount to a problem of constitutional magnitude.  First,

12  petitioner takes Brady's statement about remembering the facts out of context.  It is clear that

13  Brady was trying to remember the quantity of meth Probst usually sold to his customers.

14  Precisely identifying that quantity was not a significant concern.  Second, petitioner fails to point

15  out that the misstatement about the use of a firearm occurred during Brady's argument to the

16  judge on his motion for a new trial.  While it may have demonstrated some confusion on Brady's

17  part at that time, petitioner makes no attempt to argue how it could have had any effect on the

18  guilt phase verdict.

19                              k.   Errors at Jury Selection

20          Petitioner alleges attorney Brady acted unreasonably in multiple ways during voir dire.

21  (LD 29, 2003 State Pet. at 113-15.)  He fails to make a prima facie showing of ineffective

22  assistance of counsel with respect to jury selection.  Therefore, the California Supreme Court

23  reasonably rejected these claims.

24          First, petitioner argues Brady should have challenged eight prospective jurors for cause

25  because they expressed pro-death penalty views during voir dire.  Instead, Brady used his

26  peremptory challenges to excuse these jurors.  The court cannot comprehend how petitioner

27  believes he was prejudiced by the use of peremptory challenges because he also alleges Brady

28  was ineffective for using only 21 of his available peremptory challenges.  While petitioner alleges

1  Brady should have challenged and/or dismissed a few more jurors, he does not show Brady would

2  have exhausted his peremptory challenges had he done so.  Accordingly, petitioner has failed to

3  show he was prejudiced by Brady's use of peremptory challenges on the eight "pro-death

4  penalty" potential jurors.

5      Petitioner next argues Brady failed to further question four jurors who expressed "strong

6  views favoring capital punishment."  When asked whether she had "any strong feelings about the

7  death penalty in general, either for it or against it, Juror Reid responded, "I'm definitely for it."

8  (RT 1633.)  She also stated that she could honestly consider life as an alternative sentence and

9  that she did not see herself as "black and white" when it came to a sentence.  In response to the

10  same questions, Juror Annis stated that she did have strong feelings, "I'm for the death penalty."

11  (RT 1648.)  She also stated that she felt she could fairly consider a life sentence.  (RT 1649.)

12  Juror Powers' response was less certain.  He stated only that he "generally" supported the death

13  penalty.  (RT 1699.)  He also agreed that he could be fair.  Finally, Juror Powell's responses were

14  even less pro-death penalty.  When asked if he had strong feelings one way or the other, Juror

15  Powell responded that he felt that the methods of execution were not swift enough and he

16  "hate[d] to see people suffer," particularly in the electric chair.  (RT 1708-709.)  Juror Powell felt

17  that he could fairly consider either penalty.  (RT 1709.)  Petitioner provides no basis to find that

18  Brady's reliance upon the jurors' commitments to be fair was unreasonable and no reason to think

19  these jurors were not, in fact, fair.

20      Petitioner's third argument is that Brady failed to attempt to rehabilitate two jurors who

21  were excused for their anti-death penalty views.  With respect to the first juror, petitioner's

22  assertions are incorrect because Brady did attempt to rehabilitate the juror.  With respect to the

23  second, petitioner has not established Brady erred.

24      When asked whether she had strong feelings about the death penalty, prospective juror

25  Josephine Herrera-Williams stated

26      I would say about five years ago I was for the death penalty but I
        think with movies and the press, I don't think anybody should be
27      put to death.  If a person is guilty, I feel that they should be [sic] life
        in prison without the possibility of parole because that's really
28      severe, taking the death penalty.

1   (RT 1531.)  In response to the judge's further questioning, Ms. Herrera-Williams said she did not

2   think she could consider the possibility of death as a penalty.  (Id.)  She explained that she felt the

3   death penalty was "too severe;" she added that sentencing someone to death would be on her

4   conscience and would "really bother me."  (RT 1531-532.)  Mr. Brady then questioned Ms.

5   Herrera-Williams.  He pointed out that she had indicated on her questionnaire that the death

6   penalty might be appropriate when the crime was "so severe" and the evidence presented a "cut

7   and dry case."  (RT 1532.)  Ms. Herrera-Williams clarified her response by stating that she might

8   not oppose the death penalty for a mass murderer like Charles Manson, but that she herself could

9   not impose it.  (RT 1532-533.)  With no objection from Brady, the trial court excused Ms.

10  Herrera-Williams for cause.  (RT 1533.)

11          Prospective juror Rodney Wolfe stated that he was against the death penalty and gave the

12  following reason: "I suppose I feel that human life is in a sense sacred.  I'm not a religious person

13  but I feel that we don't have a right to take another person's life."  (RT 1423.)  When asked by the

14  court whether he could imagine any circumstance where the death penalty would be appropriate,

15  Mr. Wolfe responded that he could not.  (RT 1424.)  With no objection from Brady, the trial court

16  excused Mr. Wolfe for cause. (RT 1425.)

17          Petitioner simply argues Brady should have attempted to "rehabilitate" these witnesses

18  without describing what more Brady should have done.  A juror may be excused for cause where

19  the juror's views would "prevent or substantially impair the performance of his duties as a juror

20  in accordance with his instructions and his oath."  Wainwright v. Witt, 469 U.S. 412, 424 (1985).

21  A juror's views on the death penalty may be grounds for excusal for cause.  Id.  Petitioner has

22  failed to make a prima facie showing that attorney Brady erred in failing to question these jurors

23  further after they both expressed an unwillingness to follow the sentencing laws.

24          In his state petition, petitioner nitpicks about a number of other errors by Brady at the guilt

25  phase.  Unsurprisingly, none of these alleged errors are mentioned in petitioner's section 2254(d)

26  briefing because none have merit.

27  ////

28  ////

83

1.   Failure to Investigate Juror's Post-trial Statement

When interviewed by a defense investigator after trial, Juror Swafford stated that Bonnie Hogue was present at the Kaula Drive house when the victims were murdered.  (CT 824.[32]) Petitioner argues Brady erred by failing to investigate this statement to determine whether Swafford had learned of statements Hogue made to others that were not presented at trial. Petitioner fails to mention, however, that during the proceedings on the motion for a new trial, the judge questioned Mr. Swafford about these statements to the investigator.  The judge asked, "What caused you to believe that [Hogue] was at the crime scene?"  (RT 4302.)  Mr. Swafford then explained why, based on the evidence he heard at trial, he felt Hogue's involvement was greater than what her testimony showed.  The judge specifically asked Swafford whether he had "any information from any source that Bonnie Hogue was at the scene or that she stole some clothing from the scene?"  (RT 4304.)  Mr. Swafford replied, "Nobody told me.  I assumed that . . . ."  (RT 4304-305.)  Whether or not Brady should have investigated Swafford's statement before moving for a new trial, petitioner has failed to show any prejudice from that failure.

3.   Cumulative Effect of Ineffective Assistance of Counsel at the Guilt Phase

As described above, petitioner has demonstrated sufficiently three Sixth Amendment errors potentially impacting the guilt phase of his trial.  His claim that counsel misinformed him of the consequences of an accessory conviction is important.  As described above, petitioner has shown a reasonable possibility of a different guilt phase verdict had he chosen to have the jury instructed on that lesser included offense.  While counsel's other two errors, failing to investigate and present evidence of Hogue's relationship with Reese, and failing to question Kellie Harley about Reese's unpredictable and violent nature were not sufficient alone to establish prejudice, they would have contributed to a jury's reasonable doubt that petitioner intended to kill the victims.  When considered along with the claim that counsel erred regarding the lesser-included-offense instruction, petitioner has adequately shown prejudice.  Further, when considered with

---

[32] A transcript of the investigator's interview with Swafford was attached to petitioner's motion for a new trial in support of his argument that jurors inappropriately discussed the case before deliberations.

1  petitioner's other sufficiently plead claims of guilt phase error, the California Supreme Court

2  could not reasonably have held petitioner had failed to show prejudice.  The analysis of that

3  cumulative effect of the constitutional errors is discussed below in claim 21.

4        C.  Juror Misconduct – Claim 1

5        Petitioner makes a number of claims of juror misconduct based on bias, the receipt of

6  extrajudicial information, and jurors' failure to follow instructions. Some of these claims were

7  rejected by the California Supreme Court on appeal.  See People v. Majors, 18 Cal. 4th 385, 417-

8  30 (1998).  He added claims, and added factual support to some of the appellate claims, in his

9  state habeas petition.  As set out below, this court finds that petitioner has made out a prima facie

10  case for the subclaim that Juror Mohr was biased.

11            1.  Legal Standards

12        The Sixth Amendment right to a jury trial "guarantees to the criminally accused a fair trial

13  by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961).  Due

14  process requires that the defendant be tried by "a jury capable and willing to decide the case

15  solely on the evidence before it." Smith v. Phillips, 455 U.S. 209, 217 (1982); Bayramoglu v.

16  Estelle, 806 F.2d 880, 887 (9th Cir. 1986) ("Jurors have a duty to consider only the evidence

17  which is presented to them in open court.").  A defendant is denied the right to an impartial jury if

18  even one juror is biased or prejudiced.  Fields v. Woodford, 309 F.3d 1095, 1103 (9th Cir.),

19  amended, 315 F.3d 1062 (9th Cir. 2002); Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998) (en

20  banc).

21        Bias may be actual or presumed.  The Ninth Circuit has examined three ways to prove

22  bias.  Fields v. Brown, 503 F.3d 755, 766 (9th Cir. 2007).  First, the court considered whether a

23  juror's untruthfulness in response to a jury selection question demonstrated bias.  The Court of

24  Appeals found that Supreme Court authority required a showing that "'a juror failed to answer

25  honestly a material question on voir dire, and then further show that a correct response would

26  have provided a valid basis for a challenge for cause.'"  Id. at 767 (quoting McDonough Power

27  Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984)); see also Elmore v. Sinclair, 799 F.3d

28  1238, 1253 (9th Cir. 2015) (same), petition for cert. filed, No. 15-7848 (U.S. Jan. 19, 2016).  Voir

dire examinations protect the right to a fair trial by exposing biases that could result in a juror

being excused for cause or by providing "hints of bias" that may assist a party in exercising a

peremptory challenge.  McDonough Power Equip., 464 U.S. at 554.  Courts have found bias

based on untruthful voir dire responses where a juror in a heroin-conspiracy trial failed to inform

the court that he had two children in prison for heroin-related offenses in United States v.

Eubanks, 591 F.2d 513, 517 (9th Cir. 1979), and where a juror in a capital murder trial failed to

disclose the fact her brother had been murdered and her husband was in jail on a rape charge in

Dyer v. Calderon, 151 F.3d 970 (9th Cir. 1998).

When a tenable claim of juror bias has been made, a hearing should be held to permit the

defendant to prove bias.  See Smith v. Phillips, 455 U.S. 209, 215 (1982).  For example, where a

juror was untruthful on voir dire, the only way to establish bias will be to question the juror about

his or her impartiality.  See Williams v. Taylor, 529 U.S. 420, 442-44 (2000).  The Court in Smith

stressed the necessity of a hearing.  In that case, defense attorneys learned after trial that, during

the course of the trial, one of the jurors had applied for an investigator job in the district attorney's

office.  Upon the motion to set aside the verdict, the trial judge held an evidentiary hearing.  After

hearing testimony from the juror and the prosecuting attorneys, the trial judge concluded that

while the juror's application was an "indiscretion," he found no indication it affected the juror's

ability to be impartial.  Smith, 455 U.S. at 213-14.  The defense appealed, arguing that bias

should be implied in this situation.  While it did not reject the doctrine of implied bias, the Court

focused instead on the necessity of a hearing:  "the remedy for allegations of juror partiality is a

hearing in which the defendant has the opportunity to prove actual bias."  Id. at 215.  The

question, then, is what sort of burden a defendant or petitioner must bear to be entitled to a

hearing.

The second way to prove bias requires a showing of actual bias.  Actual bias is shown by

"'the existence of a state of mind that leads to an inference that the person will not act with entire

impartiality.'"  Fields, 503 F.3d at 767 (citations omitted).  "Actual bias is typically found when a

prospective juror states that he cannot be impartial, or expresses a view adverse to one party's

position and responds equivocally as to whether he could be fair and impartial despite that view."

1   Id.; see United States v. Gonzalez, 214 F.3d 1109, 1112 (9th Cir. 2000) (collecting cases; actual

2   bias shown where potential juror stated he could not be impartial, where juror in case involving a

3   labor union emphasized his negative experience with unions and was equivocal when asked if he

4   could be fair, and where juror in drug distribution case admitted to a conviction for drug

5   possession but stated he had been entrapped).

6          Finally, a party could show presumptive or implied bias. There is some question about

7   whether the doctrine of implied bias is a clearly established legal basis for a claim of juror

8   misconduct on federal habeas. Fields, 503 F.3d at 768 ("Although the Supreme Court has not

9   explicitly adopted (or rejected) the doctrine of implied bias, both concurring opinions in

10  McDonough seem to embrace it. . . .").[33] For purposes of these findings and recommendations,

11  this court assumes bias may be inferred in "exceptional circumstances." McDonough, 464 U.S. at

12  556-57 (Blackmun, Stevens, and O'Connor, JJ., concurring). The Court of Appeals has stated

13  broadly that where a juror's actions or misconduct create "destructive uncertainties" about the

14  indifference of the juror, bias should be presumed. Green v. White, 232 F.3d 671, 676 (9th Cir.

15  2000). Typically, courts have implied bias from "an 'extreme' and 'extraordinary' relationship

16  between a juror and an aspect of the litigation." Fields, 503 F.3d at 775 n.14; e.g., Parker v.

17  Gladden, 385 U.S. 363 (1966) (bailiffs who helped sequester jury were also prosecution

18  witnesses); Smith, 455 U.S. at 222 ("extreme situations that would justify a finding of implied

19  bias" include "a revelation that the juror is an actual employee of the prosecuting agency, that the

20  juror is a close relative of one of the participants in the trial or the criminal transaction, or that the

21  juror was a witness or somehow involved in the criminal transaction") (O'Connor, J.,

22  concurring); United States v. Allsup, 566 F.2d 68, 71-72 (9th Cir. 1977) (two jurors in bank

23  robbery trial biased because they worked for a different branch of the bank that was robbed).

24  Prejudice was also presumed in the following extraordinary circumstances: where television

25

26  [33] Respondent cites to statements by the Supreme Court in Smith that implying bias is
    impermissible. Smith, 455 U.S. at 216-17. The Court in Smith stressed that the appropriate way
27  to prove bias was through an evidentiary hearing. Id. at 217. However, in Justice O'Connor's
    concurring opinion in that case, she stated that the opinion "does not foreclose the use of 'implied
28  bias' in appropriate circumstances." Id. at 221.

1   cameras were in the courtroom in a highly publicized trial, Estes v. Texas, 381 U.S. 532 (1965);

2   and where the FBI spoke to jurors regarding another case which also involved Communist party

3   affiliation, Gold v. United States, 352 U.S. 985 (1957).  Finally, as described above, the Court in

4   Smith determined that, after the trial court conducted a hearing and determined the juror was not,

5   in fact, biased, the Court would not go on to imply bias based on the juror's submission of an

6   employment application to the prosecutor's office.  455 U.S. at 215.

7        Due process requires that the defendant be tried by "a jury capable and willing to decide

8   the case solely on the evidence before it."  Smith, 455 U.S. at 217; see also United States v.

9   Plache, 913 F.2d 1375, 1377-78 (9th Cir. 1990).  The introduction of prejudicial extraneous

10   influences into the jury room constitutes misconduct which may result in the reversal of a

11   conviction.  Parker, 385 U.S. at 364–65.  A claim that jurors were exposed to extrajudicial

12   evidence is considered based on an objective standard – whether the evidence would have

13   affected a reasonable juror's consideration of the evidence.  Fields, 503 F.3d at 781 n.22.  Courts

14   have found prejudice from extra-judicial information such as extensive pretrial publicity, Irvin,

15   366 U.S. at 726; exposure to the defendant's confession, Rideau v. Louisiana, 373 U.S. 726

16   (1963); and where a third party approached a juror with a possible bribe and the juror was then

17   investigated by the FBI, Remmer v. United States, 350 U.S. 377 (1956).

18        Not every incident of juror misconduct requires a new trial.  United States v. Klee, 494

19   F.2d 394, 396 (9th Cir. 1974).  Rather, "[t]he test is whether or not the misconduct has prejudiced

20   the defendant to the extent that he has not received a fair trial."  Id.  On collateral review, juror

21   misconduct claims "are generally subject to a 'harmless error' analysis, namely, whether the error

22   had 'substantial and injurious' effect or influence in determining the jury's verdict."  Jeffries v.

23   Wood, 114 F.3d 1484, 1491 (9th Cir. 1997) (citing Brecht v. Abrahamson, 507 U.S. 619, 638

24   (1993)), overruled on other grounds by Gonzalez v. Arizona, 677 F.3d 383 (9th Cir. 2012); see

25   also Brown v. Ornoski, 503 F.3d 1006, 1018 (9th Cir. 2007); Fields , 503 F.3d at 781 & n.19

26   (noting that Brecht provides the standard of review for harmless error in cases involving

27   unconstitutional juror misconduct); Jeffries v. Blodgett, 5 F.3d 1180, 1190 (9th Cir. 1993) (a

28   ////

88

1    habeas petitioner must show that the alleged error "'had substantial and injurious effect or

2    influence in determining the jury's verdict.'").

3          Federal Rule of Evidence 606(b) limits the court's consideration of juror testimony.  A

4    threshold question is the extent to which the court can consider the jurors' comments regarding

5    their deliberations in addressing petitioner's jury misconduct claims.  See United States v. Maree,

6    934 F.2d 196, 201 (9th Cir. 1991), abrogated on other grounds in United States v. Adams, 432

7    F.3d 1092 (9th Cir. 2006).  As discussed in Sassounian v. Roe, 230 F.3d 1097 (9th Cir. 2000),

8    juror testimony may be considered to demonstrate that extraneous evidence or information was

9    introduced during the jury's deliberation, but not, for instance to show the subjective impact of

10   that extraneous information:

11          A long line of precedent distinguishes between juror testimony
            about the consideration of extrinsic evidence, which may be
12          considered by a reviewing court, and juror testimony about the
            subjective effect of evidence on the particular juror, which may not.
13          . . . Therefore, although we may consider testimony concerning
            whether the improper evidence was considered, we may not
14          consider the jurors' testimony about the subjective impact of the
            improperly admitted evidence.
15

16   Id. at 1108-09; see also Jeffries, 5 F.3d at 1190.  However, it is "proper to consider the timing of

17   shifts in jury votes relative to the introduction of extrinsic evidence."  Fields , 503 F.3d at 798.

18          Evidence concerning the mental processes by which a juror arrived at her verdict is

19   inadmissible to test the validity of that verdict.  See Tanner v. United States, 483 U.S. 107, 117,

20   127 (1987) ("[L]ong-recognized and very substantial concerns support the protection of jury

21   deliberations from intrusive inquiry.").  This rule is intended to protect the jury's deliberative

22   process by preventing challenges to a verdict based on arguments, statements, discussions, mental

23   and emotional reactions, votes, or methods used in reaching a verdict.  Fed. R. Evid. 606

24   Advisory Committee's Notes; In re U.S. Financial Securities Litigation, 609 F.2d 411, 430 n.68

25   (9th Cir. 1979).

26                2.  Claims relating to Bias by Juror Swafford

27          Petitioner makes two claims that Juror Swafford was biased.  First, he shows that Juror

28   Swafford had two recent convictions for soliciting prostitution that he did not reveal during voir

1   dire.  At the time of trial, Swafford was on informal probation, monitored by the district

2   attorney's office, for those convictions.  Second, petitioner shows that in 1989, shortly before

3   trial, the district attorney's office commenced a paternity/child support action against Swafford.

4   That action was pending at the time of petitioner's trial.  Petitioner argues that each of these legal

5   problems would have caused Swafford to be partial to the prosecution because he needed to stay

6   in the good graces of the district attorney's office.

7                   a.   Swafford's Prior Convictions and Probationary Status

8          In August 1988 and again in July 1990, Mr. Swafford was arrested for soliciting an act of

9   prostitution.  (LD 47, Ex. 138 at 7-14, 17-21.)  On September 19, 1988, Mr. Swafford was

10  convicted of the first offense and placed on informal probation for three years.  (LD 48, Ex. 328

11  at 99.)  On August 21, 1990, Mr. Swafford was sentenced again to three years of informal

12  probation.  (LD 31, Ex. 101.)  According to petitioner, informal probation is monitored by the

13  Sacramento County District Attorney's Office.  (See LD 47, Ex. 137.)  A police report

14  accompanying the 1990 citation states that Mr. Swafford pleaded with police to be given a break

15  and told the officer that the judge in his prior case "told me I would get 6 months in jail if I got

16  caught again."  (LD 47, Ex. 138 at 13.)  During the course of petitioner's trial in the fall of 1990,

17  Mr. Swafford was subject to both of these informal probation orders.

18                  b.   Paternity/Child Support Action against Juror Swafford

19         In October 1989, the Sacramento County District Attorney's Office filed a complaint for

20  judgment of parentage and for child support against Mr. Swafford.  (LD 36, Ex. 506, last four

21  pages.)  The case proceeded through 1990.  After a trial in mid-1991, the superior court ruled

22  against Mr. Swafford.  (Id. at consec. pp. 14-18.)  Petitioner points out that the complaint against

23  Swafford sought child support payments and other support to be paid to the district attorney's

24  office.

25                  c.   Juror Swafford's Disclosures During Jury Selection

26         Mr. Swafford responded "no" to a question asking whether he was acquainted with

27  anyone from the Sacramento County District Attorney's Office.  He failed to answer a question

28  asking whether he had been involved in a criminal case.  Finally, when asked whether he felt

1    there were any reasons he could not or should not serve as a juror, Mr. Swafford responded,

2    "There are none."  (LD 36, Ex. 503 at 3, 4, 7.)

3           In court, when discussing his availability for the duration of the trial, Mr. Swafford

4    mentioned that a "lady filed a palimony suit against me; I guess that's what you call it.  And then

5    I – I was instructed by the judge to go take a blood test and that they would continue" the

6    proceedings on October 28, 1990.  (RT 1471-72, 1485-86.)

7                          d.    Testimony at Hearing on Jury Misconduct

8           Juror Swafford testified during a hearing that the trial court held regarding allegations of

9    misconduct by Juror Mohr (discussed below) and allegations that Juror Swafford discussed the

10   evidence with other jurors prior to deliberations.  During that hearing, Juror Miller testified that

11   during the course of the trial, Juror Swafford told Miller that he had formed the opinion that

12   petitioner was guilty and that the prosecutor was losing the case.  (RT 4183-84.)  Miller testified

13   that other jurors also gave their opinions about petitioner's guilt during the course of the trial.

14   (RT 4184-85.)   Juror Swafford testified that he made that statement "in the deliberating box"

15   "after the trial."  (RT 4196-97.)  He testified that he was deeply troubled that the prosecution

16   introduced no fingerprints or ballistic evidence tying Petitioner directly to the crime scene.  (RT

17   4196.)  Swafford testified that, "for a while," he thought petitioner was innocent, and that, at one

18   point, he was the only juror in favor of voting to acquit petitioner.  (RT 4191, 4195.)  Swafford

19   added that throughout the trial he remained conscious of his pledge during jury selection to decide

20   the case without any prejudice.  (RT 4197.)

21                          e.    Discussion

22          Petitioner argues that Mr. Swafford had a vulnerability to, and a bias in favor of, the

23   government.  None of petitioner's allegations show Mr. Swafford was actually biased against

24   him.  And, nothing about his responses to his jury questionnaire would lead to a presumption that

25   he was biased.  Just because he had been prosecuted by the district attorney's office and was

26   under its informal supervision does not mean he would have necessarily felt he was "acquainted"

27   with anyone from that office. The fact that he failed to respond to the question about his

28   involvement in criminal proceedings was not dishonest; it was simply blank.  Finally, there is no

1  reason to think Mr. Swafford did not feel that he could be a fair juror.  His response that there

2  were no reasons he could not be fair could very well have been honest.

3       Mr. Swafford died before petitioner filed his habeas petition.  (LD 47, Exs. 135 and 136.)

4  Respondent argues that the absence of Mr. Swafford makes a hearing to show actual bias

5  impossible.  Petitioner argues a hearing would be feasible.  He claims that, just as a defendant's

6  intent is proven without the defendant's testimony, Mr. Swafford's actual bias could be proven

7  without a hearing.  However, petitioner does not make any attempt to show how he might prove

8  Swafford's bias.  As described above, there are significant restrictions on the admission of

9  evidence regarding jurors' deliberations. The California Supreme Court would not have been

10  unreasonable in finding that petitioner had failed to make at least a prima facie showing of actual

11  bias to justify a hearing.

12       Petitioner also fails to make a sufficient showing under a theory of implied bias.

13  Petitioner's probationary status and the fact of the pending child support/paternity proceeding do

14  not amount to the sort of extraordinary circumstance justifying a presumption that Mr. Swafford

15  was biased.  Petitioner argues that Swafford's probationary status alone establishes a prima facie

16  case of bias because the United States Supreme Court has "explicitly recognized" that a

17  probationer is particularly vulnerable to bias and might "act out of fear or concern of possible

18  jeopardy to his probation." Davis v. Alaska, 415 U.S. 308, 311, 318 (1974).  Petitioner takes the

19  statements from Davis out of context.  The issue in Davis, a burglary case, was whether a

20  defendant was denied his rights under the Confrontation Clause when he was not permitted to

21  question a key prosecution witness about his probationary status which stemmed from a juvenile

22  burglary.  The defense argued that the witness could have identified the defendant to shift

23  suspicion away from himself and also out of fear of possible probation revocation.  The Supreme

24  Court held that the defense should have had the right to develop evidence to show the witness was

25  subject to undue pressure because of his "vulnerable status as a probationer" and because he did

26  not want to be considered a suspect in the investigation.  Davis, 415 U.S. at 317-18.  The

27  confrontation clause issues in Davis are a far cry from the question of implied juror bias at issue

28  here.

1    Most courts have found implied bias only from a relationship to the proceedings that was

2    substantially more entangled than being subject to probationary supervision or being prosecuted

3    by the civil division of the district attorney's office for child support.  See, e.g., Solis v. Cockrell,

4    342 F.3d 392, 398-99 & n.42 (5th Cir. 2003) (collecting cases); Gonzalez, 214 F.3d at 1112 (bias

5    presumed where case presents "a relationship in which the potential for substantial emotional

6    involvement, adversely affecting impartiality, is inherent").  Petitioner's argument that Mr.

7    Swafford would have had a motivation to "curry favor" with the prosecution does not rise to the

8    level of an extraordinary and presumptively prejudicial relationship.  Mr. Swafford's motivations

9    to curry favor would have been even less substantial than the juror/job applicant in Smith.  The

10   defendant in that case used a similar argument – that a reasonable juror in his position would have

11   believed the jury's verdict would directly affect the district attorney's evaluation of his job

12   application.  Smith, 455 U.S. at 214.  The Court found this relationship insufficient to presume

13   bias.  A reasonable juror in Mr. Swafford's position was even further removed from the case.  Mr.

14   Swafford did not need to show he was pro-prosecution and he could not reasonably anticipate

15   adverse consequences from a defense verdict.  Petitioner has failed to show "extreme facts that

16   created an unconstitutional probability of bias." Caperton v. A.T. Massey Coal Co., 556 U.S.

17   868, 887 (2009).  The California Supreme Court would not have been unreasonable in concluding

18   petitioner failed to make a prima facie showing that bias on Mr. Swafford's part should be

19   implied.

20   Petitioner argues that even if he has not sufficiently shown bias, it is only because he has

21   not had the opportunity to do so.  Under Smith, petitioner claims he should be given the

22   opportunity to prove actual bias at a hearing.  Respondent only really addresses this assertion by

23   arguing that a hearing would be fruitless because Mr. Swafford is deceased.  While the court does

24   not agree that Mr. Swafford's presence is a necessity, petitioner must make some showing that he

25   could succeed if permitted to present evidence.  This court reviews the California Supreme

26   Court's decision for reasonableness.  Even if this court would find a hearing necessary to permit

27   petitioner to flesh out his claim, that does not necessarily mean that no reasonable jurist could

28   find otherwise.  Here, petitioner points to no indications of actual bias on Mr. Swafford's part.  In

1   fact, according to his own testimony at the hearing on Juror Mohr's misconduct, Mr. Swafford

2   was apparently the sole vote for a not guilty verdict at one point during deliberations.  Through

3   this testimony, declarations of other jurors, or declarations from Mr. Swafford's family members

4   or others who might have known he had an inclination to be biased towards the government,

5   petitioner has had an opportunity to attempt to show some evidence of actual bias.  His failure to

6   do so means this court cannot find the California Supreme Court acted unreasonably in failing to

7   conduct an evidentiary hearing on petitioner's allegations that Mr. Swafford was biased.

8         Petitioner also makes brief arguments that:  (1) the prosecutor committed misconduct

9   because he failed to reveal Juror Swafford's probationary status and that he was the focus of a

10   paternity/child support action; and (2) attorney Brady was ineffective because he failed to

11   investigate Mr. Swafford, including failing to follow up on Swafford's failure to answer the

12   question about his criminal history.  Petitioner has failed to show that a prosecutor has a duty to

13   uncover the criminal background of a potential juror.  The cases he cites are inapposite.  In the

14   cases involving jurors, prosecutors were aware of information that was not revealed by a juror.  In

15   Smith, during the course of petitioner Phillips' trial, employees of the district attorney's office

16   brought the juror's job application to the attention of the attorneys prosecuting Phillips.  Smith,

17   455 U.S. at 212-13.  The prosecutors determined they did not need to inform the trial court or the

18   defense.  Id.  The Supreme Court held that the prosecutor's failure to disclose the job application

19   required a post-trial hearing on juror bias, but based on the evidence that the juror was not, in fact,

20   biased, petitioner Phillips' due process rights were not violated.  Id. at 220-21.  In Williams v.

21   Taylor, 529 U.S. 420, 421-22 (2000), the prosecutor knew that one of the jurors had been married

22   to a deputy sheriff who was called as a witness.  Petitioner also cites cases involving witnesses,

23   not jurors.  As discussed above, a prosecutor does have a duty to investigate the background of a

24   prosecution witness.  However, petitioner's attempt to use the witness standard for a potential

25   juror is unsupported.  Accordingly, he has not made a prima facie showing of prosecutorial

26   misconduct.

27         Petitioner has a better argument that attorney Brady acted incompetently.  First, Brady

28   failed to request criminal background information on Mr. Swafford.  Counsel was entitled to that

94

1    information under state law if the prosecutor had sought it.  See People v. Murtishaw, 29 Cal. 3d

2    733, 767 (1981).  Second, Brady failed to follow up on Mr. Swafford's failure to respond to the

3    question regarding his criminal history.  However, while Brady may have acted unreasonably,

4    petitioner has not made a prima facie showing of prejudice.  He has shown neither that a

5    reasonable attorney in Brady's position would have excused Mr. Swafford, nor has he shown, as

6    discussed above, that Mr. Swafford's presence on the jury was prejudicial to him because he was

7    biased.

8                    3.    Claims relating to Bias by Juror DiBenedetto

9              Petitioner claims Juror DiBenedetto falsely answered two questions on the jury

10   questionnaire.  First, to the question asking whether she was acquainted with anyone from the

11   District Attorney's Office, she responded "no."  (LD 36, Ex. 503 at 3.)  Second, to the question

12   asking whether she had been involved in a criminal case, Juror DiBenedetto also responded "no."

13   (Id. at 4.)  Petitioner presents evidence showing that Ms. DiBenedetto had been convicted of three

14   misdemeanors in two separate prosecutions.  (LD 48, Ex. 329.)  The second conviction occurred

15   less than a year before she filled out the juror questionnaire in petitioner's case.

16             This court does not find Juror DiBenedetto's response to the first question to be false.  As

17   described above with respect to Juror Swafford, it would have been reasonable to believe a

18   prosecutor was not an "acquaintance."  However, petitioner is correct that Juror DiBenedetto

19   answered the second question falsely.  Under McDonough, this falsehood is sufficient to raise a

20   suspicion of bias.  464 U.S. at 555.  However, that is not the end of the inquiry.  To succeed on a

21   claim of juror bias under McDonough, a petitioner must also establish that the juror's correct

22   response to the question would have "provided a valid basis for a challenge for cause."  Id. at 556.

23   As the Court pointed out, "[t]he motives for concealing information may vary, but only those

24   reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial."  Id.  The

25   question in the present case, then, is whether Juror DiBenedetto's revelation that she had suffered

26   convictions for contributing to the delinquency of a minor and petty theft would have amounted

27   to sufficient cause to excuse her from the jury.

28   ////

1          Petitioner makes a tortured argument that the court should infer from Juror DiBenedetto's

2     misstatement that she felt a need to "curry favor with the prosecution," that she "would be harder

3     on someone else who was charged with a crime," and that she felt "considerable gratitude" to the

4     district attorney's office for not prosecuting her for a more serious offense when she was charged

5     with petty theft the second time.  None of these inferences are reasonable.  The fact that Juror

6     DiBenedetto made a mistake or that she was ashamed of her criminal record seem like much

7     more reasonable inferences from the record.  The information Juror DiBenedetto failed to reveal

8     is nothing like the information, usually closely associated with the subject matter of the case, that

9     courts have found significant in other cases.  See, e.g., McDonough, 464 U.S. at 555 (in a case

10    involving a boy injured by a riding lawn mower, juror failed to reveal that his son had suffered

11    injuries from the explosion of a truck tire); Clark v. United States, 289 U.S. 1 (1933) (juror lied

12    about her former employment with the company for which the defendants worked and lied about

13    her relationship to one of the defendants because she wished to serve on the jury; during

14    deliberations the juror brought in extrinsic information); Dyer v. Calderon, 151 F.3d 970 (9th Cir.

15    1998) (juror in a capital murder trial failed to disclose the fact her brother had been murdered and

16    her husband was in jail on a rape charge); United States v. Eubanks, 591 F.2d 513, 517 (9th Cir.

17    1979) (juror in heroin-conspiracy trial failed to inform the court that he had two children in prison

18    for heroin-related offenses).  Petitioner has failed to make a prima facie showing that Juror

19    DiBenedetto was biased.

20         Petitioner makes prosecutorial misconduct and ineffective assistance of counsel claims

21    similar to those made with respect to Juror Swafford.  Petitioner's prosecutorial misconduct

22    argument fails for the same reasons described above.  With respect to ineffective assistance of

23    counsel, petitioner argues that had attorney Brady known about DiBenedetto's convictions, he

24    would have successfully challenged her for cause.  That statement is not supported by the

25    authority petitioner cites or by common sense.  Petitioner relies upon People v. Morris, 53 Cal. 3d

26    152 (1991), in which the California Supreme Court held a trial court did not abuse its discretion

27    when it disqualified a juror for concealing information regarding prior convictions.  It does not

28    follow, however, that a reasonable attorney in Brady's position would have sought to disqualify

1  Juror DiBenedetto, nor does <u>Morris</u> stand for the proposition that such a request would have been

2  granted.

3                    4.    Claims relating to Bias by Juror Mohr

4          Petitioner alleges that Juror Rring Mohr, who was the foreperson of the jury, was biased.

5  Petitioner contends that Juror Mohr failed to respond truthfully to three questions on the jury

6  questionnaire.

7                    a.    Background re Mohr's Connections to Prison Guards

8          Question No. 13 on the Juror Questionnaire asked, "Are you or any close friend or relative

9  associated with any federal, state or local law enforcement agency or other governmental office

10  such as Sacramento County Sheriff's Department; District Attorney; Judges; or the Department of

11  Corrections?"  Juror Mohr answered, "No."  (LD 36, Ex. 502 at 4.)  In addition, Question No. 16

12  asked, "Have you or any close friend or relative ever been involved in a criminal case or

13  assaultive crime either as a victim, defendant, or witness?"  Mr. Mohr answered, "My sister had a

14  drunk driver drive his car across they're [sic] property and hit theyre [sic] house."  (<u>Id.</u>)

15          After trial, Mohr was interviewed by a defense investigator, and he told him, in two

16  recorded interviews, that he had "buddies who are guards" at California state prisons, including

17  one who was the "chief on the staff for Folsom."  (CT 811, 821.)  In addition, Mohr's sister's

18  brother-in-law, Wayne Nye, had been a prison guard but had been "slashed" about a year earlier

19  by an inmate and "couldn't take it after that."  (CT 811-12, 817, 820.)  Based on this information,

20  defense counsel brought a motion for new trial, alleging that Mohr had failed to reveal his

21  connections to guards.  (CT 787-833.)

22          A hearing was held at which the recorded interviews were admitted into evidence and Mr.

23  Mohr testified.  (RT 4198, 4167-69.)  Mohr reiterated that his sister's brother-in-law "was slashed

24  by an inmate" and left the Department of Corrections as a result of the slashing.  (RT 4172.)

25  Mohr first suggested that he did not consider Nye to be his relative, but then he testified "I don't

26  know why" he had not mentioned Nye and "obviously I didn't think of it."  (RT 4174, 4175.)

27          Mohr was asked if he had told the defense investigator that other friends were currently

28  guards, and he responded, "I know of people who are correctional officers, I call everybody my

1    friend . . . . So when it came down — when I filled out that big old paper, it took me a long time

2    to answer the questions.  I had to thoroughly think through is this person really my friend, are

3    they really a member of my family." (RT 4172-73.)  He did not consider the people he knew at

4    the Department of Corrections to be "close friends or relatives." (RT 4174.)

5           The trial judge denied the new trial motion.  He articulated his reasoning with respect to

6    many of the assertions of jury misconduct, but not with respect to Mohr's responses to the jury

7    questionnaire.  (RT 4226-28.)  He concluded that he was "satisfied in this case that this was not

8    jury misconduct that would have as a potential likelihood of influencing the outcome of the trial

9    or influencing the vote of any individual juror." (RT 4228.)

10          Petitioner presents the 2006 declarations of Wayne Nye and Mr. Mohr in support of this

11   claim.  These declarations indicate that Nye and Mohr had known each other since 1982 and that,

12   at the time of petitioner's trial, Nye and Mohr attended the same church.  (LD 47, Ex. 141,  ¶¶ 2,

13   4; Ex. 142,  ¶¶ 1, 2.)  Nye further attested that Mohr "is one of my closest friends." (LD 45, Ex.

14   142,  ¶ 1.)  Nye had "very frequent contact with Rring [Mohr] until he was married in 1986" and

15   thereafter spoke with Mohr "several times a year by phone and sometimes in person." (Id., ¶ 2.)

16   Nye stated that the attack by the prison inmate "had severe consequence for me both physically

17   and emotionally." (Id., ¶ 4.)  Nye was eventually diagnosed with PTSD.  (Id.)  Mohr "was a good

18   friend in my time of crisis and very supportive." (Id., ¶ 6.)  Since 1989, Nye held a day job, but

19   "I spend most of my nights and weekends in my apartment due to the secondary affects [sic] of

20   PTSD in the form of agoraphobia.  Rring [Mohr] continued to be there as a friend and supporter.

21   He knows very well the adverse affects [sic] that my time as a Correctional Officer has had on me

22   and my family.  I find it hard to trust and try to have as little contact with the outside world as

23   possible, although I do trust Rring Mohr and continue to this day to enjoy his friendship and

24   support." (Id., ¶ 8.)

25                      b.   Background re Mohr's Connections to Drug Dealers/Users

26          Question No. 51(a) on the Juror Questionnaire asked, "Do you know anyone whom you

27   believe to be a drug user/seller? (Yes/No)."  Mr. Mohr answered this question, "No." (LD 36, Ex.

28   502 at 19.)  In his post-trial interviews with the defense investigator, Mr. Mohr indicated that his

98

1    wife Renee had dealt drugs when she was in high school, before he knew her, and that she "could

2    have been knocked off very easily." (CT 810, 819.)  After they were married, the couple had

3    lived across the street from a drug lab, whose occupants "shot a couple of people," and even after

4    they purchased the house they were living in during the trial, people continued to attempt to buy

5    drugs from the former owner.  (Id.)

6         Mohr's failure to disclose these matters in voir dire was also a subject of trial counsel's

7    new trial motion.  At the hearing on the motion, Mohr testified that he had answered "No" to

8    Question No. 51(a) because "I didn't know anybody at the time, friend or anybody, that either

9    sold drugs or used drugs that I was aware of either doing it at that time." (RT 4176.)

10        Petitioner raised this claim on direct appeal and his state habeas.  He presented no

11   additional facts in support of the claim when he raised it on habeas.

12                        c.   Ineffective Assistance of Counsel re Juror Mohr

13        Petitioner also alleges attorney Brady rendered ineffective assistance when he failed to

14   "elicit from Mr. Mohr" the "true facts" described above.  He argues counsel should have

15   conducted further voir dire of Mohr.

16                        d.   California Supreme Court Decision

17        The California Supreme Court rejected on appeal and habeas both claims regarding Juror

18   Mohr.  Its appellate decision regarding the allegations that Mohr failed to reveal his relationships

19   with correctional officers was based, in large part, upon Mohr's testimony that he did not consider

20   the correctional officer "buddies" that he mentioned to the defense investigator or Wayne Nye to

21   be "close friends or relatives."  Petitioner's habeas claim is different.  Petitioner presented the

22   declarations of Nye and Mohr which establish that they had a fairly close relationship.  This court

23   finds the California Supreme Court's decision on appeal regarding the failure to mention Nye to

24   be problematic.  The California Supreme Court misconstrued Mohr's testimony when it stated

25   that Mohr's testimony was "uncontradicted" that he "did not consider [Nye] to be a 'close friend[]

26   or relative[].'"  18 Cal. 4th at 419.  In fact, Mohr testified that he did not feel that "buddies" were

27   "close friends or relatives."  With respect to Nye, Mohr testified that he did not think of Nye

28   when answering the juror questionnaire.  Nonetheless, because petitioner raised significant new

99

evidence in support of this claim in his state habeas petition, this court does not consider the

California Supreme Court's decision on appeal regarding Nye to be the decision subject to review

under section 2254(d).  Rather, this court must consider the California Supreme Court's silent

denial of the habeas claim regarding Nye and determine whether there is any basis for its finding

that petitioner failed to make a prima facie showing of error.

Because petitioner did not present any additional evidence to the California Supreme

Court in his habeas claim regarding Mohr's response to the drug users/dealers question, the

California Supreme Court's decision on appeal is the last reasoned decision on this claim and,

under section 2254(d), its reasonableness is subject to review.  The court held:

> [D]efendant maintains that Mohr should have identified his wife in response to question No. 51A. Defendant characterizes Mohr's response as "simplistic and hypertechnical." We disagree. Mohr's wife's drug sales occurred when she was a teenager, before Mohr even knew her. More importantly, question No. 51A was clearly phrased in the present tense. We cannot fault Mohr's decision to respond to the question as phrased.

18 Cal. 4th at 419-20.

The California Supreme Court rejected the ineffective assistance of counsel claim for the

following reasons:

> Defendant has failed to demonstrate that his trial counsel's performance was deficient. As a preliminary matter, defendant has not shown that it was his trial counsel who was responsible for the limiting language used in the jury questionnaire. Although his trial counsel drafted the questionnaire, the trial court stated that it had made some modifications to it. The nature of these modifications is not apparent in the record. Assuming arguendo it was defendant's trial counsel who was responsible for the wording, there is still no basis for a claim of deficient performance. Of necessity, not every aspect of every potential juror's background can be explored during voir dire. Trial counsel's decision to focus on present drug use or sales and on close friends or relatives fell well within an objective standard of reasonableness under prevailing professional norms. (People v. Williams, supra, 16 Cal.4th at p. 215; see also People v.
>
> Kelly (1992) 1 Cal.4th 495, 517 [3 Cal.Rptr.2d 677, 822 P.2d 385] [examples of topics routinely addressed during voir dire].)

18 Cal. 4th at 420.

////

////

1              e.   Discussion

2       Petitioner's claim that Mohr was untruthful about knowing drug users/dealers is baseless.

3  As the California Supreme Court points out, the question was phrased in the present tense.

4  Petitioner has failed to show at the time he responded to the questionnaire, Mohr knew anyone he

5  believed to be a drug user or drug dealer.

6       Petitioner's claim that Mohr should have mentioned the correctional officer "buddies" he

7  mentioned to the investigator is similarly baseless.  The trial court held a hearing and Mohr

8  explained that he did not consider these people to be his "close friends."  The trial judge

9  apparently felt that response was truthful.  Petitioner has not shown otherwise.  He presents only

10  the declaration of Doyle Melville, one of the correctional officers Mohr knew at the time of

11  petitioner's trial.  (LD 47, Ex. 143.)  Mr. Melville states that he and Mohr shared an apartment

12  from 1984 to 1985 and that Mohr may have attended Melville's wedding reception in 1987.  (Id.).

13  Nothing about Melville's declaration shows that he and Mohr had a continuing relationship or

14  any sort of "close" friendship in 1990 when Mohr filled out the juror questionnaire.

15       Petitioner's claim that Mohr was untruthful regarding Wayne Nye has a better

16  underpinning.  He has shown that Mohr and Nye had a relationship that was more than casual.  In

17  2006, Nye referred to Mohr as one of his closest friends.  Nye suffered his injury in December

18  1986.  (LD 47, Ex. 142, ¶ 4.)  Mohr completed the questionnaire four years later, in October

19  1990.  (LD 36, Ex. 502.)  In 2006, many years after that date, Mohr still recalled that in the

20  "months and years after the stabbing he [Nye] would tell me that he was always breaking out in

21  sweats and that he would panic for no reason."  (LD 47, Ex. 141, ¶ 4.)

22       Respondent argues that it is only Nye's declaration that states the two were "close friends"

23  and that Mohr did not so state.  The fact that Mohr did not use the precise term "close friends" is

24  not particularly important.  The question is whether a reasonable person in Mohr's position would

25  have considered it appropriate to mention Nye in response to two questions posed on the juror

26  questionnaire.  Further, respondent's argument goes to interpreting the facts presented.  At the

27  prima facie case stage, a court considers the allegations in the light most favorable to the

28  petitioner.  On state habeas, had the California Supreme Court done that analysis, the evidence

1   presented showed that Mohr and Nye had what could reasonably be considered a close

2   relationship and Mohr should have described Nye in his answers to both the question regarding

3   correctional officers and the question regarding involvement in a crime.

4       Respondent further argues that what petitioner has presented is insufficient to support

5   implied bias on the part of Mohr.  However, that is not the only test of bias.  As discussed above,

6   another question is whether petitioner has made a showing sufficient to justify a hearing at which

7   he could prove actual bias on the part of Mohr.  While the trial court held a hearing, it was

8   extremely limited on this subject and the trial court made only passing reference to it when ruling

9   on the motion for a new trial.  Mohr testified only that he was not sure why he failed to mention

10  Nye in his jury questionnaire responses.

11      Petitioner has made an adequate showing that Mohr was biased based on his false or

12  incomplete responses to two questions.  Further, had Mohr revealed his relationship with Nye, the

13  attack on Nye, and its consequences for him, it is not unreasonable to think Brady would have

14  requested Mohr be excused based on the possibility he would be prejudiced in favor of the

15  prosecution, particularly when it came to sentencing petitioner to death, rather than to life in

16  prison.  Moreover, it is possible that Mohr could have been excused for cause.  However, much of

17  that analysis depends upon the credibility of Mohr and Nye at an evidentiary hearing.  Because

18  the California Supreme Court denied petitioner's claim summarily, he was not given the

19  opportunity to make that showing.  This court finds that the failure to permit further factfinding of

20  petitioner's claim that Mohr was biased was an unreasonable construction of the facts under

21  2254(d)(2) or an unreasonable interpretation of the law regarding jury bias.

22      With respect to petitioner's claim of ineffective assistance of counsel, petitioner makes

23  few attempts to argue its merit.  This claim is limited to Brady's behavior during voir dire.

24  Petitioner argued on appeal and in his state petition that Brady failed to conduct a further voir dire

25  of Mr. Mohr.  Petitioner first attempts to argue that this court should consider the California

26  Supreme Court to have failed to rule on the merits of this aspect of this ineffective assistance of

27  counsel claim.  Petitioner is correct that the state court considered only whether Brady acted

28  unreasonably in failing to craft a broader juror questionnaire.  The court did not explicitly, at

102

1    least, consider the remainder of petitioner's argument – that Brady failed to conduct a further voir

2    dire of Mr. Mohr.  Petitioner argues that the California Supreme Court's silence on this aspect of

3    the ineffective assistance of counsel claim means it failed to consider it.  To the contrary, the

4    United States Supreme Court has held that a federal court must presume that an issue presented to

5    the state court was adjudicated on its merits.  Johnson v. Williams, 133 S. Ct. 1088, 1091-92

6    (2013).  Petitioner has not rebutted this presumption.  Further, because petitioner also raised the

7    claim in his state habeas petition, with its additional support in the form of the Mohr and Nye

8    declarations, this court will not consider the California Supreme Court's appellate decision, or

9    lack thereof, on the claim its final one.

10           Petitioner has failed to show just why or how Brady should have further questioned Mohr

11   during voir dire.  Further, to the extent he makes this argument regarding Mohr's knowledge of

12   anyone who had dealt drugs, petitioner has not shown that Mohr's knowledge that his wife had

13   dealt drugs as a teen, before he knew her, would have made him subject to challenge.

14                    5.  Jurors' Receipt of Extrinsic Evidence

15           Petitioner argues jurors received four categories of extrinsic information during trial:  (1)

16   Bonnie Hogue was at the crime scene; (2) Robert Reese had been killed in Arizona; (3) a person

17   sentenced to death would not likely ever be executed; and (4) one of the murder victims, Patrick

18   Mungavin, had been a neighbor of Juror Swafford and had attended school with Swafford's

19   daughter.  This court finds petitioner has failed to satisfy section 2254(d) for these claims.

20                    a.  Legal Standards

21           As set out above, it is clearly established federal law that the introduction of prejudicial

22   extraneous influences into the jury room constitutes misconduct which may result in the reversal

23   of a conviction.  Parker v. Gladden, 385 U.S. 363, 364–65 (1966).  Petitioner argues that the

24   jury's receipt of extraneous information is presumptively prejudicial.  However, the presumption

25   of prejudice applies only in limited situations, primarily when there has been communication or

26   contact with an outside party.  See Remmer v. United States, 347 U.S. 227, 229 (1954) ("[A]ny

27   private communication, contact, or tampering directly or indirectly, with a juror during a trial

28   about the matter pending before the jury is, for obvious reasons, deemed presumptively

1   prejudicial."); Parker, 385 U.S. at 363-64 (prejudice presumed where bailiff told jurors the

2   petitioner was a "wicked fellow" who was "guilty," and that "if there is anything wrong (in

3   finding petitioner guilty) the Supreme Court will correct it"); Turner v. Louisiana, 379 U.S. 466,

4   472-73 (1965) (deputies, who were key witnesses, had a "continuous and intimate association"

5   with the jury that was inherently prejudicial); United States v. Stinson, 647 F.3d 1196, 1216 (9th

6   Cir. 2011) (presumption of prejudice applies to any "possibly prejudicial" "unauthorized

7   contact"); Caliendo v. Warden, 365 F.3d 691 (9th Cir. 2004) (presumption applies to

8   unauthorized communications between a juror and a witness or other interested party); United

9   States v. Dutkel, 192 F.3d 893 (9th Cir. 1999) (presume prejudice only in cases of intentional jury

10  tampering).  In more prosaic cases involving the receipt of extrinsic information, the courts apply

11  the Brecht harmless error standard – the receipt of extraneous information violates a petitioner's

12  due process rights only where it had "a 'substantial and injurious' effect or influence in

13  determining the jury's verdict."  Estrada v. Scribner, 512 F.3d 1227, 1235 (9th Cir. 2008)

14  (quoting Jeffries v. Wood, 114 F.3d 1484, 1491 (9th Cir. 1997), overruled on other grounds by

15  Gonzalez v. Arizona, 677 F.3d 383 (9th Cir. 2012), and Brecht v. Abrahamson, 507 U.S. 619, 638

16  (1993)).

17              b.   Information that Bonnie Hogue was Present when Murders Committed

18          When he spoke to a defense investigator shortly after trial, Juror Swafford stated that he

19  became convinced petitioner was guilty because "[t]his broad, Bonnie Hogue, that the

20  prosecution gave immunity to the prosecution [sic], she was in the house.  She was there when the

21  gun was fired."  (CT 824.)  Petitioner assumes Swafford must have learned this information from

22  another source because Hogue told various people that she was present when the murders

23  occurred and the prosecutors had record of those statements.  However, during the post-trial

24  evidentiary hearing on possible jury misconduct, Juror Swafford stated that no one told him

25  Hogue was present at the scene.  He was speculating.  (RT 4303-304.)  Because petitioner has

26  failed to make a prima facie showing that any of the jurors received extrinsic information that

27  Hogue was present at the murder scene, the California Supreme Court was not unreasonable in

28  rejecting this claim.

c.   Information that Reese and Others had been Killed in Arizona

i.   Background

Near the beginning of trial, a newspaper article was published reporting that Robert Reese had been found shot to death in an Arizona desert a month after his trip to Sacramento with Mr. Majors.  (See RT 4224-25); People v. Majors, 18 Cal. 4th at 425.  On October 31, 1990, the seventh day of the prosecution's guilt-phase case-in-chief, juror Mark Powers reported to the court that he had been exposed to some unadmitted evidence.  (RT 2845.)  He was brought into chambers and, at a brief hearing, explained as follows:

> On my way home, or way back to work on Monday, I stopped at a sandwich shop on J Street and was standing in line and not paying much attention to anything. But I overheard a statement that somebody had made behind me, a man that said, "No, no. Reese was killed in Arizona."   And so I immediately, you know, got out of line and walked out the door, didn't, you know, look to see who it was or anything else. And then just went back to work.

(RT 2845A-2845B.)  Mr. Powers added that it seemed as if the speaker "were correcting some type of error."  (RT 2845B.)  Mr. Powers was asked if he could "separate what you hear on the street from what you hear in this courtroom and make a decision on this case based solely on the evidence you hear in this courtroom," and Powers responded, "I think so."  (RT 2845B-45C.)  He agreed he would not discuss such matters with other jurors.  (RT 2845C.)  The trial court asked Mr. Powers if he had drawn any conclusions about why Reese had been killed, and Powers responded:

> Well, I've tried to separate that and not think about it anymore. But, you know, the natural thought that keeps coming to mind is: Well, who would have reason to make sure that he didn't, you know, live? And that would be, you know, obvious — Obviously Mr. Majors. But I —
>
> I would probably not give any credence to that natural assumption or anything else or — Because he's obviously a drug dealer; it could have been a multiple thing. And it was just the time and the number of years that have passed obviously since that; there was no indication of when that happened or what.
>
> So, no, honestly, that was an assumption that I tried to put that out of my mind and say, well, there's a possibility that it could have been. And just because that's one didn't mean that — That's the one that is the truth.

(RT 2845C-45D.)  In response to further questioning from the court, Mr. Powers agreed that

Reese "could have died in a car wreck, a plane crash. There's a number of ways that he could

have — An overdose, whatever."  (RT 2845D.)  Powers only heard that Reese had been killed in

Arizona, not that he was murdered.  (Id.)

Following a recess at which defense counsel Brady discussed "whether or not to challenge

Mr. Powers with Mr. Majors," Brady advised the court that

> [t]here is some concern that has been expressed by Mr. Majors as to
> the objectivity. I represented to Mr. Majors that Mr. Powers is a
> juror that I would hate to lose. He's a bright guy, and I think that
> he's bright enough to be able to separate what he hears from the
> outside from that in the courtroom.
>
> Having that in mind, Mr. Majors has deferred to my
> judgment in having requested that he not be excused.

(RT 2845E-2845F.)

At the conclusion of the guilt phase, the court instructed the jury that

> [t]here has been evidence in this case indicating that a person other
> than defendant was or may have been involved in the crime for
> which the defendant is on trial.
>
> There may be many reasons why such a person is not here
> on trial. Therefore, do not discuss or give any consideration to why
> the other person is not being prosecuted in this trial or whether or
> not he has been or will be prosecuted. Your sole duty is to decide
> whether the People have proved the guilt of the defendant on trial.

(RT 3451.)

Following the final arguments of counsel, a second newspaper article was published,

repeating the information about Reese's shooting death and adding that bullets recovered from the

murder scene in the current case had been linked to "a string of seven homicides in Arizona."

(See RT 4225); People v. Majors, 18 Cal. 4th at 425.  After the penalty phase trial ended, juror

Rring Mohr told a defense investigator that although he had not read the newspapers, "my

neighbors kept calling and he wanted me to come and look at it, that he [Majors] was connected

to a bunch of other murders now.  I mean jeepers, I am glad that he was convicted because I

didn't know he was connected to all these murders, you know, killing people left and right."  (CT

812.)  Mohr said he knew nothing about Reese's involvement, though the jurors wanted to know where he was.

> [S]ome people were like is Robert [Reese] alive or is he dead, or has been tried in Arizona or what? But any time that topic would come up, I would just tell him hey, that is just guessing. All we have to do is deal with the facts. We have got the facts here we have got the safe, we the [sic] got the necklace we got the pictures, Robert Reese I am sure we will find out after trial.

(CT 816.)  Juror Swafford told the defense investigator,

> I ain't never known nothing about Jim Majors uh, uh Robert Reese being dead. I was speculating like everybody else. [¶]  I could see where every once in a while, like Robert Reese is dead. That's ain't nobody told me and I hadn't read it in no damn paper. I just noticed that we were all talking about Robert Reese, but ain't nobody seen him. [¶]  I said, and I was wondering where the hell is he?"

(LD 47, Ex. 139 (Decl. of paralegal who transcribed tape) at 26.)

In his motion for new trial, defense counsel alleged juror receipt of outside information. A hearing was held, and two jurors testified with respect to this issue.  Asked about his statement to the investigator regarding telephone calls from his neighbor, Juror Mohr testified, "I may have said it but I don't recall what I was thinking."  (RT 4177.)  Mohr initially testified he did not recall that his neighbor had told him that Majors had been involved in other murders, and then he said that the neighbor had not told him.  (RT 4178.)  Mohr again said he "cannot explain" his statement to the investigator.  "All I know, you know, I reel off at the mouth, I get going and I can't explain everything I say."  (RT 4178.)

Juror Michael Miller testified that the fact that Reese had been found dead "was mentioned basically during the deliberations a few times.  It was again more speculation.  [¶]  I didn't know.  It was speculation to me."  (RT 4185.)  When asked whether during trial he was aware that petitioner had been accused of killing other people in Arizona, Miller responded, "I had heard that before."  (RT 4186.)  Miller explained that he heard it during jury deliberations:

> During the jury deliberations in the last week or so.  It was speculated by one member of the jury.  It last for about ten or 15 seconds and then that was it.  Most of the other jury said we don't know that for a fact, that's speculation.  So the person that said that, it was just washed out as quickly as it came.

1   (Id.)  Miller further explained that he believed the speculation involved the death of Robert Reese.

2   "[I]t was speculated that he was killed.  They didn't really tie Jim [petitioner] to that, they said

3   Robert Reese was killed.  And the speculation part of it was who did it."  (Id.)  "At that time there

4   was no proof given [that Reese was killed], it was all speculation.  It came briefly who might

5   have done it and then that was the end of it."  (RT 4187.)  Miller was not aware of a link between

6   petitioner and other killings in Arizona.  (Id.)

7           At the conclusion of the hearing, the trial court denied the motion for new trial.  In

8   relevant part, the court stated:

> On the issue of Mr. Mohr or any other juror receiving information about evidence about any other homicides or what happened to Mr. Reese, I forget which juror, one of the jurors told us that during the trial that he had come across that information that Mr. Reese had been killed or had died or whatever. And he assured us, and counsel and the Court accepted that assurance, that he could set that aside and that would not affect his deliberations.

> I'm sure the jurors naturally suspect that there was some other information out there because we were continually admonishing them not to be exposed to the media.

> But I accept Mr. Mohr's testimony in court that this was not something that he received during the trial nor affected his deliberations during the trial.

> So I find that although certain things may have happened during jury deliberation — I would like to think that jury deliberation is pure and pristine and that they consider only the absolutely limited material that they're told to, consider it and they interpret the law strictly and accurately.  But I'm also not naive enough to think that that actually happens, that during all jury deliberations — we admonish the jurors not to form any opinion, not only not express an opinion but not to form an opinion which is in my own personal opinion a total impossibility for someone to sit and listen to someone talk about what happened and not periodically form opinions as to whether or not something really did happen.

> . . .

> And I'm satisfied in this case that this was not jury misconduct that would have as a potential likelihood of influencing the outcome of the trial or influencing the vote of any individual juror.

(RT 4227-28.)

////

108

The motion was reopened about ten days later, and further testimony was taken from Jurors Mohr and Swafford.  Mohr now claimed that the neighbor had talked to him but only after trial.  (RT 4319-20.)  He did acknowledge that the jury "did a lot of speculation" on what had happened to Robert Reese.  (RT 4322.)  Swafford testified that he had not known that Reese was dead,

> [b]ut as the trial went on, questions — Robert Reese name came up from Michelle Blouir and she said, 'I loved him'. Remember what I just said 'I loved him'. So I said to myself Robert Reese ain't here no more, he's history.  But I didn't tell nobody.  But it created more doubt.

(RT 4307-08.)  The renewed motion was implicitly denied.

ii.      California Supreme Court Decision

Petitioner raised this claim on appeal.[34]  The California Supreme Court rejected the claim:

a) *Juror Mark Powers*

> Shortly after the trial court gave its initial admonition regarding Reese, Juror Mark Powers approached the trial court and said that he had been exposed to something about the case. At a hearing outside the presence of the rest of the jury, Powers explained that "[o]n my way home, or way back to work on Monday, I stopped at a sandwich shop on J Street and was standing in line and not paying much attention to anything. But I overheard a statement that somebody had made behind me, a man that said, 'No, no. Reese was killed in Arizona.' [¶] And so I immediately, you know, got out of line and walked out the door, didn't, you know, look to see who it was or anything else. And then [I] just went back to work." The references to "Reese" and "Arizona" had caught Powers's attention.

> Powers assured counsel and the trial court that he would not share what he had heard with other jurors or allow it to enter into his deliberations in any way. The trial court then conducted the following inquiry:

> "The Court: From that statement, did you make any conclusions about why he was killed or when or-Do you have any thoughts about that at all?

---

[34] Petitioner also raised the issue in his state habeas petitions.  It appears, however, that he did not present any additional evidence in support of the habeas claims and they were, therefore, essentially the same as the claim made on appeal.  Accordingly, the California Supreme Court's reasoned rejection of the claim on appeal is the opinion considered by this court under 28 U.S.C. § 2254(d).

"Juror Powers: Well, I've tried to separate that and not think about it anymore. But, you know, the natural thought that keeps coming to mind is: Well, who would have reason to make sure that he didn't, you know, live? And that would be, you know, obvious-Obviously Mr. Majors. But I- [¶] I would probably not give any credence to that natural assumption or anything else or-Because he's obviously a drug dealer; it could have been a multiple thing. And it was just the time and the number of years that have passed obviously since that; there was no indication of when that happened or what. [¶] So, no, honestly, that was an assumption that I tried to put that out of my mind and say, well, there's a possibility that it could have been. And just because that's one didn't mean that-That's the one that is the truth.

"The Court: Okay. I think-Well, then, you do recognize that there's many, many possibilities as to how or whether that was an accident or-Whatever?

"Juror Powers: Yeah. I thought he could have died in a car wreck, a plane crash. There's a number of ways that he could have-An overdose, whatever.

"The Court: The thing you heard was, he was killed in Arizona?

"Juror Powers: Right.

"The Court: Not that he was murdered or anything else?

"Juror Powers: No."

After conferring with defendant, defense counsel declined to challenge Powers. Defense counsel explained, "I have discussed whether or not to challenge Mr. Powers with Mr. Majors. There is some concern that has been expressed by Mr. Majors as to the objectivity. I represented to Mr. Majors that Mr. Powers is a juror that I would hate to lose. He's a bright guy, and I think that he's bright enough to be able to separate what he hears from the outside from that in the courtroom. [¶] Having that in mind, Mr. Majors has deferred to my judgment in having requested that he not be excused."

Subsequently, during the hearing on defendant's pro se motion for a new trial based on ineffective assistance of counsel, defendant stated that he had told his trial counsel to challenge Powers. Counsel's recollection was "significantly different." According to counsel, defendant "initially wanted [Powers] off. I told him that a person such as that, forthright enough to come forward when he does receive information he's not supposed to receive, in my opinion is going to bend over backwards for you to try not to use that prejudicial information. And it is certainly a crap shoot to try to have him removed. But I was satisfied with his answers. [¶] And I think one of the other things is that Mr. Powers appeared to me to be a very bright person. He was very attentive throughout the course of the trial and I did want to keep him. [¶] ...

110

And my recollection is that Mr. Majors deferred to me on what the ultimate decision was." At the conclusion of the hearing, the trial court denied defendant's motion, rejecting his claim that trial counsel had been ineffective.

Defendant now seeks to raise the issue of Powers's inadvertent receipt of outside information on this direct appeal. Apparently recognizing that his trial counsel's failure to challenge Powers has waived the issue for the purposes of appeal (People v. Gallego (1990) 52 Cal.3d 115, 187-188 [276 Cal. Rptr. 679, 802 P.2d 169]), defendant renews his claim that counsel was ineffective in failing to challenge Powers. The record fails to establish counsel's incompetence. When Powers heard the outside information, he immediately left the sandwich shop and approached the trial court voluntarily, offering his assurances that he would not share what he had heard with other jurors or allow it to enter into his deliberations in any way. Moreover, although Powers heard that Reese had been killed in Arizona, he had no idea when or how this had occurred. Defendant's trial counsel described Powers as a very bright, attentive, and forthright juror who would "bend over backwards ... to try not to use that prejudicial information." On the present record, we have no basis for second-guessing trial counsel's tactical decision to leave Powers on the jury. (See People v. Lucas (1995) 12 Cal.4th 415, 487 [48 Cal.Rptr.2d 525, 907 P.2d 373] ["Given the juror's assurance that the conversation had not affected her, and the court's admonition not to discuss the matter with the other jurors, we cannot say that the record establishes any incompetence."].)

b) *Other Unidentified Jurors*

In addition to Juror Powers, defendant contends that other unidentified jurors also received outside information regarding the killings in Arizona. He bases this claim on the following testimony of Juror Miller at the hearing on the new trial motion:

"[Defense Counsel]: Did you ever hear anyone discuss the fact that Robert Reese had been found dead in Arizona?

"[Juror Miller]: It was mentioned basically during the deliberations a few times. It was again more speculation.

"[Defense Counsel]: All right.

"[Juror Miller]: I didn't know. It was speculation to me.

. . . . . . . . . . .

"[Defense Counsel]: You were aware that Mr. Majors was accused of killing other people in Arizona during the course of the trial?

"[Juror Miller]: I had heard that before.

. . . . . . . . . . .

111

"[The Prosecutor]: When did you hear that, sir?

"[Juror Miller]: During the jury deliberations in the last week or so. It was speculated by one member of the jury. It lasted for about ten or 15 seconds and then that was it. Most of the other jury said we don't know that for a fact, that's speculation. So the person that said that, it was just washed out as quickly as it came.

"[The Prosecutor]: When you say accused of killing other people, are you talking [about] Robert Reese or somebody else?

"[Juror Miller]: I believe it was Robert Reese, that it was speculated that he was killed. They didn't really tie Jim to that, they said Robert Reese was killed. And the speculation part of it was who did it.

"[The Prosecutor]: One juror was offering the speculation, to use your word, that Robert Reese was probably dead, that he'd been killed?

"[Juror Miller]: Yes.

"[The Prosecutor]: And that same juror speculated that perhaps Jim had done it or what? I don't understand what you're saying.

"[Juror Miller]: No, it was speculated that he was killed, okay. At that time there was no proof given, it was all speculation. It came briefly who might have done it and then that was the end of it.

. . . . . . . . . . .

"[Defense Counsel]: "Maybe you didn't understand my question, Mr. Miller.

"[Juror Miller]: Okay.

"[Defense Counsel]: What I asked was specifically isn't it true that you were aware that he was linked to other murders in Arizona during the course of the trial?

"[Juror Miller]: No, I was not aware of that during the course of the trial."

Contrary to defendant's assertion, this testimony fails to establish that any of the jurors received outside information. Rather, the testimony establishes only that one juror briefly speculated that Reese might have been killed. As Miller himself noted, "there was no proof given, it was all speculation." Miller's testimony is consistent with the testimony of Foreperson Mohr, which defendant fails to reference. According to Mohr, when the speculation as to Reese's whereabouts occurred, "[a] few of the jurors said we already asked the Judge that in a question, one of the jurors did, and the response from the Judge was it's none of our business, it's not

part of the trial. So then we had to tell them, hey, you can speculate all you want but the Judge told us [Reese] is not part of this trial, so just forget about it." Given that the speculation as to Reese's whereabouts lasted only a matter of seconds and given that the jury immediately returned to the trial court's instructions, we conclude that defendant was not prejudiced by the incident.

18 Cal. 4th at 426-30.

### iii.   Discussion

Petitioner fails to show that any of the jurors, besides Juror Powers, received extrinsic information.  With respect to Powers, the trial court held a hearing at which Powers testified that he would be able to set aside what he had heard and would not tell any of the other jurors.  The judge then gave the defense the opportunity to ask for Powers' dismissal.  The defense chose not to make that request.  The trial court thoroughly dealt with the question of Powers' inadvertent receipt of information.  Petitioner has failed to show it prejudiced him.

Petitioner further fails to show that any of the other jurors did anything besides speculate about Reese's whereabouts, including whether he might be dead.  Petitioner argues that by dividing this claim into two parts, the California Supreme Court missed the import of the unidentified juror's statement.  According to petitioner, it was reported that a juror speculated that Reese had been killed in Arizona.  That is not exactly what was said.  Juror Miller testified regarding the statement of the unidentified juror.  Attorney Brady asked whether Miller had heard Reese had been killed in Arizona.  While Miller responded yes, he had heard that, his descriptions of what was discussed included only the speculation that Reese was dead, not that he was killed in Arizona.

While it is unclear whether Miller agreed that jurors discussed speculation that Reese may have died or that jurors discussed that Reese may have died in Arizona, that lack of clarity is insufficient to find the California Supreme Court unreasonably denied this claim.  Petitioner argues that the addition of the Arizona information indicates jurors got this information elsewhere because there is no way for jurors to have known that Reese died in Arizona absent some outside information.  This court disagrees.  If jurors speculated that Reese died, it is not much of a stretch to also speculate that he died in Arizona, where he was last seen and lived.  Therefore, even

113

assuming Miller's testimony was that jurors discussed whether Reese may have died in Arizona, this court finds petitioner has failed to establish the likelihood that the information came from an extrinsic source.  The trial court held a hearing on this issue and determined there was no misconduct.  It cannot be said that no reasonable jurist could find the California Supreme Court's affirmance of the trial court's decision to be reasonable.  Accordingly, petitioner fails to meet the section 2254(d) standards for this aspect of claim 1.

### d.   Discussion that Death Penalty Would Not be Carried Out

#### i.   Background

Petitioner argues that two jurors told other jurors that the death penalty was not likely to be carried out.  According to a defense investigator, Juror Mohr told him he made such statements.

> I [the investigator] commented to Mr. MOHR on the speed with which they reached the death verdict. Mr. MOHR commented that while he and some other jurors were in favor of imposing the death sentence, some of the other jurors were leaning toward life without parole. Mr. MOHR stated that he explained to them that it was general knowledge that nobody sentenced to death was actually executed in California. I believe Mr. MOHR said nobody within the past 15 years. Mr. MOHR told the jurors that he believed someone sentenced to death would actually live longer than a person placed in the general prison population because of less danger. He also told them that prisoners sentenced to death had fewer privileges and smaller cells. Thus, his theory was that those favoring life without possibility of parole were appeased by learning that nobody really gets the death penalty.

(CT 787-88.)  During a later interview, Mohr acknowledged telling at least one juror that nobody got executed and so there was no difference between death and life without parole.  (CT 814.)

> [A]ll I know is I grew up and nobody was executed my whole life. I am thirty years old and I don't have a real good memory, but ever since I was in elementary school, somebody in Georgia might have or Florida or Texas, and not even up until recently and you know I don't real [sic] alot of newspapers, but I do listen to alot of radio and I listen all the time and the guys with the death penalty never die, not in California . . . .

(CT 821.)  Juror Mohr went on to say that he learned this information from the radio or television news shows.  (Id.)  When Juror Swafford was interviewed, he indicated he had heard the

1    information from Juror Ridley, not from Juror Mohr.  (CT 828.)

2           This issue was raised in petitioner' motion for a new trial.  At the hearing on the motion,

3    the judge asked Juror Mohr about information he had received that Mohr "assure[d] one of the

4    jurors that the death penalty really won't be imposed and that people on death row actually are

5    treated better or have a better life than those sentenced to life without the possibility of parole."

6    (RT 4169-70.)  The judge then asked Mohr if Mohr recalled the instruction that jurors were to

7    assume that the penalties were accurate.  Mohr responded that he did recall that instruction,

8                    But there were opinions shared in the jury room; however,
         we did come down to the instructions that were given.  And
9        throughout the first couple of days we had our opinions.  And
         nobody was coming to any conclusion at all.
10

11                   And I said, well, we have to start with the instructions that
         are given to us by the Judge.  There were some people who didn't
12       want to hear all of the instructions from the Judge because they had
         basically already thought that they had come to their conclusion.
13       And I said, well, we can't do that.

14                   So then we started page by page, word by word started
         reading exactly.  And that's what brought us into harmony was the
15       jury instructions.  And so if it had not been for the  instructions, we
         would have been just a mess.  So we did refer to the instructions
16       and did stick with those instructions.

17                   However, occasionally there were people that shared their
         opinions.  But, a lot of them were like my opinion, had nothing to
18       really do with anything.  Sometimes people would just say well this
         and we'd say well that's just your opinion.

19                   So we stuck straight with the facts, the facts that were given
         and the jury instructions.
20

21   (RT 4170-71.)

22          In his ruling on the new trial motion, the judge held:

23                   Regarding jury misconduct.  I'm not pleased to find out that
         jurors, particularly the foreperson, even mentioned whether or not
24       the death penalty is imposed or would be imposed or what the jail
         conditions are like.
25
                     However, I'm satisfied with Mr. Mohr's testimony that this
26       was just a passing comment and that the jurors focused on the law
         and reminded each other that they had to follow the law as dictated
27       by the Court.  And with that I cannot see how this could possibly
         have affected or influenced the verdict.
28

                                              115

1  (RT 4227-28.)

2                      ii.       California Supreme Court Decision

3          Petitioner raised this issue on appeal and again in each of his state habeas petitions.

4  Because the habeas claims were essentially the same as the claim raised on appeal, the California

5  Supreme Court's decision on appeal is its last reasoned decision on this issue.  The court held:

6                  For the purposes of our analysis, we shall assume, without
           deciding, that Mohr made the comment in question.  Our decision
7          in People v. Cox (1991) 53 Cal.3d 618 [280 Cal.Rptr. 692, 809 P.2d
           351] is particularly instructive.  In Cox, one of the jurors told the
8          entire panel that no one in California had been executed since the
           1960's and referred to former Chief Justice Rose Bird.  (Id. at pp.
9          693, 696.)  We rejected defendant's misconduct claim, holding that
           the comment came within "the ambit of 'knowledge and beliefs
10         about general matters of law and fact that find their source in
           everyday life and experience,' which jurors necessarily bring to
11         their deliberations because our jury system is 'fundamentally
           human.' [Citation.] [¶] At the time the jury was considering
12         defendant's penalty, February 1986, Chief Justice Bird and
           Associate Justices Grodin and Reynoso were the objects of a
13         strenuous and well publicized campaign to unseat them at the
           impending retention election.  It coalesced around the high
14         percentage of death penalty reversals and the claim that, led by the
           Chief Justice, this court was intentionally evading the law in
15         refusing to affirm more of those decisions and allow executions to
           recommence.  Regardless of their political interest or inclination,
16         few citizens of the state could have been unaware of the situation or
           the circumstances prompting these efforts. [Citation.] We find no
17         misconduct in a single reference to factual matters of which the
           entire jury undoubtedly had some independent knowledge." (Id. at
18         p. 696.)

19                 Defendant attempts to distinguish Cox on the grounds it
           "was tried during a time when several members of the California
20         Supreme Court were being challenged politically because of their
           rulings on death penalty cases. [Citation.]  The question of whether
21         people were going to be executed was squarely in front of the
           public on a day to day basis.  No such situation existed in the Fall
22         of 1990 when the present case was tried."  We are not persuaded by
           this attempt to distinguish Cox.  Although the retention election
23         was over by the time this case was tried, there had still not been an
           execution in California since 1967, and the question of when, and
24         if, anyone would be executed was still very much a matter of public
           debate.
25
                   In any event, the trial court specifically found that Mohr's
26         remark was "just a passing comment and that the jurors ... reminded
           each other that they had to follow the law as dictated by the Court."
27         This finding is supported by substantial evidence, FN22 and, hence,
           we accept it here.  (People v. Nesler, supra, 16 Cal.4th at p. 582
28         (lead opn. of George, C. J.).)  Under these circumstances, even if

                                          116

1        we were to deem the comment to have been misconduct, we would
2        readily conclude that the presumption of prejudice arising
         therefrom had been rebutted.

3                FN22 At the hearing on the new trial motion, Mohr testified
                 that although jurors occasionally shared their opinions on
4                matters that "like my opinion, had nothing to really do with
                 anything," they reminded each other "that's just your
5                opinion" and returned to the facts and the trial court's
                 instructions.

6

7    18 Cal. 4th at 421-22.

8                        iii.    Discussion

9            Petitioner makes one argument – that the California Supreme Court made a factual error

10   when considering this claim because it referred only to Juror Mohr making the comments, not

11   that Juror Ridley may have made them as well.  However, petitioner misreads Juror Swafford's

12   statement to the defense investigator.  Juror Swafford told the investigator that Ridley, not Mohr,

13   mentioned that the death penalty would not be carried out.  Whether the statement came from

14   Ridley or Mohr, it was still one statement and petitioner presents no evidence indicating that it

15   was considered any more extensively than how Mohr described it in his responses to the judge's

16   questions during the hearing on the motion for a new trial.  In fact, petitioner presents no

17   evidence, besides the transcript of the investigators discussion with Juror Swafford, to support the

18   allegation that Juror Ridley also told other jurors the death penalty would not be carried out.

19           Furthermore, petitioner's argument is a new one and the California Supreme Court can

20   hardly be faulted with failing to consider it.  Petitioner's argument before the state court was that

21   Juror Mohr made the statement.  In his opening brief on appeal, petitioner mentioned Juror

22   Swafford's statement in a footnote and stated that any claim regarding Swafford's statement that

23   Juror Ridley also raised the issue would be pursued in petitioner's habeas petition.  (AOB at 91

24   n.10.)  It was not.  (1997 State Pet. at 59-61; 2003 State Pet. at 90.)  Nor were any allegations that

25   Juror Ridley had also raised the issue made in the federal petition.  (ECF No. 140 at 74.)  Rather,

26   all of petitioner's habeas petitions focused solely on the statements made by Mohr.  The

27   California Supreme Court did not make an unreasonable factual determination in denying

28   petitioner's claim.

                                        117

e.   <u>Information that Juror Swafford Received from his Daughter</u>

Patrick Mungavin was one of the persons killed.  His name was read to prospective jurors during jury selection.  (RT 1019, 1439.)  No juror indicated a familiarity with Mr. Mungavin.  However, after trial Juror Swafford told a defense investigator that he had discussed his knowledge of Mr. Mungavin with another juror during trial.

> Okay, now, I said to the judge, first I said to Arlene, before I said this to Rring [Mohr], Mungavin went to school with my daughter, okay.
>
> . . .
>
> And I said Mungavin lived next door to me for 8 months. So they said, why don't you tell the judge. I said okay. So I did. I had mentioned that to [juror Michael] Miller and I had mentioned that to Rring. So I went in and told the judge and Mr. O'Mara [the prosecutor] and the uh, uh Brady [defense counsel] and they said will that cause you to be prejudice? I said by all means not, but I wanted you to know that one of the deceased people went to school with my daughter. I said I did not know this and I, and I didn't at the time the trial started, prior to the trial starting.
>
> . . .
>
> I found it out during the trial, okay.
>
> . . .
>
> His sister never told me.
>
> . . .
>
> My daughter said she read a few things in the paper. She said, little Mungavin was in my honor society at Mitchell and he also was in Cordova papa, with me. I said what. She said yeah did you see him when he stayed over at Bob's that little bitty small guy? Yet still he was a wrestler he wasn't no weakin, weakling.
>
> . . .
>
> Okay. So I told the judge about it, but first I tested it out with Rring because I wondered if, wondered if it would be a problem.

(LD 47, Ex. 139 (investigator's trans. of tape rec. of int. with Swafford) at 25-26; CT 831-32.)

Petitioner contends that Mr. Swafford never brought the matter to the trial court's attention, or to the attention of the prosecutor or defense counsel.  (<u>Cf.</u> RT 4312 (judge says nothing was done off the record in the case.))  At the hearing on the motion for new trial,

1   Swafford was asked about what he had told the defense investigator.  Swafford continued to

2   maintain that he had told the judge about his knowledge of Mr. Mungavin.  (RT 4309.)  When

3   asked about his statement that he found out "during the trial" that Mungavin went to school with

4   his daughter, Swafford now claimed that his daughter had not talked to him until after the trial.

5   Nonetheless, Swafford also continued to insist that he had told the judge about his connections to

6   Mungavin and even claimed that this had occurred in petitioner's presence.  (RT 4311.)

7          Petitioner claims he raised this issue in his two state habeas corpus petitions, which were

8   denied summarily.  He points out that the 1997 claim was also denied, along with the entire group

9   of jury misconduct claims, as having been "raised and rejected on appeal."  Petitioner contends

10  that this ruling shows the California Supreme Court did not consider his claim on the merits

11  because it was not, in fact, raised on appeal.  However, as respondent points out, the claim raised

12  in the 1997 petition stated only that Juror Swafford "had discussions with his daughter concerning

13  things she had read in the newspaper about petitioner's case."  (LD 23 at 57.)  This is a far cry

14  from petitioner's current claim, described in his 2003 state petition and in his federal petition, that

15  Swafford knew one of the victims.  The California Supreme Court denied the 2003 petition on the

16  merits.  That is the decision this court reviews for reasonableness.

17         With respect to the merits of petitioner's claim, it is worth pointing out that Mr.

18  Swafford's statements are far from clear.  However, the judge and counsel all appeared to be in

19  agreement that Mr. Swafford never described his knowledge of Mr. Mungavin on the record, that

20  everything occurring before the judge had been recorded, and that, therefore, Mr. Swafford did

21  not inform the judge about the connection to Mr. Mungavin during the course of the trial.  In

22  court, Mr. Swafford also disavowed a number of things he told the defense investigator.  In sum,

23  petitioner has not provided a basis to support a claim that during the course of the trial Mr.

24  Swafford received outside information that his daughter knew Mr. Mungavin, and that he,

25  therefore, had been a neighbor of Mungavin's.  And, even if petitioner made a sufficient showing

26  that during trial Swafford became aware he had been a neighbor of Mr. Mungavin, petitioner has

27  failed to show that information prejudiced Swafford against him.  The California Supreme Court

28  ////

119

1   would not have been unreasonable in finding petitioner failed to make a prima facie showing of

2   unconstitutional jury misconduct.

3         6.   <u>Improper Pre-Deliberation Discussions by Jurors</u>

4         a.   <u>Background</u>

5       With petitioner's motion for a new trial, he submitted an affidavit from his wife, Shirley

6   Majors.  Ms. Majors described two incidents involving jurors on November 15, 1990, during the

7   lunch recess.  This lunch recess was taken during the middle of the prosecutor's rebuttal to the

8   defense closing argument at the guilt phase.  (RT 3754.)  Ms. Majors stated

9
10
11
12   > [W]hile in the courthouse cafeteria during the luncheon recess of
   > this case, I observed three male members of the jury engaged in a
   > discussion obviously centering around said case.  Two of the jurors
   > were black and one was white.  The white juror used a hand signal
   > representing a handgun placed to his head, and then slumped in his
   > chair duplicating the position of the victim Mungavin.

13
14
15
16
17
18   > [A]pproximately 20 minutes later, while sitting outside courtroom
   > #15 on the 5th floor, I observed three other jurors.  One man and a
   > woman were seated on a bench with another man standing.  The
   > male juror sitting on the bench picked up a portion of a newspaper
   > which had previously been placed there by other persons, and
   > proceeded to look through it.  I do not know what portion it was.
   > They then began to make jokes about Bonnie Hogue and were
   > laughing loudly.  The juror standing advised that he had an
   > eightball for lunch, and that he had something to show them that
   > better depicted Bonnie Hogue than that of the demonstration by
   > Michael Brady.

19   (CT 742-43.)

20       Ms. Majors further stated that she told attorney Hamlin and petitioner about what she had

21   observed.  Petitioner then told her he had discussed it with attorney Brady, who "became very

22   upset" because if the judge became aware of what had transpired it could cause a mistrial.  Ms.

23   Majors also attempted to contact the judge.  She stated that she left a message with someone in

24   his office that she had observed a potential problem with the jury and left her phone number in

25   case the judge wanted to talk with her.  (CT 743.)

26       During his post-trial interview with a defense investigator, Juror Swafford, one of only

27   two African-American jurors, stated that he did not recall a conversation in the cafeteria about the

28   crime scene and Mr. Mungavin.  (CT 831.)  However, he did recall talking with Juror Miller, the

1    other African-American juror, and Juror Mohr in the cafeteria about petitioner "not being

2    convicted" because the prosecutor "loosen [sic] this case." (Id.)  Swafford also stated that he and

3    Miller had out-of-court discussions that included Miller's reluctance to be part of the process and

4    vote for guilty and "some informal talks and the more we talked the more we looked at the crime

5    scene we picked out little things.  Somebody was moved and somebody did this, this person was

6    shot here and we tried to figure out who was shot first."  (CT 830, 831.)

7        During Juror Mohr's interview with the defense investigator, he was asked to confirm that

8    "there was never any discussion that you can remember about the case" outside the courtroom.

9    Mohr replied, "Other than stuff that wouldn't apply to it, you know as far as talking about it to the

10   other jurors, I sometimes say gees, you know, I am glad I don't know this person.  Or [i]f I were

11   accused, I hope you know, I have a good lawyer or something.  I mean we kept that right inside

12   the courtroom and that is about it."  (CT 817.)

13       During the hearing on the motion for a new trial, both Jurors Swafford and Miller testified

14   on this subject.  Miller denied having any conversations about the evidence in the case.  (RT

15   4182.)  However, he did state that he and Swafford would talk outside the courthouse before

16   going home for the day and that sometimes the evidence in the case came up.  That probably

17   happened once or twice a week.  (RT 4183.)  Miller clarified that if someone told him their

18   opinion about the case, he told them he did not "want to hear it and the conversation changed."

19   (Id.)  Miller also testified he did hear other jurors talk about the case briefly on two or three

20   occasions.  (RT 4182.)  He "heard groups of three, two, [jurors] give their opinions on the case, at

21   least six or seven give their opinions."  (RT 4185.)  Those opinions were varied and "[i]t was all

22   speculation."  (Id.)  Miller stated that although he "may have heard some things I really blotted it

23   out.  I made my own decision."  (Id.)

24       Juror Swafford also testified at the post-trial hearing about conversations outside

25   deliberations.  He denied talking with Juror Miller about the case during their after-hours

26   conversations.  (RT 4192.)  He also denied talking with Miller and Mohr in the cafeteria about the

27   case.  (Id.)  He repudiated statements he made to the defense investigator.  (RT 4192-93.)  He

28   ////

1    testified that he told Miller and Mohr that if he started discussing the evidence, they should stop

2    him.  "And they did a good job."  (RT 4195.)

3            The trial judge concluded that he was

4            satisfied that any discussions that Mr. Miller and Mr. Swafford had
             were not focusing on the evidence of the case or the outcome of the
5            case but more so the process and perhaps the frustration of being a
             black person in what Mr. Miller may consider a white process.  And
6            I can understand . . .  I am satisfied that could not reasonably have
             affected the outcome of the trial.
7

8    (RT 4227.)

9            Right before sentencing, the trial judge re-opened the possible jury misconduct issues

10   raised in the motion for a new trial.  (RT 4301, 4325.)  At that time, Juror Mohr testified that he,

11   Juror Miller, and Juror Swafford

12           had discussions.  They weren't always concerning the case, but we
             had a lot of discussions, a ton of discussions, yeah.
13

14                   As far as the details of the case, I had to keep a lid on Mr.
             Swafford.  If you know Mr. Swafford like I got to know him, he
15           likes to talk.  He likes to ramble on.  And he knew that he likes to
             talk a lot, so he told Mr. Miller and especially me and Mr. Miller
16           that if he started to get out of line that we jump on him and stop
             him.

17   (RT 4324.)  When asked specifically whether they had any discussions about the evidence in the

18   case, Mr. Mohr replied "no."  (Id.)  The trial judge reaffirmed his denial of the motion for a new

19   trial.  (RT 4340.)

20                   b.  California Supreme Court Decision

21           Petitioner raised this claim on appeal and the same claim, with no new evidence, in both

22   state habeas petitions.  The California Supreme Court's decision on appeal is thus the last

23   reasoned opinion on the issue.  The court held:

24                   Defendant's third misconduct claim is premised on his
             assertion that some jurors, separated from the rest of the jurors,
25           discussed the trial and expressed opinions while the trial was in
             progress.  "The Penal Code provides that jurors must not 'converse
26           among themselves or with anyone else on any subject connected
             with the trial, or . . . form or express any opinion thereon until the
27           cause is finally submitted to them.' ([Former] § 1122[, now § 1122,
             subd. (b)].) [Defendant's] jury was so instructed. FN23 Violation of
28           this duty is serious misconduct. [Citation.]" ( In re Hitchings, supra,

122

6 Cal.4th at p. 118, original fn. omitted.) Defendant has failed to establish that such misconduct occurred in the present case.

> FN23 At the outset of the trial, the jurors were admonished as follows: " [Y]ou must not converse among yourselves nor with any other person on any subject connected with this case or this trial. If anyone should try to talk to you about this case or this trial, please let me know immediately. [¶] Also, you must not form or express any opinion upon any matter involved in this case until the entire case is finally submitted to you." The parties then stipulated "that at any recess or adjournment it will be legally sufficient if the Court reminds the jurors of this admonition without repeating it in full[.]"

. . .

> As noted above, in determining whether misconduct occurred, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence. [Citations.]" (People v. Nesler, supra, 16 Cal.4th at p. 582 (lead opn. of George, C. J.).) In this case, the record at the hearing on the new trial motion provides ample support for the trial court's finding that "any discussions that Mr. Miller and Mr. Swafford had were not focusing on the evidence of the case or the outcome of the case." Both Swafford and Mohr testified that the discussions did not relate to the evidence in the case. Miller's testimony was vague and contradictory, at some points suggesting that the discussions related to the evidence and at other points stating "[o]ur discussion was not about the trial." Even when defense counsel asked a highly leading question about whether Swafford had expressed a particular opinion, Miller could only reply that the opinion was "somewhat like that."

> The trial court made no specific findings as to jurors other than Miller and Swafford. The evidence as to these jurors, however, is even more equivocal. Although Miller testified that he heard them expressing opinions, he could not recall what these opinions were, repeatedly referring to them as "speculation." Absent concrete evidence as to the content of the jurors' discussions or the nature of their opinions, the record fails to establish misconduct. As this court observed a century ago, "[t]he law does not demand that the jury sit with the muteness of the Sph[i]nx, and when jurors are observed to be talking among themselves it will not be presumed that the act involves impropriety, but in order to predicate misconduct of the fact it must be made to appear that the conversation had improper reference to the evidence, or the merits of the case." (People v. Kramer (1897) 117 Cal. 647, 649 [49 P. 842].)

18 Cal. 4th at 422-25.

////

////

123

c. <u>Discussion</u>

The legal standards governing the requirements that jurors be impartial and that they decide a case based solely on the evidence presented are set out above.   Petitioner first argues that section 2254(d) is inapplicable because the California Supreme Court did not adjudicate the federal aspects of this claim on the merits.   The United States Supreme Court addressed this very question in <u>Johnson v. Williams</u>, 133 S. Ct. 1088 (2013).   The Court considered whether a state court decision that addresses some claims, but does not expressly address the federal claim in question, is subject to section 2254(d) deference.   The Court held that the presumption that the state court has ruled on the merits of a claim applies in this situation.   <u>Johnson</u>, 133 S. Ct. at 1091-92 (citing <u>Harrington v. Richter</u>, 562 U.S. 86 (2011)).   Petitioner provides no reason to rebut the presumption.   Accordingly, his contention that section 2254(d) deference should not apply to this claim fails.

Petitioner's second argument is that the California Supreme Court unreasonably determined the facts in a variety of ways:  (1) because Mohr's testimony was irrelevant to the discussions Swafford and Miller had a number of times at the end of the day; (2) because Swafford's testimony conflicted with his statement to the investigator; (3) because Swafford's testimony that he made a comment that the prosecutor was "loosen this case" during deliberations made no sense because he used the present tense, indicating the trial was still going on; (4) because the court's statement that Miller's testimony was equivocal ignored the fact that Miller stated he heard other jurors give their opinions and speculate.   The trial court held a hearing on this issue, heard evidence, and concluded that there was no misconduct.   The California Supreme Court was not unreasonable in holding that petitioner lacked concrete evidence about the nature of any of these conversations and in denying petitioner's federal claim.   Further, as respondent points out, the fact that jurors may have violated instructions and expressed opinions about petitioner's guilt does not mean petitioner did not receive a fair trial.   Petitioner has failed to make either a factual or legal showing of a violation of his constitutional rights.

////

////

124

7.   <u>Juror Discussion During Penalty Phase</u>

a.   <u>Background</u>

In his post-trial interview with the defense investigator, Juror Mohr was asked whether he felt that returning a penalty verdict of life without possibility of parole would be "like doing [petitioner] a favor," to which Mohr responded, "Yeah, it would be doing him a favor and with life without parole, maybe somewhere down the line the laws might change. Or he might get out. See he knows me he knows my name, now he doesn't alot [sic] of the other people's names, or maybe he does. When we were picking these jurors, he was right there with the attorneys."  (CT 812.)  Mohr was asked whether other jurors brought up a concern about petitioner coming after them, and Mohr replied,

> Yeah. That was brought up. Some people thought well, you know if we don't give him the death penalty, then he can come after us. That was talked about. But, we had to disregard that because we got to serve justice and if he is worthy of it, then he is gonna get it. Basically the bottom line was we owed it to the community to make sure that if he is guilty, he gets the full penalty of the law — the full implication of of [sic] the law but if he didn't then he should be free and we owe it to him to give him every opportunity so we had to cover all him and try and give him every mercy and still take care of the public and the public won that time. So that was talked about but it was — we had to disregard that. We can't hang a guy just because he might come after us. That is not fair. We have to go by the instructions and so we stuck real tight to the instructions, even though the penalty phase instructions we[re] a lot more vague.

(CT 813.)

The trial court did not explicitly address this matter at the hearing on the motion for new trial, but it was briefly addressed when the court subsequently heard renewed testimony by Jurors Swafford and Mohr.  Swafford did not recall whether the questions of release and retribution against the jurors was mentioned, but Mohr did so recall.  (RT 4316, 4322.)  Mohr expressed this view himself, as did "a few others who were afraid that possibly [petitioner] might get out and come hunt them down."  However, Mohr testified he told the others this was not a reason "to convict" petitioner and that they had to "stick strictly" to the instructions and "not be worried about fear or intimidation" from petitioner.  (RT 4322.)

////

125

1    b.  <u>California Supreme Court Opinion</u>

2        Petitioner raised this claim in his 1997 and 2003 state habeas petitions.  The first petition

3    was denied on the merits and the court also denied the entire jury misconduct claim as having

4    been raised, and rejected, on appeal.  The 2003 state petition was denied on the merits.

5    c.  <u>Discussion</u>

6        In addition to the general rules regarding jury conduct described above, petitioner cites

7    well-established Eighth Amendment jurisprudence that a death sentence must be reliably imposed

8    and that sentencing juries must be "carefully and adequately guided in their deliberations."

9    <u>Woodson v. North Carolina</u>, 428 U.S. 280, 305 (1976); <u>Gregg v. Georgia</u>, 428 U.S. 153, 193

10   (1976).  Petitioner first argues, as he did above, that the California Supreme Court's rejection of

11   this claim because it was raised and rejected on appeal, which it was not, shows that the court did

12   not consider it.  However, petitioner ignores the fact that the California Supreme Court's 2010

13   denial of petitioner's exhaustion petition noted that this specific claim had not been raised on

14   appeal, but should have been.  (LD 57, Apr. 28, 2010 Order.)  In addition, the court denied the

15   claim on the merits.  Accordingly, section 2254(d) applies to the state court's merits

16   determination.

17       Petitioner's second argument is that the jurors' expressed concerns were a violation of the

18   court's admonition that jurors must assume the penalties imposed would be accurate.  By failing

19   to adhere to that instruction, jurors injected an arbitrary, and non-evidentiary, factor into their

20   deliberations.  However, petitioner's claim is based solely on Mohr's testimony and Mohr was

21   very clear that while jurors may have raised concerns about the possibility of petitioner being

22   released, they were re-focused and decided the case on the instructions given.  Petitioner has not

23   shown otherwise and the California Supreme Court would not have been unreasonable in holding

24   that petitioner failed to make out a prima facie claim of jury misconduct in this regard.

25   D.  <u>Courtroom Security – Claim 3</u>

26       Petitioner was shackled during the entire guilt phase.  He had waist chains that bound him

27   to a security chair and, at some points, he was handcuffed.  The type of shackling was not done at

28   the behest of the court or the prosecutor.  Rather, defense counsel requested it.  Petitioner claims

1   the shackling was the result of ineffective assistance of counsel and was a direct denial of his

2   constitutional rights.  This court finds petitioner has failed to satisfy section 2254(d) for his

3   claims involving shackling and courtroom security.

4           1.   Legal Standards

5           The "Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to

6   the jury absent a trial court determination, in the exercise of its discretion, that they are justified

7   by a state interest specific to a particular trial."  Deck v. Missouri, 544 U.S. 622, 629 (2005).  To

8   establish a claim of unconstitutional shackling, a petitioner must show that he was physically

9   restrained in the presence of the jury, that the shackling was seen by the jury, and that the

10   physical restraint was not justified by state interests.  Ghent v. Woodford, 279 F.3d 1121, 1132

11   (9th Cir. 2002).  Where a defendant was seen shackled in the courtroom for a significant period of

12   time, courts have found the shackling "inherently prejudicial," and, once it is established that it

13   occurred without adequate justification, the burden shifts to the state to prove the error was

14   harmless beyond a reasonable doubt under Chapman v. California, 386 U.S. 18 (1967).  Deck,

15   544 U.S. at 635; Estelle v. Williams, 425 U.S. 501, 504-06 (1976); Holbrook v. Flynn, 475 U.S.

16   560, 568-69 (1986).  However, if the defendant was seen shackled outside the courtroom or was

17   seen shackled in the courtroom only briefly, prejudice has not been presumed and the petitioner

18   must prove he was actually prejudiced.  Ghent, 279 F.3d at 1133; Rhoden v. Rowland, 172 F.3d

19   633, 636 (9th Cir. 1999); United States v. Olano, 62 F.3d 1180, 1190 (9th Cir. 1995) (jurors brief

20   exposure to defendant in shackles as he entered courtroom requires a showing of actual

21   prejudice); United States v. Halliburton, 870 F.2d 557, 561-62 (9th Cir. 1989) (jurors' brief view

22   of defendant handcuffed outside courtroom requires showing of actual prejudice); Wilson v.

23   McCarthy, 770 F.2d 1482, 1486 (9th Cir. 1985) (defendant required to make an "affirmative

24   showing of prejudice" from jurors brief exposure to shackles as defendant was leaving the

25   witness stand); United States v. Figueroa-Espinoza, 454 F.2d 590, 591 (9th Cir. 1972) (fact some

26   jurors may have seen defendants in handcuffs when they reentered the courtroom after a recess

27   "was not so inherently prejudicial as to require a mistrial").  Prejudice is not inherent in shackling

28   outside the courtroom because "'[i]t is a normal and regular as well as a highly desirable and

1    necessary practice to handcuff prisoners when they are being taken from one place to another, and

2    the jury is aware of this.'"  Halliburton, 870 F.2d at 561 (quoting United States v. Leach, 429

3    F.2d 956, 962 (8th Cir. 1970)).

4         The Court of Appeals has held that considerations in determining the prejudicial effect of

5    a shackling error include "the appearance and visibility of the restraining device, the nature of the

6    crime with which the defendant was charged and the strength of the state's evidence against the

7    defendant."  Larson v. Palmateer, 515 F.3d 1057, 1064 (9th Cir. 2008) (citing Dyas v. Poole, 317

8    F.3d 934, 937 (9th Cir. 2003)).  In addition, the Court of Appeals has considered that more

9    elaborate physical restraints would likely heighten the appearance of the defendant's

10   dangerousness.  Id. (citing Spain v. Rushen, 883 F.2d 712, 722 (9th Cir. 1989)).  "Similarly, if the

11   defendant is charged with a violent crime, then the risk of prejudice increases, because shackling

12   'essentially brand[s] [him] as having a violent nature.'"  Id. (quoting Rhoden, 172 F.3d at 637).

13        This court recognizes that all of these considerations have been set out by the Courts of

14   Appeals.  As such, they do not necessarily reflect "clearly established Federal law as decided by

15   the Supreme Court."  The Court of Appeals recognized this AEDPA limitation on the use of Dyas

16   and other circuit case law.  Walker v. Martel, 709 F.3d 925, 941 (9th Cir. 2013).  However, the

17   considerations mentioned by the Court of Appeals in Larson and Dyas are just that,

18   considerations.  They are logical facts to consider when determining whether or not a defendant

19   suffered prejudice from being inappropriately shackled at trial.  This court looks to those listed

20   considerations, among others, when examining the reasonableness of a California Supreme Court

21   determination that any constitutional shackling error was harmless.

22        The standards for an ineffective assistance of counsel claim are set out above.  Simply,

23   petitioner must show counsel acted unreasonably and that there is a reasonable probability that

24   absent counsel's error, the result of the proceeding would have been different.  Strickland v.

25   Washington, 466 U.S. 668, 687-88, 694 (1984).

26              2.  Background Facts

27        On September 17, 1990, the day before jury selection was to begin, defense counsel

28   Michael Brady brought up the matter of shackling.

128

> There is one other issue we should address, which is the security chair. You know, Mr. Majors has been cooperative with me throughout my representation of him.
>
> It seems to me — and I have not had an opportunity to discuss it with him, if I may just think out loud — it seems to me it's in our best interest to have you belly chained in the chair with one officer behind you versus having two or three officers sitting behind you which may have the appearance of something greater than it is. So just cover it with your sweater, but that's up to you.

(RT 1004-05.)  In response to Mr. Brady's statements, the trial court asked, "Now as far as even the point of having any type of additional restraint, that is, the belly chain attached to the security chair, is there any need to make a record that is necessary in this matter? He has an escape history." (RT 1006.)  Brady responded he would discuss the matter with his client, and the next day, Brady stated that

> [Y]esterday, upon leaving or getting ready to adjourn, we had addressed the issue of whether or not Mr. Majors would be confined to a security chair. The other option, in the absence of a security chair, meaning that he was going to have a belly chain that is unobservable to the jurors or the public and strapped to a chair and have the one bailiff versus having several bailiffs behind him.
>
> After discussing the situation with Mr. Majors, it is our decision that we would like to have him strapped to the chair and have less bailiffs, making that conscious choice. So we would ask the Court to allow him to be strapped to the security chair.

(RT 1008.)  The court asked petitioner if this was his decision, and petitioner replied that it was. (RT 1009.)

At the end of the first day of testimony, a question arose as to whether the court reporter needed to report the sidebar proceedings at which the jurors' proposed questions for witnesses were reviewed.  When asked whether he would object to not being present for these discussions, petitioner stated, "the problem I see with that is the chains, you would have to dismiss the jury every time.  Unless you want to remove them, it's fine with me."  (RT 2006.)  Later, when the jury retired for its guilt phase deliberations, defense counsel Brady asked the court not to require petitioner's presence until there was a verdict or a mistrial.  Brady said that "because of the nature of the offense [petitioner] is shackled, arm and belly chained and sitting on a hard bench all day long and I just, he would prefer to, to remain at the main jail . . . ."  (RT 3808.)

Petitioner presents the declarations of three jurors who saw petitioner shackled. Juror Alice Carter stated that she heard other jurors say they had seen petitioner "chained" in court. "This seemed to make some of the jurors nervous." (LD 31, Ex. 115.) Juror Kay Silva stated, "During Mr. Major's trial, one of the male jurors sitting near me pointed out that Mr. Majors was chained around his waist and the chain was connected to his chair. I saw he was chained like this during the trial." (LD 31, Ex. 116.) Juror Mark Powers declared:

> During the trial, I noticed that Mr. Majors was shackled while seated at the defense table. The shackles were in plain sight of anyone sitting in the jury box. I also recall seeing Mr. Majors in handcuffs which were connected to a chain that ran vertically down the front of his body toward the chair. I don't recall if he always wore the handcuffs because on one occasion I remember seeing him writing at the table during trial.

(LD 31, Ex. 125.)

In addition, petitioner presents evidence that he suffers from serious back problems, which he claims rendered shackling unnecessary because he had limited mobility. In 1988, two years before trial, a doctor opined that petitioner had "sustain[ed] permanent injury to the spine," which caused "progressive disk deterioration and herniation" and he would "most likely be unable to resume any type of repetitive bending or lifting activity, as well as any lifting over 25 to 30 pounds." (LD 32, Ex. 204.) According to attorney Donald Manning, who was initially appointed to represent petitioner at trial, petitioner "was suffering from chronic back pain as a result of a car accident when I was appointed to his case. He wore a leather brace at the jail and when he was required to make a court appearance. He often expressed discomfort after climbing the stairs to the jail visiting room and upon arrival at court." (LD 31, Ex. 124.) Petitioner also presents jail medical records showing that he was prescribed various medications for back pain. (LD 35, Ex. 401.)

### 3. California Supreme Court Decision

Petitioner raised this claim on appeal, but he supplemented the claim in his 2003 state petition with the declarations from jurors who saw petitioner shackled. Accordingly, the California Supreme Court's 2010 summary denial of the habeas claim is its final determination on the claim presented to this court.

130

1          4.   Discussion

2          Respondent argues petitioner cannot show unconstitutional shackling because he

3   consented to be shackled at trial.  Petitioner has failed to present federal law clearly establishing

4   that a petitioner who consented to shackling at trial may later argue the trial court violated his

5   constitutional rights by doing so.  The California Supreme Court did not unreasonably hold that

6   petitioner failed to make a prima facie showing that he was unconstitutionally shackled.  See

7   Packard v. Cash, 2012 WL 1616964, *12 (C.D. Cal. Apr. 11, 2012) (The petitioner's request to

8   be shackled "prevents him from prevailing on his claim that the restraints were ordered by the

9   trial court in violation of due process."); cf. Estelle v. Williams, 425 U.S. 501, 512-13 (1976)

10  (defendant's failure to object to requirement that he wear prison garb forfeits later claim of

11  constitutional violation in that regard).

12         Petitioner has a better claim that counsel erred by not only failing to object to shackling,

13  but by suggesting shackling in the first place.  Attorney Brady raised the issue, mentioned two or

14  three options for security, and, after discussing it with his client, suggested the security chair.

15  The trial court appeared to consider the necessity of security when he asked counsel whether a

16  record of necessity needed to be made because petitioner had an escape history.  Presumably, the

17  judge was implying that making such a record was either not necessary or could be easily

18  accomplished.

19         Whether or not Brady acted reasonably in suggesting, rather than opposing, shackling,

20  petitioner has failed to make out a prima facie showing of prejudice.  Petitioner has failed to show

21  that, had Brady objected, the trial court would not have shackled petitioner.  To the contrary,

22  petitioner was charged with three murders, had significant prior crimes, at least one of which

23  involved violence, and, most importantly, had attempted to escape from prison.  Petitioner has not

24  shown this court that his back problems were sufficient to cause a judge to question whether, with

25  his criminal record and the pending charges, he should be shackled. [35]  Instead, in light of a

_____

[35] Petitioner also points out that he comported himself well during the trial.  Petitioner does not
explain, however, how the fact that the judge commented on his good behavior near the end of
trial reflects on any decision made at the beginning of trial to shackle petitioner.  (See ECF No.
235 at 157.)  Petitioner also points to two places in the record near the beginning of trial where

1  foregone conclusion that petitioner would be shackled, and in consultation with petitioner, Brady

2  made an understandable decision about how to minimize the appearance of the shackles and

3  accompanying guards and their impact on the jurors.  Accordingly, because petitioner has not

4  shown that any objection by Brady to shackling was reasonably likely to lead to a different result,

5  petitioner has failed to show the California Supreme Court's rejection of this claim was

6  unreasonable.

7       E.  Guilt Phase Stipulations – Claim 4

8       Petitioner alleges that a variety of stipulations had the effect of undermining the jury's

9  consideration of lingering doubt at the penalty phase, that petitioner did not knowingly and

10  intelligently waive his right to a jury determination of the stipulated facts, and that counsel was

11  ineffective for entering the stipulations.  This court finds petitioner has failed to show the

12  California Supreme Court unreasonably rejected these claims.

13       1.  Legal Standards

14       Petitioner argues that any fact that serves as a predicate for increased punishment must be

15  found beyond a reasonable doubt by a jury.  Petitioner admits, however, that his reliance upon

16  Ring v. Arizona, 536 U.S. 584, 602 (2002), for this proposition is misplaced.  (ECF No. 243 at

17  70.)  In addition, petitioner's argument that the stipulations violated his due process rights

18  because he did not knowingly and voluntarily give up his rights of confrontation and cross-

19  examination has no legal support.  Respondent shows that lower courts have held that evidentiary

20  stipulations fall within counsel's discretion and do not require waiver by the defendant.  (ECF No.

21  237 at 102-03.)  Petitioner has failed to show the United States Supreme Court has held

22  otherwise.  Accordingly, petitioner's waiver argument also lacks a legal basis.

23

---

24  the judge made comments indicating he did not feel petitioner was a risk.  (See RT 1214-15 (in
25  response to juror's request that his questionnaire be kept confidential, judge responded, "if there
    were some threat involved where I thought the jurors were at some risk by even being on trial,
26  then we could consider something like that. But that just doesn't apply in this case"); RT 1790
27  (after jurors were sworn, the court started the proceedings even though there was no security in
    the room.)  Petitioner fails to point out that both those comments were made when he was
    already shackled so they do not reflect that the judge felt comfortable having petitioner
28  unshackled.

1    Petitioner primarily focuses on the ineffective assistance of counsel allegations in this

2    claim.   The legal standards for those allegations have been set out above.

3          2.   Discussion

4    Petitioner has failed to show that many of the stipulations were unreasonably made.   The

5    stipulation that Danny Hobbs made a statement to police officers about the missing TransAm was

6    a stipulation to only that, the fact that Danny Hobbs made that statement.  (See RT 1910:17-18

7    (trial judge describes stipulation as being that the "statement was made.")  It was not a stipulation

8    that the TransAm was in fact missing at that time.  Further, attorney Brady used Danny Hobbs'

9    statement to his advantage.  In closing argument he used it to show the prosecution's theory of the

10   time of the murders was incorrect.  (RT 3618-20.)  The stipulation that the TransAm contained

11   nothing of evidentiary value was insignificant because the prosecution did not argue petitioner

12   had been in the car.  Rather, the focus was on the lack of fingerprints in the residence, which

13   Brady emphasized during his closing argument.  (RT 3622-23.)

14   Petitioner takes the stipulation regarding the first date of Sacramento Bee coverage out of

15   context.  Respondent shows that, when read in the context of the trial testimony, the date was

16   correct.  (RT 3292-93.)

17   Petitioner fails to show how the following stipulations prejudiced him in any way:  (1) the

18   date that police turned the crime scene over to Probst's family (RT 1986); and (2) the date witness

19   Betty Jane Smith testified she last saw victim Thomas Probst (RT 2310).[36]

20   Several stipulations require closer analysis.  First, petitioner points to counsel's

21   stipulation, in response to an apparently unreported juror question, that "Bonnie Hogue was

22   uncooperative with both the Arizona authorities and the homicide detail here in Sacramento.  The

23   reason being, she didn't want to be involved in this particular case."  (RT 3151.)  Petitioner

24   argues this stipulation was untrue.  Bonnie Hogue volunteered information to the Sheriff's

25   Department, received a $2500 reward for her cooperation, and, he argues, traded further

26

27   [36] Counsel did not stipulate to this date.  Apparently, petitioner is arguing that counsel should
     have challenged Ms. Smith about the date.

28

1    cooperation for benefits as detailed in Claims 2 and 23.  However, attorney Brady raised the

2    stipulation in argument when discussing Hogue's failure to provide the police with the gloves and

3    bandana she claimed to have seen in the motel room and taken with her or with the clothes she

4    testified petitioner purchased for her.  (RT 3669-71.)  Further, without knowing the juror's

5    question, it is not possible to know the reach of the stipulation.  Petitioner has failed to show

6    Brady acted unreasonably in this respect.

7        Petitioner makes much of two stipulations regarding firearms evidence.  First, counsel

8    stipulated that petitioner possessed a .32 caliber revolver, and its manual, before the murders.

9    (RT 3362.)  The stipulation acknowledged Rusty Hartley's uncontroverted testimony that he saw

10   petitioner with a .32 caliber handgun about three weeks before the murder.  (RT 2885.)  The

11   second stipulation was that various other weapons "are in no way involved in any of the three

12   homicides."  (Id.)  The stipulation then identified guns that testimony had linked to either

13   petitioner or Robert Reese.  (RT 3362-63.)

14       Petitioner argues counsel should have attempted to exclude Hartley's testimony and the

15   evidence of the various weapons found at petitioner's home.  However, because a prosecution

16   criminalist testified that the bullet that killed Thomas Probst could have been shot by a .32

17   revolver, Hartley's testimony about petitioner's possession of a .32 gun was certainly relevant.

18   Further, no bullets were recovered from victim Jeanne Copeland's body.  Accordingly, the type of

19   gun used to shoot her was unknown and it is likely that evidence of ownership of any type of gun

20   that could have been used would have been admissible.  Petitioner has not shown that any

21   objection to Hartley's testimony would have been sustained or that Brady's stipulation to

22   petitioner's possession of the .32 prejudiced him.

23       With respect to the second stipulation that none of the guns found at petitioner's home

24   were used in the homicides, petitioner has failed to make a showing that decision was an

25   unreasonable one.  The prosecution introduced a note of expenses found at petitioner's home that

26   listed $1500 worth of guns.  Showing that petitioner had a number of guns that were not

27   connected to the homicides gave some meaning to that note besides the prosecution's contention

28   that it showed the purchase of guns for the purpose of committing the Sacramento murders.

134

1  Counsel stipulated that (1) Mr. Majors "had a cellular phone during the period that we've

2  been discussing, the latter part of 1988 and the early part of 1989," and (2) that on November 22,

3  1988, a three minute call was placed from that phone to Fair Oaks, California.  (RT 3366.)

4  According to petitioner, both stipulations were misleading and prejudicial because the jury could

5  have inferred petitioner had the phone for the purpose of planning and facilitating the crime.

6  Petitioner argues that the first stipulation's use of the term "the period we've been discussing"

7  was misleading.  Further, counsel could have shown that the November 22 call was just one of

8  thousands made from petitioner's phone and the only one made to the Probst residence.

9  However, the prosecution did not argue that the cell phone had been obtained for the purpose of

10  the crimes and this court does not find it reasonable to assume, even for the purposes of making

11  out a prima facie case, that the jury would have made that inference from the stipulations.

12  Moreover, petitioner's argument does not lessen the impact of the one call made from petitioner's

13  phone to the Probst residence.  Accordingly, petitioner has failed to show prejudice from the cell

14  phone stipulations

15  Counsel stipulated to the testimony that would have been presented by Karen Brott, an

16  acquaintance of Robert Reese, regarding conversations she had with Reese before and after his

17  trip to Sacramento. The stipulated testimony included Brott's observations of cash, jewelry, and

18  drugs that Reese possessed after the trip.  Petitioner argues that defense counsel should have

19  cross-examined Brott with statements she made to police that Reese had gone to Sacramento to

20  visit his brother, that he had reported afterwards that his brother "had made some speed and was

21  going to set him up with some deals," and that he had appeared shocked by news of Thomas

22  Probst's death.  Petitioner does not explain why Brott's testimony was prejudicial.   Part of the

23  defense at trial was that Reese acted alone.  Brott's testimony implicated Reese, but did nothing

24  to directly implicate petitioner.  Further, a number of people testified that they saw Reese with

25  cash, jewelry, and drugs after the trip.

26  Trial counsel stipulated to certain facts that impeached Bonnie Hogue's testimony, rather

27  than presenting live testimony.  Counsel submitted stipulations that: (1) a custodian of records

28  for Mike Lowrie Trucking would testify if called that Bonnie Hogue had never worked for the

1    company, as she had testified; (2) a custodian of records for the California Highway Patrol would

2    testify if called that Hogue's husband, Timothy Hogue, had never worked for the California

3    Highway Patrol, as she had told police; and (3) store records from Foxy's Clothing showed sales

4    substantially less than Hogue claimed Mr. Majors had spent on her the day after the homicides.

5    Petitioner argues that by stipulating to each of these facts, counsel forfeited an opportunity to

6    expose the full extent of Bonnie Hogue's untruthfulness and lost the opportunity to develop

7    additional facts about those lies.  Petitioner shows that the owner of Lowrie Trucking Company

8    could have established that Ms. Hogue had never even applied to work with the firm, let alone

9    driven a company truck, and he had never seen her.  (LD 32, Ex. 305.)  The owner of Foxy's

10    Clothing could have testified that Ms. Hogue's claim that petitioner purchased a $200 dress for

11    her there was wrong – the store's most expensive item at that time sold for $129.  (LD 44, Exs.

12    712, 713.)  None of these items of impeachment were particularly significant.  The only one

13    relating to the crimes was impeaching Ms. Hogue's testimony about how much money petitioner

14    spent on her.  But, the precise amount petitioner spent on Ms. Hogue's clothing can hardly be

15    considered important impeachment, particularly considering all the other money petitioner spent

16    on meals, airplane tickets, motel, and prostitution.

17         The final stipulation to which petitioner objects was introduction at the penalty phase of a

18    photo depicting a "typical prison cell" and the stipulation that the cell measured 5 by 8 feet.  (RT

19    3992-93.)  Petitioner argues that this gave the jury too sterile a picture of what a life-without-

20    parole prisoner's daily life might be like.  During his closing argument, defense counsel Hamlin

21    raised this issue.  He stressed that life without parole meant petitioner would die in prison, he

22    used the photo to discuss the tight confines of a prison cell, and he discussed the limitations on

23    petitioner's activities and freedoms.  (RT 4114-16.)  However, under state law, he was not

24    entitled to actually introduce such evidence in trial because it "involves speculation as to what

25    future officials in another branch of government will or will not do."  See People v. Thompson,

26    45 Cal. 3d 86, 139 (1988).  The California Supreme Court so held when addressing petitioner's

27    claim of ineffective assistance of counsel at the penalty phase for counsel's failure to attempt to

28    present evidence regarding the conditions of confinement for a life prisoner.  People v. Majors, 18

1    Cal. 4th at 416 & n.16.  Counsel cannot be faulted for failing to introduce evidence that petitioner

2    has failed to show was admissible at the penalty phase.

3         F.    Pretrial Publicity – Claim 5

4        In Claim 5, petitioner argues that extensive and highly inflammatory pretrial publicity

5    violated his right to a fair trial.  He further alleges ineffective assistance of counsel for his trial

6    attorneys' failure to move for a change of venue.  Petitioner has failed to make a prima facie

7    showing of success on these claims.

8         1.   Legal Standards

9        The Sixth Amendment "guarantees to the criminally accused a fair trial by a panel of

10    impartial, 'indifferent' jurors."  Irvin v. Dowd, 366 U.S. 717, 722 (1961); see also Green v.

11    White, 232 F.3d 671, 676 (9th Cir. 2000).  "[I]f prejudicial pretrial publicity makes it impossible

12    to obtain an impartial jury," then the trial judge must grant the defendant's motion for a change of

13    venue.  Daniels v. Woodford, 428 F.3d 1181, 1210 (9th Cir. 2005) (quoting Ainsworth v.

14    Calderon, 138 F.3d 787, 795 (9th Cir.), amended, 152 F.3d 1223 (1998)); Gallego v. McDaniel,

15    124 F.3d 1065, 1070 (9th Cir. 1997); Harris v. Pulley, 885 F.2d 1354, 1361 (9th Cir. 1988).

16    However, jurors are not required to be totally ignorant of the facts and issues involved in a case.

17    Irvin, 366 U.S. at 722; see also Murphy v. Florida, 421 U.S. 794, 800 (1975); United States v.

18    Sherwood, 98 F.3d 402, 410 (9th Cir. 1996).  It is sufficient if the jurors can lay aside their

19    impressions or opinions and render a verdict based on the evidence presented in court.  Holt v.

20    United States, 218 U.S. 245 (1910); Patton v. Yount, 467 U.S. 1025, 1035 (1984) (issue is

21    whether jurors could impartially judge the defendant, not whether they remembered the case).

22    Thus, pretrial publicity is so prejudicial that it requires a change of venue where "the community

23    where the trial was held was saturated with prejudicial and inflammatory media publicity about

24    the crime" or "voir dire reveals that the jury pool harbors 'actual partiality or hostility [against the

25    defendant] that [cannot] be laid aside.'"  Hayes v. Ayers, 632 F.3d 500, 508 (9th Cir. 2011)

26    (quoting Harris, 885 F.2d at 1361, 1363).

27        Prejudice from pretrial publicity may be presumed where the size of the community

28    suggests that impartial jurors may be hard to find, where the information is so "blatantly

1    prejudicial" that those exposed to it "could not reasonably be expected to shut [it] from sight,"

2    and where the publicity occurs shortly before trial.  Skilling v. United States, 561 U.S. 358, 382-

3    84 (2010).[37]  Courts have presumed prejudice in very few cases.  Respondent contends, and

4    petitioner does not contest, that the United States Supreme Court has presumed prejudice from

5    pretrial publicity only once, in Rideau v. Louisiana, 373 U.S. 723 (1963).  The publicity in

6    Rideau consisted of television broadcasts replaying a filmed confession by defendant Rideau.

7    Those broadcasts occurred three times and were seen by at least a third of the people in the

8    community.  The broadcasts occurred immediately after the crime, just two weeks before

9    Rideau's lawyers moved for a change of venue, and less than two months before Rideau's trial.

10           The Court found actual prejudice from pretrial publicity where there was both a barrage of

11   inflammatory publicity shortly before trial and a number of jurors who stated that they had

12   formed an opinion that the defendant was guilty prior to trial.  See Irvin, 366 U.S. at 728.

13           2.  Background Facts

14           Petitioner presents evidence of highly inflammatory publicity at the time of the crimes and

15   at the time of petitioner's arrest in March 1989.  Petitioner was described as a suspect in seven

16   murders in Arizona, including the murder of Richard Reese, and some reports referred to

17   petitioner as a "hit man."  Some reports included descriptions of petitioner's criminal past

18   including a burglary conviction, an arrest for kidnapping, and, wrongly, an escape conviction.  In

19   addition, the crimes were often described sensationally as "execution-style shootings," a

20   "massacre," and being part of a "killing spree."  Petitioner presents evidence that over a dozen of

21   these articles appeared in Sacramento-area papers between January and May 1989.  (LD 44, Ex.

22   603.)  Around the time of the preliminary hearing in September 1989, after a defense motion to

23   close the hearing was denied, several more articles appeared.  While they were largely factual,

24   some did mention Reese's "bullet-riddled body" being discovered in Arizona and that he likely

25   died a few days before petitioner was apprehended.  (Id.)  Petitioner also alleges television

26   _____

27   [37] Skilling was decided shortly after the California Supreme Court's rejection of petitioner's claim
     in the exhaustion petition.  Therefore, it was not "clearly established" law at the time the
     California Supreme Court rendered its decision.  The undersigned relies only upon portions of
28   Skilling in which the Court relied upon cases preceding the California Supreme Court's opinion.

1   coverage, though he does not produce specific evidence to support that allegation.  (See ECF No.

2   235 at 176.)  For purposes of considering petitioner's claim at this point, this court assumes the

3   California Supreme Court accepted petitioner's representations about media coverage.

4       Petitioner claims a majority of jurors in his case read local newspapers and watched local

5   television news stations.[38]  At that time, 91% of Sacramento households received delivery of at

6   least one of Sacramento's local newspapers.

7       Petitioner also alleges, without citation to any evidentiary support or other authority, that

8   in two other supposedly "less sensational" Sacramento County murder cases, changes of venue

9   were ordered where research showed a high level of awareness of the cases in the community.

10  However, petitioner provides no information about the date of those surveys, the date of those

11  motions for changes of venue, and the extent or content of the publicity in those cases.  Further,

12  no such surveys were apparently conducted in petitioner's case so the other cases do not provide a

13  good source of comparison.

14      Finally, petitioner briefly states that the presence of media in the courtroom had a

15  prejudicial effect.  He presents no documentation regarding when members of the media were

16  present for any period besides his arraignment, preliminary hearing, and sentencing.  Based on

17  this showing, petitioner's jury was only possibly exposed to the media presence during

18  sentencing.  However, petitioner presents no evidence regarding what sort of media was present,

19  how visible it was, or what portion of the sentencing proceedings members of the media attended.

20              3.   California Supreme Court Decision

21      The California Supreme Court rejected this claim summarily in 2010 when it denied the

22  exhaustion petition.

23  ////

24  ////

---

25  [38] Respondent points out that petitioner did not back up this allegation in state court.  He provided
26  the court with the jury questionnaires from only three jurors.  Here, petitioner points to juror
    questionnaires showing that over two-thirds of the jurors read local newspapers.  For purposes of
27  this court's review of petitioner's claim, the court assumes the California Supreme Court accepted
    petitioner's allegations that a majority of jurors read local newspapers.

28

4. <u>Discussion</u>

While petitioner alleges that publicity about this case re-sparked right before and during petitioner's trial, he presents no evidence to back up that allegation.  He has certainly shown that in the Spring of 1989, many residents of the Sacramento area were exposed to some highly prejudicial information about the crimes and about petitioner himself.  He has also shown that again in September 1989, there was a short burst of coverage.  However, jury selection in this case did not begin until September 1990.  (RT 1085.)  Petitioner presents no evidence of publicity regarding this case during that intervening year.[39]  It is worth noting that petitioner's originally appointed attorneys considered that a "substantial decline in publicity" might render a change of venue unnecessary.  (LD 39, Ex. 521 (Mtn. to Close Prelim. Hrg.).)  In addition, petitioner presents nothing to show the sort of "circus atmosphere" due to the presence of media in the courtroom that the Supreme Court has held supported a presumption of prejudice from inflammatory pretrial publicity.  <u>See</u> <u>Estes v. Texas</u>, 381 U.S. 532 (1965); <u>Sheppard v. Maxwell</u>, 384 U.S. 333 (1966).

Petitioner's showing is far short of that necessary to presume prejudice under <u>Rideau</u>. With respect to making a showing of actual prejudice, petitioner presents only the fact that a year prior to being selected as jurors, a majority of the jurors may have been exposed to prejudicial publicity about the case.  Petitioner cites to no juror responses to voir dire questions asking whether jurors had heard anything about the case or whether they followed media reports of criminal cases or the criminal justice system.  (<u>See</u> LD 36, Ex. 501 (juror questionnaire).) Petitioner has failed to make a showing of actual prejudice from the pretrial publicity.  Therefore, the California Supreme Court was not unreasonable in finding petitioner failed to make a prima facie showing of a due process or Sixth Amendment violation based on pretrial publicity.

////

---

[39] Petitioner states that requests by news organizations to cover court proceedings "span the life of the case, from Mr. Majors' arraignment through sentencing."  However, the cited exhibit provides copies of requests made only during spring 1989 for the arraignment and one additional request in January 1991 to cover the sentencing.  (LD 44, Ex. 604.)  This is insufficient evidence to show continual media coverage of petitioner's case and certainly does not show media coverage shortly before or during jury selection.

1        This court also finds the California Supreme Court could have reasonably rejected

2   petitioner's claim of ineffective assistance of counsel for failure to move for a change of venue.

3   Based on the lack of evidence showing prejudicial publicity shortly before trial and based on the

4   apparent lack of jury knowledge of the case revealed during voir dire, the California Supreme

5   Court could have reasonably found attorney Brady did not have an obligation to move to change

6   venue.

7        G.   Absence of Unanimity Instruction – Claim 6

8        Petitioner concedes that the California Supreme Court's rejection of this claim was not

9   unreasonable under 28 U.S.C. § 2254(d).

10        H.   Robbery-Murder Special Circumstance Instruction – Claim 7

11        Petitioner claims the trial judge erred in his verbal instruction on the elements of the

12   robbery-murder special circumstance to the jury.  Rather than instructing the jury that both of the

13   two elements of the special circumstance were required, the judge stated that the jury could find

14   either element.  Petitioner argues the instruction violated his constitutional rights to have each

15   element of the crime charged found beyond a reasonable doubt by the jury.  See United States v.

16   Gaudin, 515 U.S. 506, 509-10 (1995) (citing Sullivan v. Louisiana, 508 U.S. 275, 277-78 (1993)).

17   Petitioner fails to show the California Supreme Court unreasonably rejected this claim.

18        1.   Legal Standards

19        A claim that jury instructions were incorrect under state law does not state a cognizable

20   federal habeas corpus claim.  Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  To find

21   constitutional error, a court must find a "'reasonable likelihood that the jury has applied the

22   challenged instruction in a way' that violates the Constitution."  McGuire, 502 U.S. at 72 (quoting

23   Boyde v. California, 494 U.S. 370, 380 (1990)).  In making this determination, the jury

24   instruction "'may not be judged in artificial isolation,' but must be considered in the context of

25   the instructions as a whole and the trial record."  Id. (quoting Cupp v. Naughten, 414 U.S. 141,

26   147 (1973)).  It is not enough that the instruction is "undesirable, erroneous, or even universally

27   condemned," it must violate some constitutional right.  Id. at 72 (quoting Donnelly v.

28   DeChristoforo, 416 U.S. 637, 643 (1974)).

1    To obtain relief on federal habeas corpus review based on instructional error, a petitioner

2    must show that the error "'so infected the entire trial that the resulting conviction violates due

3    process.'" Id. at 72 (quoting Cupp, 414 U.S. at 147); Middleton v. McNeil, 541 U.S. 433, 437

4    (2004).  The standard for determining whether a petitioner is entitled to relief is whether the error

5    "had substantial and injurious effect or influence in determining the jury's verdict."  Brecht v.

6    Abrahamson, 507 U.S. 619, 637 (1993).  Because this court examines whether the California

7    Supreme Court was reasonable in its denial of this claim on direct review, it must consider that

8    the standard the state court should have used is the harmless-beyond-a-reasonable-doubt standard

9    of Chapman v. California, 386 U.S. 18 (1967).

10              2.   Background Facts

11    The trial judge instructed the jury as follows:

12              To find that the special circumstance, referred to in these
              instructions as murder in the commission of robbery, is true, it must
13              be proved:

14              1a) The murder was committed while the defendant was engaged in
              the commission of a robbery;
15
              1b) Or the murder was committed during the immediate flight after
16              the commission of a robbery by the defendant or;

17              2) The murder was committed in order to carry out or advance the
              commission of the crime of robbery or to facilitate the escape
18              therefrom or to avoid detection.  In other words, the special
              circumstance referred to in these instructions is not established if
19              the robbery was merely incidental to the commission of the murder.

20    (RT 3466.)  He also read the verdict forms to the jury, stating:  "The first special circumstance

21    states:  We, the jury in the above entitled cause, find the defendant, James David Majors,

22    murdered the victims during the commission of a robbery."  (RT 3795.)

23    The jury was provided with six written copies of the instructions.  (RT 3796.)  The written

24    version omitted the word "or" used twice by the judge when reading paragraph 1b) of the

25    instructions.  (CT 696.)  The parties do not dispute that the written version of the robbery-murder

26    special circumstance instruction was the correct one.

27    ////

28    ////

3.   California Supreme Court Decision

On appeal, the California Supreme Court held:

> Defendant argues that the addition of the second italicized "or" to the instruction given to the jury orally removed the temporal element described in paragraphs 1(a) and 1(b) from the jury's consideration. In other words, the oral instruction allowed the jury to find the special circumstance to be true without finding that "[t]he murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit" robbery. (§ 190.2, subd. (a)(17)(A).)
>
> We conclude that any error in the oral instruction was harmless. The jury received the correct instruction in written form. (See People v. Crittenden (1994) 9 Cal.4th 83, 138 [36 Cal.Rptr.2d 474, 885 P.2d 887] [and cases cited therein].) In addition, the prosecutor emphasized the temporal element of the robbery-murder special circumstance during his closing argument, telling the jury that in order to find the special circumstance to be true it "must find that the murder was committed during the course of a robbery." "Rather than exacerbating the trial court's misreading, this argument served to reinforce the correct written version of the instruction." (People v. Crittenden, supra, 9 Cal.4th at p. 139.) Finally, the verdict form itself reflects the jury's finding that defendant "murdered the victims during the commission of a robbery."

18 Cal. 4th at 409-10.

4.   Discussion

Before analyzing petitioner's claim, the court notes some confusion about how the different parts of the jury instruction are described and about petitioner's argument in state court and here. The instruction has two parts. The first part is the temporal aspect – the murder must have been committed either during the commission of a robbery or during the immediate flight after a robbery. The second part involves the perpetrator's state of mind. The murder must have been committed to facilitate either the robbery or the escape after a robbery.

On appeal and in his habeas corpus petition before the California Supreme Court and this court, petitioner argued that the problem with the instruction was that it eliminated the temporal relationship between the homicides and the robbery. (LD 18 (AOB) at 229-30; LD 29 (2003 State Pet.) at 273-75.) In other words, petitioner argued that the jury could have found true paragraph 2 of the instruction without considering that it also needed to find true paragraph 1a) or

143

1  1b).  Thus, in its denial of this claim on appeal, the California Supreme Court unsurprisingly

2  focused on the fact that the temporal aspect of the instruction had been mentioned by the

3  prosecutor and was part of the verdict form.

4         In his current brief addressing the application of 28 U.S.C. § 2254(d), petitioner argues for

5  the first time that the instruction is unconstitutional because the jury could have chosen to find

6  either that the murder was committed during or immediately after the robbery (the paragraph 1

7  requirements) OR that the murder was committed in order to facilitate the robbery or the escape

8  therefrom (the paragraph 2 requirement).  That argument was not made to the state court, is not

9  included in the federal petition, and will not be considered here.

10        The California Supreme Court did not unreasonably determine the claim made in state

11  court.  The jury heard the temporal element of the special circumstance from the prosecutor,

12  verbally from the judge when he read the verdict form, in the written instruction provided, and,

13  finally, in the written verdict form.  Because the trial court's error was not of constitutional

14  magnitude, any failure by the state court to apply the appropriate harmless error standard was not

15  unreasonable.

16        I.    Trial Court Failure to Promptly Rule on Post-trial Marsden Motion – Claim 8

17        Petitioner argues the trial court erred when it failed to hold an immediate hearing on

18  petitioner's request to consider whether attorney Brady rendered ineffective assistance of counsel

19  at the guilt phase.  For the reasons below, this court finds petitioner has not satisfied section

20  2254(d) for claim 8.

21        Petitioner's claim is based on the following facts.  Six days after the guilt phase verdicts

22  were returned, attorney Brady informed the court that petitioner wished to have the court consider

23  whether Brady was constitutionally ineffective during the guilt phase.  (RT 3841.)  Brady

24  indicated that he told petitioner he thought it would be best to wait until the conclusion of the

25  penalty phase to raise the issue by way of a motion for a new trial.  (Id.)  During an ex parte

26  conference, the judge heard Brady describe what he felt were some of petitioner's concerns and

27  again stated that he felt these should be addressed after the conclusion of the penalty phase.  (RT

28  3848-51.)  However, the judge disagreed, stating "[i]f Mr. Majors feels that there are grounds to

1   relieve you of [sic] counsel, then it's best that we hear it now, and I'll research what – After I've

2   heard the basis for it." (RT 3851-52.) At that point, petitioner stated that he needed some time to

3   get everything together. (RT 3852.) Mr. Brady then told the judge that petitioner hoped to have a

4   third attorney appointed to help him look into potential ineffective assistance of counsel claims.

5   (RT 3854.) The judge stated that he would not appoint a third attorney when there were no

6   potential problems raised. (Id.) However, he told Brady and petitioner that the issue could be

7   raised again when the parties were back in court to discuss penalty phase jury instructions. (RT

8   3855.) On November 30, at the conclusion of the day's proceedings, the trial judge inquired

9   whether there was anything to discuss about the "previous motions about relieving counsel." (RT

10  3873.) Attorney Brady stated that he and petitioner had discussed the matter and agreed that

11  petitioner would make the motion after the conclusion of the penalty phase. (RT 3873.)

12  Petitioner agreed, stating "[u]nless something else turns up, that's true." (RT 3874.)

13          On December 7, before the beginning of the penalty phase, the issue came up again.

14  Defense attorney Hamlin told the judge that petitioner

15
16              was under the belief that if he didn't bring it before the
                commencement of the penalty phase that he would be in some
                fashion in a worse position, that his rights would be prejudiced, and
                that the Court would not consider that motion in the same light if it
17              was brought afterwards.

18  (RT 3888.) Hamlin then described his discussion with petitioner that he would have more time to

19  prepare a better motion if he waited. Hamlin asked for the court's assurance that petitioner would

20  not be prejudiced by waiting. The trial judge responded, "[y]ou have that assurance from --

21  There is no legal or emotional reason why I would treat it any differently or why I would want to

22  treat it any differently." (RT 3889.) The judge then pointed out that because the penalty phase

23  was set to begin and was planned to be only a day and a half long, if he granted any motion for

24  new counsel, "the cure would be to retry the whole entire case."

25
26              So there's nothing that we could do at this point in time. If I were
                to make that finding, there would be nothing that I could do but to
                regroup and make some changes and go ahead and finish the trial.
27              So it doesn't make sense to take the time and delay the penalty
                phase and have the jurors be subject to contamination by being
                exposed to the – To other information that we've been trying to
28              keep from them. And just the aggravation of being – Having the

                                    145

1

trial delayed further and interfere with their lives further.  So again,
I think that it's in everyone's best interest to proceed.

2

3      (Id.)

4          Petitioner argues that under California law, the trial court was required to provide a timely

5   hearing on petitioner's request.  See People v. Marsden, 2 Cal. 3d 118 (1970).  Petitioner argues

6   this procedural right is protected as a liberty interest under the Due Process Clause as described in

7   Hicks v. Oklahoma, 447 U.S. 343 (1980).

8          Petitioner originally raised this claim on appeal.  The California Supreme Court denied it

9   as baseless because petitioner had not made a motion prior to the beginning of the penalty phase.

10  18 Cal. 4th at 412.  In addition, the court pointed out, as soon as petitioner made his motion, the

11  trial court held an "exhaustive in camera hearing, at which defendant fully aired his complaints

12  and defense counsel responded point by point."  Id.  This claim was also raised in petitioner's

13  state habeas petition and summarily denied by the California Supreme Court.

14         Petitioner has failed to establish the factual or legal underpinnings for this claim.  First,

15  petitioner did not seek a determination on his ineffective assistance of counsel claims before the

16  penalty phase.  When the issue was first raised, the judge told petitioner he was prepared to

17  consider the claim at that time.  However, petitioner stated he was not ready.  On November 30,

18  the judge asked petitioner about his motion and petitioner told him he intended to make it after

19  the penalty phase concluded.  On December 7, when the issue was raised a third time, the judge

20  assured petitioner he would consider his motion no differently if he waited until after the penalty

21  phase concluded.  Again, petitioner agreed to wait.  Second, petitioner's liberty interest argument

22  is premised on a state law requirement that the trial court immediately hold a hearing when a

23  defendant expresses dissatisfaction with his attorney.  As the California Supreme Court described,

24  that is not California law.  Rather, state law requires the trial court to conduct a hearing when the

25  defendant moves to discharge his attorney.  See People v. Majors, 18 Cal. 4th at 412 (citing

26  People v. Lucky, 45 Cal. 3d 259, 281 (1988)).  Petitioner did not state then that he intended to

27  make that motion.  The California Supreme Court was not unreasonable in denying petitioner's

28  claim.

J.   Petitioner's Absence from the Penalty Phase – Claim 9

Petitioner alleges trial court error and ineffective assistance of counsel with respect to his decision to absent himself from the penalty phase.  This court finds petitioner has failed to meet the section 2254(d) requirements for this claim.

1.   Legal Standards

A criminal defendant has a right "to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness" or reliability of the procedure.  Kentucky v. Stincer, 482 U.S. 730, 745 (1987); United States v. Gagnon, 470 U.S. 522, 527 (1985) (per curiam).  A defendant must be allowed to be present "to the extent that a fair and just hearing would be thwarted by his absence."  Stincer, 482 U.S. at 745 (quoting Snyder v. Massachusetts, 291 U.S. 97, 108 (1934)).  The constitutional right to be present at every critical stage of the trial is based on the Fifth Amendment Due Process Clause and the Sixth Amendment Confrontation Clause.  Gagnon, 470 U.S. at 526; United States v. Marks, 530 F.3d 799, 812 (9th Cir. 2008).  The right to be present during all critical stages of the proceedings is subject to harmless error analysis.  Rushen v. Spain, 464 U.S. 114, 117 (1983); Campbell v. Rice, 408 F.3d 1166, 1172 (9th Cir. 2005).

The right to be present, like many other constitutional rights, may be waived, provided such waiver is voluntary, knowing, and intelligent.  See Gagnon, 470 U.S. at 529; Taylor v. United States, 414 U.S. 17, 19-20 (1973).  The Ninth Circuit has held that a defendant convicted of a capital offense may waive his right to be present at the penalty phase of trial.  See Amaya-Ruiz v. Stewart, 121 F.3d 486, 496 (9th Cir. 1997) (defendant's insistence on being removed from penalty phase unless he was unshackled constituted a voluntary waiver of his presence), overruled on other grounds, United States v. Preston, 751 F.3d 1008 (2014).  The court has also held that a capitally-charged defendant may waive his right to be present at jury selection.  Campbell v. Wood, 18 F.3d 662 (9th Cir. 1994).

Under California statutory law, a defendant's presence at any part of a capital trial may not be waived.  See Cal. Penal Code § 1043(b)(2).  However, the trial may continue without a capital defendant if the defendant "insists on conducting himself in a manner so disorderly,

1   disruptive, and disrespectful of the court that the trial cannot be carried on with him in the

2   courtroom.  Cal. Penal Code § 1043(b)(1).  Any voluntary waiver of a defendant's presence must

3   be in writing.  Cal. Penal Code § 977(b)(2).  Petitioner argues that these state laws create "an

4   interest in personal presence that is protected by the due process clause of the U.S. Constitution"

5   under Hicks, 447 U.S. at 346, and Vitek v. Jones, 445 U.S. 480, 488-89 (1980).

6             2.   Background Facts

7                  a.   Facts in the Trial Record

8         On November 26, 1990, shortly after the conclusion of the guilt phase, attorney Brady

9   advised the trial judge that petitioner had "indicated that he may want to waive his appearance for

10   the penalty phase" because he was "very upset" by the jury's guilt-phase verdict, and "just doesn't

11   want to act out."  (RT 3855.)  Brady told the court petitioner was "having a hard time coping with

12   the stress" and was "concerned that during the course of the penalty phase that he's going to have

13   a hard time coping with that, emotionally."  (Id.)  Petitioner told the court he feared "listen[ing] to

14   [prosecutor] John O'Mara call me three kinds of assholes and whatever else he's going to do,

15   because I know he's going to. And I don't really know if I can handle it."  (RT 3856.)

16         Brady further stated that he felt it was in petitioner's best interest to be present because

17   "the jury should see how upset he is about it."  (RT 3856.)

18         The trial court noted that petitioner had "conducted [himself] in an exemplary manner"

19   throughout the proceedings. (RT 3856.)  The judge said he appreciated the "cooperative attitude"

20   petitioner displayed "all along, particularly in the occasion when [he] fell down the stairs" and

21   injured his back.  (RT 3857-58.)  Mr. Brady also noted that petitioner had been "very well

22   behaved during the course of the trial" and "showed respect for the Court."  (RT 3855.)

23         Petitioner proposed an alternative to total absence, asking the judge if he could speak up if

24   he became upset. The judge replied that it was not unusual to take a recess to let someone calm

25   down.  (RT 3857.)  He offered to halt penalty phase proceedings any time petitioner needed a

26   break.  (RT 3857-58.)  The judge told petitioner, "any time you feel you can't hold it in any

27   longer, just let us know.  We'll recess the jury, and you can run in the back hallway and yell and

28   ////

1    scream.  Or I'll bring my kid's karate punching bag down here, and you can work on that."  (RT

2    3858.)

3            On Friday, December 7, 1990, during court proceedings to prepare for the penalty phase,

4    attorney Hamlin informed the court that:

5                    I've spoken with Mr. Majors at length about his
                participation in the penalty phase and specifically about him being
6                at counsel table during the calling of witnesses, during the cross
                examination of the People's witnesses, and then through arguments.
7
                    He has made it very clear to me that he does not want to be
8                here for cross examination or the presentation of witnesses.  And he
                does not want to be here during argument.
9
                    The reason that he's put forth to me, he said it would be
10               very trying and very emotional to him. He feels that he would not
                be able to sit in a manner where he would not act out.
11
                    I do not suggest that he would act out violently towards me
12               or towards the Court, but we are talking about very emotional
                aspects, and specifically with his mother and father.  He was very
13               dubious about me calling them in the first place; he has not wanted
                to put them through this.  I have worked with him to convince him
14               that I need to do that for the proper presentation and presentation of
                his case.
15
                    It is something that he has allowed me to do, but he is
16               definitely not enthusiastic about it and just would feel great pain in
                sitting here and actually watching his mother and father having to
17               take the stand, given the circumstances that they would be testifying
                under.
18
                    . . .
19
                    It's going to be very difficult for him to sit and listen to the
20               prosecutor call for his death, his execution. And he has made it very
                clear to me that he does not want to be here.
21
                    And, personally, after we have discussed all the issues, I
22               would concur with that.  I feel that I would be able to present this
                part of the trial in a better fashion because I know how hard it
23               would be on Mr. Majors.  And I think that that would allow this to
                be presented in its best light and give him the best opportunity at
24               life in prison without the possibility of parole.

25                   So with that, I'm prepared to put on the record, basically a
                waiver, and I think that would be the most appropriate method.
26

27   ////

28   ////

                                        149

1

> [Section] 977 specifically doesn't deal with trial situations.
> So I think if we did it orally and thoroughly enough, that that would
> be the most proper manner.

2

3    (RT 3890-91.)

4         The judge agreed.  (RT 3891.)  He expressed concern that jurors might draw unfavorable

5    inferences from petitioner's absence, including speculation that petitioner had been removed for

6    acting out, because he did not agree with the testimony being presented by his parents, because he

7    could not stand having his parents lie on his behalf, or because he could not control himself,

8    which might confirm for jurors that he was a violent person.  (RT 3891-92.)  The judge

9    recognized that Penal Code § 977 "specifically does not allow a defendant to excuse himself

10   during evidentiary proceedings."  (RT 3892.)  However, he noted that, while he had not

11   researched the issue, prosecutor O'Mara had and "he's confident that the case law would allow a

12   defendant to be excused under these circumstances."  (Id.)  The judge further noted that the plain

13   language of the statute required Mr. Majors' presence unless and until he actually disrupted the

14   proceedings.  The judge felt, however, that it did not make sense to force petitioner to be present,

15   act out, and then be excused.  (Id)

16        The judge told petitioner he did not feel it was in his best interests to absent himself, but

17   that, despite his "extreme reluctance" to do so, he would permit it.  (RT 3893.)

18        The judge then held an ex parte proceeding to permit petitioner to explain further why he

19   felt it necessary to be absent.  During this proceeding, attorney Hamlin questioned petitioner

20   about regarding his waiver:

21
> MR. HAMLIN:  Mr. Majors, have you and I specifically discussed
> your presence during the penalty phase of the trial?

22

23
> THE DEFENDANT:  Yes.

24
> MR. HAMLIN:  Okay.  And during that time, have I advised you
> that some jurors may take that in a negative light and might hold it
> against you and in fact vote for the death penalty because of your
> absence?

25

26
> THE DEFENDANT:  Yes.

27   ////

28   ////

150

MR. HAMLIN:  Now, some of the reasons that you told me that you did not want to be here was because – Stem from a lot of anger that you have about the way that this case has turned out.

Is that correct?

THE DEFENDANT:  That's correct.

MR. HAMLIN:   And because of that anger and your frustration with the position that you're presently in, how do you feel that you would be impacted by seeing your mother and father testifying on your behalf?

THE DEFENDANT:  I don't want them here in the first place.  I think it would be – I don't want to see it.

(RT 3895-96.)

The judge then asked whether petitioner felt it was not in his best interest to have them testify, or whether he simply did not wish to be present when they did.  (RT 3896.)  Petitioner replied:

To be perfectly candid, I don't think the jury is going to vote for anything but death anyway, since they came back in such a short time, and I think it's just a waste of time to even go for this phase of it.

And I really don't want to put my mother and father through this.  But he says he thinks he can save my life, which I don't really care a lot about right now is the way I feel. . . .

I don't want to sit here and watch my mother go to pieces on the stand because I'm going to go to pieces. And if John O'Mara starts calling her a liar and starts talking about perjury and all this crap, when he had Bonnie Hogue up there who committed perjury at the prelim and nothing was done about it and committed perjury in your court here and nothing was done about it – I will probably say something that I shouldn't. And I don't want to be here. I don't.

(RT 3896.)

Attorney Hamlin continued by asking petitioner whether they had discussed what the defense and prosecution arguments at the penalty phase were likely to be.  Petitioner agreed that they had.  (RT 3896-97.)  He then reiterated that he did not "want to sit through any of it."  Petitioner further explained that he was partly concerned that he would not be able to sit calmly through the penalty phase and partly he was "just disgusted with the whole thing.  And I don't know; I can't explain it.  I'm just not happy with the whole thing."  (RT 3897.)

151

1    Mr. Hamlin reminded petitioner about the judge's warning of possible ramifications of his

2    decision.  He then asked petitioner to confirm that they had discussed the likely testimony of the

3    prosecution's two penalty phase witnesses and that he understood that he would not be able to

4    help in the cross-examination of those witnesses.  Petitioner confirmed that he understood all

5    those things and still wished to be absent.  (RT 3898.)

6    The judge again told petitioner he was reluctant to allow him to absent himself.  He

7    explained that if petitioner broke down and cried, it was "probably in your best interest to have

8    the jury see that you have those types of emotions."  (RT 3899.)  Mr. Hamlin then stated:

9    
> If I might comment, you Honor:  We have really extensively
> examined those type of issues.  And I think in my dealings over
> these months with Mr. Majors, I've gotten to understand some of
> his emotions, and I think the only emotion that he would have
> during this portion – We talked about this specifically yesterday –
> Is one of anger.  And that anger, I think, balanced out with
> everything else, would not be in our best interest in the penalty
> phase.
>
> We have weighed the possibility of speculation; I am
> prepared to follow the admonitions, follow the law.  I have weighed
> all the potential ramifications, possible thoughts of him not being
> able to control himself because of violence, and I've weighed that
> against in reality what might happen if he's here.  And I don't think
> it's a negative thing to say, but Mr. Majors is just very upset.  He's
> very angry.  And his frustration and the anger with the way things
> have turned out, I am quite confident, would be displayed to this
> jury.  And I feel that that would be very detrimental.

19   (RT 3899-900.)  Mr. Hamlin explained further that he did not feel petitioner might cry or be

20   emotional in a way that could be helpful.  Rather, he knew petitioner and felt "that that would not

21   come out."  (RT 3900.)

22   The judge told petitioner he would not excuse him just because he thought "it's a waste of

23   time, you're disgusted, you're depressed, those things."  However, if the judge felt there was a

24   "strong possibility" that petitioner would act out,

25   
> get angry and beat on the table or stand up and call somebody an
> asshole, do something of that nature that would disrupt the
> proceedings and perhaps make an impact on the jury that would be
> detrimental to you, then I would excuse you for that reason and for
> that reason only.

28   (RT 3900.)  Petitioner responded, "I would definitely give you that – I would do that.  I believe I

152

1  would."  The judge then implied that he could only excuse Mr. Majors if there were a record

2  supporting a finding of imminent disruption, and offered Mr. Majors the opportunity to make

3  such a record.  (RT 3893-94.)  During a closed session outside the prosecutor's presence,

4  petitioner acknowledged that he had been advised that the jury might hold his absence against

5  him, and might even vote for the death penalty because of it, but that he didn't care.  (RT 3895.)

6  Petitioner said that a penalty phase defense was a waste of time and that he didn't care about

7  counsel's effort to save his life.  (RT 3896.)

8          The following exchange followed:

9          THE COURT: Okay. I -- I would not excuse Mr. Majors just on the
10         basis that you think it's a waste of time, you're disgusted, you're
           depressed, those things; I would specifically order you to remain
11         here.

12              However, I respect your evaluation of yourself and your
           emotions in the situation, and you tell me that there is a strong
           possibility that you would act out, get angry and beat on the table or
13         stand up and call somebody an asshole, do something of that nature
           that would disrupt the proceedings and perhaps make an impact on
14         the jury that would be detrimental to you, then I would excuse you
           for that reason and for that reason only.
15
16         THE DEFENDANT: I would definitely give you that – I would do
           that. I believe I would.

17         THE COURT: Okay. You feel that that is a strong possibility or
           probability that you would be unable to control your emotions and
18         that you would physically or verbally act out in that type of
           fashion?
19
           THE DEFENDANT: Yes.
20
           THE COURT: Okay.
21
           THE DEFENDANT:  I wouldn't – I don't think I would hit
22         anybody.  Anything like that.  But I would probably say a lot of
           things that I don't want to say, because I told you before, that's why
23         I brought it to your attention before.  I don't want to do that.  I
           really don't.
24
                And, you know, I think the jury has already made up their
25         mind.  I don't think this is going to change their minds in any way.
           And I don't want to be here to watch it.  Because I know I'll go off.
26         I know I will.

27         THE COURT:  Okay.  Well, that's the critical point, the last few
           words.  You certainly don't want to be here to watch it because
28         you're disgusted with it.  That's certainly one thing, but if you feel

                                              153

1

> there's a strong risk that you're going to act out, then I think it's
> best to comply with your wishes.

2

3   (RT 3900-01.)

4   The court then invited the prosecutor back and proceeded to, again, advise petitioner of

5   the risks of his absence.  He again explained that he could not control what jurors might infer and

6   explained in some detail the rights of confrontation and cross-examination that petitioner would

7   be giving up.  (RT 3903-04.)   The judge then specifically found,

8

> that you [petitioner] have made a knowing and intelligent waiver of
> your right to be present, your right to confront and cross-examine
> the witnesses, although you're technically not waiving your right to
> cross-examine, and that is a knowing and intelligent waiver of your
> presence.  And I'm going to grant that waiver, grant your request
> not to be present for the reasons that I've stated previously.

9

10

11

12   (RT 3906-07.)

13   At the beginning of the penalty phase, the judge informed the jury that petitioner was not

14   present:

15

> Mr. Majors has elected not to be present during the penalty
> phase.  He's stated that due to the emotional impact of seeing his
> mother and father testify and the content of closing argument that
> he respectfully desires not to be present.  And you must not draw
> any inference from his absence; further, you must not either discuss
> the matter nor permit it to enter into your deliberations in any way.

16

17

18

19   (RT 3913.)   The judge reiterated that explanation and instruction during his reading of the jury

20   instructions at the close of the penalty phase evidence.  (RT 4006.)

21   b.   Additional Facts Presented on Habeas

22   Petitioner alleges summarily in his brief that he suffered from chronic depression and

23   severe anxiety at the time of trial.  The only evidentiary support for this allegation are the reports

24   of psychologist Dr. Daniel Edwards and psychiatrist Dr. Albert Globus.  According to a June

25   1991 report prepared by Dr. Globus, Dr. Edwards performed neuropsychological testing on

26   petitioner in August 1989 and prepared a report.  (LD 23, Ex. N at 12.)  Dr. Edwards concluded

27   that petitioner had a "dysthemic disorder with somatoform features and agitation and mild

28   histrionic and borderline personality trends."  Dr. Globus tested petitioner in March 1990.  In his

report, which was not provided to counsel until after trial, Dr. Globus diagnosed petitioner with "Dysthymia or Depressive Neurosis and Obsessive Compulsive Personality Style with Borderline and Schizoid Traits (Note this is not a pathological diagnosis.)." (Id. at 19.) Dr. Globus found "no evidence that [petitioner] was incompetent at the time of trial." (Id. at 20.)

Petitioner makes a number of other factual allegations that he fails to support with any evidence: (1) counsel failed to prepare him for the possibility of conviction; (2) counsel failed to develop a relationship of trust with petitioner; (3) counsel failed to investigate petitioner's mental state; (4) petitioner's decision to absent himself was the product of depression; (5) counsel failed to address petitioner's concerns about the penalty phase; and (6) petitioner was unaware Mr. Brady would not participate in the penalty phase proceedings before the jury.

### 3.   California Supreme Court Decisions

On appeal, petitioner argued that Penal Code § 977 required petitioner's presence at the penalty phase. (LD 18, AOB at 206.) He also argued he had a right to be present under statutory law and under the U.S. Constitution. He claimed that this right could not be waived in a capital case. (Id. at 211.) The California Supreme Court denied the claim as follows:

> Defendant now asserts that the express terms of sections 977 and 1043 (see ante, fn. 15) prohibited him from waiving his presence during the penalty phase or, in the alternative, that a written waiver was required. "[W]hen read together, sections 977 and 1043 permit a capital defendant to be absent from the courtroom only on two occasions: (1) when he has been removed by the court for disruptive behavior under section 1043, subdivision (b)(1), and (2) when he voluntarily waives his rights pursuant to section 977, subdivision (b)(1). However, section 977, subdivision (b)(1), the subdivision that authorizes waiver for felony defendants, expressly provides for situations in which the defendant cannot waive his right to be present, including during the taking of evidence before the trier of fact. Section 1043, subdivision (b)(2), further makes clear that its broad 'voluntary' exception to the requirement that felony defendants be present at trial does not apply to capital defendants." (People v. Jackson (1996) 13 Cal.4th 1164, 1210 [56 Cal.Rptr.2d 49, 920 P.2d 1254].)

> As noted, under the governing statutory scheme, a trial court retains the discretion to remove a capital defendant who "has been disruptive or threatens to be disruptive.... The trial court's ability to remove a disruptive or potentially disruptive defendant follows not only from section 1043, subdivision (b)(1), but also from the trial court's inherent power to establish order in its courtroom. (See Code Civ. Proc., § 1209 [trial court has the power to sanction

various acts of contempt of court].)" ( <u>People v. Jackson</u>, <u>supra</u>, 13 Cal.4th at p. 1211.)

Here, the trial court did not permit defendant to "waive" his presence in the sense of voluntarily absenting himself from the courtroom.  Rather, it is abundantly clear from the trial court's remarks that the only reason it permitted defendant to be absent was that it accepted his representations that he was likely to be disruptive. We generally defer to a trial court's determination as to when disruption from a defendant may be reasonably anticipated. (<u>People v. Jackson</u>, <u>supra</u>, 13 Cal.4th at p. 1211.) Such deference is particularly warranted where, as here, the likelihood of disruption turns on the credibility of a defendant's own representations to the trial court. Since the trial court's ruling was based on a credible threat of disruption, defendant's focus on the form of his "waiver" is equally misplaced.

Defendant also claims that the trial court violated his rights under the state and federal Constitutions when it authorized his absence during the penalty phase. He is mistaken. Defendant relinquished his constitutional right to be present, both by requesting to be absent and by threatening to be disruptive. (<u>People v. Jackson</u>, <u>supra</u>, 13 Cal.4th at p. 1210; <u>People v. Medina</u> (1995) 11 Cal.4th 694, 738 [47 Cal.Rptr.2d 165, 906 P.2d 2]; <u>People v. Price</u> (1991) 1 Cal.4th 324, 405 [3 Cal.Rptr.2d 106, 821 P.2d 610]; <u>People v. Sully</u> (1991) 53 Cal.3d 1195, 1239 [283 Cal.Rptr. 144, 812 P.2d 163].)

18 Cal. 4th at 414-15.

In his 2003 state habeas petition, petitioner added claims of ineffective assistance of counsel. (LD 29 at 280-88.)  In addition, he argued: (1) that the California Supreme Court in its appellate decision violated the ex post facto clause and petitioner's due process rights by applying retroactively changes to California Penal Codes §§ 977 and 1043; and (2) that state rules requiring his presence created a liberty interest and their violation deprived him of due process. The California Supreme Court summarily denied the exhaustion petition.

4.   <u>Discussion</u>

a.   <u>Challenge to Trial Court's Decision</u>

Petitioner argues the trial judge failed to conduct a competency proceeding to determine whether petitioner's waiver was voluntary and that he violated state law by permitting petitioner to absent himself and/or not requiring a written waiver of his presence.  Petitioner's argument is somewhat confusing because he blends the trial judge's two rulings.  In the first, the trial judge determined that state statutory law required him to find petitioner was disruptive to permit

156

1   petitioner to be absent.  The trial judge decided the probability of petitioner's disruptive behavior
2   was sufficient to meet that state law standard.  In the judge's second ruling, he held that petitioner
3   understood the risks of absenting himself and had discussed those risks with both the judge and
4   with his attorney.  The judge found petitioner knowingly, intelligently, and voluntarily waived his
5   constitutional right to be present.

6       Petitioner argues that clearly established federal law did not permit the judge to accept
7   petitioner's waiver of presence or to base such a waiver on the threat of disruption.  He relies
8   upon Illinois v. Allen, 397 U.S. 337, 342-44 (1970).  The decision in Allen does not support him.
9   The question in Allen was whether a trial judge violated a defendant's Sixth Amendment rights
10  by removing him from the courtroom because he was so disruptive.  The defendant in Allen
11  insisted he wanted to remain in the courtroom and the question turned on whether he had an
12  absolute right to do so.  In the present case, the question is whether a defendant may waive that
13  right.  The Court's holding in Allen that the Sixth Amendment right to be present is not absolute
14  does not support petitioner's assertion that his waiver was invalid.

15      Further, the Court has held that a defendant may waive his right to be present.  See United
16  States v. Gagnon, 470 U.S. 522, 529 (1985) (per curiam); Taylor v. United States, 414 U.S. 17,
17  19-20 (1973).  And, while it does not appear the Supreme Court has ruled on the issue, the Ninth
18  Circuit Court of Appeals has held that a capital defendant may waive his right to be present at the
19  penalty phase of trial.  See Amaya-Ruiz v. Stewart, 121 F.3d 486, 496 (9th Cir. 1997)
20  (defendant's insistence on being removed from penalty phase unless he was unshackled
21  constituted a voluntary waiver of his presence), overruled on other grounds, United States v.
22  Preston, 751 F.3d 1008 (2014).  No clearly established federal law provides otherwise.

23      Petitioner has also failed to show that the trial judge should have made a further inquiry to
24  determine whether petitioner was competent to waive his presence.  The judge informed
25  petitioner of his rights, warned him, and questioned him thoroughly.  The judge heard petitioner
26  testify that he and his attorney had discussed the risks involved in his absence and the reasons
27  attorney Hamlin wanted petitioner's parents to testify.  Further, petitioner has presented nothing
28  to show that his depression rendered him in fact incompetent to intelligently and voluntarily

1   waive his presence.  Petitioner's anger and understandable upset at being convicted does not

2   amount to cause to question his competency.

3         Further, petitioner's complaints about the trial judge's determination that he could allow

4   petitioner to be absent based on only a threat of disruption have to do with the statutory standards

5   for petitioner's presence.  The trial judge separately determined that petitioner's waiver was

6   intelligent and voluntary.  The California Supreme Court did the same.  Under clearly established

7   federal law, that determination was sufficient.

8         Finally, petitioner's brief argument that he had a liberty interest in state statutory law

9   requiring his presence at trial and/or a written waiver is not supported by the authority he cites.

10  The Supreme Court's decisions in Hicks v. Oklahoma, 447 U.S. 343, 346 (1980), and Vitek v.

11  Jones, 445 U.S. 480, 489-93 (1980), do not clearly establish that these statutory requirements

12  create federal due process requirements.  Similarly, petitioner has failed to show the California

13  Supreme Court's interpretation of California statutory law in this case amounted to an ex post

14  facto change in the law under Collins v. Youngblood, 497 U.S. 37, 42 (1990), or other clearly

15  established federal law.

16                    b.  Ineffective Assistance of Counsel Challenge

17        Petitioner also fails to show counsel acted unreasonably.  He has shown no reason counsel

18  should have questioned petitioner's competence to waive his presence and the record shows

19  counsel discussed the risks with petitioner and considered the advisability of putting petitioner's

20  parents on the stand.  Those determinations are subject to double deference under Strickland and

21  section 2254(d).  Further, petitioner's reliance only upon one statement by attorney Brady that

22  "he was not one to hold a client's hand" is obviously grossly inadequate to support a claim that

23  counsel failed to establish an appropriate attorney/client relationship.  The California Supreme

24  Court was not unreasonable in holding petitioner failed to make a prima facie showing of

25  ineffective assistance of counsel.

26        K.  Ineffective Assistance of Counsel at the Penalty Phase – Claim 10

27        Petitioner alleges counsel was ineffective for failing to investigate and present mitigating

28  evidence at the penalty phase.  As set out below, this court finds petitioner has established a clear

1    prima facie case of ineffective assistance of counsel on these grounds and can find no reason the

2    California Supreme Court could have held otherwise.

3           1.   Legal Standards

4           To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his

5    trial counsel's performance "fell below an objective standard of reasonableness" and that "there is

6    a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

7    would have been different."  Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984).

8           As described above in the section on guilt phase ineffective assistance of counsel, the

9    Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct

10   and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains simply

11   reasonableness under prevailing professional norms.'"  Wiggins v. Smith, 539 U.S. 510, 521

12   (2003) (quoting Strickland, 466 U.S. at 688).  However, "general principles have emerged

13   regarding the duties of criminal defense attorneys that inform [a court's] view as to the 'objective

14   standard of reasonableness' by which [a court must] assess attorney performance, particularly

15   with respect to the duty to investigate."  Summerlin v. Schriro, 427 F.3d 623, 629 (9th Cir. 2005).

16   "[S]trategic choices made after thorough investigation of law and facts relevant to plausible

17   options are virtually unchallengeable."  Strickland, 466 U.S. at 690.  However,

18           "strategic choices made after less than complete investigation are
            reasonable precisely to the extent that reasonable professional
19          judgments support the limitations on investigation.  In other words,
            counsel has a duty to make reasonable investigations or to make a
20          reasonable   decision   that   makes   particular   investigations
            unnecessary.  In any ineffectiveness case, a particular decision not
21          to investigate must be directly assessed for reasonableness in all the
            circumstances, applying a heavy measure of deference to counsel's
22          judgment."

23   Wiggins, 539 U.S. at 521 (quoting Strickland, 466 U.S. at 690-91).

24          With respect to counsel's role in presenting penalty phase mitigating evidence, "[t]he duty

25   to investigate is critically important."  Summerlin, 427 F.3d at 630.  Counsel should attempt to

26   discover "'all reasonably available mitigating evidence and evidence to rebut any aggravating

27   evidence that may be introduced by the prosecutor.'"  Wiggins, 539 U.S. at 524 (quoting ABA

28   Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA

159

1    Guidelines") 11.4.1(c), p. 93 (1989)) (emphasis in original); see also Caro v. Calderon, 165 F.3d

2    1223, 1227 (9th Cir. 1999) ("It is imperative that all relevant mitigating information be unearthed

3    for consideration at the capital sentencing phase.").  Where "'indications in the record' suggest

4    that certain mitigating evidence may be available, those leads must be pursued."  Lambright v.

5    Schriro, 490 F.3d 1103, 1117 (9th Cir. 2007) (quoting Stankewitz v. Woodford, 365 F.3d 706,

6    719-720 (2004)); Summerlin, 427 F.3d at 632 (counsel ineffective for failing to obtain readily

7    available mental health evidence when he had been told by defendant's prior attorney that

8    defendant may be mentally ill); Stankewitz, 365 F.3d at 719-22 (counsel ineffective for failing to

9    thoroughly investigate defendant's childhood, history of drug abuse, and mental health problems

10   notwithstanding the fact that he was on notice that such an investigation might yield mitigating

11   evidence); Mayfield v. Woodford, 270 F.3d 915, 927-28 (9th Cir. 2001) (counsel ineffective for

12   failing to consult appropriate medical experts or collect relevant records after "his investigator's

13   limited efforts revealed evidence of diabetes and substance abuse," and for failing to explain to

14   the jury the relevance of the evidence that was presented).  Of course, if counsel conducted a

15   reasonable investigation, and nothing put counsel on notice of the existence of certain evidence,

16   counsel cannot be faulted for failing to locate and present it.  Babbitt v. Calderon, 151 F.3d 1170,

17   1174 (9th Cir. 1998).  In addition, "a lawyer may make reasonable decisions that render particular

18   investigations unnecessary."  Id.

19          Mitigating evidence counsel should consider includes "medical history, educational

20   history, employment and training history, family and social history, prior adult and juvenile

21   correctional experience, and religious and cultural influences."  Wiggins, 539 U.S. at 524 (citing

22   ABA Guidelines 11.8.6, p. 133 (1988)) (emphasis omitted).  Counsel has a "'duty to investigate

23   and present mitigating evidence of [any] mental impairment.'"  Summerlin, 427 F.3d at 630

24   (quoting Bean v. Calderon, 163 F.3d 1073, 1080 (9th Cir. 1998)).  Furthermore, in preparation for

25   the penalty phase, "counsel has an affirmative duty to provide mental health experts with

26   information needed to develop an accurate profile of the defendant's mental health."  Caro v.

27   Woodford, 280 F.3d 1247, 1254 (9th Cir. 2002).  "The defendant's history of drug and alcohol

28   abuse should also be investigated."  Summerlin, 427 F.3d at 630 (citing Jennings v. Woodford,

160

1   290 F.3d 1006, 1016-17 (9th Cir. 2002)).  In addition to investigating the mitigating evidence,

2   "[c]ounsel also has an obligation to present and explain to the jury all available mitigating

3   evidence," unless counsel has a strategic reason for omitting it.  Wiggins, 539 U.S. at 533;

4   Hamilton v. Ayers, 583 F.3d 1100, 1113 (9th Cir. 2009) (citing Correll v. Ryan, 539 F.3d 938,

5   946 (9th Cir. 2008)); see also Stankewitz v. Wong, 698 F.3d 1163, 1172 (9th Cir. 2012) (citing

6   Hamilton, 583 F.3d at 1113).

7          When determining prejudice from penalty phase error, the court must reweigh the

8   aggravating evidence presented, the mitigating evidence that was, and should have been,

9   presented, and any potential rebuttal to the newly presented mitigating evidence to determine

10  whether there is a "reasonable probability that at least one juror would have struck a different

11  balance." Wiggins, 539 U.S. at 537.

12         Petitioner argues the California Supreme Court has a practice of requiring a causal

13  connection between a defendant's dysfunctional background and the crimes, contrary to Tennard

14  v. Dretke, 542 U.S. 274, 287 (2004), which prohibits states from requiring such a nexus.

15  Petitioner cites to just one California Supreme Court case to show a "practice" of requiring a

16  causal nexus.  In re Crew, 52 Cal. 4th 126, 153 (2011), the California Supreme Court noted

17  that the mitigating evidence of petitioner's dysfunctional family, which was presented on

18  collateral review, may have elicited sympathy from the jury, but petitioner failed to show any

19  causal connection between his family environment and the murder.  "Even if petitioner's

20  upbringing was not ideal, it was not so horrible as to leave him incapable of functioning as a law-

21  abiding member of society."  Taken in context, the California Supreme Court appears to be

22  discussing the weight of the dysfunctional family evidence, not its admissibility or relevance.

23  Further, even if the court did give the lack of a connection an inappropriate focus, the fact that in

24  2011 the court made one such statement hardly establishes that the court had a regular "practice"

25  of requiring causality between family background and the crimes.  Petitioner provides insufficient

26  reason to believe the California Supreme Court, in this case, engaged in such a practice contrary

27  to federal law.

28  ////

2.   <u>Background Facts</u>

    a.   <u>Penalty Phase Evidence Presented at Trial</u>

Both the prosecution and defense penalty phase cases were brief.  Each side presented just two witnesses and the entire proceeding, including argument and jury instructions, spanned less than two days.  (RT 3913-4129.)

i.   <u>Prosecution Case</u>

The prosecution's first witness was Nancy Jo Fleig.  (RT 3922-953.)  In 1971, Ms. Fleig, who was then 19 years old, and her husband resided in a house in Evansville, Indiana.  One night that year, she returned home in the evening to find a man there.  He had a pair of pantyhose over his face and appeared to be wearing her husband's clothing.  Her husband was working until late that night.  The man put a gun up to her face and demanded money.  She had very little money on her person so he demanded she walk upstairs with him to look for any money there.  They found none.  She saw that the man had already rifled through drawers.

The man then asked her to fix him something to eat.  She complied.  The man took the stocking off his face and they both sat at the table while he ate.  They talked.  The man laid the gun down beside him on the table.  The man then pulled her watch out of his pocket and asked whether it meant anything to her.  She said it did.  He returned it to her.

He then told her he wanted to go to his uncle's house.  He left through the back door.  She went out the front door, got the car, and drove it around back to pick him up.  She said she did as she was told because she was afraid.  She then drove two or three miles to a house and the man got out and went up to the door.  He spoke to a man in the doorway for about ten minutes.  He then returned to the car and told her to go home and not tell anyone what had happened.  He got out of the car and walked off.  She drove home to wait for her husband to return.  When he got home, she reported the incident to the police.  She identified the man as petitioner.

On cross-examination, Ms. Fleig explained that petitioner had not ordered her to fix him food; she had offered.  She testified that while petitioner ate, they discussed personal things, including her husband.  She testified that she did not remember kissing petitioner, despite the fact

////

162

1  the statement she gave to police said she had.  She explained that she did not kiss him, "he might

2  have kissed me."

3      Ms. Fleig testified that petitioner told her he had taken a bath in her home and put on some

4  clean clothes because he had been hiding under the porch and was dirty.  Attorney Hamlin also

5  questioned Ms. Fleig to show she was alone in the car twice, when she first got the car to take

6  petitioner to his uncle's and again while there, but she did not drive away.

7      Petitioner took clothes and a gun from the house.  After a trial, petitioner was convicted of

8  burglary.

9      The prosecution's second witness was Ronald Hayes.  (RT 3954-973.)  He testified that in

10  1976 he was living near Phoenix.  One evening, he had just pulled into a parking lot in his

11  Mercedes and, as he left his car, a man, who he identified as petitioner, asked for the time.  As he

12  looked at his watch, petitioner put a gun in Mr. Hayes' side and told him to unlock the car and get

13  in.  He did.  A second man was standing next to the passenger side door and got into the car.

14  Petitioner climbed into the back seat area.  Petitioner asked for Mr. Hayes' wallet, which he

15  passed back to him.  Petitioner also took Mr. Hayes' ring and watch.

16      Petitioner directed Mr. Hayes' to drive to the parking lot of the Phoenix zoo.  Once there,

17  all three men got out of the car and petitioner and the other man, both of whom were armed,

18  forced Mr. Hayes into the trunk of his car.  The men then drove around, with Mr. Hayes in the

19  trunk.  Eventually, they stopped and told Mr. Hayes to count to 100 and then start yelling for

20  help.  He waited a few minutes after they had walked away and yelled and pounded on the trunk.

21  Many hours later, a police officer opened the trunk.  Everything had been taken from the glove

22  compartment of the car.

23      About three weeks later, Mr. Hayes was in his apartment and heard a knock on the door.

24  When he opened the door, petitioner and another man were standing outside.  When Mr. Hayes

25  tried to slam the door shut, petitioner put his foot in the door to keep it open and pushed his way

26  into the apartment.  He was holding a gun out and told Mr. Hayes to lay on the floor.  Mr. Hayes

27  jumped at petitioner and tried to hit him.  Petitioner shot Mr. Hayes in the shoulder and ran out of

28  ////

the apartment.  The other man with petitioner did not enter the apartment.  Petitioner plead guilty to charges of robbery and kidnapping.

In his closing argument, the prosecutor focused on the choices petitioner made to commit crimes.  (RT 4015-079.)  He told the jury that petitioner was twenty-eight when he robbed and kidnapped Mr. Hayes and forty-one at the time of the current crimes.  He reminded the jury that petitioner had a wife, a son, and, according to guilt phase testimony, a nice house.

The prosecutor argued that if sentenced to life, petitioner would have the opportunity to exercise, and to do "a plethora of other things inside prison."

ii.     Defense Case

The first defense witness was Betty Canary, petitioner's mother.  (RT 3979-987.)  She testified that she was 17 years old when petitioner was born.  She was then in her second marriage.  At the time of trial, she had been married six times.  She, petitioner, and his father lived with Ms. Canary's mother.  When petitioner was about a year old, she and petitioner's father divorced.  Ms. Canary's mother took care of petitioner frequently.  Ms. Canary testified that she did not feel that she was a competent mother.  Petitioner's grandmother is no longer alive.

By the time petitioner was two, Ms. Canary came by to visit petitioner about twice a month.  The longest period of time he spent with her was about three months, when he was twelve.  Typically, though, he spent only two or three days with her.

Ms. Canary did not feel that her mother disciplined petitioner.  Petitioner did not finish high school.

When petitioner got out of prison in 1982, he was living in Arizona.  In 1987, he was in an automobile accident that badly injured his back.  It limited his ability to work as a painter and caused him pain.  Shortly after that time, someone stole all of petitioner's painting tools.  Also during that time, petitioner was bit by a rattlesnake.  Petitioner told her he thought he was going to die.  The first place he sought help turned him away.  One finger had to be amputated as a result of the bite.  All of these events affected petitioner's ability to work.

////

1    Ms. Canary' first husband, Joe Munson, claimed to be petitioner's father and tried to visit

2    him.  Petitioner was bothered by that fact.

3    After one of her husbands died, petitioner's father Bob Majors, petitioner, and Ms. Canary

4    had a photo taken. Petitioner said, "I've got my mother and my dad with me for the first time in

5    my life."

6    Ms. Canary then asked the jury to spare petitioner's life.

7    The second defense witness was petitioner's father Robert Majors.  (RT 3988-991.)  After

8    he and petitioner's mother were divorced when petitioner was about a year old, petitioner's father

9    saw petitioner only occasionally.  He also recounted the snakebite incident and the importance of

10   the "family" photo to petitioner.  Mr. Majors said he did not want his son to die.

11   Both of petitioner's parents cried during their testimony.

12   The last part of the defense case was the introduction of a photo that the parties stipulated

13   showed a typical cell for an individual committed to prison for life without the possibility of

14   parole.  The parties also stipulated that the size of the cell was about five feet by eight feet.

15   Mr. Hamlin's closing argument spans over three times the number of transcript pages that

16   the testimony of the defense witnesses spanned.  (RT 4079-121.)  Mr. Hamlin argued primarily

17   lingering doubt – that the jury could not know what happened at Thomas Probst's house the night

18   of the killings.  He indicated that a homicide should not be surprising in the midst of a drug deal.

19   He also argued that Robert Reese was "wound up" on drugs that night and might have been

20   unpredictable and too quick to respond to a perceived threat.

21   When talking about the prior crimes, Hamlin argued Ms. Fleig "sold a bill of goods" to a

22   jury in 1971.  He argued that facts indicated Ms. Fleig knew petitioner or knew of him well

23   enough to invite him into her house, cook for him, talk with him, and kiss him.  Hamlin stressed

24   that, based only on Ms. Fleig's story, petitioner was convicted of burglary and sentenced to ten to

25   twenty years in prison.  Hamlin told the jury they should not consider the burglary aggravating.

26   Mr. Hamlin said little about the crimes against Mr. Hayes, recognizing that it was a "bad

27   thing."  He attempted to have the jury put those crimes in the context of petitioner's anger at

28   being sentenced to prison for burglarizing the Fleig home.  Then, for five years after he was

165

1  released in 1982, petitioner did not have criminal problems.  In 1987, he suffered a number of

2  serious personal setbacks:  a car accident that caused back problems affecting his ability to work,

3  the tool robbery, and then losing a finger from the rattlesnake bite.  According to Hamlin, this is

4  when petitioner "slid back into drugs."

5      Hamlin told the jury the evidence of petitioner's 1987 problems provided "some of the

6  reasons" that his client became involved in crime and would "put[] into context why [petitioner]

7  got into the position that he did."  Hamlin also discussed, albeit briefly, "what [petitioner] had to

8  go through and some of the reasons that he got to the point of dealing drugs."  He mentioned

9  petitioner's abandonment by his parents as evidence of a "very unsettled childhood."  He

10  explained that petitioner's grandmother thought his mother was unfit to raise him and that

11  petitioner had "great confusion about who his real father was."  He added that petitioner was not

12  disciplined and had no "guidance."

13      Hamlin concluded by telling the jury that, by deciding not to kill Danny Hobbs, petitioner

14  and Robert Reese showed "some compassion" that day.  He also showed the jury the picture of

15  the prison cell and described the privations of living in prison for the rest of one's life.

16              b.   Evidence Presented on Habeas

17                   i.      Evidence of Petitioner's Background

18      Petitioner presents the following evidence regarding his childhood and family history:  (a)

19  June 18, 2003 Declaration of Paul Mann, an investigator for federal habeas counsel, regarding his

20  April 14, 2003 interview with petitioner's aunt, Alice ("Sissie") Carnahan Coomes (LD 31, Ex.

21  103); (b) June 19, 2003 declaration of petitioner's mother Betty Canary (LD 31, Ex. 106); (c)

22  June 23, 2003 declaration of petitioner's cousin Brenda Peach (LD 31, Ex. 107); (d) June 23,

23  2003 declaration of petitioner's cousin Jeff Wilkerson (LD 31, Ex. 108); (e) information

24  regarding conditions at the Indiana Boys School, and a lawsuit and Congressional investigation

25  regarding those conditions (LD 31, Ex. 201; LD 37, Exs. 510 and 511); (f) school records (LD 31,

26  Exs. 202 and 203); and (g) juvenile commitment records (LD 39, Ex. 526).  That evidence

27  describes the following background.

28  ////

Petitioner was born to 17-year-old Betty Carnahan in 1948.[40]  He was given the surname of Betty's then-husband, Bob Majors, but his biological father was Betty's previous husband Joe Munson.  Betty often took the baby to her parents' (Bessie and Ed's) home to stay, but her father Ed repeatedly threw them out.  Ed was an alcoholic who regularly beat his wife and children (once breaking his wife Bessie's jaw, and another time causing a miscarriage by kicking her in the stomach), violently assaulted strangers (including a hobo Ed slashed with a straight razor and a traveling salesman whose teeth Ed knocked out), and committed acts of psychological cruelty such as telling his grandson Jeff Wilkerson that he had crushed the boy's pet turtle.  Betty often left petitioner with her infirm grandmother or with her own mother, Bessie, both before and after Bessie divorced Ed.

Betty and Bob divorced when petitioner was one year old, and Betty married Earl Straw, her third husband. They lived in a house on stilts in the tidal flats of the Wabash River, without running water or electricity.  When the house flooded every year, they would stay with Bessie and her second husband, Merl Johnson.  Betty and Earl fought frequently and drank heavily.  Betty would sneak out of the house at night, hang out in bars, and take speed she got from truckers.  Petitioner was often left with relatives.  On four or five occasions his grandmother Bessie observed bruises on petitioner's body that indicated to her he was being beaten at home.

When petitioner was three or four years old, he moved in permanently with Bessie and when he was five, she obtained custody of him.  Bessie suffered from depression, migraines, and multiple physical ailments (some of which were related to the syphilis she had contracted from Ed Carnahan).  To accommodate Bessie, her second husband Merl insisted on silence in the home.  Petitioner and his cousins were not allowed to play inside or to have friends over.  On at least a few occasions, Merl shamed petitioner and falsely accused him of sexually inappropriate behavior.

////

---

[40] Carnahan is petitioner's mother's maiden name.  At the time she testified at the penalty phase, she was using the name Betty Canary.  Throughout the discussion of petitioner's background, petitioner identifies his mother as Betty Carnahan and this court will as well.

1    Neither Bessie nor Merl demonstrated affection for petitioner.  They lived in

2  impoverished conditions and moved frequently.  Petitioner's education was often disrupted, and

3  he struggled in school.  As petitioner got older, Bessie's health continued to decline.  Betty

4  repeatedly told petitioner that he was a burden for his grandmother.  Petitioner became withdrawn

5  and displayed nervous tics (scratching his head until it bled, and blinking his eyes repeatedly).

6    Petitioner grew up around his maternal aunts Mary and Alice ("Sissie"), both of whom

7  suffered from alcoholism and mental illness.  Mary was hospitalized several times for severe

8  mental problems, attempted suicide on several occasions, and could be aggressively violent.

9  Sissie was a victim of chronic domestic violence.  Sissie married when she was 14, to a man who

10  brutally abused her.  After particularly bad beatings she would move in for stays of up to 6

11  months at a time with Bessie, Merl, and petitioner.  Sissie suffered from depression and anxiety

12  and was hospitalized twice for depression.

13    In his teens, petitioner began hanging out with older boys and getting in trouble.  At the

14  age of 17, he was declared "delinquent" and sent to the Indiana Boys School ("IBS").  The

15  conditions at this institution during petitioner's nine-month incarceration – overcrowding,

16  inadequate supervision, inadequate educational programs, systemic failure to provide needed

17  psychological services, arbitrary infliction of corporal punishment including floggings, use of

18  extended solitary confinement, involuntary injections of heavy tranquilizers for the purpose of

19  controlling behavior, and rampant sexual violence – were the subject of a Pulitzer Prize-winning

20  series of articles, U.S. Senate Subcommittee hearings, and a lawsuit that resulted in findings that

21  Indiana had violated the due process and Eighth Amendment rights of its juvenile wards.  See

22  Nelson v. Heyne, 491 F.2d 352 (7th Cir. 1974); (LD 32, Ex. 201 (May 4, 1971 Stmt. of IBS

23  Superintendent to U.S. Senate Subcomm. to Investigate Juv. Delinq.); LD 37, Exs. 510 and 511

24  (Nelson v. Heyne, No. 72 S 98 (U.S. Dist. Ct., N.D. Ind., orders dated Jun. 15, 1972 and Feb. 8,

25  1973)); LD 37, Ex. 511 (Nelson v. Heyne (memo and order dated Feb. 8, 1973)); LD 39, Ex. 526

26  (Sept. 27, 1965 court finding of petitioner's delinquency and order committing him to IBS).)

27  Petitioner presents little information about his stay there.  He alleges that he was given Thorazine

28  at IBS, and suffered a dangerous allergic reaction.  However, he cites only to Dr. Globus's report

1    for this statement.  According to Dr. Globus, petitioner told him he had taken Thorazine for pain

2    and suffered a reaction after he had had rectal relapse surgery.  (LD 23, Ex. N at 15.)  It was not

3    done, as petitioner implies, for "behavior control" and appears that he did not even have that

4    surgery while at IBS.  (See id. at 14.)  Petitioner also claims he was sexually assaulted while at

5    IBS.  His cousin Brenda Peach stated that when petitioner returned home from IBS, he was silent

6    and sullen and indicated to her that he had been the victim of sexual assault.  (LD 31, Ex. 107, ¶

7    33.)

8         Petitioner also presents evidence of an extensive family history of alcoholism and drug

9    abuse.  As a baby and young child, petitioner was dosed with paregoric (an alcohol based tincture

10   of morphine) by his mother and grandmother to control him and make him sleep.  His grandfather

11   and uncle got him drunk for the first time when he was 12 years old.

12        Petitioner used drugs as an adult.  Petitioner now contends that on the night of the capital

13   crimes he used methamphetamine.

14        Petitioner presents the declaration of psychiatrist Albert Globus, who was hired by

15   petitioner's original defense attorney, to show that, had he had the additional information of

16   petitioner's background presented on habeas, he would have determined that petitioner's

17   psychological problems were much worse than he originally determined.  (LD 31, Ex. 127.)  Dr.

18   Globus explains, "It is almost axiomatic and considered incontrovertibly true that such an early

19   life as James Majors had is psychologically crippling to an adult."  (Id., ¶ 20.)

20        Petitioner also presents the June 2003 declarations of his ex-wife Linda Adcock and his

21   son James Majors II ("Jimmy") to show the positive relationship he had with them.  (LD 31, Exs.

22   104 and 105).  Jimmy came to live with petitioner and his second wife Shirley in Arizona in

23   1987, when Jimmy was a sixteen.  Petitioner gave his son a job in his house-painting business.

24   Linda stated that petitioner was a "concerned" parent who she trusted to take care of Jimmy

25   during Jimmy's visits to stay with him.  Jimmy stated that petitioner was a good father to him.

26        Finally, petitioner presents evidence to show he was a well-adjusted and well-behaved

27   inmate during his prior prison term in Arizona.  (LD 35, Ex. 402 (Arizona prison records).)

28   ////

1        ii.        Evidence of Counsel's Preparation for the Penalty Phase

2            (a)   What Counsel Did

3        In June 1990, attorney Brady hired investigator Charles Pacheco to work on petitioner's

4    case.  It was the first capital case Pacheco had ever investigated.  (LD 31, Ex. 133 (June 23, 2003

5    Decl. of C. Pacheco).)  Further, Mr. Pacheco had no capital case training.  He found the "size and

6    complexity of the case" "overwhelming and intimidating at times."  (Id.)  David Deragisch was

7    the other defense investigator.  Petitioner presents an October 1997 declaration that Mr.

8    Deragisch prepared for another capital case.  (LD 31, Ex. 128.)  Therein, he states that he first

9    worked for Michael Brady in 1989 when Brady was Keenan counsel in the capital trial of Jeffrey

10   Hawkins.  At that time, he had no experience with murder cases or doing penalty phase

11   investigations.  He relied upon Mr. Brady to tell him what to do and little, if any, of that work

12   involved penalty phase investigation.  In May 1990, Brady hired Deragisch to work on

13   petitioner's trial.  Petitioner's original attorney Bill Owen had hired Rod Harmon to conduct

14   investigations, but it appears that after Mr. Owen left the case, Mr. Harmon did as well.[41]

15       Before trial, the prosecution notified the defense that it intended to present evidence of

16   seven Arizona murders, including the murder of Robert Reese, as aggravating factors.  (CT 477-

17   78.)  On November 28, 1990, days before the penalty phase was set to begin, Mr. Hamlin moved

18   to strike the seven Arizona murders as possible aggravators.  (CT 728-34.)  Mr. Hamlin argued

19   that petitioner had not been charged with those murders.  On November 30, the prosecutor

20   informed the court that he would not be presenting evidence at the penalty phase of petitioner's

21   involvement in any of the Arizona murders.  (RT 3860.)  Mr. Hamlin then asked the court for a

22   one-week continuance because, due to the prosecution's withdrawn threat of putting on evidence

23   of the Arizona killings, "we've had to put a lot of plans on hold and make different

24   _____

25   [41] In a sealed addendum to these Findings & Recommendations, the undersigned sets out
     additional information regarding the investigations conducted by the defense.  This information is
26   derived from funding requests and bills submitted by counsel to the state court.  The California
     Supreme Court maintained those records under seal.  They were lodged with this court under seal
27   as well in a volume entitled "Lodged Document 5a, Augmented Clerk's Transcript."  This court
     also issued a protective order for the documents in LD 5a and ordered that those records be
28   maintained under seal in this court.  (ECF No. 254.)

arrangements." (RT 3861.)  Hamlin indicated that the prosecutor's decision not to put on the

Arizona murder evidence meant that the defense needed time to "work out the arrangements of

having a couple individuals come.  They are coming from Indiana and possibly somebody from

Arizona, and the extra week will give me time to work that out so they'll be ready to go on

Monday." (RT 3861.)  Because of the uncertainty regarding the prosecution's penalty phase case,

the defense had "been kind of preparing on different scenarios, if different things occurred, and

now I'll need one week just to pull everything together." (Id.)

Hamlin further stated that his presentation at the penalty phase would be limited so as not

to open the door to evidence of the Arizona killings.  (RT 3864.)  Brady explained,

> I think as a matter of strategy, if someone gets on the stand, we're not going to be talking about the fact that Mr. Majors is a peaceful person and has no propensity for violence and then have Mr. O'Mara cross-examine them about seven other alleged homicides that occurred in Arizona.  So that's why it's going to be short.

(RT 3864.)

### (b)  What Petitioner Alleges Counsel Did Not Do

Petitioner's first appointed trial attorney, William Owen, contacted social psychologist Dr.

Craig Haney and obtained authorization from the court to retain Dr. Haney to prepare a mitigation

case.  (LD 23, Ex. I to 1997 State Pet.)  In his declaration, Dr. Haney states that he does not recall

ever being contacted by Mr. Brady, Mr. Hamlin, or anyone else working for petitioner's defense

after Mr. Owen left the case.[42]  (LD 31, Ex. 131.)

Mr. Owen also retained Dr. Albert Globus, a psychiatrist, who evaluated petitioner in

March 1990.  (LD 23, Exs. J (Owen's Mar. 1990 letter to Globus), and N (Globus's June 1991

letter and report to Brady) to 1997 State Pet.)  While petitioner states that attorney Brady "never

contacted Dr. Globus thereafter," Brady was at that time representing petitioner as Keenan

////

////

////

_____

[42] Additional information in sealed addendum.  See n.41, supra.

1   counsel.[43]   Nothing indicates whether Brady discussed Dr. Globus having been retained, or his

2   findings, with Mr. Owen before Owen was relieved.[44]

3           On November 30, 1990, Dr. Globus wrote Brady a letter stating that he had "called your

4   office on several occasions" but "have not yet heard from you."   He stated he was calling to find

5   out if there was anything he could do in petitioner's case.   (LD 23, Ex. K.)   On January 25, 1991,

6   Dr. Globus sent Brady a bill for Globus's time from May 1990 through June 1990.   That time

7   included a "conference" on May 10, 1990, and record review.   (LD 23, Ex. L to 1997 State Pet.)

8   In a February 4, 1991 letter to Dr. Globus, Brady stated, "We have requested a report from your

9   office regarding James David Majors on no less than three occasions and we have yet to receive

10  said report."   (LD 23, Ex. M to 1997 State Pet.)   Brady continued that he would pay Globus's bill,

11  including the costs of the report, when Brady received it.   Brady concluded, "to protect the record

12  and myself from any incompetency claims, I must have your report."   On June 3, 1991, Globus

13  sent Brady a report.   (LD 23, Ex. N to 1997 State Pet.)   In his cover letter, Globus stated that he

14  had "called your office repeatedly during the guilt and penalty phase and left messages asking if

15  there was anything I could do or what might be appropriate in completing this report."

16          Attorney Owen also hired psychologist Daniel Edwards.[45]   Dr. Edwards' report was an

17  exhibit to petitioner's 1997 state habeas petition.   (LD 23, Ex. G.)   The cover letter shows that it

18  was provided to attorney Owen in August 1989.   Dr. Edwards determined that petitioner was

19  "somewhat depressed by being incarcerated and by his current predicament where he is charged

20  with murder."   He also mentioned petitioner's anxiety and his "fairly severe somatic symptoms"

21  of it.   However, he concluded that "[t]here were no indications of any major intellectual,

22  cognitive or neuropsychological deficits and his major problems are more of an emotional nature

23  and include some impulsivity when under pressure."

24  ////

25  [43] Brady was appointed on September 29, 1989.   (CT 433.)

26  [44] Additional information in sealed addendum.   See n.41, supra.

27  [45] Additional information in sealed addendum.   See n.41, supra.

28

1    Trial counsel's files included records from petitioner's prior counsel that mentioned,

2  among other things, petitioner's incarceration at the Indiana Boys School.  (LD 44, Ex. 714 (Mar.

3  and Apr. 1990 letters from investigator Rodney Harmon to investigators in Indiana).)  Petitioner

4  contends that, despite this knowledge, his attorneys conducted no investigation into petitioner's

5  time there.

6    In his declaration, Mr. Brady stated that it was his practice to "start anew" rather than

7  picking up "where my predecessor left off."  (LD 31, Ex. 132, ¶ 13.)   He also stated that besides

8  talking with the prosecutor about the Arizona murders, he "did little else at the penalty phase."

9  (Id., ¶ 20.)  "Mr. Hamlin was responsible for the penalty phase."[46]  (Id., ¶ 21.)  Brady continued,

10  "I believe the investigators should have known what they were looking for to present in

11  mitigation.  If the investigators were unable to discover this information due to neglect, then it

12  was a mistake, and counsels [sic] were responsible."  (Id., ¶ 23.)

13    Petitioner's mother stated that she recalled speaking with petitioner's attorney, "but he

14  really didn't spend that much time with me."  (LD 31, Ex. 106.)  Brenda Peach, petitioner's son

15  Jimmy, and Jeff Wilkerson all stated that they were never contacted by petitioner's trial attorneys.

16  (LD 31, Exs. 107, ¶ 34; 108, ¶ 11; 105, ¶ 5.)

17    3.   California Supreme Court's Decision

18    The California Supreme Court denied this claim summarily on habeas.

19    4.   Discussion

20    a.   Reasonableness of Counsel's Conduct

21    The standards for counsel's conduct at the penalty phase are described above.  In brief,

22  counsel has an obligation to investigate and present mitigating evidence, including medical

23  history, educational history, employment and training history, family and social history, prior

24  adult and juvenile correctional experience, religious and cultural influences, mental health

25  history, and history of substance abuse.  Petitioner also cites the opinions of one of his original

26  attorneys, Donald Manning, and of trial counsel Michael Brady to establish the standards for

27

28  [46] Additional information in sealed addendum.  See n.41, supra.

investigation for the penalty phase.  Mr. Manning is an experienced criminal defense attorney who has tried approximately thirty homicide cases.  (LD 31, Ex. 124 (June 24, 2003 Decl. of D. Manning), ¶ 1.)  He stated that he is familiar with the standards of practice during the period from 1989-1991, when petitioner was tried and sentenced.  (Id., ¶ 2.)  Those standards required counsel to "conduct extensive factual and legal investigations" into penalty phase issues, including hiring mental health experts to evaluate the defendant for issues related to mitigation, examining the defendant's "entire life  history," and interviewing as many of the defendant's family members as possible.  (Id., ¶¶ 3, 9, 10, 12.)   Mr. Brady indicated that the failure to locate the life history information presented on habeas was the fault of petitioner's trial attorneys.  (LD 31, Ex. 132, ¶ 23.)  He also stated that had he known about the life history information, he would have insisted that Mr. Hamlin put on that evidence.  (Id.)

The evidence of petitioner's dysfunctional childhood, which included gross neglect, poverty, and pervasive mental illness and alcoholism in petitioner's family, his resulting psychological problems, and his substance abuse are just the sort of "classic mitigation evidence" the United States Supreme Court has held counsel has an obligation to seek out.  See Williams, 529 U.S. at 396; Wiggins v. Smith, 539 U.S. 510, 524 (2003); Porter v. McCollum, 558 U.S 30, 41 (2009) (Mitigation should "humanize [the defendant] or allow [the jury] to accurately gauge his moral culpability.").  The record before this court is absent of any but a few, minimal attempts by petitioner's attorneys to obtain this sort of evidence.[47]

Counsel knew that petitioner had been raised by his grandmother, who was then deceased, and that his parents had had little contact with him during his formative years.  Counsel also knew or should have known about petitioner's incarceration at the Indiana Boys School.  The law is clear that counsel had an obligation to look further to find witnesses who could provide more detailed information about petitioner's upbringing and who might be able and willing to testify. See Stankewitz v. Woodford, 365 F.3d 706, 719 (9th Cir. 2004) (court recognizes that counsel has an obligation to interview people "who may have examined or spent significant time with [the

---

[47] Additional information in sealed addendum.  See n.41, supra

1  petitioner] during his childhood and youth"); <u>Douglas v. Woodford</u>, 316 F.3d 1079 (9th Cir.

2  2003) (counsel ineffective where he had notice that petitioner had a particularly difficult

3  childhood, but made no attempt to contact persons who might have more detailed information

4  about petitioner's past).

5         Whether counsel should have pursued additional mental health evaluations is a more

6  difficult question.  Petitioner alleges the defense did not have contact with Dr. Globus, or

7  apparently, with Dr. Edwards.  Whether there was or was not contact, neither Dr. Globus nor Dr.

8  Edwards opined at that time that petitioner had any significant mental health problems.

9  Therefore, counsel did not necessarily have an obligation to have further mental health

10  evaluations conducted.  Counsel's failure with regard to petitioner's mental health is wrapped up

11  with their failure to investigate petitioner's past.  Had petitioner's trial attorneys acted reasonably

12  and developed information on petitioner's background, they would have needed to present that

13  information to the jury in a way that helped the jury understand how petitioner came to be before

14  them.  It is certainly reasonable to assume that any such presentation would have included some

15  sort of psychological analysis.  (<u>See</u> LD 31, Ex. 131 (Decl. of Dr. Craig Haney).)  Such a

16  presentation was obviously the intention of petitioner's original attorney Bill Owen when he

17  requested authorization to retain social psychologist Craig Haney.

18         Petitioner also argues counsel should have uncovered and presented evidence about his

19  drug use.  However, he points to little evidence that he had a drug problem.  Further, petitioner

20  argues that attorney Hamlin told the jury he would present such evidence.  That does not appear

21  to be the case.  In his opening statement, Hamlin told the jury that petitioner's series of difficult

22  events, culminating in losing a finger after the rattlesnake bite, would demonstrate to them

23  petitioner's "subsequent involvement with his drug activity."  (RT 3921.)  This appears to be a

24  reference to petitioner's drug dealing, not drug use.  Again, in his closing argument when Hamlin

25  stated that the events explained why petitioner "slid back into drugs," the next sentence makes

26  clear Hamlin was referring to "drug sales," not taking drugs.  (RT 4105.)

27         Petitioner denied taking methamphetamines on the night of the crimes.  This denial was

28  important because the defense was attempting to show that Reese was strung out on drugs and

1   acting erratically and nervously, while petitioner was relatively calm.  As part of the defense of

2   lingering doubt at the penalty phase, attorney Hamlin attempted to describe the events of the

3   crimes as possibly being instigated by a nervous Reese suddenly popping off and shooting.  (RT

4   4109.)  Adding petitioner's drug use into the penalty phase mix would not have been helpful to

5   that defense.

6         The defense had even better reasons to avoid evidence of petitioner's good behavior while

7   in prison.  That evidence would have permitted the introduction of evidence of petitioner's escape

8   from jail in Indiana.  Certainly, evidence of escape could have caused some jurors to fear it might

9   happen again should petitioner be sentenced to life.  Similarly, any attempt to show petitioner's

10  good character could well have opened the door to evidence of other bad acts.  In fact, Brady told

11  the judge the defense would obviously not be putting on good character evidence for that reason.

12  Petitioner has not shown this was a strategically bad decision.

13        It appears that petitioner's counsel was focused on the seven Arizona murders the

14  prosecution had intended to present at the penalty phase.  While investigating those murders was

15  certainly necessary, those investigations did not ameliorate the need to also investigate

16  petitioner's background.  It appears that Mr. Hamlin knew of this necessity, but did little about it.

17  His request for a continuance after the threat of the seven Arizona murders disappeared shows

18  that he was unprepared to present evidence of petitioner's background.  The result of an apparent

19  scramble for background evidence was having only petitioner's parents, who did not raise him,

20  testify to the little they knew about his childhood.

21        Mr. Hamlin told the jury petitioner's childhood was "unsettled."  His focus on petitioner's

22  accident, loss of tools, and rattlesnake bite show that he knew it was relevant and important to

23  show the jury how petitioner ended up committing crimes.  There was no reason not to flesh out

24  for the jury that petitioner's childhood was more than "unsettled."  Further, evidence of

25  petitioner's childhood would not have conflicted with the defense focus on lingering doubt about

26  petitioner's innocence.  Even had the jury been receptive to the lingering doubt defense, it was

27  still faced with evidence of petitioner's drugs and arms dealing, and of the two prior crimes,

28  particularly the kidnaping, robbery, and shooting of Mr. Hayes.  The evidence of petitioner's

1    early life of neglect and abuse would have shed some light on how he came to commit those prior

2    criminal acts.[48]

3            This court can conceive of no reasonable argument that counsel could have made a

4    strategic decision not to at least investigate and likely present additional evidence of petitioner's

5    difficult childhood.[49]  The fact is that an attempt was made to present some evidence of

6    petitioner's childhood and to explain why petitioner ended up committing criminal acts.  The

7    problem is that the attempt was far short of what a reasonably prepared attorney would have done.

8    Both the Supreme Court and the Court of Appeals for the Ninth Circuit have found deficient

9    attorney performance at the penalty phase where only a few family members testified in a general

10   or cursory fashion about the petitioner's background and the petitioner's attorneys failed to

11   thoroughly investigate or present a better picture of that background.  See Williams v. Taylor, 529

12   U.S. 362, 396 (2000) (counsel's presentation of three mitigating witnesses to testify that

13   petitioner was not a violent person was unreasonable where significant evidence of petitioner's

14   childhood of abuse and neglect and possible mental impairments was available); Stankewitz, 365

15   F.3d at 706 (9th Cir. 2004) (petitioner made prima facie showing that counsel acted unreasonably

16   for putting on very limited mitigation case and failing to investigate and present evidence of

17   petitioner's traumatic and abusive childhood, history of mental illness, and long-term substance

18   abuse); Ainsworth v. Woodford, 268 F.3d 868 (9th Cir. 2001) (counsel unreasonable for

19   presenting several witnesses who gave very brief, general testimony about petitioner and his

20   background; counsel failed to investigate and present available evidence of petitioner's troubled

21   _____

22   [48] Petitioner's accident, loss of tools, and rattlesnake bite all occurred after his prior convictions
     so did nothing to mitigate the jury's consideration of them.

23   [49] Respondent focuses on the fact that petitioner relies upon the declarations of two cousins and
     an interview with an aunt to show the circumstances of his young life.  Respondent argues that
24   petitioner has failed to show counsel should have known to talk with any of these people.
     However, the record shows that petitioner did not have siblings and was primarily raised by his
25   grandmother, who was deceased at the time of trial, and by her husbands, with the involvement of
     other relatives.  Talking to aunts, uncles, and cousins who may have had contact with petitioner
26   when he was young certainly seems well within the scope of any reasonable investigation of
     petitioner's background.  Moreover, even if petitioner was not forthcoming with useful
27   information about his background, counsel had an obligation to obtain mitigating evidence from
     other sources.  Douglas, 316 F.3d at 1088.

28

                                                177

1   childhood and substance addictions); Wallace v. Stewart, 184 F.3d 1112 (9th Cir. 1999); Bean v.

2   Calderon, 163 F.3d 1073 (9th Cir. 1998) (counsel put on some mental health testimony at penalty

3   phase, but those experts were unprepared; counsel failed to obtain evidence that petitioner was

4   functionally mentally retarded, was brain-damaged, suffered from PTSD, and was incompetent at

5   the time of trial).

6          Petitioner has unquestionably made a prima facie showing that counsel acted

7   unreasonably in preparing for the penalty phase and in presenting evidence at the penalty phase.

8   To the extent the California Supreme Court found otherwise, it did so unreasonably.

9                      b.  Prejudice

10         Petitioner's next hurdle is to show the California Supreme Court could not have

11  reasonably found he failed to make a prima facie showing that he suffered prejudice as a result of

12  counsel's failures to investigate and present mitigating evidence.  The standard under Strickland

13  is whether there is a reasonable probability the result of the proceedings would have been

14  different absent counsel's errors.  The effect of the aggravating evidence was mixed.  On the one

15  hand, the crimes at issue were certainly brutal and there were multiple victims.  But, there was

16  little evidence showing just what transpired that night.  Petitioner had a substantial basis to argue

17  lingering doubt.  The evidence of petitioner's burglary of Ms. Fleig's home was bizarre and, all

18  things considered, not an indication that petitioner was the "worst of the worst."  The crimes

19  against Mr. Hayes, on the other hand, put petitioner in a more violent light and Mr. Hayes'

20  testimony was important aggravating evidence.

21         When this aggravating evidence is weighed against the surprisingly small amount of

22  mitigating evidence, it is unsurprising that the jury chose the death penalty.  The jury had no

23  context for petitioner's life and no way to assess his "moral culpability" because they knew so

24  little about how he became the man that sat before them.

25         Petitioner now presents evidence of a childhood of abuse, exposure to domestic violence,

26  substance abuse, mental illness, instability, neglect, and poverty.  He also presents evidence of the

27  extreme conditions he was subject to when an inmate at the Indiana Boys School during his teens.

28  Finally, with Dr. Globus's declaration, petitioner shows how an expert could have put petitioner's

1   life story in context for the jury.  The question is whether petitioner has made a prima facie

2   showing that it is reasonably probable this evidence would have caused at least one juror to vote

3   for life without parole.

4       Courts have held that similar evidence could have swayed a juror, even in the face of

5   significant aggravating evidence.  For example, in the sentencing phase of <u>Williams</u>, the

6   prosecution proved a number of prior convictions, including convictions for armed robbery,

7   burglary, and provided evidence of other crimes, including violent assaults on elderly victims.

8   One victim was in a vegetative state and not expected to recover.  The defense case involved very

9   brief testimony of Williams' mother and two neighbors that Williams was not a violent person

10  and a focus on the fact Williams had initiated contact with the police and confessed.  <u>Williams</u>,

11  529 U.S. at 368-69.  After finding counsel acted unreasonably in failing to investigate and present

12  evidence of Williams' background and mental health, the Court held that "the graphic description

13  of Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline

14  mentally retarded,' might well have influenced the jury's appraisal of his moral culpability."  <u>Id.</u>

15  at 398 (citing <u>Boyde v. California</u>, 494 U.S. 360, 387 (1990)).  The Court found that the state

16  court's decision to the contrary was unreasonable.  <u>Id.</u> at 399.

17      The Court of Appeals for the Ninth Circuit has also found prejudice from counsel's failure

18  to investigate and present mitigating evidence of the defendant's background in cases where the

19  prosecution presented a substantial case in aggravation.  <u>See, e.g.</u>, <u>Douglas</u>, 316 F.3d at 1091

20  ("the gruesome nature of the killing did not necessarily mean the death penalty was

21  unavoidable"); <u>Karis v. Calderon</u>, 283 F.3d 1117, 1141 (9th Cir. 2002).

22      Respondent argues that had petitioner attempted to present more humanizing testimony,

23  the prosecution would have countered with evidence that petitioner was a suspect in several other

24  murders in Arizona.  However, the prosecution had intended to, and determined it could not, put

25  on that evidence of other murders.  Respondent does not explain why a more thorough defense

26  presentation about petitioner's childhood would  have changed the prosecution's decision not to

27  put on that evidence.  And, respondent's argument misconstrues the purpose of evidence of a

28  troubled childhood.  The evidence would not have been presented to show good character, to

1   which rebuttal in the form of other crimes evidence might have been admissible.  Rather, the

2   purpose of the background evidence would have been quite different.  It would have shown the

3   jury that, in Dr. Globus's words, petitioner's history "has all the early life events that go to

4   produce impulsive and aggressive behavior secondary to mild early brain damage and poor early

5   socialization."  (LD 31, Ex. 127, ¶ 19.)   And, further, "[i]t is almost axiomatic and considered

6   incontrovertibly true that such an early life as James Majors had is psychologically crippling to an

7   adult."  (Id., ¶ 20.)

8          Petitioner presents evidence of "the kind of troubled history [the Supreme Court has]

9   declared relevant to assessing a defendant's moral culpability."  Wiggins, 539 U.S. at 535.  The

10  Court considers evidence of a defendant's "background and character" highly relevant "because

11  of the belief, long held by this society, that defendants who commit criminal acts that are

12  attributed to a disadvantaged background ... may be less culpable than defendants who have no

13  such excuse."  Penry v. Lynaugh, 492 U.S. 302, 319 (1989), abrogated on other grounds in Atkins

14  v. Virginia, 536 U.S. 304 (2002); see also Douglas, 316 F.3d at 1090 (background evidence is

15  "precisely the type of evidence that we have found critical for a jury to consider when deciding

16  whether to impose a death sentence").  Petitioner need not prove his claim at this point.  He only

17  needed to show the California Supreme Court that there was a reasonable likelihood he could

18  succeed on this claim when the evidence was fleshed out.  And, the state court was required to

19  consider the evidence proffered in the light most favorable to petitioner in making this

20  determination.  Under those standards, this court cannot understand how the California Supreme

21  Court could have determined petitioner failed to make a prima facie showing of prejudice.  This

22  court finds petitioner has satisfied 28 U.S.C. § 2254(d) for claim 10.

23          L.   Penalty Phase Instruction on Aggravating Circumstances – Claim 11

24          Petitioner alleges that a jury instruction meant to clarify aggravating circumstances

25  precluded consideration of mitigating circumstances.  He further alleges ineffective assistance of

26  trial counsel for failing to correct the problem and ineffective assistance of appellate counsel for

27  failing to raise the issue on appeal.  Petitioner fails to show the California Supreme Court

28  unreasonably rejected any of these arguments.

1    1.    Legal Standards

2        The Eighth Amendment requires that capital jurors be permitted to consider any relevant

3    mitigating evidence presented.  Lockett v. Ohio, 438 U.S. 586, 604-09 (1978); Eddings v.

4    Oklahoma, 455 U.S. 104, 112-17 (1982).  The Supreme Court has defined "relevant mitigating

5    evidence" as "any aspect of a defendant's character or record and any of the circumstances of the

6    offense that the defendant proffers as a basis for a sentence less than death."  Lockett, 438 U.S. at

7    604; see also Hitchcock v. Dugger, 481 U.S. 393, 398-99 (1987); Skipper v. South Carolina, 476

8    U.S. 1, 4 (1986); Eddings, 455 U.S. at 110.  Penalty phase jury instructions must permit the jury

9    to consider this relevant mitigating evidence to assess the defendant's "moral culpability" for his

10   actions.  Penry, 492 U.S. at 328.  When a defendant claims that an instruction violates this rule, a

11   reviewing court must determine "whether there is a reasonable likelihood that the jury has applied

12   the challenged instruction in a way that prevents the consideration of constitutionally relevant

13   evidence."  Boyde, 494 U.S. at 380.

14       2.    Background

15       Prior to arguments at the penalty phase, the court instructed the jury to consider all of the

16   evidence received during the trial and to "consider, take into account and be guided by the

17   following factors, if applicable."  (RT 4010-12.)  Among the factors listed were factor (b) (other

18   criminal activity involving force or violence or an attempt or threat to use force or violence) and

19   factor (c) (prior felony conviction).  The final factor, factor (k), told the jury to consider:

20               Any other circumstance which extenuates the gravity of the crime
             even though it is not a legal excuse for the crime and any
21           sympathetic or other aspect of the defendant's character or record
             that the defendant offers as a basis for a sentence less than death,
22           whether or not related to the offense for which he is on trial.  You
             must disregard any jury instruction given to you in the guilt or
23           innocence phase of this trial which conflicts with this principle.

24   These factors were on page 10 of the written instructions given to the jury.  (See CT 760-61.)

25   The instructions then told the jurors that evidence of Mr. Majors' prior convictions and prior

26   criminal activity could only be considered if the convictions or criminal activity had been proven

27   beyond a reasonable doubt, although the jury did not have to be unanimous as to either matter.

28   (RT 4012-13.)

Finally, the instructions directed the jury to "consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed," and after giving definitions of aggravating factors and mitigation circumstances and stating that the jurors were "free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider," the pre-argument instructions concluded as follows:

> In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.

(RT 4013-14.)

After counsel for both sides presented their arguments to the jury, the court gave the jury further instructions, which concluded with the following:

> Now, you have been instructed regarding aggravating and mitigating factors. The alleged burglary of Nancy Fleig and the alleged robbery and kidnap of Ronald Hayes were listed under "criminal activity". And I'll refer you to [factor (b) on] page 10, subpart (B), and then — And they were also listed as prior felony convictions. And I refer you to [factor (c) on] page 10, sub-part (C).
>
> In your consideration of any of these three allegations, if you are satisfied beyond a reasonable doubt that the prior conviction is true and that Mr. Majors committed the underlying criminal act, you are instructed to consider the act and the conviction for the act as a single factor.
>
> In other words, you must not consider the same fact more than once in determining the presence of aggravating factors. The allegation of assault with a deadly weapon is alleged only as a criminal act. There is no felony conviction relating to that act.

(RT 4126.)

      3.   California Supreme Court Opinion

The California Supreme Court denied this claim summarily on habeas.

      4.   Discussion

Petitioner argues that, taken as a whole, the instructions were reasonably likely to have been understood by the jury as indicating that only the Fleig and Hayes offenses were permissible

182

considerations in deciding between death and life imprisonment without the possibility of parole. That argument is based on the final instruction's reference to the previous instructions on "aggravating and mitigating factors."

Not surprisingly, petitioner does not spend much time trying to explain why that interpretation of the instructions was the "reasonably likely" one.  The California Supreme Court could have reasonably concluded there was no reasonable likelihood that the jury understood the court's instructions to preclude consideration of the mitigation evidence it had heard.  Because the final instruction referred to only two of the possible ten enumerated circumstances (factors (b) and (c)), a reasonable juror would have recognized that it supplemented rather than supplanted the earlier instructions.  Further, jurors were provided with copies of the written instructions on mitigating factors in addition to the final clarifying instruction.  No reasonable juror would have concluded that the final instruction somehow eliminated the necessity of considering "any sympathetic or other aspect of the defendant's character or record that the defendant offers" under factor (k) or any other mitigating factor presented or argued.  Accordingly, petitioner has failed to show the instruction violated the Constitution.

Because the instruction cannot reasonably be construed to have precluded the consideration of mitigating evidence, neither trial nor appellate counsel acted unreasonably in failing to raise the issue.  Claim 11 should be denied.

M.  <u>Information on Conditions for Life Sentence – Claim 12</u>

During penalty deliberations, the jury sent out a note requesting to "view a life without parole cell and environment with the normal people who live there." (CT 779.)  Petitioner alleges the trial court's refusal to grant that request was unconstitutional.  Petitioner further alleges: (1) the prosecutor committed misconduct by informing the jury, without evidentiary support, that petitioner would be permitted to do a "plethora" of things if sentenced to life in prison, and (2) counsel was ineffective for failing to object to the prosecutor's argument and seek to present additional evidence about the conditions of confinement.  Petitioner has failed to satisfy section 2254(d) for any of these allegations.

////

183

1          1.   Legal Standards

2          Petitioner cites no legal authority for the proposition that a trial judge must permit jurors

3    to see prison conditions either live or by videotape.  Rather, petitioner couches that argument in

4    terms of the trial court's "failure" to clear up the prosecutor's misleading argument that petitioner

5    would have a plethora of things to do in prison.  With respect to the prosecutor's argument, the

6    law is clear that a deliberate misrepresentation of the evidence violates the Due Process Clause.

7    See Miller v. Pate, 386 U.S. 1 (1967).   And, "a defendant may not be sentenced to death 'on the

8    basis of information which he had no opportunity to deny or explain.'"  Skipper, 476 U.S. at 5 n.1

9    (quoting Gardner v. Florida, 430 U.S. 349, 362 (1977)).  In a sentencing proceeding, the Eighth

10   Amendment prevents imposition of a death sentence based on materially inaccurate evidence and

11   prevents argument that diminishes the jury's sense of responsibility for its sentencing decision.

12   Johnson v. Mississippi, 486 U.S. 578, 586-87, 590 (1988); Caldwell v. Mississippi, 472 U.S. 320,

13   336, 341 (1985).

14         Finally, the standards for ineffective assistance of counsel have been discussed above.  In

15   brief, petitioner must show counsel acted unreasonably and that there is a reasonable probability

16   those actions affected the verdict.  Strickland v. Washington, 466 U.S. 668, 694 (1984.)

17         2.   Background

18         At the end of the defense's evidentiary presentation at the penalty phase, counsel Hamlin

19   introduced a photograph of a typical jail cell and the parties stipulated that "a typical jail cell for a

20   person that is committed to life imprisonment without the possibility of parole is five by eight."

21   (RT 3992-93.)  During his argument, prosecutor O'Mara discussed the photograph:

22              Now you're going to see the photograph of the cell, the five-
23         by-eight cell. I don't think either Mr. Hamlin or myself mean to
           suggest to you and it's certainly not true if the suggestion is going
24         to be left there that he's going to spend twenty-four hours a day in
           the cell for the rest of his life if he receives life without the
25         possibility of parole. Prison is like every other part of society. He'll
           have the opportunity to exercise on a limited basis, he will have the
26         opportunity to do a plethora of other things inside the prison.

27   (RT 4020-21.)  During his subsequent argument, Mr. Hamlin stated:

28   ////

                                            184

He's [Mr. Majors] gonna die in prison, at the very least.

Now, you'll have a chance to look at this, and I'm just asking you, please, to look at it.

It is a picture of — Exemplifies itself that a person would be in it. And Mr. O'Mara's correct. And he is going to be confined, 24 hours a day, and there will be limited activity. He'll get out of the cell from time to time to get some limited exercise, things like that. Like Mr. O'Mara was talking about.

But you need to realize the measurements, five by eight; that is basically the width of the inside of the elevator.  Eight feet back is not a very deep home. You're talking about being locked up like a caged animal, and it is better than dying. It is. But he's going to have to think about the reason he's there every day of his life. He's never getting out.

You and I hope to advance in life and enjoy our freedoms. I want to wake up, do what I want to do on the weekend, hope to move to a bigger house someday. Mr. Majors will only know one thing, that is that he is going to spend every day of his life in that size cell. He's not going to the park; he's not going to a baseball game. He's not gonna cook the food he wants to cook. He's going to be stuck with whatever decisions are made for him.

Some might think it's as harsh, if not worse, than death. Don't get us wrong; we are clearly asking for life imprisonment without the possibility of parole. But what I am trying to argue to you is that this is not some liberal position where we want to divert wrong and responsibility. It is a very harsh but just punishment, the most harsh penalty, short of death, that you can give.

It is basically the perfect insurance policy in hopes that something positive will happen out of all of this.  There's so much tragedy right now; so many people have been hurt.  And you can put somebody away for the rest of their lives and know that they're never getting out, and maybe, through sitting and thinking and staring at himself in the mirror, some good will be had.

(RT 4114-16.)

On the second day of jury deliberations, the foreman gave a note to the court that said, "We would like to view a life without parole cell and environment with the normal people who live there."  (CT 779.)  The trial judge stated that he "assume[d]" "you want to actually either see live or on videotape some prison environment, and that just can't be done."  (RT 4135.)

3.   California Supreme Court Opinion

In his appeal, petitioner argued that the trial court erred in refusing the jury's request and made a very brief argument that defense counsel was ineffective for failing to "present the

185

requested information in any other form or to present any evidence of a similar nature." (LD 18, AOB at 223-25.) The California Supreme Court rejected these claims as follows:

> The trial court's ruling was correct. The requested information was not a mitigating circumstance because "[i]t went neither to defendant and his background nor to the nature and circumstances of his crime." (People v. Thompson (1988) 45 Cal.3d 86, 139 [246 Cal.Rptr. 245, 753 P.2d 37]; see also People v. Quartermain (1997) 16 Cal.4th 600, 632 [66 Cal.Rptr.2d 609, 941 P.2d 788]; People v. Daniels (1991) 52 Cal.3d 815, 877-878 [277 Cal.Rptr. 122, 802 P.2d 906].) Moreover, "[d]escribing future conditions of confinement for a person serving life without possibility of parole involves speculation as to what future officials in another branch of government will or will not do. [Citation.]" (People v. Thompson, supra, 45 Cal.3d at p. 139.) Although defendant argues that "this logic is incorrect and the matter should be revisited, at least as to the question of the admissibility of evidence about how a life without parole prisoner would live," he advances no persuasive reason as to why this is so. Since the evidence was inadmissible, defendant's claim that his trial counsel was ineffective in failing "to present the requested information in any other form or to present any evidence of a similar nature" also fails.[fn]

> [fn] In any event, the premise underlying defendant's ineffectiveness claim is mistaken. At defense counsel's request, the trial court admitted a photograph of a prison cell along with a stipulation that it depicted a typical five-foot by eight-foot cell occupied by a prisoner serving a sentence of life without the possibility of parole. Defense counsel used the photograph to defendant's advantage during his penalty phase closing argument.

18 Cal. 4th at 416 & n.16.

In his 2003 state habeas petition, petitioner again argued trial court error. He expanded upon his ineffective assistance of counsel claim by arguing that defense counsel should have objected to the prosecutor's argument or asked to reopen the evidentiary portion of the proceedings to rebut it. (LD 29, 2003 State Pet. at 334-35.) However, the primary argument on habeas was new. Petitioner argued that the prosecutor committed misconduct because his "opportunity to do a plethora of other things" comment was false and was not supported by evidence in the record. (Id. at 332-35.) The California Supreme Court summarily denied petitioner's habeas claim.

////

////

1          4.   Discussion

2          Because petitioner fails to support his claim of trial court error with any authority, the

3   California Supreme Court was reasonable in denying it.  Petitioner's claim that the prosecutor's

4   statement was both false and unsupported by the evidence is only partly valid.  Petitioner fails to

5   present any evidence to show the prosecutor's statement was false.  However, he is correct – the

6   prosecutor's description of the conditions of life without parole as including many opportunities

7   outside of sitting in a cell was unsupported by any evidence in the record.  Petitioner has failed to

8   show, however, that no reasonable jurist could have rejected this argument.

9          Petitioner relies upon two cases to show the prosecutor's argument prejudiced him.  In

10  both cases, the prosecutor's conduct was far more egregious, and the obvious repercussions far

11  more severe, than the prosecutor's conduct in the present case.  In Miller v. Pate, 386 U.S. 1

12  (1967), the prosecutor presented evidence and argued that a pair of underwear discarded by the

13  defendant contained the blood of the eight-year-old victim.  However, the prosecutor knew that

14  the stains were in fact paint, not blood.  The Supreme Court found the underwear evidence was a

15  "vital component" of the case against the defendant.  Miller, 386 U.S. at 3.  The Court invalidated

16  the conviction because it was obtained by the knowing use of false evidence.  Id. at 7.  In Alcorta

17  v. Texas, 355 U.S. 28 (1957), the defendant was charged with murdering his wife.  His defense

18  was that he had killed her in a sudden surge of passion upon seeing his wife kissing another man.

19  That other man was the only eyewitness to the crime.  The prosecutor elicited testimony from him

20  that he and the defendant's wife had not been romantically involved.  That testimony undermined

21  the defendant's "sudden passion" defense.  However, the prosecutor was aware that the witness's

22  testimony was false.  He knew that the witness and the victim had had sexual intercourse several

23  times.  The Supreme Court found that, had the witness testified truthfully, the defendant might

24  well have been found guilty of a lesser charge and avoided the death penalty.  The conviction was

25  reversed.

26         In the present case, the prosecutor made a vague comment indicating that petitioner might

27  have access to many activities in prison.  Jurors were instructed that statements made by lawyers

28  were not evidence.  (RT 4007.)  The California Supreme Court could have reasonably concluded

187

1   that jurors would not have taken the prosecutor's generalized reference to activities to be

2   particularly important when considering whether petitioner should be sentenced to life or death.

3       Petitioner makes two additional arguments to show prosecutorial misconduct.  The

4   California Supreme Court was not unreasonable in denying these as well.  First, to the extent

5   petitioner argues that the defense was prejudiced because it was unable to rebut the prosecutor's

6   comment, the California Supreme Court would also not have been unreasonable in rejecting that

7   argument.  Because his argument followed the prosecutor's, Mr. Hamlin certainly had the

8   opportunity to rebut the "plethora" comment.  Second, petitioner's argument that the prosecutor's

9   comment gave jurors a "false choice" between penalties because it misrepresented prison

10   conditions is not supported by the cases he cites, in which the defendant's future dangerousness

11   was an issue and jurors were not told that a life sentence did not include the possibility of parole.

12   See Simmons v. South Carolina, 512 U.S. 154, 169-71 (1994); Shafer v. South Carolina, 532 U.S.

13   36, 51 (2001) (same).

14       With respect to petitioner's claim of ineffective assistance of counsel, because the

15   prosecutor's conduct was not materially prejudicial when it was made, Mr. Hamlin did not err in

16   failing to object to it.  However, Mr. Hamlin was made aware that at least one juror was interested

17   in knowing about the prison conditions of a life sentence.  Certainly, the jury note should have

18   caused defense counsel to consider whether to request a re-opening of the evidence on that

19   subject.  However, petitioner has failed to show the defense had a right to present that evidence or

20   any reason to think such a request would have been granted.  Accordingly, the California

21   Supreme Court would not have been unreasonable in denying this aspect of petitioner's

22   ineffective assistance of counsel claim as well.

23       Therefore, Claim 12 should be denied.

24       N.   Challenges to California's Death Penalty Scheme – Claim 13

25       Petitioner raises numerous challenges to the death penalty statute, both on its face, as it

26   existed at the time of petitioner's crimes and trial, and as it was applied to petitioner.  Each is

27   addressed below.  The court finds petitioner has failed to establish a prima facie case for relief on

28   ////

1   any of these issues.  Further, even when the effects of each challenge are considered in the

2   aggregate, petitioner has failed to show California's death penalty scheme is unconstitutional.

3                          1.   Death Penalty Scheme Fails to Narrow

4         Petitioner argues that California's special circumstances are so numerous and so broad

5   that at least one can be found in almost any first degree murder case.  Therefore, his argument

6   continues, California's special circumstances fail to narrow the class of murderers eligible for the

7   death penalty as required by the Eighth Amendment.  Petitioner also argues the related claim that

8   the felony murder special circumstance is, alone, overbroad.  In state court, petitioner relied upon

9   a study by law professor Steven Shatz that concluded that "[o]nly 11.6% of those statutorily

10   death-eligible are sentenced to death."  (LD 31, Ex. 117 (Feb. 2003 Decl. of Steven Shatz), ¶30.)

11   Professor Shatz determined "statutory eligibility" for the death penalty by looking at first degree

12   murder cases in which special circumstances were found by a trier of fact or could have been

13   found, based on Professor Shatz's own review of the facts of the case.  (Id., ¶10.)

14         For the reasons set out below, this court finds petitioner has failed to show the California

15   Supreme Court's rejection of this claim was unreasonable.  The narrowing sub-claim of claim 13

16   should be denied.

17                     a.   Legal Standards

18         The Eighth Amendment's narrowing requirement is the product of a series of Supreme

19   Court decisions beginning with Furman v. Georgia, 408 U.S. 238 (1972).  In Furman the Court

20   held the Georgia and Texas capital sentencing statutes violated the Eighth and Fourteenth

21   Amendments.  However, there was little clear agreement among the justices on the underlying

22   rationale for that decision.  Five justices wrote separate concurring opinions.  The opinions of

23   Justices Stewart and White are considered some basis for a "majority" holding in Furman.  See

24   408 U.S. at 401 (Burger, J., dissenting) (stating that while it is "not entirely clear" what the

25   holding is, the Stewart and White opinions are the "two pivotal concurring opinions").  Both

26   Justice Stewart and Justice White focused on the fact that the states' capital sentencing statutes

27   made every murderer eligible for the death penalty but provided no guidance to assist juries in

28   deciding when to impose that penalty.  As a result, "the death penalty is exacted with great

1    infrequency even for the most atrocious crimes and . . . there is no meaningful basis for

2    distinguishing the few cases in which it is imposed from the many cases in which it is not." Id. at

3    313 (White, J., concurring).  Justice Stewart similarly focused on the apparent arbitrariness of

4    imposition of the death penalty:

> These death sentences are cruel and unusual in the same way that
> being struck by lightning is cruel and unusual. For, of all the people
> convicted of rapes and murders in 1967 and 1968, many just as
> reprehensible as these, the petitioners are among a capriciously
> selected random handful upon whom the sentence of death has in
> fact been imposed. My concurring Brothers have demonstrated that,
> if any basis can be discerned for the selection of these few to be
> sentenced to die, it is the constitutionally impermissible basis of
> race. But racial discrimination has not been proved, and I put it to
> one side. I simply conclude that the Eighth and Fourteenth
> Amendments cannot tolerate the infliction of a sentence of death
> under legal systems that permit this unique penalty to be so
> wantonly and so freakishly imposed.

12   Id. at 309-10 (footnotes and citations omitted).

13       The Supreme Court later explained that in Furman it had held that the death penalty

14   "could not be imposed under sentencing procedures that created a substantial risk that it would be

15   inflicted in an arbitrary and capricious manner." Gregg v. Georgia, 428 U.S. 153, 188 (1976).

16   Rather, "where discretion is afforded a sentencing body on a matter so grave as the determination

17   of whether a human life should be taken or spared, that discretion must be suitably directed and

18   limited so as to minimize the risk of wholly arbitrary and capricious action." Id. at 189 (opinion

19   of Stewart, Powell, and Stevens, JJ.).  In his concurring opinion in Gregg, Justice White described

20   how a constitutionally permissible death penalty statute should work:

> As the types of murders for which the death penalty may be
> imposed become more narrowly defined and are limited to those
> which are particularly serious or for which the death penalty is
> peculiarly appropriate as they are in Georgia by reason of the
> aggravating-circumstance requirement, it becomes reasonable to
> expect that juries even given discretion not to impose the death
> penalty will impose the death penalty in a substantial portion of the
> cases so defined. If they do, it can no longer be said that the penalty
> is being imposed wantonly and freakishly or so infrequently that it
> loses its usefulness as a sentencing device.

27   ////

28   ////

1   Id. at 222-23.  The Court in Gregg upheld Georgia's revised death penalty statute which, at a

2   separate penalty phase, required a jury to find at least one of ten statutory aggravating factors to

3   be true before it imposed a death sentence.  Id. at 198-205.

4        Thereafter, the Supreme Court examined Georgia's aggravating circumstances and held

5   that each must "genuinely narrow the class of persons eligible for the death penalty and must

6   reasonably justify the imposition of a more severe sentence on the defendant compared to others

7   found guilty of murder."  Zant v. Stephens, 462 U.S. 862, 877 (1983).  The Court concluded that

8   each aggravating circumstance must "provide a principled basis for distinguishing" the

9   petitioner's case "from the many other murder cases in which the death penalty was not imposed

10  under the statute."  Id. at 878 n.16.

11       Subsequently, the narrowing principles described by the Court in Zant were applied to

12  Louisiana's death penalty sentencing statute:

13           To pass constitutional muster, a capital sentencing scheme must
             "genuinely narrow the class of persons eligible for the death penalty
14           and must reasonably justify the imposition of a more severe
             sentence on the defendant compared to others found guilty of
15           murder." Under the capital sentencing laws of most States, the jury
             is required during the sentencing phase to find at least one
16           aggravating circumstance before it may impose death. By doing so,
             the jury narrows the class of persons eligible for the death penalty
17           according to an objective legislative definition.

18  Lowenfield v. Phelps, 484 U.S. 231, 244 (1988) (internal citations omitted).

19       Respondent argues that the Ninth Circuit has rejected the challenge petitioner makes here.

20  However, Karis v. Calderon, 283 F.3d 1117, 1141 n.11 (9th Cir. 2002), upon which respondent

21  relies, is not controlling.  The Karis court ruled without considering any available evidentiary

22  support; here, petitioner's claim relies upon the evidentiary support provided by the declaration of

23  Professor Shatz.

24       To summarize, the goal of the Eighth Amendment's narrowing requirement is to limit the

25  possibility of arbitrary and capricious imposition of the death penalty.  States may accomplish this

26  by enacting objective legislative standards to limit the pool of those eligible for the death penalty

27  in a way that reasonably justifies imposition of a more severe sentence on them.  The sentencer

28  may then exercise discretion to determine if that sentence should be imposed in a particular

191

1   case.[50]  If the death eligible pool is so large that it includes persons with vastly different levels of

2   culpability, then the discretionary decision-making at the selection stage is not sufficiently

3   limited.  Without sufficiently objective limits with respect to when that ultimate sentence is

4   appropriately imposed, the system risks arbitrary and capricious application of the death penalty

5   upon those who are not necessarily the most deserving of the greatest punishment.

6                                    b.   Discussion

7         The California Supreme Court considered petitioner's claim on appeal and in the 2003

8   habeas petition.  Petitioner states the court should "look through" the silent habeas denial to the

9   court's "last reasoned decision" on the claim in its appellate decision under Ylst v. Nunnemaker,

10   501 U.S. 797, 804, 806 (1991.)  (See ECF No. 243 at 86.)  But, the claims alleged on appeal and

11   on habeas were not the same.  Petitioner presented empirical evidence to support his state habeas

12   claim, as he has done here, which substantially changes the nature of that claim.  Thus, this court

13   considers the California Supreme Court's summary denial of that claim to be its final decision on

14   the merits of the claim that appears in the federal petition.[51]  The question, then, is whether

15   petitioner established a prima facie case for relief in state court and the California Supreme Court

16   could not have reasonably held otherwise.  This court must review the state court record to

17   "determine what arguments or theories ... could have supported the state court's decision; and

18   then [ask] whether it is possible fairminded jurists could disagree that those arguments or theories

19   are inconsistent with the holding in a prior decision of [the Supreme] Court."  Harrington v.

20   Richter, 562 U.S. 86, 102 (2011).

---

21   [50] The final selection process necessarily involves greater discretion because it requires
    "particularized consideration of relevant aspects of the character and record of each convicted
22   defendant," Abdul-Kabir v. Quarterman, 550 U.S. 233, 247 (2007) (quoting Woodson v. North
    Carolina, 428 U.S. 280, 303 (1976)), and consideration of "any aspect of a defendant's character
23   or record and any of the circumstances of the offense that the defendant proffers as a basis for a
    sentence less than death." Id., at 247-48 (quoting Lockett v. Ohio, 438 U.S. 586, 604 (1978)).
24

25   [51] Petitioner argues that the California Supreme Court erroneously relied on two Supreme Court
    cases, Pulley v. Harris, 465 U.S. 37 (1984), and Tuilaepa v. California, 512 U.S. 967 (1994), in
26   rejecting the narrowing claim on appeal.  Because this court finds the California Supreme Court's
    habeas denial to be the last reasoned decision on his claim, it need not address that argument.
27   Even if this court did need to address it, respondent adequately explains why petitioner's claim of
    reliance on Harris and Tuilaepa is unsupported.  (ECF No. 237 at 148-49.)
28

1      As discussed above, the Court of Appeals for the Ninth Circuit rejected a claim that

2  California's statutory scheme, on its face, fails to narrow.  Karis, 283 F.3d at 1141 n.11; see also

3  Berryman v. Ayers, 2007 WL 1991049, ** 183-85 (E.D. Cal. Jul. 10, 2007).  While Karis does

4  not control petitioner's claim here, it is instructive when considering the reasonableness of the

5  California Supreme Court's ruling.  Has the United States Supreme Court clearly established a

6  rule that the evidentiary showing made by petitioner would, if proved, demonstrate an Eighth

7  Amendment violation?  This court does not find the law clear cut beyond all reasonable

8  disagreement.  The United States Supreme Court has not clearly established a benchmark for

9  determining when a state's death-eligible class is so broad that it violates the Eighth Amendment.

10  Other courts have similarly so held.   See Hawkins v. Wong, 2013 WL 3422701, *3 (E.D. Cal.

11  Jul. 8, 2013) (no clearly established federal law that only those death penalty schemes in which a

12  large percentage of death-eligible inmates receive the death penalty adequately narrow the death-

13  eligible class); Carter v. Chappell, 2013 WL 1120657, ** 198-201 (S.D. Cal. Mar. 18, 2013).

14  Moreover, the showing petitioner made before the California Supreme Court through the study

15  conducted by Professor Shatz does not measure the same thing measured in Furman.  In Furman,

16  the Court looked to those who were in fact eligible for the death penalty because they had been

17  convicted of a death eligible crime and determined that those among them who were actually

18  sentenced to death were so few that the penalty was arbitrarily applied.  In Professor Shatz's

19  study, he examined the universe of those potentially eligible for the death penalty, a number far

20  greater than those who had in fact been convicted of a death-eligible offense, and the number of

21  those in fact sentenced to death.  The California Supreme Court could reasonably have

22  determined that this apples-to-oranges comparison was insufficient support for a prima facie

23  showing of an Eighth Amendment violation.

24      It cannot be said that the California Supreme Court's rejection of petitioner's narrowing

25  claim was unreasonable.  Because petitioner has not satisfied the requirements of 28 U.S.C. §

26  2254(d) for this narrowing claim, it should be denied.

27  ////

28  ////

193

1          2.  "Circumstances of the Crime" Aggravating Factor is Vague as Applied

2          Petitioner argues that the California Supreme Court has considered a broad range of

3  circumstances under this factor to be aggravating.  He cites cases in which the court held jurors

4  could have considered the following circumstances to be aggravating:  (a) that the defendant had

5  a hatred of religion; (b) that the defendant sought to conceal evidence three weeks after the crime;

6  (c) that the defendant threatened witnesses after his arrest; and (d) that the defendant disposed of

7  the body in a manner that precluded its recovery.  (ECF No. 235 at 248-49.)  He also shows that

8  prosecutors have argued circumstances that are essentially the opposite of each other.  For

9  example, juries have considered as aggravating factors things such as infliction of many wounds

10  and infliction of just one wound, killing for an arguably aggravating motive and killing for no

11  motive, killing of a youthful victim and killing of an elderly victim.  (Id. at 249-53.)

12          Petitioner recognizes that the "circumstances of the crime" aggravating factor survived a

13  facial Eighth Amendment challenge in Tuilaepa v. California, 512 U.S. 967, 987-88 (1994).  He

14  argues that application of the circumstance has been both a due process and an Eighth

15  Amendment violation because factor (a) is so broad that it fails to channel and guide the jury's

16  discretion as required by Maynard v. Cartwright, 486 U.S. 356, 363 (1988).  In Maynard, the

17  Court considered Oklahoma's "especially heinous, atrocious, or cruel" aggravating circumstance.

18  The Court held the circumstance was so vague that it failed to channel the jury's discretion as

19  required by the Eighth Amendment.  486 U.S. at 362-65.  The Court relied largely on Godfrey v.

20  Georgia, 446 U.S. 420, 428-29 (1980), in which it had held that the "outrageously or wantonly

21  vile, horrible and inhuman" aggravating circumstances failed to contain "any inherent restraint on

22  the arbitrary and capricious infliction of the death sentence."

23          The problem with petitioner's reliance upon Maynard and Godfrey is the fact that the

24  concern of the Court in those cases was with a defendant's eligibility for the death penalty.  The

25  aggravating factors in those cases acted to "channel the jury's discretion to permit it to make a

26  principled distinction between the subset of murders for which a death sentence is appropriate and

27  the majority of murders for which it is not."  Valerio v. Crawford, 306 F.3d 742, 750 (9th Cir.

28  2002).  As discussed in the prior section, in California, a finding of a special circumstance makes

1   a defendant eligible for the death penalty.  Thereafter, during the penalty or selection phase, a jury

2   determines whether or not a death sentence should be imposed.

3        The Court in Tuilaepa examined this distinction between eligibility and selection phases.

4   While it addressed a facial challenge to factor (a), the Court also considered the nature of the

5   jury's discretion in sentencing and held:  "the sentencer may be given 'unbridled discretion in

6   determining whether the death penalty should be imposed after it has found that the defendant is a

7   member of the class been made eligible for that penalty.'"  512 U.S at 979-80 (quoting Zant v.

8   Stephens, 462 U.S. 862, 875 (1983)).  Given the broad discretion allowed a jury in selecting a

9   sentence, petitioner has failed to show that the California Supreme Court's rejection of his claim

10   violated clearly established federal law.

11                 3.   Burden of Proof

12        Petitioner argues that California's death penalty scheme is unconstitutional because it fails

13   to require proof beyond a reasonable doubt (a) of the existence of the aggravating factors relied

14   on; (b) that aggravating factors outweigh mitigating factors; and (c) that death is the appropriate

15   penalty.  He goes on to argue that if the Constitution does not require proof beyond a reasonable

16   doubt, it does require either proof by a preponderance of the evidence or requires the jury be

17   instructed as to some burden of proof.

18        Petitioner cites to no controlling Supreme Court authority.  And, circuit courts have

19   rejected many of these arguments.  See Harris v. Pulley, 692 F.2d 1189, 1194-95 (9th Cir. 1982)

20   (no constitutional requirement that jury find beyond a reasonable doubt that death penalty

21   appropriate), reversed on other grounds, 465 U.S. 37 (1984); Williams v. Calderon, 52 F.3d 1465,

22   1485 (9th Cir. 1995) (same); Ford v. Strickland, 696 F.2d 804, 818 (11th Cir. 1983) (en banc)

23   (jury need not find beyond a reasonable doubt that aggravating factors outweigh mitigating

24   factors).  The Supreme Court has held generally that "the constitution does not require a state to

25   adopt specific standards for instructing the jury in its consideration of aggravating and mitigating

26   circumstances."  Zant, 462 U.S. at 890.

27        Petitioner makes a smattering of additional, creative arguments.  He claims (a) proof by a

28   preponderance of the evidence is the "minimum burden historically permitted in any sentencing

1   proceeding;" (b) California requires proof by a preponderance of the evidence to impose an

2   upper-term sentence in a non-capital case; and (c) California Evidence Code § 520 requires that a

3   party claiming a person is guilty of wrongdoing has the burden of proof on that issue.  Finally, he

4   argues that the absence of any burden of proof to guide the jury at the penalty phase violates the

5   Eighth Amendment and the Due Process Clause.  None of the cases cited control petitioner's

6   arguments.  He has failed to show the California Supreme Court's denial of these claims was an

7   unreasonable application of clearly established federal law.

8                    4.   Failure to Require Unanimity on each Aggravating Factor

9        California law does not require the jury to unanimously find each aggravating factor.

10   Petitioner argues this failure could lead to an "unreliable," "arbitrary," and "chaotic" verdict.  He

11   further argues that it violates his right to a trial by jury as described in Ring v. Arizona, 536 U.S.

12   584 (2002), and Apprendi v. New Jersey, 530 U.S. 466 (2000).  Ring is the relevant case.  In

13   Ring, the Supreme Court held that the Sixth Amendment requires a jury, not a judge, to find an

14   aggravating circumstance necessary for imposition of the death penalty.  Ring, 536 U.S. at 609.

15       Petitioner's reliance on Ring is misplaced.  The Supreme Court has specifically held that

16   the rule announced in Ring "does not apply retroactively to cases already final on direct review."

17   Schriro v. Summerlin, 542 U.S. 348, 358 (2004).  Because petitioner's case was final on direct

18   review before Ring was decided, petitioner cannot rely on it here.  The California Supreme

19   Court's denial of petitioner's claim that the jury was required to unanimously agree on

20   aggravating factors was not unreasonable.

21                    5.   Proof of Prior Crimes

22       Factor (b) permits the jury to consider any "criminal activity by the defendant other than

23   the crimes for which the defendant has been tried in the present proceedings which involve the

24   use or attempted use of force or violence or the express or implied threat to use force or

25   violence."  (RT 4010-11.)  Petitioner makes a variety of arguments that the evidence of his prior

26   convictions for burglary, kidnapping, and robbery and evidence of the unadjudicated offense of

27   assault with a deadly weapon, was improperly presented.  First, he argues that evidence violated

28   his due process rights because those incidents occurred "outside of the state and ha[d] no relation"

                                             196

1    to the crimes.  Second, he claims the use of unadjudicated criminal conduct violates the Eighth

2    Amendment requirement of heightened reliability in capital case.

3        Again, petitioner lacks support for his arguments.  The Court in <u>Zant</u> noted that evidence

4    of a defendant's prior criminal convictions is "fully admissible at the sentencing phase" of his

5    capital trial.  <u>Zant</u>, 462 U.S. at 886.  A number of Courts of Appeals have held that evidence of

6    unadjudicated criminal conduct at the penalty phase does not violate the Eighth or Fourteenth

7    Amendments.  <u>See</u> <u>Hatch v. Oklahoma</u>, 58 F.3d 1447, 1465 (10th Cir. 1995); <u>Devier v. Zant</u>, 3

8    F.3d 1445, 1464 (11th Cir. 1993); <u>Williams v. Lynaugh</u>, 814 F.2d 205, 208 (5th Cir. 1987).

9    Petitioner has failed to show clearly established federal law to the contrary.

10        6.  <u>Failure to Require Written Findings of Aggravating Factors</u>

11        Petitioner argues that California's failure to require jurors to make written findings

12    regarding the aggravating factors found violates his due process and Eighth Amendment rights to

13    a reliable penalty verdict and meaningful appellate review.  The Ninth Circuit has rejected this

14    argument.  See <u>Harris v. Pulley</u>, 692 F.2d at 1195-96; <u>Williams v. Calderon</u>, 52 F.3d at 1484-85.

15    Petitioner cites no controlling Supreme Court authority to the contrary.  The California Supreme

16    Court reasonably rejected this claim.

17        7.  <u>Failure to Conduct Proportionality Review</u>

18        Petitioner argues that the state's lack of intercase proportionality review violated his due

19    process and equal protection rights.  The Supreme Court has held that the Constitution does not

20    require comparative proportionality review.  <u>Pulley v. Harris</u>, 465 U.S. 37 (1984).  Petitioner

21    contends <u>Harris</u> is not controlling because the court there considered the 1977 version of the

22    California sentencing statute.  Petitioner was sentenced under the 1978 version of the statute,

23    which contains many more special circumstances than the 1977 version.  However, petitioner

24    fails to show that the holding of <u>Harris</u> was not clearly established federal law in 1999 when the

25    California Supreme Court considered, and rejected, this claim.  In fact, much of petitioner's

26    argument relies upon the same reasoning he used to show the 1978 California statute failed to

27    adequately narrow.  As described above, petitioner has also failed to show clearly established

28    federal law supports that narrowing claim.

197

8. <u>Restrictive Descriptions of Mitigating Factors</u>

Mitigating factors (d) and (g) were described to the jury as follows:

> (d) Whether or not the offense was committed while the defendant was under the influence of <u>extreme</u> mental or emotional disturbance.

> (g) Whether or not the defendant acted under <u>extreme</u> duress or under the <u>substantial</u> domination of another person.

RT 4011 (emphasis added).  Petitioner argues that the emphasized adjectives unconstitutionally restricted the jury from considering all relevant mitigating evidence.  See <u>Boyde v. California</u>, 494 U.S. 370, 377-78 (1990).  When considering a similar argument, the Supreme Court held that an instruction very similar to California's factor (k), the "catch-all" factor, which permitted the jury to consider "any other mitigating matter concerning the character or record of the defendant, or the circumstances of his offense," allowed consideration of less-than-extreme emotional or mental disturbance.  <u>Blystone v. Pennsylvania</u>, 494 U.S. 299, 308-09 (1990).  In light of <u>Blystone</u>, petitioner has failed to show how he can succeed on this claim and that the California Supreme Court's denial of it was reasonable.

9. <u>Failure to Identify Certain Factors as Mitigating</u>

Petitioner next argues that the California sentencing statute is unconstitutional because it does not require that juries be informed that eight of the sentencing factors are solely mitigating. The California Supreme Court identified those factors as being solely relevant to mitigation.  See <u>People v. Hamilton</u>, 48 Cal. 3d 1142, 1184 (1989); <u>People v. Edelbacher</u>, 47 Cal. 3d 983, 1034 (1989); <u>People v. Lucero</u>, 44 Cal. 3d 1006, 1031 n.15 (1988); <u>People v. Melton</u>, 44 Cal. 3d 713, 769-70 (1988); <u>People v. Davenport</u>, 41 Cal. 3d 247, 288-89 (1985).

The Supreme Court has stated that "[a] capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision."  <u>Tuilaepa</u>, 512 U.S. at 979.  The Ninth Circuit has held that the Constitution does not require that juries be given specific guidance on what factors are mitigating and what are aggravating.  See <u>Harris v. Pulley</u>, 692 F.2d at 1194 (California's failure to label factors as aggravating or mitigating does not invalidate its death penalty statute because the statute "establishes factors to guide the jury's discretion and allows for

1    consideration of particular aggravating and mitigating circumstances"); <u>Williams v. Calderon</u>, 52

2    F.3d at 1484 (same).  Petitioner cites no clearly established federal law to the contrary.  The

3    California Supreme Court's denial of this aspect of claim 13 was not unreasonable.

4                    10. <u>Failure to Give Death Sentences the Review Required for Lesser Sentences</u>

5           Petitioner argues here that the California sentencing scheme violates the equal protection

6    rights of capital defendants by failing to provide the same kind of sentence review it provides

7    non-capital felony defendants who were sentenced to determinate terms.  Former Penal Code §

8    1170(f) required the state's Board of Prison Terms to review the sentence of these non-capital

9    defendants "to determine whether the sentence is disparate in comparison with the sentences

10   imposed in similar cases."  Petitioner claims the failure to provide capital defendants with similar

11   review violated the equal protection clause's ban on "arbitrary and disparate treatment of citizens

12   when fundamental interests are at stake."

13          Equal protection concerns are not implicated because petitioner has failed to establish the

14   basic premise of the equal protection clause – "'that all persons similarly situated should be

15   treated alike.'"  <u>Lawrence v. Texas</u>, 539 U.S. 558, 579 (2003) (O'Connor, J., concurring) (quoting

16   <u>Cleburne v. Cleburne Living Center, Inc.</u>, 473 U.S. 432, 439 (1985)).  Capital defendants and

17   defendants with determinate sentences are not similarly situated.  The California Supreme Court

18   has set out numerous bases distinguishing the two sentencing systems.  <u>See</u> <u>People v. Allen</u>, 42

19   Cal. 3d 1222, 1286-87 (1986); <u>People v. Williams</u>, 45 Cal. 3d 1268, 1330 (1988), <u>abrogated on</u>

20   <u>other grounds</u> by <u>People v. Diaz</u>, 60 Cal. 4th 1176 (2015).  Petitioner has made no contrary

21   showing.

22          Petitioner also relies on <u>Bush v. Gore</u>, 531 U.S. 98 (2000).  In <u>Bush v. Gore</u>, the Court

23   considered specific problems stemming from the 2000 presidential election.  The Court explicitly

24   limited its holding to those election process issues.  <u>Bush v. Gore</u>, 531 U.S. at 109 ("Our

25   consideration is limited to the present circumstances, for the problem of equal protection in

26   election processes generally presents many complexities."); <u>see also</u> <u>Coleman v. Quarterman</u>, 456

27   F.3d 537, 542-43 (5th Cir. 2006) ("<u>Bush v. Gore</u>'s utter lack of implication in the criminal

28   procedure context" is "beyond debate."); <u>Baca v. Scribner</u>, 2008 WL 850309, *9 (E.D. Cal.

1   March 28, 2008), adopted, 2008 WL 3992725 (E.D. Cal. August 25, 2008); Nguyen v. Runnels,

2   2007 WL 879008 (N.D. Cal. Mar. 21, 2007).  Petitioner has failed to show the California

3   Supreme Court unreasonably denied this equal protection claim.

4            11. Prosecutorial Discretion in Seeking the Death Penalty

5        Petitioner argues that prosecutors' "unbounded" discretion in seeking the death penalty,

6   illustrated by the disparities in seeking that penalty in each county, violates the Equal Protection

7   Clause.  Petitioner relies primarily upon the United States Supreme Court's decision in Bush v.

8   Gore, to argue the state must assure uniformity in implementing a fundamental right.  As

9   discussed above, Bush v. Gore is inapplicable.

10       The United States Supreme Court has rejected equal protection challenges to death

11  penalty schemes and has refused to limit prosecutorial discretion in charging decisions absent

12  some showing that a particular decision was based on a discriminatory standard.  In rejecting a

13  petitioner's argument that the Georgia capital punishment system operated in a discriminatory

14  manner, the Supreme Court held, "absent a showing that Georgia's capital punishment system

15  operates in an arbitrary and capricious manner, [the petitioner] cannot prove a constitutional

16  violation by demonstrating that other defendants who may be similarly situated did not receive

17  the death penalty." McCleskey v. Kemp, 481 U.S. 279, 306-07 (1987).  Further, the Court has

18  held that prosecutorial charging decisions are "particularly ill-suited to judicial review." Wayte v.

19  United States, 470 U.S. 598, 607 (1985); see also Bordenkircher v. Hayes, 434 U.S. 357, 364

20  (1978) ("So long as the prosecutor has probable cause to believe that the accused committed an

21  offense defined by statute, the decision whether or not to prosecute, and what charge to file or

22  bring before a grand jury, generally rests entirely in his discretion.").  Petitioner fails to show the

23  California Supreme Court's denial of this claim was contrary to, or an unreasonable application

24  of, clearly established federal law.

25           12. Death Penalty Violates International Norms

26       Petitioner's final argument in claim 13 is that the use of the death penalty as a regular,

27  rather than as an extraordinary, punishment violates international norms, the Eighth Amendment,

28  and the Fourteenth Amendment.  Petitioner cites only to broad statements regarding the

1    "evolving" nature of concepts of due process and cruel and unusual punishment.  He also notes

2    that the United States Supreme Court has looked to international "standards of decency" to

3    interpret the Eighth Amendments requirements.  See Atkins v. Virginia, 536 U.S. 304, 316 n. 21

4    (2002) (death penalty held unconstitutional for the intellectually disabled); see also Roper v.

5    Simmons, 543 U.S. 551, 575 (2005) (Court holds death penalty unconstitutional for minors and

6    notes that it has "referred to the laws of other countries and to international authorities as

7    instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel and unusual

8    punishments.'")   Petitioner does not, however, cite to any clearly established federal law in

9    support of his claim that the use of the death penalty as a regular punishment for murder violates

10   international law and the Constitution.  The California Supreme Court was not unreasonable in

11   rejecting this argument.

12           O.   Denial of Motion to Reduce the Death Sentence – Claim 14

13           After a death sentence is returned by the jury in a California case, the defendant "shall be

14   deemed to have made an application for modification of such verdict . . . ."  Cal. Penal Code

15   §190.4(e).  In ruling on the motion, the judge is required to "review the evidence, consider, take

16   into account, and be guided by the aggravating and mitigating circumstances referred to in 190.3,

17   and shall make a determination as to whether the jury's findings and verdicts that the aggravating

18   circumstances outweigh the mitigating circumstances are contrary to law or the evidence

19   presented."  Id.  According to the California Supreme Court, "'[t]he trial judge's function is not to

20   make an independent and de novo penalty determination, but rather to independently reweigh the

21   evidence of aggravating and mitigating circumstances and then to determine whether, in the

22   judge's independent judgment, the weight of the evidence supports the jury verdict.'"  People v.

23   Mickey, 54 Cal. 3d 612, 704 -05 (1991) (quoting People v. Lang, 49 Cal. 3d 991, 1045 (1989))

24   (italics omitted).

25           In claim 14, petitioner alleges that the trial judge's ruling denied him due process because

26   it was based in part on information he had no opportunity to deny or explain, because it deprived

27   petitioner of a state-created liberty interest, and because it violated the Eighth Amendment

28   requirement of reliability in capital sentencing.  Petitioner further argues that his appellate

1   counsel rendered ineffective assistance by failing to raise those errors on appeal.  The California

2   Supreme Court summarily denied this claim on the merits and on procedural grounds.

3         The position of defense counsel Brady at the hearing on the § 190.4(e) motion

4   was that the death sentence should be reduced because of lingering doubt about Mr. Majors' guilt.

5   (RT 4286-87.)  Mr. Brady began by saying he would not be "going through the litany of

6   witnesses that came before the court, I think the Court has this case fresh in mind."  The judge

7   responded, "Don't overestimate the Court's memory. I've been involved in a number of cases

8   since then.  On the other hand, I appreciate you don't have to recite all of the facts in the case."

9   (RT 4286.)  After Brady outlined his position, the court responded as follows:

10              Well, addressing again this motion goes only to the penalty
11        phase, not the guilt phase, although I grant you it goes to the guilt
          phase to a certain extent since you made a strong argument on
12        lingering doubt.

13              But in this case — I'm making a statement now, if Mr.
          O'Mara wishes to add anything to it to refresh my recollection he
14        may do so.

15              But my evaluation of this case on the penalty phase is that
          the brutality involved in these killings, and it is with all three
16        killings, was — I am having difficulty even finding words to
          describe it. But the brutal way these three lives were taken is
17        unusual even in this violent day and age.

18              The fact that there were three killings, the fact that Mr.
          Majors has shown no remorse at all, of course that is consistent
19        with maintaining his innocence.  But a significant factor in this
          case, in addition to the facts of this particular murder, were the two
20        prior incidents that Mr. Majors was involved in were particularly
          shocking, as his conduct regarding the individual he placed in the
21        trunk of the car and then apparently tracked that person down with
          the intent of killing him. It just shows a mind that has absolutely no
22        regard for human life. And somebody who would go to that extent
          to kill someone just is not deserving of leniency of the court.

23              Those are the factors that come to my mind. I have not
24        reviewed any transcripts or any of my notes regarding this case, but
          those are the factors that come to my mind.

25   (RT 4287-88.)

26         Then, after remarks from the prosecutor and petitioner, the court concluded as follows:

27              As I stated partially before I do find that the aggravating
28        factors in this case as I articulated and brutality of the murders and
          all of the circumstances surrounding the murders more than justify

the death penalty in this case.

The factors offered in mitigation for little more than what the average person or what many people suffer throughout their life times is not a significant factor.

But I find it's kind of unique that on the snakebite issue, as I understand it, if you hadn't been trying to kill the snake it wouldn't have bit you in the first place. Whether that's a correct assessment of the facts is not significant, but I just find it rather unique.

So therefore I do affirm the jury's verdict.

(RT 4297-98.)

Petitioner's first contention is that the judge's statement that the way the victims died was "unusual even in this violent day and age" amounted to new evidence of which he had no notice or opportunity to confront. The California Supreme Court could have reasonably concluded that this statement amounted to nothing more than a characterization of the severity of the crime and did not violate the general due process standards cited by petitioner. Petitioner adds an argument that the trial judge's statement indicating he did not recall all the facts of the case rendered his decision upholding the verdict unreliable. Petitioner cites no controlling authority for this claim of an Eighth Amendment violation.

The second contention is that state law prohibited reliance at the penalty phase upon a lack of remorse. According to petitioner, the trial judge's comment on remorse thus violated a state-created liberty interest. The California Supreme Court could have reasonably rejected this argument. The trial judge mentioned petitioner's lack of remorse, but immediately noted that it made sense because petitioner continued to maintain his innocence. The judge did not mention lack of remorse in his concluding statements. The California Supreme Court could have reasonably determined that petitioner's lack of remorse was not a factor upon which the judge relied in affirming petitioner's sentence.

Petitioner's final argument that appellate counsel was ineffective for failing to raise these issues on appeal is baseless because whether or not counsel acted reasonably, petitioner has failed to show prejudice. He has not shown a reasonable probability that the California Supreme Court would have granted these claims on appeal.

1          P.   Denial of Fair and Reliable Appeal – Claim 15

2          Petitioner argues that his due process rights to a fair and reliable appeal were denied for a

3     variety of reasons, including the California Supreme Court's unfair handling of claims of

4     ineffective assistance of trial counsel, a general lack of thoroughness, and, primarily, the state

5     court's lack of impartiality due to the politicization of supreme court justices' positions.

6     Petitioner includes in this claim his arguments involving the three-year-delay in appointment of

7     counsel to represent him on appeal and the appointment of "incompetent" attorneys to handle his

8     appeal and his habeas petition.  Those issues are also separate claims and are addressed below in

9     the discussion of claims 16, 17, and 18.

10          First, petitioner complains of the state court's requirement that he raise ineffective

11    assistance of counsel issues in his appeal, but that any requiring extra record evidence be raised in

12    habeas, is inconsistent and unfairly applied because of the state's rule that issues resolved on

13    appeal will not be reconsidered on habeas corpus.  He points to several instances in which the

14    California Supreme Court denied ineffective assistance of counsel claims on appeal because the

15    record was inadequate to adjudicate the claims.  Petitioner complains that when he raised those

16    claims again on habeas, he was denied the right to make a record to support those claims.

17    However, contrary to the implication of petitioner's argument that his ineffective assistance of

18    counsel claims were denied because they had already been raised on appeal, the California

19    Supreme Court denied all of his habeas claims on the merits.  Thus, to the extent petitioner argues

20    that the state court's rule required him to raise issues on appeal that were then procedurally

21    defaulted when he attempted to explicate them, he has failed to show he was, in fact, affected by

22    this supposed practice.  To the extent petitioner argues that the California Supreme Court unfairly

23    refused to permit him to investigate and present his claims, that argument is addressed with

24    respect to each of petitioner's ineffective assistance of counsel claims discussed previously in

25    these findings and recommendations.

26          Second, petitioner's argument that the California Supreme Court's opinion is not factually

27    thorough is nothing more than attempted nitpicking, is not supported by clearly established

28    federal law, and does little or nothing to support his claim of bias.

1    Finally, petitioner's argues that the California Supreme Court fails to provide meaningful

2    appellate review because the justices' positions have become politicized.  He bases this argument

3    on the changes in the California Supreme Court's reversal rate in death penalty cases after three

4    justices were voted out of office in 1986.  Exit polls showed that a majority of those who voted

5    against retention of the three justices based their decision on the high rate of the court's reversal

6    of death sentences.  Petitioner cites studies showing that between 1979 and 1986, the state court

7    reversed 95 percent of the death penalty cases it reviewed.  After the three justices were replaced,

8    that reversal rate changed to 28 percent during the first two years of the reconstituted court and

9    dropped even lower thereafter.  According to petitioner, the reversal rate from 1990 to 2003

10   dropped to less than 5 percent.  The statistics petitioner presents show that the California Supreme

11   Court's reversal rate is now lower than any other capital-sentencing jurisdiction in the country.

12   While these statistics are certainly alarming, petitioner has not shown clearly established federal

13   law recognizes either political pressure or a low reversal rate as bases to find the California

14   Supreme Court's system of resolving capital cases unconstitutional or that the California Supreme

15   Court acted unreasonably under section 2254(d) in his case.

16   Petitioner further argues the institutional pressure to affirm capital cases is illustrated by a

17   number of methods the California Supreme Court uses to "find a way" to affirm a death sentence.

18   Primarily, petitioner focuses on the California Supreme Court's use of the harmless error

19   doctrine.  Petitioner describes the "mis-application" of harmless error analysis in many California

20   cases.  Again, petitioner does not explain how the California Supreme Court's resolution of his

21   case, by inappropriately finding harmless error or otherwise, was unreasonable.  To the extent he

22   makes that argument with respect to specific claims, this court addresses it in its discussion of

23   those claims.  Here, however, petitioner has not shown he suffered a constitutional violation as a

24   result of any of the defects he points out in the state appellate process for resolving capital cases.

25   Q.  Ineffective Assistance of Appellate Counsel – Claim 16

26   Petitioner claims appellate counsel's failure to raise nine issues on appeal violated his

27   Sixth Amendment right to effective assistance of counsel.  It is well-established that petitioner

28   had a right to the effective assistance of counsel on appeal.  See Evitts v. Lucey, 469 U.S. 387,

1    396-97 (1985).  To prevail on a claim that appellate counsel was ineffective, a petitioner must

2    meet the Strickland standards by showing counsel acted unreasonably and that there is a

3    reasonable probability that had counsel acted reasonably, the result of the proceeding would have

4    been different.  Smith v. Robbins, 528 U.S. 259, 285 (2000).  Reasonably effective appellate

5    counsel should raise all "arguably meritorious issues."  1989 ABA Guidelines, Guideline

6    11.9.2.E.

7           Whether or not appellate counsel was unreasonable in failing to raise these claims, as

8    described below petitioner has failed to show that he was prejudiced by showing a reasonable

9    probability that they would have been successful.  The California Supreme Court was not

10   unreasonable in denying claim 16.

11               1.   Instruction Defining Reasonable Doubt

12       The guilt phase jury was given the following instruction defining reasonable doubt:

13                   It is not a mere possible doubt because everything relating to human
                     affairs and depending on moral evidence is open to some possible
14                   or imaginary doubt. It is that state of the case which, after the entire
                     comparison and consideration of all the evidence, leaves the minds
15                   of the jurors in that condition that they cannot say they feel an
                     abiding conviction to a moral certainty of the truth of the charge.
16

17   (RT 3458.)  In Sandoval v. California (No. 92-9049), decided sub nom Victor v. Nebraska, 511

18   U.S. 1, 16-17 (1994), the Supreme Court considered this instruction and, while it found the

19   "moral certainty" language troubling, upheld the instruction because the remaining language in it

20   would have lead the jury to apply the instruction in a constitutional manner.  Petitioner argues the

21   effect of additional instructions given in his case, and not considered in Sandoval, when

22   considered with the "moral certainty" language, diluted the requirement that reasonable doubt be

23   a "very high level of probability."  Sandoval, 511 U.S. at 14.

24          Petitioner points to the instruction regarding circumstantial evidence.  After stating that

25   "each fact or circumstance upon which such inference necessarily rests must be proved beyond a

26   reasonable doubt," the judge continued to explain that where one interpretation of the evidence

27   "appears to you to be reasonable" and another interpretation appears unreasonable, "you must

28   accept the reasonable interpretation and reject the unreasonable."  (RT 3449.)  A similar

1  instruction was given regarding reasonable and unreasonable interpretations of evidence

2  regarding specific intent.  (RT 3449-50.)  According to petitioner, allowing the jury to accept an

3  inference that just "appears" to be reasonable, when considered with the "moral certainty"

4  language, diluted the prosecution's burden of proof beyond a reasonable doubt of each fact

5  necessary to a finding of guilt.  This court does not find the connection petitioner makes between

6  the instructions to be a sensible way to read them.  The jury would not have considered the term

7  "appears reasonable" to define the beyond a reasonable doubt standard.  The "appears" language

8  simply told the jury to choose the reasonable interpretation of evidence over an unreasonable

9  interpretation.  The jury also had to find that evidence proved beyond a reasonable doubt before it

10  could be considered to establish guilt.  The jury was clearly so informed:

11
12  > [E]ach fact which is essential to complete a set of circumstances
> necessary to establish the defendant's guilt must be proved beyond
> a reasonable doubt.  In other words, before an inference essential to
> establish guilt may be found to have been proved beyond a
13  > reasonable doubt, each fact or circumstance upon which such
> inference necessarily rests must be proved beyond a reasonable
14  > doubt.

15  (RT 3449.)

16      Petitioner argues a fourth instruction also contributed to diluting the beyond a reasonable

17  doubt standard.  When instructing the jury on considering witness testimony, the judge told them:

18
> You are not bound to decide an issue of fact in accordance with the
> testimony of a number of witnesses which does not convince you as
19  > against the testimony of a lesser number or other evidence, which
> appeals to your mind with more convincing force.  You may not
20  > disregard the testimony of the greater number of witnesses merely
> from caprice, whim, or prejudice, or from a desire to favor one side
21  > against the other.  You must not decide an issue by the simple
> process of counting the number of witnesses who have testified on
22  > the opposing sides.  The final test is not in the relative number of
> witnesses but in the convincing force of the evidence.
23

24  (RT 3453-54.)  Again, this instruction tells jurors how to choose between different versions of the

25  facts.  The fact that jurors should choose the most "convincing" evidence does not mean they do

26  not also need to find that evidence true beyond a reasonable doubt.

27      Petitioner has a better argument that the prosecutor's characterization of the reasonable

28  doubt standard as containing "weasel words" and invoking the concept of "moral certainty" as the

207

1   degree of certainty necessary to find a fact beyond a reasonable doubt contributed to a dilution of

2   the reasonable doubt standard.  (See RT 3480-81, 3710.)  However, the California Supreme Court

3   could have reasonably determined that these few references to a "moral certainty" were

4   insufficient to cause the jury to ignore the instructions, upheld in Sandoval, to consider and

5   compare all the evidence to arrive at an "abiding conviction" of petitioner's guilt.  Petitioner has

6   failed to show that clearly established federal law required the California Supreme Court to hold

7   otherwise.  Because petitioner has not shown a reasonable likelihood he would have prevailed

8   upon this claim had it been raised on appeal, the California Supreme Court was not unreasonable

9   in holding he failed to make out a prima facie case of ineffective assistance of appellate counsel.

10                    2.  Consciousness of Guilt Instruction

11          Petitioner next argues appellate counsel should have challenged a guilt phase instruction

12   regarding jury consideration of false statements by petitioner because that instruction singled him

13   out while the consideration of false statements by the prosecution witnesses was lumped into one,

14   generic instruction.  The court gave the following instruction:

15              If you find that before this trial the defendant made a willfully false
                or deliberately misleading statement concerning the crimes for
16              which he is now being tried, you may consider such statement as a
                circumstance tending to prove a consciousness of guilt.  However,
17              such conduct is not sufficient by itself to prove guilt, and its weight
                and significance, if any, are matters for your own determination.
18

19   (RT 3450.)  Shortly thereafter, the court gave the jury extended instructions about considering

20   witness testimony, including how to consider discrepancies in a witness's testimony and the

21   effect of a witness's false testimony.  (RT 3453.)  Petitioner argues these instructions favored

22   prosecution witnesses, particularly Bonnie Hogue.  Of course, what petitioner ignores is that he is

23   comparing apples and oranges.  Petitioner did not testify at the guilt phase.  The jury was

24   considering the testimony of others regarding petitioner's false statements to police.  Petitioner's

25   citation to cases holding that courts should be impartial does not come close to establishing that

26   he could have succeeded on this claim on appeal.  The California Supreme Court was not

27   unreasonable in concluding that whether considered alone, or along with petitioner's other claims

28   ////

1   of guilt phase and appellate error, petitioner had failed to state a prima facie claim of ineffective

2   assistance of appellate counsel.

3                    3.   Other Challenges to Guilt-Phase Instructions

4        Petitioner adds that three instructions were unnecessary and that appellate counsel should

5   have challenged the trial court's failure to sua sponte instruct on the reliability of child witnesses

6   and shackling.  Petitioner fails to show why the unnecessary instructions were unwarranted or

7   why the court's instruction that jurors "disregard any instruction which applies to facts

8   determined by you do not exist" did not cover any possible confusion.  Further, he does not

9   establish that the trial court was obligated to provide the additional instructions.

10                   4.   Inadmissible Testimony at the Penalty Phase

11       With respect to the penalty phase errors petitioner alleges his appellate counsel missed, he

12  first argues counsel should have challenged the admission of testimony from Ms. Fleig.  Ms.

13  Fleig testified about the facts underlying petitioner's conviction for burglary in 1972.  Defense

14  counsel questioned Ms. Fleig about whether she had a romantic encounter with petitioner inside

15  her home.  On re-direct examination, the prosecutor asked Ms. Fleig whether this issue had been

16  raised during petitioner's 1972 trial.  Ms. Fleig testified that it had been raised.  The defense

17  objected and the judge held an in-chambers discussion regarding the relevance of the information.

18  The judge stated that "under normal circumstances," the prosecution would not be permitted to

19  introduce evidence that a prior jury had made a finding on a fact in dispute.  However, the court

20  held the information was relevant to the reliability of petitioner's burglary conviction, which was

21  a circumstance apart from the description of the crime, and overruled the defense objection.  (RT

22  3951.)

23       While petitioner argues this evidence was inadmissible as hearsay and because it was

24  irrelevant.  He cites absolutely no authority to support that argument.  Accordingly, he has failed

25  to show prejudice from appellate counsel's failure to raise this claim because he does not attempt

26  to show a reasonable probability the claim would have been successful.

27  ////

28  ////

5.   Penalty Phase Instructional Error

Petitioner next contends appellate counsel should have challenged several penalty phase instructions.  First, he points to the instruction that jurors should "reach a just verdict regardless of the consequences."  (RT 4006.)   Petitioner is correct that in 1993 the California Supreme Court found that instruction should not be given at the penalty phase.  People v. Cummings, 4 Cal. 4th 1233, 1336 (1993).  However, he ignores the California Supreme Court's further holding that use of the instruction during the penalty phase is harmless where the record shows the jury understood the consequences of its penalty phase decision.  Id. at 1337 ("There is no possibility that the jurors were misled or had their sense of individual, personal responsibility for the verdict diminished."); see also People v. Nicolaus, 54 Cal. 3d 551, 585-86 (1991) (The instruction "must be deemed harmless where, as here, the record indicates that the jury fully understood the grave consequences of its penalty decision.").  Petitioner has failed to demonstrate that the jury did not understand its responsibilities at the penalty phase.  He has thus failed to demonstrate prejudice for this ineffective assistance of appellate counsel claim.

Petitioner raises several other claims of instructional error at the penalty phase.  However, he does nothing more than cite general constitutional standards for each claim.  Petitioner fails to provide legal support to show how he could have succeeded on these claims had they been raised on appeal.  Again, he fails to demonstrate he was prejudiced by appellate counsel's failure to raise them.

R.   Ineffective Assistance of State Habeas Counsel – Claim 17

Petitioner acknowledges that this is not a stand-alone claim but has been raised only to establish "cause" to overcome procedural bars under Martinez v. Ryan, 132 S. Ct. 1309 (2012).  Because this court will consider any procedural default arguments after resolution of the section 2254(d) issues, there is no need to consider petitioner's ineffective assistance of habeas counsel arguments at this time.

S.   Challenges to Delay and Conditions on Death Row – Claim 18

Petitioner makes far-ranging challenges to the conditions of his confinement on death row, the California Supreme Court's policies for capital habeas cases, and the length of time the

California Supreme Court took to rule on his appeal and habeas petitions.  This court finds

petitioner has failed to show the California Supreme Court unreasonably rejected these

challenges.

1.   Background Facts

Petitioner has resided on death row since he was sentenced in February 1991.  In mid-

1992, petitioner filed a federal habeas corpus petition based on the state court's failure to provide

him with counsel.  On December 30, 1993, the California Supreme Court appointed Richard

Power to serve as counsel for the direct appeal and Elizabeth Barranco to serve as counsel for the

purpose of filing a state habeas corpus petition.  In 1994, the federal proceeding was dismissed

without prejudice.

On June 22, 1998, the California Supreme Court affirmed the conviction and sentence on

appeal.

On June 30, 1997, petitioner filed his first state habeas petition.  After the state filed a

response in 1998, Ms. Barranco was granted five extensions of time to file a reply brief, but never

did so.  In February 2001, the California Supreme Court notified petitioner that any reply brief

was due by March 26, 2001.  Thereafter, Ms. Barranco and Mr. Power filed a number of

documents in the habeas proceeding accusing each other of misconduct.   On March 23, Mr.

Power filed a reply brief and shortly thereafter Ms. Barranco was relieved as petitioner's counsel.

On September 19, 2001, the California Supreme Court summarily denied the petition on the

merits without issuing an order to show cause.

On October 12, 2001, Mr. Power filed on petitioner's behalf a second state petition ("2001

State Pet.") alleging a single claim that Ms. Barranco had attempted unsuccessfully to amend into

the first state petition.  On October 31, the California Supreme Court summarily denied the

petition on the merits.

In June 2003, petitioner filed his third state petition on the same day he filed his federal

petition herein.  The California Supreme Court denied that third petition in 2010.

Petitioner argues that during that time of his confinement, he has been subjected to

uncertainties flowing from the failures of his state appellate and habeas lawyers and from the

1   California Supreme Court's "vague and arbitrary" policies, the stress of the death sentence, and

2   onerous conditions on death row.  As a result, he suffered "psychological injuries, including

3   intense anxiety, terror, depression, degradation, dehumanization, exposure to extreme violence."

4          2.   Discussion

5   Petitioner states an involved list of legal bases for relief:

6       (1)  that the punishment actually being impose[d] upon Mr.
7   Majors is cruel and unusual and is therefore prohibited by
    Eighth and Fourteenth Amendments; (2) that the sentence
8   was determined and imposed in violation of Mr. Majors'
    due process rights; (3) that the sentence as it is being
9   carried out is cruel, inhuman, and degrading, and involves
    psychological torture in violation of article 7 of the
10  Convention on Civil and Political Rights ("ICCPR"), article
    1 and article 16 of the Convention Against Torture and
11  Other Cruel, Inhuman or Degrading Treatment or
    Punishment ("Torture Convention"), and article 5 of the
12  American Convention on Human Rights ("ACHR"); (4)
    that the sentence constitutes an unforeseeable expansion of
13  the penalty provided for by California law at the time of the
    crimes for which Mr. Majors was convicted and therefore
14  violates the Due Process and Ex Post Facto Clauses of the
    Constitution, and article 15, paragraph 1, of the ICCPR; (5)
15  that it is an additional punishment superadded to the
    sentence of death and therefore violates the above
16  provisions, the Double Jeopardy Clause and article 14,
    paragraph 7, of the ICCPR and articles 1 and 16 of the
17  Torture Convention; and (6) that Mr. Majors was denied a
    fair and reliable sentencing determination based on an
18  accurate description of the penalty that would be inflicted,
    in violation of the Constitution and article 6, paragraph 1,
19  article 7, article 9, paragraph 1, article 14, paragraphs 3(b),
    3(d), 3(e), and 5 of the ICCPR, and article 2, paragraph 1 of
20  the Torture Convention.

21  (ECF No. 235 at 306-07.)   Petitioner's more specific arguments follow.

22      Petitioner first argues his prolonged confinement on death row, made worse by conditions

23  "incompatible with the concept of human dignity[52]" and by California's arbitrary procedures,

24  amounts to cruel and unusual punishment under the Eighth Amendment and international law.

25  

---

26  [52] Petitioner describes death row as "a concentration camp for the condemned."  The court finds
    this description insensitive, to say the least.  Those on death row have been convicted of first
27  degree murder and in prison are fed, sheltered, and provided at least some medical care, which
    can in no way be compared to the horrendous treatment suffered by political prisoners and
28  members of persecuted minorities in concentration camps.

1    Petitioner contends that authority from the Ninth Circuit Court of Appeals rejecting similar claims

2    does not bar his arguments because the "factual considerations" he raises go well beyond those

3    raised before that court previously.  See Smith v. Mahoney, 611 F.3d 978, 997-98 (9th Cir. 2010);

4    Allen v. Ornoski, 435 F.3d 946, 958-59 (9th Cir. 2006); McKenzie v. Day, 57 F.3d 1461, 1466-

5    67 (9th Cir. 1995); see also Andrews v. Davis, 798 F.3d 759, 790 (9th Cir. 2015).  However,

6    petitioner does not describe just how his claim differs from those considered, and rejected,

7    previously.  Further, the cases petitioner cites in support of his claim do not necessarily support it.

8    They either make broad statements about the purposes of the Eighth Amendment protections,

9    often within the context of claims in different procedural postures than the claims in petitioner's

10   present habeas petition, and/or they address issues that bear no resemblance to the arguments

11   petitioner makes here.  See Farmer v. Brennan, 511 U.S. 825, 833 (1994) (in civil action for

12   damages, Court cites rule that prison official violates the Eighth Amendment where the

13   deprivation of a right is sufficiently serious, the infliction of pain is "unnecessary and wanton,"

14   serving no "legitimate penological objective," and the official is at least deliberately indifferent to

15   the inmate's health or safety); Helling v. McKinney, 509 U.S. 25, 35 (1993) (prisoner's exposure

16   to second-hand tobacco smoke states a viable Eighth Amendment claim);  Estelle v. Gamble, 429

17   U.S. 97, 102 (1976) (Eighth Amendment violation can be based on inadequate prison medical

18   care); Greg v. Georgia, 428 U.S. 153, 182 (1976) (Eighth Amendment requires that "the sanction

19   imposed cannot be so totally without penological justification that it results in the gratuitous

20   infliction of suffering"); Trop v. Dulles, 356 U.S. 86, 101 (1958) ("denationalization" as

21   punishment for desertion from the military violates the Eighth Amendment); Weems v. United

22   States, 217 U.S. 349 (1910) (punishment of 15 years in leg irons at hard labor imposed for crime

23   of falsifying public records was cruel and unusual); In re Kemmler, 136 U.S. 436, 447 (1890) (in

24   challenge to death by electrocution, Court notes that death itself is not a cruel punishment; rather,

25   punishments are cruel when there is "something inhuman and barbarous, something more than the

26   mere extinguishment of life"); In re Medley, 134 U.S. 160, 172 (1890) (change in statute to

27   require condemned prisoner to be held in solitary confinement and not to be informed of time of

28   execution were additional punishments inflicted on him in violation of the Ex Post Facto Clause);

1   Wilkerson v. Utah, 99 U.S. 130, 136 (1878) (explaining that while the Constitution permits

2   execution by various means, including by firing squad, none may involve the infliction of

3   torture).  Petitioner has failed to show the California Supreme Court's rejection of this aspect of

4   claim 18 flies in the face of clearly established federal law.  See Wright v. Van Patten, 552 U.S.

5   120, 125 (2008) (state court did not unreasonably apply clearly established federal law where

6   "our cases give no clear answer to the question presented").  The California Supreme Court

7   certainly did not act unreasonably in holding that petitioner had failed to state a prima facie claim

8   for relief.

9          Petitioner next argues that the judicial delay, the mental suffering caused by appointed

10   state court counsel and the state court's procedures, and the physical and mental suffering caused

11   by the "unnecessarily punitive conditions" on death row violate his rights under the Due Process

12   and Equal Protection Clauses and under international law.  Petitioner first relies on cases stating a

13   due process right to a speedy appeal.  However, as those courts explain, the Supreme Court has

14   not recognized such a right.  See Simmons v. Beyer, 44 F.3d 1160, 1169 (3rd Cir. 1995).  The

15   California Supreme Court fails to follow federal law under section 2254(d) only when that law

16   has been clearly established by the United States Supreme Court.  Petitioner next attempts to

17   analogize his detention pending review of his death sentence to a pretrial detention.  However, he

18   cites no authority supporting this analogy.  Finally, he just states that the ten years it took the

19   California Supreme Court to resolve his claims was "sufficiently long to constitute a denial of due

20   process."  He cites no Supreme Court authority for this proposition and, as discussed above, his

21   reliance on international law is unsupported.  Accordingly, petitioner has failed to satisfy section

22   2254(d) for this aspect of claim 18.

23          Petitioner's next interprets his sentence as one of indefinite long-term confinement,

24   coupled with prolonged mental suffering, followed by a death sentence.  This confinement, he

25   claims, amounts to two consecutive sentences, violating his due process rights by unforeseeably

26   expanding the death penalty statute retroactively.  Petitioner again relies upon authority that

27   establishes the broad principles that judicial enlargement of a criminal statue, including expansion

28   of the punishment for a crime, can operate like an ex post facto law.  See California Dept. of

214

1  Corrections v. Morales, 514 U.S. 499, 505 (1995); Bouie v. City of Columbia, 378 U.S. 347, 353-

2  54 (1964); In re Medley, 134 U.S. at 171.  Yet, petitioner cites no authority explaining when a

3  condemned inmate's confinement is so long that it constitutes a second sentence or otherwise

4  supporting his argument that delay in executing a death sentence amounts to a second sentence.

5  Accordingly, the California Supreme Court was not unreasonable in denying this claim.  And, for

6  the same reasons, it was not unreasonable in denying the double jeopardy claim based on the

7  same theory.

8  Petitioner's final argument in claim 18 is that his sentence is invalid because the jury was

9  not told that if it imposed a death sentence, it would not be carried out for many years and

10  petitioner would suffer long-term incarceration "while being terrorized and degraded" followed

11  by death.  Petitioner relies on the Supreme Court's decision in Simmons v. South Carolina, 512

12  U.S. 154, 161 (1994), holding that a prisoner's due process rights were violated when the jury

13  was mistakenly given an instruction that their sentencing choice was death or life with the

14  possibility of parole, rather than life without the possibility of parole.  Again, petitioner does not

15  explain how the California Supreme Court unreasonably failed to extend the Simmons

16  requirement to his case nor has he shown it even applies.  Moreover, petitioner has failed to show

17  why jurors would have understood that the death sentence would be executed immediately under

18  the instructions given.

19  T.  Violations of International Law – Claim 19

20  Petitioner contends his death sentence violates international law in a variety of ways.  As

21  demonstrated by the fact that petitioner cites no case law in support of this claim, petitioner has

22  failed to show clearly established federal law, as determined by the Supreme Court, requires

23  adherence to international law regarding the death penalty or any of petitioner's various other

24  arguments.

25  U.  Conviction and Death Sentence Unreliable – Claim 20

26  Here, petitioner simply groups a number of previously stated claims to argue that, when

27  considered cumulatively, he has established that his conviction and sentence are unreliable.

28  Because this claim is based solely on claims examined previously and because petitioner argues

1    cumulative prejudice from errors in claim 21, discussed below, he has failed to establish any

2    independent constitutional basis for this claim and has failed to show the California Supreme

3    Court's rejection of it was unreasonable.

4         V.   Cumulative Prejudice – Claim 21

5         The combined effect of multiple errors at trial violates due process where it renders the

6    trial fundamentally unfair.  Montana v. Egelhoff, 518 U.S. 37, 53 (1996) (citing Chambers v.

7    Mississippi, 410 U.S. 284 (1973)); Taylor v. Kentucky, 436 U.S. 478, 487 n.15 (1978).  The

8    Ninth Circuit has described the standard for evaluating cumulative error on habeas as

9    "determining whether the combined effect of multiple errors rendered a criminal defense 'far less

10   persuasive' and had a 'substantial and injurious effect of influence' on the jury's verdict."  Parle

11   v. Runnels, 505 F.3d 922, 928 (9th Cir. 2007).  While claim 21 is not an independent ground for

12   relief, petitioner has shown prejudice from errors at both phases of his trial, when considered

13   cumulatively.

14        1.   Prejudice at the Guilt Phase

15        As set out above, this court finds the California Supreme Court would have been

16   unreasonable in holding that petitioner failed to make out a prima facie case of constitutional

17   error at the guilt phase on the following bases:  (1) the prosecutor's failure to reveal Bonnie

18   Hogue's memory problems (claim 23); (2) counsel's failure to investigate and present evidence of

19   Hogue's relationship with Robert Reese (claim 2); (3) counsel's failure to question Kellie Harley

20   regarding Robert Reese's unpredictable and violent nature (claim 2); (4) counsel's failure to

21   correctly advise petitioner about potential sentences causing petitioner to reject a lesser-included-

22   offense instruction (claim 2); and (5) Juror Mohr's bias (claim 1).  While the court finds above

23   that, standing alone, the claims involving counsel's failure to investigate Hogue's relationship

24   with Reese, counsel's failure to further question Kellie Harley, and Juror Mohr's bias alone may

25   not have sufficiently established prejudice, when considered together with all claims of guilt

26   phase error, they do establish potential prejudice.

27        Respondent argues the prosecution had a strong guilt phase case against petitioner so that

28   any error did not affect the guilt phase verdict.  He points to the following evidence:  (1)

216

1   petitioner flew into Sacramento with Reese on the night of the murders; (2) he remained with

2   Reese hours after the murders while they were in possession of weapons, methamphetamine, and

3   jewelry; (3) he arranged for items, including a gun, to be shipped back to Arizona on a

4   Greyhound bus using a false name; and (4) petitioner had a list of expenses for the trip that

5   included $1,500 for guns.  Respondent argues further that petitioner's defense was compromised

6   by his initial false statements to Detective Bell that he had come to Sacramento with Reese to sell

7   marijuana.  In addition, petitioner's suggestion that Reese might have committed the murders by

8   himself was undermined by crime scene evidence showing that at least two guns were used in the

9   murders.  The defense failed to point to any evidence showing who, besides petitioner, may have

10  been involved with Reese.

11          The defense did not need to prove someone else accompanied Reese; it needed to give at

12  least one juror a reasonable basis to doubt that petitioner was that person.  And, had an accessory

13  instruction been given, the defense needed to show that, while petitioner may have participated

14  with Reese before and after the crimes, there was reason to doubt petitioner intended to kill the

15  victims.  The defense had important evidence in the testimony of Denise Madsen that she saw

16  petitioner and Reese together at Denny's one night, saw Reese leave petitioner there, and saw

17  Reese return in different clothes.  Madsen had no reason to be untruthful.

18          Had the defense been bolstered by better attacks on Hogue's credibility, the scales may

19  very well have been tipped to reasonable doubt.  Had the defense shown that Hogue was unable

20  to remember much of what happened the night of the crimes, jurors may have doubted her other

21  testimony.  Had the defense been able to uncover evidence of Hogue's memory blackouts and

22  visual and aural hallucinations, the jury would have had an even greater reason to question her

23  veracity.  Much of the defense's impeachment of Hogue focused on her lack of truthfulness

24  generally – she lied about her work experience and her husband's job.  Showing that she may

25  very well have lied about not knowing Robert Reese before that night would have had a much

26  more direct impact on her testimony.  Jurors may have wondered why Hogue was hiding that

27  relationship.  Further, the key evidence identified by respondent includes evidence based solely

28  on the testimony of Hogue.  It was her testimony that showed petitioner with money, jewelry, and

1    drugs after the crimes.  It was also her testimony that showed the package petitioner had her ship

2    contained a gun.  These were important, inculpatory facts that were not corroborated by other

3    evidence.

4         Of course, this court does not know why the California Supreme Court rejected the guilt

5    phase claims on their merits.  The question under section 2254(d) when considering the court's

6    summary denial is whether there was "any reasonable basis for the state court to deny relief."

7    Harrington v. Richter, 562 U.S. 86, 98 (2011).  For the reasons described above, this court can

8    find no reasonable basis for the state court to have rejected these claims without permitting

9    factual development.  For these reasons, this court recommends the district court find petitioner

10   has satisfied the 28 U.S.C. § 2254(d) gateway for the five claims described above and permit

11   them to proceed through federal habeas review.

12                 2.   Prejudice at the Penalty Phase

13        As described in the discussion of claim 10, this court finds petitioner has made a clear

14   prima facie case that counsel acted unreasonably in failing to investigate and present mitigating

15   evidence of petitioner's social and family history.  The court further finds above that had counsel

16   acted reasonably, the result of the penalty phase may have been different.  In addition, many of

17   the guilt phase errors described in the prior section would have contributed to penalty phase

18   prejudice.  A stronger guilt phase defense would have strengthened petitioner's lingering doubt

19   argument.  Juror Mohr's potential bias could very well have influenced his penalty phase

20   decision.  The undersigned recommends the district court find petitioner has satisfied section

21   2254(d) for this penalty phase claim as well.

22        W.   Denial of Access to Records – Claim 22

23        Petitioner acknowledges that the California Supreme Court reasonably rejected this claim.

24                           CONCLUSION

25        Based on the foregoing findings, and good cause appearing, IT IS HEREBY

26   RECOMMENDED that:

27        1.   The court find petitioner has satisfied 28 U.S.C. § 2254(d) for the following claims

28             and subclaims:

      a.   The allegation in claim 23 that the prosecutor failed to reveal witness Bonnie Hogue's memory problems;

      b.   The allegation in claim 2 that petitioner's trial counsel failed to investigate and present evidence of Bonnie Hogue's relationship with Robert Reese;

      c.   The allegation in claim 2 that petitioner's trial counsel failed to question prosecution witness Kellie Harley regarding Robert Reese's unpredictable and violent nature;

      d.   The allegation in claim 2 that petitioner's trial counsel failed to correctly advise petitioner about potential sentences, causing petitioner to forego a lesser-included-offense instruction;

      e.   The allegation in claim 1 that Juror Mohr was biased;

      f.   Claim 10 that petitioner's trial counsel was ineffective for failing to investigate and present mitigating evidence; and

      g.   Claim 21 that petitioner has established prejudice from the cumulative effect of the errors set out above.

2.   The court find that consideration of claim 17 (ineffective assistance of state habeas counsel) should be deferred until the consideration of any procedural default issues.

3.   The court find petitioner has failed to satisfy section 2254(d) for the remaining claims and subclaims in the petition and deny habeas relief on those claims and subclaims.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within sixty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file

////

////

////

////

219

1    objections within the specified time may waive the right to appeal the District Court's order.

2    Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3    Dated:  May 26, 2016

4

5    _____
     KENDALL J. NEWMAN
6    UNITED STATES MAGISTRATE JUDGE

7

8    Majors 2254d. fr final

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

220